# 23-208-cv

# United States Court of Appeals
## for the
# Second Circuit

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

*Plaintiffs-Appellants,*

v.

SUFFOLK COUNTY, NEW YORK, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER,, Individually, Superintendent STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his Official Capacity,

*Defendants - Appellees,*

JOHN DOES 1-5, Individually, JANE DOES 1-5, Individually,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ............................................................................... i

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUE PRESENTED FOR REVIEW ..................................................... 1

STATEMENT OF THE CASE............................................................... 1

*Suffolk County 2-3 Year Process to Obtain a Handgun License*............................. 2

*The Applicants*............................................................................................. 2

*Each Applicant Subjected Themselves to the NYS Handgun Licensing Scheme* ........................................................................................ 3

*Amendment to Remove Carry Restrictions – Michael McGregor* ........................... 3

*Firearms Training Instructor - Frank Melloni and RFI*........................................... 4

The Local and State Regulations Challenged Below ................................. 5

*SCPD Lengthy Wait Times for a Handgun License*.................................... 6

*Enforcement of New York State CCIA Regulations* ................................... 8

*CCIA Regulations – Penal Law sec. 400.00(1)(o); 400.00(19)* ............................. 8

*CCIA Regulations – Penal Law sec. 400.00(1)(b)*.................................... 10

*SCPD Arrest Policy for Unlicensed "Live Fire" Training* .................................... 10

Relevant Proceedings Below ....................................................... 11

SUMMARY OF THE ARGUMENTS .................................................. 13

STANDARD OF REVIEW ............................................................... 15

# TABLE OF CONTENTS (con't)

**Page(s)**

I.  Appellants Have "Skin in the Game" to Confer Article III Standing ............... 16

   A. SCPD Delays Create 'Futility' for Standing Purposes ........................... 16

   B.  The Lower Court Decision Establishes Standing Based on Futility ....... 17

   C.  No Requirement to Comply With Unconstitutional Regulations ........... 18

II.   The Lower Court Abused Its Discretion By Declaring the Regulations 'Constitutional' Absent Any Discussion of 'Text, History, and Tradition ..... 19

   A.  All Second Amendment Challenges Require the Bruen Test ............... 19

   B. *Bruen* Denounced Discretionary and Subjective Criteria Like 400.00(1)(b) and (o) ................................................................................ 21

III.  The Lower Court Abused its Discretion by Disregarding SCPD Delays and Speculating About the Final Determination of the Applications ................... 24

   A. Lengthy Delays Presumptively Violate the Second Amendment ........ 24

   B. The Lower Court Abused Its Discretion by Engaging in Speculation .. 26

IV.  The Lower Court Improperly Conflated 'Likelihood of Success on the Merits of Appellants' Second Amendment Claims' With Likelihood Their Handgun License Application Would Be Approved by SCPD ....................................... 28

V. Melloni and RFI Are Suffering 'Invasion of a Legally Protected Interest' ....... 29

VI. It Was an Abuse of Discretion Not to Enjoin SCPD's Arrest Policy ............. 32

   A. The Lower Court Failed to Take Appellants' Uncontested Declarations as True ........................................................................... 32

   B.  Appellants Do Not Seek an "Injunction[] Against Arrest and Prosecution under *State Law*" ............................................................. 34

# TABLE OF CONTENTS (con't)

**Page(s)**

C.  A Credible Threat of Enforcement Exists............................................ 37

D.  SCPD Policy Presents a 3+ Year Barrier to Concealed Carry ............ 39

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almontaser v. N.Y.C. Dep't of Educ.*,
  519 F.3d 505 (2d Cir. 2008) ................................................................. 15

*Andrews v. State*,
  50 Tenn. 165 (1871) ............................................................................. 31

*Antonyuk v. Hochul*,
  2022 WL 16744700 (N.D.N.Y.) ................................................... 17, 38

*Black v. United States*,
  388 F. Supp. 805 (E.D.N.Y. 1975) ...................................................... 32

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ............................................................................. 28

*Corning Glass Works v. Lady Cornella, Inc.*,
  305 F.Supp. 1229 (E.D.Mich.1969) .................................................... 32

*Craig v. Boren*,
  429 U.S. 190 (1976) ............................................................................. 31

*D.C. v. Heller*,
  544 U.S. 570 (2008) ........................................................................ 2, 22

*Dark Storm Indus. LLC v. Cuomo*,
  471 F. Supp. 3d 482 (N.D.N.Y. 2020) ................................................ 30

*Does 1-10 v. Suffolk County*,
  2022 WL 2678876 ................................................................................ 36

*Drummond v. Twp.*,
  361 F. Supp. 3d 466 (W.D. Pa.) .......................................................... 30

i

# TABLE OF AUTHORITIES (con't)

**Page(s)**

**Cases**

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................. 32

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ................................................. 30

*Forty-Second St. Co. v. Koch*,
   613 F. Supp. 1416 (S.D.N.Y. 1985) ..................................... 30

*Hedges v. Obama*,
   724 F.3d 170 (2d Cir. 2013) .................................................. 38

*Libertarian Party of Conn. v. Lamont*,
   977 F.3d 173 (2d Cir. 2020) .................................................. 15

*Matter of Nikim A.*,
   179 A.D.2d 638 (2d Dept. 1992) .......................................... 39

*McDonald v. City of Chicago, Ill.*,
   561 U.S. 742 (2010) .............................................................. 22

*Nat'l Folding-Box & Paper Co. v. Robertson*,
   99 F. 985 (C.C.D. Conn. 1900) ............................................. 32

*NYSRPA v. Bruen*,
   142 S.Ct. 2111 (2022) ............................................... 1, 2, 4, 17

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*,
   477 U.S. 619 (1986) .............................................................. 38

*Pac. Cap. Bank, N.A. v. Connecticut*,
   542 F.3d 341 (2d Cir. 2008) .................................................. 38

*People v. Montgomery*,
   106 A.D.2d 410 (2d Dept. 1984) .......................................... 39

# TABLE OF AUTHORITIES  (con't)

**Page(s)**

**Cases**

*People v. Roccaforte*,
    141 A.D.2d 775 (2d Dept. 1988) ........................................................ 39

*People v. Watson*,
    163 A.D.3d 855 (2d Dept. 2018) ........................................................ 39

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) ........................................................................... 31

*Shuttlesworth v. City of Birmingham, Ala.*,
    394 U.S. 147 (1969) ........................................................................... 18

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................... 33, 38

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) .............................................................. 30

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) .......................................................... 16, 18

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
    *State, Inc.*,
    454 U.S. 464 (1982) ........................................................................... 16

*Vermont Right to Life Committee, Inc. v. Sorrell*,
    221 F.3d 376 (2d Cir.2000) ............................................................... 38

*Walter E. Heller & Co. v. Cox*,
    379 F. Supp. 299 (S.D.N.Y. 1974) .................................................... 32

*Western Air Lines v. Flight Engineers Internat'l Ass'n.*,
    194 F.Supp. 908 (S.D.Cal.1961) ....................................................... 32

*Williams v. San Francisco Unified School District*,
    340 F.Supp. 438 (N.D.Cal.1972) ....................................................... 32

## TABLE OF AUTHORITIES (con't)

**Page(s)**

**Statutes**

28 U.S.C. §1291 ................................................................................. 1
28 U.S.C. § 1331 ............................................................................... 1
New York State Constitution Article XIII .............................................. 26

**Rules**

FRAP 8(a)(1) .................................................................................... 13

**Other Authorities**

Senate Bill 51001 ............................................................................. 4

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1331, as the causes of action arose from violations of the U.S. Constitution. The Memorandum and Order appealed from, which denied Appellants' application for a preliminary injunction, was entered by the Clerk of the Court on February 14, 2023. Appellant timely filed a Notice of Appeal on February 16, 2023. Jurisdiction in this court is proper pursuant to 28 U.S.C. §1291.

## ISSUE PRESENTED FOR REVIEW

1) Whether the district court's reasons for denying Appellants' preliminary injunction were an abuse of discretion.

## STATEMENT OF THE CASE

The Supreme Court invited constitutional challenges to licensing regimes that impose "lengthy wait times." *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2138 n. 9 (2022) ("because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.").

### *Suffolk County 2-3 Year Process to Obtain a Handgun License*

Suffolk County residents seeking to possess a handgun – whether in their home or to carry concealed for self-defense – are absolutely barred from exercising this presumptively protected conduct[1] for a period of ***2-3 years***.

Appellants are comprised of 3 groups of individuals – initial applicants; an existing licensee amending his license to remove concealed carry restrictions; and a firearms training instructor.

### *The Applicants*

Zachary Giambalvo, Shane Mashkow, John Mougios, and Kevin McLaughlin (the "Applicants") are each eligible under federal and state law to possess and purchase firearms.[2]

As residents of Suffolk County, Applicants were required[3] to apply for and obtain a NYS handgun license from Suffolk County Police Commissioner Rodney

---

[1] *D.C. v. Heller,* 544 U.S. 570, 592 (2008) ("Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation."); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2134 (2022) (finding "little difficulty" concluding that carrying handguns publicly for self-defense is conduct protected by the plain text of the Second Amendment).

[2] The term "firearms" as used herein encompasses handguns, rifles, and shotguns.

[3] The possession, purchase, carriage, and receipt of a handgun for self-defense in New York State is a crime. See, Penal Law § 265.00, et seq.  A New York State pistol license may be obtained to lawfully possess, purchase, carry concealed, and/or receive a handgun for self-defense, which requires individuals to apply to the statutory licensing officer in the county in which they reside. See, Penal Law § 400.00, et seq.

Harrison by way of the Suffolk County Police Department ("SCPD") Licensing Bureau. [A93-A116].

### *Each Applicant Subjected Themselves to the NYS Handgun Licensing Scheme*

Giambalvo, Mougios, Mashkow, and McLaughlin subjected themselves to the New York State handgun licensing scheme and "initiated the licensing procedure to obtain a New York State handgun [license]"[4] by filing the SCPD "Applicant Questionnaire" and paying the filing fee:

- Giambalvo filed in February 2020[5] and June 2022;

- Mougios filed in July 2021;[6]

- Mashkow filed in 2020 and February 2022; and

- McLaughlin filed in July 2022.

[A93 at ¶¶ 6-10; A105 at ¶¶ 9-11; A109 at ¶ 4; A101 at ¶ 8].

### *Amendment to Remove Carry Restrictions – Michael McGregor*

Michael McGregor was issued a concealed carry handgun license (CCW) by SCPD in March 2022, 16-months after commencing the licensing process by paying the fee and filing the SCPD Questionnaire. [A114].

---

[4] A2111.
[5] SCPD claimed payment for the 2020 license applications of Giambalvo and Mashkow were never received; both were required to refile, which further delayed the issuance of a license. [A95; A107].
[6] Mougios' application was denied on February 17, 2023 for refusing to comply with one of the challenged CCIA regulations, § 400.00(1)(o) requiring character references. None of the remaining Applicants have yet been fingerprinted.

SCPD issued McGregor a CCW restricted to carrying a handgun concealed during "sportsman" activities; the license does not authorize McGregor to carry his handgun in public for self-defense. McGregor could not obtain an unrestricted CCW because he did not meet the then-imposed "proper cause" requirement under Penal Law § 400.00(2)(f), later held unconstitutional by the Supreme Court in *Bruen*. [A114-115].

In August 2022, after the *Bruen* decision and prior to the enactment of the CCIA[7] on September 1, 2022, McGregor filed an amendment with SCPD to remove the carry restrictions on his CCW and allow for unrestricted concealed carry. To date, McGregor has received no determination nor have his restrictions been removed. [A112-116].

### Firearms Training Instructor - Frank Melloni and RFI

As of September 1, 2022, individuals applying for or renewing a concealed carry handgun license must take and pass an 18-hour training course, which includes a 2-hour "live fire" component. [8]

Frank Melloni is a federal firearms licensee and firearms instructor. Through his company Renaissance Firearms Instruction, Inc. ("RFI"), Melloni trains

---

[7] New York State Penal Law Concealed Carry Improvement Act, Senate Bill 51001, which took effect September 1, 2022.
[8] New York State Penal Law Concealed Carry Improvement Act, Senate Bill 51001, which took effect September 1, 2022.

4

individuals in the 18-hour course, including the live-fire component, for certification under the CCIA. [A117-19].

Melloni's 18-hour course is offered to students and potential students, including unlicensed individuals who seek to complete the CCIA training required to apply for a concealed carry license ("unlicensed individuals"). [*Id.*].

Normally, the mere possession of a handgun by an unlicensed individual is a felony.[9] The CCIA, however, created an exemption from being convicted of a firearm-related offense that allows unlicensed individuals to possess/handle a loaded handgun while completing the live-fire portion of the 18-hour mandated training.[10]

Under Penal Law § 265.20(3-a), Mr. Melloni can lawfully instruct, and unlicensed individuals can lawfully take, the live-fire instruction to complete the training requirements for a concealed carry license. *Id.* Melloni registered several unlicensed individuals who sought to take the 18-hour course through RFI. [A118-19].

### **The Local and State Regulations Challenged Below**

Appellants filed a complaint in the federal district court for the Eastern District of New York to challenge Suffolk County policies and certain provisions of the CCIA. [A12-60].

---

[9] Penal Law § 265.01-b.
[10] Penal Law § 265.20(3-a).

**SCPD Lengthy Wait Times for a Handgun License**

Applicants Giambalvo, Mashkow, Mougios, and McLaughlin challenge the lengthy wait times imposed by SCPD for the issuance (or denial) of a handgun license, which averages 2-3 years. [*Id.*].

McGregor challenges the lengthy delay to simply remove the public carry restrictions from his license. SCPD's delay is inexplicable as McGregor is not subject to the CCIA requirements[11] and no legal basis exists to deny his amendment. Yet, 8 months have passed since he filed his amendment application, and he still has not received a determination. [A114-15].

Obtaining a New York State handgun license from SCPD – whether for one's home (premise) or concealed carry – takes ***2-3 years***. [A94-95; A99-100; A101-103; A107; A110].

Under SCPD policy, applicants must fill out the SCPD questionnaire, pay a filing fee and then wait approximately 1½ - 2 years before they are assigned to an investigator. [A73-83; A93-116]. Applicants are then scheduled for an interview, where they are fingerprinted, photographed, and provided with the New York State-required PPB-3 Application to take home, complete, have signed by 4 character references, and hand back to SCPD. [A80-83; A94-97]. Applicants are made to wait

---

[11] McGregor is neither an applicant nor is he renewing his license. See, Penal Law 400.00(1)(o) ("No application shall be made or renewed except…").

6

an additional 6 months or more before receiving their license or a letter denying the application. [A112-16; A208].

SCPD obstructs every avenue to move the process along: it will not publish or provide the PPB-3 until an investigator is assigned, nor will it accept the PPB-3, required photographs, and/or unsuppressed New York State criminal history report from the Division of Criminal Justice Services "upon presentation" by an applicant. [A95-97; A110-116; A208].

SCPD's 2-3 year licensing process is memorialized in writing and recorded communications with the SCPD Licensing Bureau. [A99-100; A10 at 42-7].

On July 19, 2022, the Licensing Bureau informed Giambalvo, "there is an approximately a 2 year wait before you will hear from an investigator for the in person interview." [A94; A99].

In August 2022, Giambalvo was informed by "Suzanne" at the SCPD Licensing Bureau, "it's going to take about a year and a half to 2 years to get called for the interview" – a conversation digitally recorded by Giambalvo.[12] [A95; A100].

Mashkow emailed the SCPD Licensing Bureau for a status update on his pistol license application and was informed by email dated July 14, 2022, "We are currently processing November/December of 2020, there is an extremely long wait for the interview." [A10 at 42-7].

---

[12] Appellants' motion for leave to file audio recordings is pending before this Court.

*Enforcement of New York State CCIA Regulations*

Applicants challenge the enforcement of various roadblocks to the exercise of protected conduct – carrying a handgun in public for self-defense – that were enacted under the CCIA.

*CCIA Regulations – Penal Law sec. 400.00(1)(o); 400.00(19)*

Penal Law § 400.00(1)(o) imposes various requirements on individuals applying for (or renewing) a concealed carry license, which are inconsistent with both the plain text of the Second Amendment and the history and tradition of firearms regulation in this Nation.

Section 400.00(1)(o) does not apply to applications to obtain (or renew) a premises license to possess handguns in one's home or place of business.

Giambalvo and Mougios challenge the requirement that they disclose their social media account information, the names and contact information for "domestic partners" or adults and children they live with or be subject to an in-person interview; nor will they ask character references to swear under oath that they have not "engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others"; the requirement is subjective and, like the social media disclosure, puts their First Amendment rights in conflict with the exercise of their Second Amendment rights. [A95-96; A103-104]. See, Penal Law § 400.00(1)(o).

8

McLaughlin, a U.S. Marine reservist with "extensive firearms training", objects to the 18-hour CCIA training requirement under Penal Law § 400.00(1)(o) and 400.00(19). [A207-209]. He will not spend money and time on the training because "[p]rotecting [himself] with a handgun is a guaranteed right and cannot be conditioned on or delayed by such a regulation nor should [he] be forced to spend hundreds of dollars to simply exercise that right." [A207-209].

Mougios will also not comply with the training requirement; he served his country for 6 years in the New York Army National Guard assigned to Bravo Company, 1/69th Infantry Division. [A103]. Mougios received extensive firearms training and has over 2½ years of experience as a Team Leader conducting live fire exercises and teaching basic infantry tactics and weapons safety courses; he should not be forced to spend time and money on training before being able to exercise the right to carry a handgun for self-defense. [A103].

Mashkow "contacted multiple businesses on Long Island, including Dark Storm Industries in Oakdale, New York (Suffolk County), regarding the 18-hour training required to apply for a concealed carry license only to discover that the "fees range from around $400 to $800 (Dark Storm's fee), which is not a nominal amount of money to have to spend to exercise a constitutional right." [A108]. He "plan[s] to train regularly at the gun range, at [his] own pace and financial ability" but feels that "prevent[ing him] from protecting [himself] with a

9

handgun until [he] satisfy[ies] a government-imposed condition is an obvious infringement and violates the Second Amendment." [*Id.*].

*CCIA Regulations – Penal Law sec. 400.00(1)(b)*

Under Penal Law 400.00(1)(b), no license shall be issued or renewed unless a licensing officer feels that the individual is "of good moral character, which, for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."

Applicants object to such subjective and discretionary criteria[13], the implementation of which was denounced in *Bruen*.

### SCPD Arrest Policy for Unlicensed "Live Fire" Training

Applicants who seek to comply with the 18-hour CCIA training course, like Giambalvo, are barred from doing so because of SCPD's "Arrest Policy."

New York State specifically created a defense against a conviction for unlawfully possessing a loaded firearm, which allows unlicensed individuals to complete the 18-hour training course required by the CCIA to obtain a concealed carry handgun license. See, Penal Law § 265.20(3-a).

But SCPD made up its own rule whereby SCPD ***will arrest*** any unlicensed individual who takes the training course and handles a pistol or revolver (the "Arrest

---

[13] See, e.g., A102-104.

10

Policy"). [A119]. Giambalvo and firearms trainer Frank Melloni/RFI challenge the Arrest Policy.

The SCPD Arrest Policy was personally explained to Melloni by the head of the SCPD Licensing Bureau, Lt. Michael Komorowski. [A119]. Specifically, Lt. Komorowski threatened that SCPD "will arrest anybody who handles a pistol or revolver without a New York State pistol permit" because SCPD is "not honoring" the § 265.20(3-a) exemption. [A119].

Melloni's sworn declaration attesting to his conversation with Lt. Komorowski was unchallenged below. [A1-11; A132-33].

The "Arrest Policy" prevents Melloni from teaching, and his students and prospective students from taking the instruction required to obtain a CCW. Melloni was forced to cancel the registration of numerous unlicensed students and potential students who are now unable to complete the training required to engage in Second Amendment protected activity.

Giambalvo, who does not object to the 18-hour training requirement, risks imminent arrest and incarceration by SCPD under the "Arrest Policy" because he publicly declared in the lower court that he will take the 18-hour course with Melloni and RFI in December 2022. [A96-97].

SCPD also prevents first-time applicants, like Giambalvo, from applying for a concealed carry license for at least 2-3 years. By preventing unlicensed individuals

11

from completing the 18-hour training under the threat they "will" be arrested, SCPD limits applicants to applying for a "premise" license, complete the 18-hour training, then apply ***anew*** for a concealed carry license – resulting in another extended delay to simply exercise the right to bear arms for self-defense.

### Relevant Proceedings Below

On November 17, 2022, Appellants filed their Amended Complaint[14] in the Eastern District of New York, which was assigned to the Hon. Gary R. Brown. [A3 at 1].

The clerk's office issued a Summons on November 21, 2022 [A6 at 15] and Affidavits of Service were filed with the Court between December 2 and 7, 2022. [A6 at 16-23]. The Suffolk County Defendants filed their Answer on December 13, 2022. [A61].

On December 11, 2022, Appellants filed a proposed Order to Show Cause and application for a Preliminary Injunction. [A6 at 27; A67-124]. On January 20, 2023, the State Defendant, Superintendent of the New York State Police Steven Nigrelli, filed his response. [A8 at 34].[15] On that same date, the Suffolk County Defendants

---

[14] The action below was commenced on August 15, 2022 and held in brief abeyance pending determination of the challenges to the Concealed Carry Improvement Act in the Northern District.
[15] By stipulation of the parties, Acting Superintendent Steven Nigrelli is no longer a party to the action. [A10].

filed their response. [A9 at 35; A125-133]. On January 27, 2023, Appellants filed their reply. [ECF Nos. 37, 38; A134-209].

By Memorandum and Order dated February 14, 2023, the lower court denied Appellants' motion for a preliminary injunction. [A210]. A timely Notice of Interlocutory Appeal was filed by Appellants on February 15, 2023. [A225].

Consistent with the requirements of FRAP 8(a)(1), and on February 17, 2023, Appellants moved in the lower court for an injunction pending this appeal. [A10 at 42-44]. On February 21, 2023, the lower court denied Appellants' motion "for the reasons set forth in this Court's Memorandum & Order dated February 14, 2023." [A10].

## SUMMARY OF THE ARGUMENTS

The lower court abused its discretion when holding that Applicants lack Article III standing to challenge the CCIA regulations (Penal Law 400.00(1)(b), (1)(o), and (19)). The lower court reached its conclusion by unilaterally declaring that the regulations being challenged were "constitutionally permissible" – without applying (or mentioning) the *Bruen* test, and in the absence of any text, history, and tradition analysis, then held that Applicants' refusal to comply with such "constitutionally permissible requisites" meant they "cannot legally qualify for a permit" and, therefore, cannot establish Article III standing.

The challenged regulations are subjective and discretionary criteria of the ilk the *Bruen* Court and Justice Kavanaugh's concurrence (joined by the Chief Justice) flatly rejected as inconsistent with this Nation's historical tradition of firearm regulations.

At the very least, Appellants have Article III standing to seek an order mandating SCPD comply with a 30-day timeframe for licensing determinations because the CCIA regulations do not apply to premises permits.[16]

The lower court completely ignored Michael McGregor's request for injunctive relief. Like the Applicants, McGregor is being harmed by SCPD's lengthy wait times. Over 8 months ago, McGregor filed an amendment to remove restrictions to his handgun license that the *Bruen* Court declared to be unconstitutional. McGregor has Article III standing to enjoin SCPD's "lengthy wait times" and order should have issued below mandating SCPD render determinations within a 30-day timeframe.

The lower court also erred in finding that Frank Melloni and RFI's harm was purely economic. As the provider of firearm training services, Melloni and RFI have a derivative Second and Fourteenth Amendment claim on behalf of the students who

---

[16] Leaving aside the CCIA provisions, the only remaining regulation challenged by the Applicants is Penal Law § 400.00(1)(b).

are prevented from participating in the 18-hour course because of SCPD's Arrest Policy. [A219-20].

Finally, the court abused its discretion by speculating, without a hearing and in the face of uncontroverted declarations, that SCPD will not enforce its "Arrest Policy", which the court *sua sponte* minimized as a "stray comment" possibly "taken out of context." [A220; A222]. Enforcement of an SCPD policy is not "an arrest and prosecution under state law"; it is a 'made up' rule that conflicts with the Penal Law. [A220]. And for the second time, SCPD 'decrees' have been given a pass. [A220-21].

## STANDARD OF REVIEW

The Court of Appeals "reviews a district court's decision to deny a preliminary injunction for abuse of discretion." *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173 (2d Cir. 2020). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id.* (quoting *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008)).

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. The injury-in fact requirement helps to ensure that the plaintiff has a personal stake in the outcome of the controversy. Accordingly, an injury sufficient to satisfy Article

15

III must be concrete and particularized, and actual or imminent, not conjectural or hypothetical.

## I. Appellants Have "Skin in the Game" to Confer Article III Standing

Article III standing requires the parties to an action have "skin in the game", which prevents the federal courts from becoming forums to 'ventilate public grievances.' See, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).

Each Appellant has a stake in the outcome of this litigation to confer Article III standing. Unlike the defendant in *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012), upon which the lower court relies, Applicants have subjected themselves to the state's licensing scheme by paying a fee and filing the Applicant Questionnaire which, as the lower court acknowledged, "initiated the licensing procedure." [A211].

### A. SCPD Delays Create 'Futility' for Standing Purposes

SCPD requires a filing fee and the completion of its Questionnaire, which "initiate[s] the licensing procedure." [A211]. But SCPD will not even *process* an application for 2-3 years – a fact undisputed by Appellants.

Such a delay itself would have rendered Applicants' applications futile for standing purposes. See, *Antonyuk v. Hochul,* 2022 WL 16744700 at *10 (N.D.N.Y.) (where state "would not even *process* an application" from plaintiff for at least a

16

year "due to a lack of available appointments", the court found his application "futile for the purpose of standing to sue, because such a delay would effectively deny him his Second Amendment right for more than a year") (emphasis supplied) citing, *Bruen*, 142 S. Ct. at 2138, n.9.

But Appellants did subject themselves to the licensing scheme. Giambalvo, Mashkow, McLaughlin continue to wait to be assigned to an investigator, fingerprinted, and photographed. McGregor filed an amendment to simply remove the carry restrictions on his "sportsman" restricted license over 8 months ago and is still waiting for a determination. And Mougios' application was denied for refusing to provide character references.

Irrespective of the ultimate determination from SCPD, every Appellant is entitled to a prompt determination and has standing to challenge SCPD's lengthy wait times.

### B. The Lower Court Decision Establishes Standing Based on Futility

According to the lower court, Appellants cannot establish standing because they will not comply with the CCIA regulations they seek to enjoin.

> "In order to establish standing to challenge the State's licensing system, plaintiffs must demonstrate that they have complied with the requisites of that system."

[A218].

17

The court held that because of Appellants' "unambiguous refusal to participate in mandated (1) firearms training, (2) disclosure of the identity of cohabitants and family members and (3) disclosure of their social media accounts" "they cannot qualify for a permit and the State can, consistent with the mandates of *Bruen* and *Heller*, deny their applications"…"they cannot legally qualify for a carry permit…" [A219] – itself an acknowledgement that Appellants' applications are futile, thereby establishing Article III standing. C.f., *Decastro*, at 164.

### C.  No Requirement to Comply With Unconstitutional Regulations

A plaintiff is not required to submit to unconstitutional regulations to establish Article III standing.

> "And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license. The Constitution can hardly be thought to deny to one subjected to the restraints of such an ordinance the right to attack its constitutionality, because he has not yielded to its demands…we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria…"

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151-53 (1969) (citation and internal quotation marks omitted) (First Amendment).

Imposing such a requirement would force an individual to engage in the very conduct they are seeking to enjoin - before a court could find they had Article III standing to challenge it. Illogical.

Penal Law 400.00(1)(b), (1)(o), and (19) are subjective factors that have no historical analogue and violate the Second Amendment. Disclosing personal information about relationships and cohabitants, social media accounts, character references, completing an arbitrarily created and costly 18-hour training course – are inconsistent with the plain text of the Second Amendment and have no historical analogue. Just as the exercise of other constitutional rights is not dependent on demonstrating "to government officers some special need", neither is the right to self-defense dependent on the requirements imposed by Penal Law sections 400.00(1)(b), (o), or (19).[17]

Appellants have no obligation to submit to unconstitutional regulations as a condition to having standing to attack their constitutionality. The lower court abused its discretion by holding that they did.

## II. The Lower Court Abused Its Discretion By Declaring the Regulations 'Constitutional' Absent Any Discussion of 'Text, History, and Tradition'

### A. All Second Amendment Challenges Require the *Bruen* Test

All Second Amendment challenges must be analyzed under the test announced in *Bruen*.

---

[17] Applying the lower court's logic, the plaintiffs in *Bruen* would have lacked Article III standing to challenge New York's 'proper cause' statute because they failed to comply with the requirement that they provide facts establishing 'proper cause' for the issuance of a concealed carry license.

"In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, at 2126; 2129-2130.

Because possessing and carrying handguns for self-defense is conduct *presumptively protected* by the plain text of the Second Amendment[18], the lower court was required to hold the government to its burden of proving that the regulations were consistent with the text, history, and tradition of the Second Amendment, which it failed to do.

Skirting the *Bruen* test and shielding the government from its burden, the lower court unilaterally (and erroneously) declared all the CCIA provisions challenged below "constitutionally permissible requisites" to the exercise of the Second Amendment. [A217-18].

---

[18] *Bruen*, at 2134 (finding "little difficulty" concluding that the plain text of the Second Amendment protects carrying handguns publicly for self-defense). "The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense. *Bruen*, at 2135.

From this constitutionally unsound platform, the lower court reasoned that the remaining issues raised by Appellants (lengthy wait times, Arrest Policy) were "inconsequential" because their non-compliance with the CCIA "ensures that they cannot legally qualify for a carry permit." [A219]. ("Due to their refusal to comply…they cannot qualify for a permit and the State can, consistent with the mandates of *Bruen* and *Heller*, deny their applications.") [A219].

Application of the *Bruen* test would have yielded the opposite conclusion because no such burdens existed in the Founding Era.

## B. *Bruen* Denounced Discretionary and Subjective Criteria Like 400.00(1)(b) and (o)

The lower court abused its discretion by concluding the CCIA regulations are 'constitutionally permissible' because *Bruen* rejected discretionary and subjective criteria as unconstitutional.

In its opinion, the lower court generally refers to *Heller* and *Bruen* to (improperly) declare the CCIA regulations are "constitutionally permissible", but an application of the analyses conducted in *Bruen*, *Heller*, and *McDonald* leads to the opposite conclusion.

21

Relying on text, history, and tradition, *Heller* and *McDonald* rejected the use of discretion in the context of Second Amendment rights. [19,20] Likewise, *Bruen* rebuked the use of discretionary and subjective factors in firearms regulation, and affirmatively rejected licensing regimes "like New York's" that "require[e] the appraisal of facts, the exercise of judgment, and the formation of an opinion…" *Bruen*, 2138 n. 9.

Penal Law sections 400.00(1)(b) and 400.00(1)(o) are subjective and discretionary factors that call for the exercise of judgment and allow the opinions of a government employee to determine who can and cannot exercise the rights protected by the Second Amendment.

While the lower court leans on *Bruen*'s nod of approval toward shall-issue licensing regimes, it cites no authority to support the conclusion that *New York's* 18-hour training course, disclosure requirements, and other regulations have survived the *Bruen* test.

---

[19] "The very enumeration of the [Second Amendment] right takes out of the hands of government - even the Third Branch of Government - the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *D.C. v. Heller*, 554 U.S. 570, 634-35 (2008).

[20] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 790-91 (2010) (rejecting Justice Breyer's idea that incorporation of the 14th Amendment "will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion.").

To the extent that Justice Kavanaugh spoke favorably of shall-issue licensing regimes (which the petitioner therein conceded were constitutionally permissible), there was no 'text, history, and tradition' test applied in *Bruen* to training requirements, disclosure of social media accounts, disclosure of personal relationships, or any of the other CCIA requirements challenged herein, none of which have an historical analogue.

Justice Kavanaugh's concurrence also conditions the continuation of *New York's* licensing regime on the State's transition to objective licensing requirements[21, 22] which to date has not occurred.

While the *Bruen* Court found "certain state handgun licensing regimes are constitutionally permissible" [A217], New York's is not.

No part of the *Bruen* decision translates into a 'stamp of approval' for New York's regulation of firearms - generally or with regard to the CCIA.

> "[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license

---

[21] "Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States." *Bruen*, at 2162.

[22] By operation of Justice Kavanaugh's concurrence, therefore, this Court should immediately declare New York's licensing scheme a nullity because we not only remain a may-issue State, the post-*Bruen* enactment of the CCIA has piled a plethora of additional subjective and discretionary factors onto an already burdensome licensing scheme.

23

applications or exorbitant fees deny ordinary citizens their right to public carry."

*Bruen*, at 2138.

*Bruen*'s acknowledgment that shall-issue regimes "often require applicants to undergo a background check or pass a firearms safety course", did not dispense with the requirement that all regulations implicating the Second Amendment are subject to analysis under the *Bruen* test, including those challenged by Appellants.

The *sine qua non* of *Bruen* is the mandate that every Second Amendment challenge be analyzed under its text, history, and tradition analysis. The lower court's failure to apply the *Bruen* test was an abuse of discretion.

## III. The Lower Court Abused its Discretion by Disregarding SCPD Delays and Speculating About the Final Determination of the Applications

### A. Lengthy Delays Presumptively Violate the Second Amendment

The lower court disregarded SCPD's lengthy delays by improperly (and erroneously) concluding that the CCIA regulations are "constitutionally permissive" (see above) and holding that Appellants had no standing to challenge them.

The Supreme Court specifically invited challenges to "lengthy wait times"[23], presuming that such delays of the exercise of a protected right are presumptively unconstitutional.

---

[23] *Bruen*, at 2138, n. 9.

Under New York State law, every sale, purchase, and disposal of a handgun, rifle, or shotgun[24] must be conducted through a Federal Firearms Licensee (FFL) and may only proceed after the purchaser completes ATF Form 4473, the FFL conducts a background check through the National Instant Criminal Background Check System (NICS), and thereafter receives a "Proceed" response.[25] NYS General Business Law § 898.[26]

Put differently, New York state law requires a background check through the federal database, which contains prohibiting information from New York's criminal and mental health databases, before the transfer of firearms can take place – approval takes less than 30 minutes.

An objective and prompt process would require no more time and information than the State requires for the transfer of a shotgun or rifle through an FFL. To the extent that a licensing regime exists for handguns, SCPD should be mandated to issue a license or a determination within 30 days of an applicants' initiation of the licensing process.

---

[24] Except those conducted "between members of an immediate family" meaning "spouses, domestic partners, children, and step-children." NYS GBL § 898.
[25] https://www.fbi.gov/how-we-can-help-you/need-an-fbi-service-or-more-information/nics/about-nics
[26] NICS contains information on individuals who are disqualified or otherwise ineligible to legally receive or possess firearms for reasons including prohibiting convictions and involuntary commitments to a mental institution, drawing from federal and state databases. https://www.fbi.gov/how-we-can-help-you/need-an-fbi-service-or-more-information/nics/about-nics

**B. The Lower Court Abused Its Discretion by Engaging in Speculation**

The lower court abused its discretion by presuming that Appellants' applications would have been denied by SCPD because (i) they did not comply with the CCIA and/or (ii) based on events and/or conditions in their backgrounds.

Appellants have the right to a prompt determination of their applications and, as discussed above, there is no requirement that they comply with unconstitutional licensing regulations. *Shuttlesworth,* supra.

Likewise, SCPD is not required to comply with regulations that violate the Second Amendment. Every public servant in New York State takes an oath to uphold the United States Constitution.[27] Perhaps Appellees will reject the unconstitutional enforcement of the CCIA or simply seek to cut their losses, as they are sued in their individual capacities, and issue licenses to Appellants. Either way, it was improper for the lower court to speculate on the outcome and, by doing so, avoid putting the brakes on SCPD's patently outrageous licensing delays.

---

[27] New York State Constitution Article XIII: Members of the legislature, and all officers, executive and judicial, except such inferior officers as shall be by law exempted, shall, before they enter on the duties of their respective offices, take and subscribe the following oath or affirmation: "I do solemnly swear (or affirm) that I will support the constitution of the United States, and the constitution of the State of New York, and that I will faithfully discharge the duties of the office of ......, according to the best of my ability;" and no other oath, declaration or test shall be required as a qualification for any office of public trust, except that any committee of a political party may, by rule, provide for equal representation of the sexes on any such committee, and a state convention of a political party, at which candidates for public office are nominated, may, by rule, provide for equal representation of the sexes on any committee of such party.

Finally, there are no events or conditions in Appellants' backgrounds that provide a basis for SCPD to deny their applications. ***Every*** Appellant is firearms-eligible and without any prohibitors under state or federal law to the possession of firearms. Most, if not all, Appellants already lawfully own long guns and have passed federal background checks through NICS.[28]

But, whether to make a point, to embarrass Appellants, or to discourage future potential plaintiffs, the lower court publicly disclosed personal and private information contained in SCPD handgun license application files of three (3) Applicants that was filed by Suffolk County in the court below ***under seal*** – and remains under seal on the lower court docket as of this date. [A218, n. 4]. Indeed, the information publicly disclosed by the lower court concerning dismissed charges and non-criminal dispositions is not publicly available and, under New York law, is only available to law enforcement under very limited circumstances.

While embarrassing,  none of the events published by the lower court disqualify Appellants from possessing or carrying firearms under state or federal law, nor do they give rise to the termination of Second Amendment rights under any analysis of text, history, and tradition.

---

[28] As set forth in the Declarations submitted to this Court in support of Appellants' motion for an injunction pending appeal, currently pending, Appellants Mougios and Giambalvo possess long guns, which they lawfully purchased after undergoing and passing a federal background check through the NICS system.

Simply put, its disclosure was gratuitous and unnecessary.

The mandate that the Right "shall not be infringed" has apparently not yet settled in.

The lower court's speculation that SCPD would have denied Applicants' applications based on dismissed charges and stale events lends support to Appellants' challenge to section 400.00(1)(b), which authorizes the subjective opinions of a government employee to determine who is and is not worthy of exercising the Right.

*Bruen* rejected discretionary licensing schemes, like New York's, that require the "appraisal of facts, the exercise of judgment, and the formation of an opinion…features that typify proper-cause standards like New York's."[29] Section 400.00(1)(b) is exactly that type of subjective standard rejected by *Bruen*.

The statute should have been enjoined by the lower court, not championed.

## IV. The Lower Court Improperly Conflated 'Likelihood of Success on the Merits of Appellants' Second Amendment Claims' With Likelihood Their Handgun License Application Would Be Approved by SCPD

The lower court found that "plaintiffs have undermined any showing of a likelihood of success on the merits…due to their refusal to comply with the requisites of the licensing process."[30]

---

[29] *Bruen*, at 2138, n. 9 quoting, *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940).
[30] A219.

The merits of Appellants' Second Amendment claims depend on the constitutional viability of the CCIA, SCPD's lengthy delays, and the "Arrest Policy", which the lower court was required to determine by application of the *Bruen* test.

Whether Appellants' applications are ultimately approved by SCPD, a decision that could be based on any number of reasons, has no role in a *Bruen* analysis.

Appellants' likelihood of success on the merits is substantial because (i) SCPD's licensing delays epitomize the unconstitutional "lengthy wait times" denounced in *Bruen*; (ii) the State's CCIA regulations have no historical analogue and are inconsistent with the plain text of the Second Amendment; and (iii) SCPD's Arrest Policy is an absolute barrier to the exercise of presumptively protected conduct, as discussed below.

## V. Melloni and RFI Are Suffering 'Invasion of a Legally Protected Interest'

Melloni and RFI have Article III standing, both directly and derivatively.

As a firearms trainer (and more specifically, as an instructor duly authorized to certify individuals in the State-required 18-hour course) Melloni and RFI have derivative standing to assert the subsidiary right to receive firearms training on behalf of their actual and potential customers. See, *Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 493 (N.D.N.Y. 2020) (finding Dark Storm Industries LLC, "as the ... operator of a gun store, ... has derivative standing to assert the

29

subsidiary right to acquire arms on behalf of [its actual and] potential customers.")

quoting, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) ("As

with purchasing ammunition and maintaining proficiency in firearms use, the core

Second Amendment right to keep and bear arms for self-defense "wouldn't mean

much" without the ability to acquire arms); citing, *Drummond v. Twp.*, 361 F. Supp.

3d 466, 480 (W.D. Pa.) ("Plaintiff[s] ..., as would-be operators of a commercial

shooting range, have standing to sue on behalf of their potential customers."), aff'd

in part, vacated in part on other grounds, remanded sub nom. *Drummond v. Twp. of

Robinson*, 784 F. App'x 82 (3d Cir. 2019); cf. *Forty-Second St. Co. v. Koch*, 613 F.

Supp. 1416, 1422 (S.D.N.Y. 1985) (rejecting defendants' argument that movie

theater companies did not have standing to assert the rights of their customers); see

also, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (Action Target, as a

supplier of firing-range facilities, is harmed by the firing-range ban and is also

permitted to act as an advocate of the rights of third parties who seek access to its

services); *Craig v. Boren*, 429 U.S. 190, 195 (1976) (allowing beer vendor to

challenge alcohol regulation based on its patrons' equal-protection rights); *Pierce v.

Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (allowing private schools to assert parents'

rights to direct the education of their children and citing "other cases where

injunctions have issued to protect business enterprises against interference with the

freedom of patrons or customers"); *Andrews v. State*, 50 Tenn. 165, 178 (1871)

("[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").

Upon being informed by Lt. Komorowski that SCPD "will arrest" any unlicensed individuals who engage in the live-fire portion of the 18-hour course, Melloni was immediately prohibited from providing the State-required firearms training to members of the general public who did not hold a New York State handgun license issued under Penal Law § 400.00 due to the threat of criminal penalties as enforced by SCPD who cannot even apply for a concealed carry license now because they have not completed the training.

Melloni/RFI's unlicensed students and potential students have suffered concrete harm because they are unable to receive the firearms training necessary to apply for a concealed carry license and therefore barred from the exercise of presumptively protected conduct, to wit, public carry for self-defense.

Melloni and RFI have suffered concrete harm because they are unable to provide the training required for students and potential students to exercise their Second Amendment rights.

## VI. It Was an Abuse of Discretion Not to Enjoin SCPD's Arrest Policy

### A. The Lower Court Failed to Take Appellants' Uncontested Declarations as True

The statements of fact in affidavits supporting motion for preliminary injunction are to be taken as true where no counteraffidavits are filed in opposition to motion. *Elrod v. Burns*, 427 U.S. 347, 350 (1976) ("For purposes of our review, all of the well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true").[31]

Melloni's uncontested Declaration averred that, during a conversation with Lt. Komorowski, Komorowski personally told him that SCPD "***will arrest*** anybody who handles a pistol or revolver without a New York State pistol permit" and that SCPD is "not honoring" the Penal Law exemption. [A119].

Although Komorowski submitted a declaration in opposition to Appellants' motion, the Komorowski Declaration was limited to the Licensing Bureau's hours of operation; Komorowski remained silent in the face of Melloni's Declaration

---

[31] See also, *Black v. United States*, 388 F. Supp. 805, 807 (E.D.N.Y. 1975), aff'd, 534 F.2d 524 (2d Cir. 1976); *Walter E. Heller & Co. v. Cox*, 379 F. Supp. 299, 302 (S.D.N.Y. 1974) citing, *Williams v. San Francisco Unified School District*, 340 F.Supp. 438, 442 (N.D.Cal.1972); *Corning Glass Works v. Lady Cornella, Inc.*, 305 F.Supp. 1229, 1231 (E.D.Mich.1969); *Western Air Lines v. Flight Engineers Internat'l Ass'n.*, 194 F.Supp. 908 (S.D.Cal.1961); *Nat'l Folding-Box & Paper Co. v. Robertson*, 99 F. 985, 987 (C.C.D. Conn. 1900) ("for the purpose of the motion for a temporary injunction, the facts alleged in said plea should be taken as true").

averring, "Lt. Komorowski informed me that SCPD will 'arrest anybody who handles a pistol or revolver without a New York State pistol permit.'" [A119 at ¶ 11; A132].

Nor has SCPD disavowed enforcement of their policy[32] should unlicensed individuals, including Giambalvo and Melloni's unlicensed students and potential students, handle a pistol or revolver as part of the live fire training required by the CCIA – whether to the lower court, this court, Giambalvo, Melloni, or non-party Joseph Terrusa.

Indeed, non-party Joseph Terrusa provided a Declaration in support of Appellants' motion for an injunction pending appeal, pending in this Court, which bears out demonstrates the existence of an SCPD policy that unlicensed individuals are subject to arrest for taking the live fire portion of the 18-hour course. Terrusa also averred that, when he went to submit his application for a CCW, he was prevented by SCPD and required to apply for a premise license. SCPD will not accept proof of training certification from unlicensed individuals and falsely informs the public that it is "illegal" to take the 18-hour training until a premise license has been issued.

---

[32] See, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (

33

Rather than take Melloni's allegations as true, the lower court dismissed uncontroverted evidence as mere "stray comments allegedly made by individual law enforcement officers, which, if made, may well have been taken out of context."

The lower court itself must have thought there was *some* risk of enforcement, as evidenced by its cautionary footnote "to the extent that Komorowski made an oral threat that an arrest could be made in contravention of state law, such an action would be highly inadvisable, and would most certainly result in serious consequences." [A222, n. 6]. Federal and state court jurisprudence is replete with causes of action for false arrest; and, considering SCPD's propensity to 'make up' laws that render conduct that is legal throughout all of New York State, somehow illegal in Suffolk County, the "Arrest Policy" should have been enjoined. Indeed, if Komorowski's threats were merely "stray" comments of a lone officer taken "out of context" – what would be the harm of enjoining conduct that would unquestionably be a false arrest?

Failing to take Melloni's Declaration as true and rejecting sworn evidence in favor of its own opinion and speculation was an abuse of the lower court's discretion.

### B. Appellants Do Not Seek an "Injunction[] Against Arrest and Prosecution under *State Law*"

The lower court erroneously equates the threat of enforcement of SCPD's Arrest Policy with federal court interference with the enforcement of criminal

34

statutes in the context of separation of powers. [A220-22]. But there is no *state law* implicated here.

The Suffolk County Police Department is a rogue and dangerous entity that needs to be reined in by the federal courts.

SCPD has a pattern of spontaneously declaring conduct that is completely lawful under existing state law to be "illegal", threatening its residents with arrest, and bullying the community into complying with SCPD's efforts to restrict and impede the Second Amendment.

In *Does 1-10*, relied on by the lower court, the plaintiffs sought to enjoin Suffolk County from arresting them for refusing to surrender their lawfully owned CT4-2A firearms to SCPD under threat of arrest. Numerous other residents complied and surrendered their property.

The *Doe* plaintiffs sued, and the residents of Suffolk County complied, acting out of fear because SCPD had already made a very public example of the owners of Jerry's Firearms, Chris and Jerry Rallo, by raiding their store in 2020, (falsely) arresting and incarcerating them for possessing and selling a firearm that was legal to own under the New York State Penal Law, sold and owned throughout the rest of New York State, including neighboring Nassau County. It was not until 2022 that New York State passed a law criminalizing the possession of "other firearms" like the CT4-2A.

35

*Does 1-10* was dismissed by the lower court, and affirmed by this Court, which found that the anonymous plaintiffs did not establish that prosecution was likely or that there was a substantial risk that they would be harmed. *Does 1-10*, 2022 WL 2678876, at *2-3.

*Does 1-10* is distinguishable. In *Does*, SCPD mailed form letters to customers of Jerry's Firearms who had purchased a CT4-2A "other firearm" (falsely) representing that the firearm was illegal to possess under the Penal Law, demanding the surrender of the property, and advising that, should the firearm not be surrendered to SCPD within 15 days they "may" be subject to arrest and criminal charges. [A222]. Does 1-10 did not surrender their firearms and, because they were afraid of being arrested by SCPD, (as Jerry and Chris Rallo were) they remained anonymous.

Here, SCPD did not threaten an arrest that "may" happen; the head of the Licensing Bureau personally and unambiguously told Melloni – a person he knows as a firearms trainer and provider of the 18-hour course - that SCPD "***will arrest*** anybody who handles a pistol or revolver without a New York State pistol permit.'" [A119]. All it would take for such arrests to be made is for word to get back to SCPD that Melloni is training unlicensed students, or for unlicensed students to present their training completion certificate to SCPD with their application for a concealed carry license.

36

The threat of certain arrest, the fear of a rogue police department, and the helplessness that comes when courts shelter unconstitutional behavior, prevents Melloni and his unlicensed students and potential students from engaging in conduct that is otherwise lawful under New York State law and presumptively protected by the Second Amendment.

## C.  A Credible Threat of Enforcement Exists

Declining to enjoin SCPD's Arrest Policy because it found "there is nothing suggesting that any plaintiff has been arrested or prosecuted or that there is otherwise a substantial risk of such action" nor have they "articulate[d] a sufficiently tangible threat of arrest" [A222-23] the lower court abused its discretion.[33]

This Court has held more than once that "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute ..., but only that it has 'an actual and well-founded fear that the law will be enforced against' it." *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008), quoting, *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.2000) (citation omitted).[34]

---

[33] The lower court also erred by requiring a threat of prosecution to find Article III standing in a pre-enforcement challenge. ["However, Plaintiffs cannot seek and relief regarding potential prosecution based upon a failure to join the proper parties." A223]. There is no prosecution to be had under the Penal Law – enforcement of SCPD's "made up rule" would be an unlawful arrest for conduct that is lawful under the Penal Law, resulting in irreparable harm from being arrested, fingerprinted, and incarcerated.

[34] A plaintiff seeking pre-enforcement action need not show that they are subject to an actual arrest, prosecution, or other enforcement action as a prerequisite to challenging the law. *Antonyuk v. Hochul*, 2022 WL 16744700 *8

"If a plaintiff's interpretation of a statute is 'reasonable enough' and under that interpretation the plaintiff 'may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Ibid.*

Taking Melloni's Declaration as true, as the lower court was required to, there exists a credible risk of enforcement of the Arrest Policy, particularly in the context of the conversation.

The court should be willing to presume that SCPD will enforce its policies, particularly because SCPD has taken no steps to disavow it. See, e.g., *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013); see also, *Pacific Capital Bank v. Connecticut*, 542 F.3d 341 (2d Cir. 2008) (holding that the plaintiff established standing to challenge a civil penalty provision despite the state's argument that it never had enforced the statute against anyone and that "it is unknown how the [s]tate will apply that section in any future enforcement action.").

Melloni, his unlicensed students and potential students, and Giambalvo have a "well-founded fear" that SCPD will enforce its Arrest Policy against them. The fear is "reasonable enough" based on Melloni's having been personally told so by Lt. Komorowski.

---

(N.D.N.Y.) quoting, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59, 165 (2014) ("like arrest or prosecution… [even] administrative action…may give rise to harm sufficient to justify pre-enforcement review") citing, *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 625–626, n. 1 (1986).

Giambalvo faces a credible risk of enforcement because he publicly announced through this lawsuit his clear and present plan to comply with the CCIA and undergo the 18-hour training with Frank Melloni and RFI in December 2022. [A96].[35,36]

### D.  SCPD Policy Presents a 3+ Year Barrier to Concealed Carry

 Consistent with the above, SCPD will not allow new applicants to apply for a concealed carry license. SCPD requires all unlicensed individuals to first apply for a premise license (2-3 years), then complete the 18-hour course, and apply for a concealed carry license (another 2-3 years)[37] - further delaying the issuance of a concealed carry license well beyond the 3 year mark.

Whether or not an arrest is imminent, SCPD is frustrating the intention behind the Penal Law training exemption and exacerbating existing constitutional violations caused by SCPD's lengthy licensing delays.

---

[35] The freedom and reputation of innocent individuals should not be gambled with based on speculation of what SCPD may or may not do, particularly in the face of overt and individualized threats.

[36] Moreover, the exemptions enumerated in Penal Law § 265.20 are merely defenses to prosecution that, if raised, require the district attorney to disprove the defense beyond a reasonable doubt. *People v. Watson*, 163 A.D.3d 855, 862, 81 N.Y.S.3d 449, 458 (2018) citing, *Matter of Nikim A.*, 179 A.D.2d 638, 639, 578 N.Y.S.2d 247; *People v. Roccaforte*, 141 A.D.2d 775, 775, 529 N.Y.S.2d 865; *People v. Montgomery*, 106 A.D.2d 410, 411, 482 N.Y.S.2d 331.

[37] See, Declaration of Joseph Terrusa at Exhibit 8 to Appellants' motion for an injunction pending appeal, and digital recording of his conversation with the SCPD Licensing Bureau, which is the subject of Appellants' motion for leave to submit digital recordings.

## CONCLUSION

For the reasons stated above, Appellants respectfully request that the Memorandum and Order appealed from be vacated and the matter remitted with a finding that Appellants have established Article III standing, and instructions consistent with the arguments made herein.

Dated:  April 20, 2023

*Amy L. Bellantoni*
Amy L. Bellantoni

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)


1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 8,892 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).


2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated:   April 20, 2023