# 23-208-cv

## United States Court of Appeals
## for the
## Second Circuit

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

*Plaintiffs-Appellants,*

v.

SUFFOLK COUNTY, NEW YORK, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER,, Individually, Superintendent STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his Official Capacity,

*Defendants - Appellees*,

JOHN DOES 1-5, Individually, JANE DOES 1-5, Individually,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# APPENDIX

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

## Table Of Contents

**Page**

U.S. District Court Docket Sheet ........ A1

District Court First Amended Complaint
Filed November 17, 2022 ........ A12

Answer, by Suffolk County Defendants
Filed December 13, 2022 ........ A61

Declaration of Amy L. Bellantoni, for Appellants,
Filed December 11, 2022 ........ A67

Exhibit 1, Email from New York State Police Pistol Permit Bureau .... A69

Exhibit 2, Suffolk County Pistol Licensing Overview, Instructions for Completing the Applicant Questionnaire, Copy of Applicant Questionnaire ........ A72

Exhibit 3, Sullivan County Pistol License Information Guide ........ A86

Exhibit 4, Chautauqua County Pistol License Information Guide ........ A88

Exhibit 5, Erie County Pistol Permit Application Process ........ A91

Declaration of Zachary Giambalvo, for Appellants,
Filed December 11, 2022 ........ A93

Declaration of John Mougios, for Appellants,
Filed December 11, 2022 ........ A101

Declaration of Shane Mashkow, for Appellants,
Filed December 11, 2022 ........ A105

Declaration of Kevin McLaughlin, for Appellants,
Filed December 11, 2022 ........ A109

Declaration of Michael McGregor, for Appellants,
Filed December 11, 2022 ........ A112

Declaration of Frank Melloni, for Appellants,
Filed December 11, 2022 ........................................................ A117

Proposed Order to Show Cause
Filed December 11, 2022 ........................................................ A122

Declaration of Arlene S. Zwilling, for Suffolk County Appellees,
Filed January 20, 2023 ................................................................ A125

Exhibit A – Pistol License File of Zachary Giambalvo,
Filed (UNDER SEAL) December 11, 2022 ............................... A127

Exhibit B – Pistol License File of John Mougios,
Filed (UNDER SEAL) December 11, 2022 ............................... A128

Exhibit C – Pistol License File of Shane Mashkow,
Filed (UNDER SEAL) December 11, 2022 ............................... A129

Exhibit D – Pistol License File of Kevin McLaughlin,
Filed (UNDER SEAL) December 11, 2022 ............................... A130

Exhibit E – Pistol License File of Michael McGregor,
Filed (UNDER SEAL) December 11, 2022 ............................... A131

Declaration of Lt. Michael Komorowski, for Suffolk County Appellees,
Filed January 20, 2023 ........................................................... A132

Reply Declaration of Amy L. Bellantoni, for Appellants,
Filed January 27, 2023 ............................................................... A134

Exhibit 1, Affidavit of Michael McGregor and Suffolk County Memorandum of Law in *McGregor v. Cameron*, (N.Y.Sup. 2021), Index No. 622716/2021,
Filed January 27, 2023 ........................................................ A136

Exhibit 2, Mark W. Smith Biography and "Not all History is Created Equal": In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868,"
Filed January 27, 2023 ............................................................ A145

Declaration of Kevin McLaughlin, for Appellants,
Filed January 27, 2023 ............................................................ A207

Memorandum and Order of the Hon. Gary R. Brown,
appealed from, dated February 14, 2023 ............................................ A210

Notice of Interlocutory Appeal, dated February 16, 2023 ................................ A225

APPEAL,ACO

**U.S. District Court**
**Eastern District of New York (Central Islip)**
**CIVIL DOCKET FOR CASE #: 2:22-cv-04778-GRB-ST**

Giambalvo et al v. New York et al
Assigned to: Judge Gary R. Brown
Referred to: Magistrate Judge Steven Tiscione
Cause: 42:1983 Civil Rights Act

Date Filed: 08/15/2022
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Zachary Giambalvo**

represented by **Amy L. Bellantoni**
The Bellantoni Law Firm, PLLC
2 Overhill Road
Suite 400
Scarsdale, NY 10583
914-367-0090
Fax: 888-763-9761
Email: abell@bellantoni-law.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Mougios**

represented by **Amy L. Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shane Mashkow**

represented by **Amy L. Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kevin McLaughlin**

represented by **Amy L. Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael McGregor**

represented by **Amy L. Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Frank Melloni**

represented by **Amy L. Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Renaissance Firearms Instruction, Inc.**
*and all similarly situated individuals*

represented by **Amy L. Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Suffolk County New York** represented by **Arlene S. Zwilling**
Suffolk County Attorney
P.O. Box 6100
H. Lee Dennison Building-Fifth Floor
100 Veterans Memorial Highway
Hauppauge, NY 11788-0099
(631)853-4049
Fax: (631)853-5833
Email: arlene.zwilling@suffolkcountyny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Police Commissioner Rodney Harrison**
*in his Official Capacity*
represented by **Arlene S. Zwilling**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Komorowski**
*Individually*
represented by **Arlene S. Zwilling**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eric Bowen**
*Individually*
represented by **Arlene S. Zwilling**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**William Scrima**
*Individually*
represented by **Arlene S. Zwilling**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**William Walsh**
*Individually*
represented by **Arlene S. Zwilling**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Does 1-5**
*Individually*

**Defendant**

**Jane Does 1-5**
*Individually*

**Defendant**

**Thomas Carpenter**
*Individually*

represented by **Arlene S. Zwilling**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Superintendent Steven Nigrelli**
*Acting Superintendent of the New York State Police, in his Official Capacity*

represented by **Patricia M. Hingerton**
NYS Office of the Attorney General
300 Motor Parkway
Suite 230
Hauppauge, NY 11788
631-231-2424
Fax: 631-435-4757
Email: Patricia.Hingerton@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Robert Edward Morelli**
Office of the New York State Attorney General
300 Motor Parkway, Suite 230
Hauppauge, NY 11788
631-231-2179
Fax: 631-435-4757
Email: robert.morelli@ag.ny.gov
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Letitia James**

represented by **Ester Murdukhayeva**
New York State Office of the Attorney General
Appeals & Opinions
28 Liberty Street
10005
New York, NY 10005
212-416-6279
Email: ester.murdukhayeva@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/15/2022 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against Eric Bowen, Jane Does 1-5, John Does 1-5, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh filing fee $ 402, receipt number ANYEDC-15843215 Was the Disclosure Statement on Civil Cover Sheet completed -Yes,, filed by Shane Mashkow, John Mougios, Zachary Giambalvo, Kevin McLaughlin, Michael McGregor. (Attachments: # 1 Exhibit NYSP Email, # 2 Exhibit SCPD Screenshot Forms, # 3 Exhibit |

| | | |
|---|---|---|
| | | SCPD Guidebook to Pistol Licensing, # 4 Proposed Summons, # 5 Civil Cover Sheet) (Bellantoni, Amy) (Entered: 08/15/2022) |
| 08/15/2022 | 2 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (Landow, Concetta) (Entered: 08/15/2022) |
| 08/15/2022 | | Case Assigned to Judge Gary R. Brown and Magistrate Judge Steven Tiscione. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Landow, Concetta) (Entered: 08/15/2022) |
| 08/15/2022 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that ***if*** all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (Landow, Concetta) (Entered: 08/15/2022) |
| 08/15/2022 | | Your proposed summons was not issued for one of the following reasons: **The name on the summons does not match the name as it appears on the complaint. If the caption does not fit on the summons, then you must attached a rider.**<br><br>Please correct and resubmit using Proposed Summons/Civil Cover Sheet. (Landow, Concetta) (Entered: 08/15/2022) |
| 08/22/2022 | 4 | Proposed Summons. Re 1 Complaint,, Quality Control Check - Summons, by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, John Mougios (Bellantoni, Amy) (Entered: 08/22/2022) |
| 08/23/2022 | 5 | Summons Issued as to Eric Bowen, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh. (Cubano, Jazmin) (Entered: 08/23/2022) |
| 09/28/2022 | 6 | SCHEDULING ORDER: An initial conference will be held at 11:00 a.m. on December 19, 2022 before the undersigned by phone. Counsel for all parties must participate and shall connect to the conference through dial-in number 888-557-8511 with access code 3152145. The attached Discovery Plan Worksheet is to be completed by counsel and electronically filed with the Court by December 15, 2022.<br><br>**THE PARTIES ARE REMINDED that audio or video recording of proceedings by any party other than the Court, is strictly prohibited by Local Civil Rule 1.8. Violation of this rule may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed appropriate by the Court.**<br><br>So Ordered by Magistrate Judge Steven Tiscione on 9/28/2022. (Vasquez, Lea) (Vasquez, Lea). (Entered: 09/28/2022) |
| 10/06/2022 | | ORDER. Upon review of the complaint herein, to ensure full compliance with appropriate procedures, plaintiffs' counsel is hereby directed to advise the Court as to whether it has complied with the requisites of Rule 5.1. Assuming such compliance is appropriate, counsel is directed to submit a proposed certification as required by 28 USC Sec. 2403 |

| | | |
|---|---|---|
| | | within one week of the date of this Order. Ordered by Judge Gary R. Brown on 10/6/2022. (Brown, Gary) (Entered: 10/06/2022) |
| 10/07/2022 | 7 | Letter *in response to Court Order dated October 6, 2022* by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, John Mougios (Bellantoni, Amy) (Entered: 10/07/2022) |
| 10/28/2022 | 8 | AMENDED COMPLAINT against Eric Bowen, Jane Does 1-5, John Does 1-5, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh, Thomas Carpenter, filed by Shane Mashkow, John Mougios, Zachary Giambalvo, Kevin McLaughlin, Michael McGregor, Frank Melloni, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 10/28/2022) |
| 10/28/2022 | 9 | Proposed Summons. Re 8 Amended Complaint, by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc. (Attachments: # 1 Proposed Summons Rider to Proposed Summons) (Bellantoni, Amy) (Entered: 10/28/2022) |
| 10/28/2022 | 10 | Letter MOTION to Amend/Correct/Supplement 9 Proposed Summons/Civil Cover Sheet, 8 Amended Complaint, by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 10/28/2022) |
| 11/02/2022 | | ORDER re 10 Motion to Amend/Correct/Supplement. The motion to amend the caption of the First Amended Complaint is denied with leave to renew before the assigned Magistrate Judge in accordance with the assigned Magistrate Judge's individual rules. See II.e.1.b. Ordered by Judge Gary R. Brown on 11/2/2022. c/ecf (LJ) (Entered: 11/02/2022) |
| 11/07/2022 | 11 | MOTION to Amend/Correct/Supplement 9 Proposed Summons/Civil Cover Sheet, 8 Amended Complaint, *to correct the caption of the First Amended Complaint* by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 11/07/2022) |
| 11/16/2022 | | ORDER granting 11 Motion to Amend the caption of the FAC to include ActingSuperintendent of the New York State Police Steven Nigrelli in his official capacity. So Ordered by Magistrate Judge Steven Tiscione on 11/16/2022. (LV) (Entered: 11/16/2022) |
| 11/16/2022 | 12 | Summons Issued as to Eric Bowen, Thomas Carpenter, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh. (JC) (Entered: 11/16/2022) |
| 11/17/2022 | 13 | AMENDED COMPLAINT *(with corrected caption)* against Eric Bowen, Thomas Carpenter, Jane Does 1-5, John Does 1-5, Rodney Harrison, Michael Komorowski, Suffolk County New York, Steven Nigrelli, William Scrima, William Walsh, filed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. (Attachments: # 1 Proposed Summons) (Bellantoni, Amy) (Entered: 11/17/2022) |
| 11/18/2022 | | Your proposed summons was not issued for one of the following reasons: **The name on the summons does not match the name as it appears on the complaint.**<br><br>Please correct and resubmit using Proposed Summons/Civil Cover Sheet. (GO) (Entered: 11/18/2022) |
| 11/18/2022 | 14 | Proposed Summons. Re Quality Control Check - Summons, 13 Amended Complaint, by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank |

| | | |
|---|---|---|
| | | Melloni, John Mougios, Renaissance Firearms Instruction, Inc. (Bellantoni, Amy) (Entered: 11/18/2022) |
| 11/21/2022 | 15 | Summons Issued as to Eric Bowen, Thomas Carpenter, Rodney Harrison, Michael Komorowski, Suffolk County New York, Steven Nigrelli, William Scrima, William Walsh. (JC) (Entered: 11/21/2022) |
| 12/02/2022 | 16 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. Steven Nigrelli served on 11/22/2022, answer due 12/13/2022. (Bellantoni, Amy) (Entered: 12/02/2022) |
| 12/07/2022 | 17 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. Suffolk County New York served on 11/23/2022, answer due 12/14/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/07/2022 | 18 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. Rodney Harrison served on 11/23/2022, answer due 12/14/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/07/2022 | 19 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. Eric Bowen served on 11/23/2022, answer due 12/14/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/07/2022 | 20 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. Michael Komorowski served on 11/23/2022, answer due 12/14/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/07/2022 | 21 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. Thomas Carpenter served on 11/23/2022, answer due 12/14/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/07/2022 | 22 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. William Scrima served on 11/28/2022, answer due 12/19/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/07/2022 | 23 | SUMMONS Returned Executed by John Mougios, Renaissance Firearms Instruction, Inc., Zachary Giambalvo, Frank Melloni, Shane Mashkow, Kevin McLaughlin, Michael McGregor. William Walsh served on 11/23/2022, answer due 12/14/2022. (Bellantoni, Amy) (Entered: 12/07/2022) |
| 12/09/2022 | 24 | NOTICE of Appearance by Patricia M. Hingerton on behalf of Steven Nigrelli (aty to be noticed) (Hingerton, Patricia) (Entered: 12/09/2022) |
| 12/09/2022 | 25 | MOTION for pre motion conference re 13 Amended Complaint, *seeking dismissal* by Steven Nigrelli. (Hingerton, Patricia) (Entered: 12/09/2022) |
| 12/10/2022 | 26 | NOTICE of Appearance by Robert Edward Morelli on behalf of Steven Nigrelli (aty to be noticed) (Morelli, Robert) (Entered: 12/10/2022) |
| 12/11/2022 | 27 | MOTION for Order to Show Cause by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Attachments: # 1 Declaration of Amy L. Bellantoni Pursuant to Local |

| | | |
|---|---|---|
| | | Rule 6.1(d), # 2 Declaration of Amy L. Bellantoni In Support, # 3 Exhibit NYSP Email, # 4 Exhibit Suffolk County Licensing Instructions and Forms, # 5 Exhibit Sullivan County Pistol Licensing, # 6 Exhibit Chautaqua County Pistol Licensing, # 7 Exhibit Erie County Pistol Licensing, # 8 Declaration of Zachary Giambalvo, # 9 Declaration of John Mougios, # 10 Declaration of Shane Mashkow, # 11 Declaration of Kevin McLaughlin, # 12 Declaration of Michael McGregor, # 13 Declaration of Frank Melloni and RFI, # 14 Memorandum in Support) (Bellantoni, Amy) (Entered: 12/12/2022) |
| 12/12/2022 | 28 | MOTION to Adjourn Conference *on consent* by Steven Nigrelli. (Hingerton, Patricia) (Entered: 12/12/2022) |
| 12/12/2022 | | ORDER granting 28 Motion to Adjourn Conference: The initial conference scheduled for December 19th is adjourned without date. Counsel shall request that the initial conference be reset if the case survives the anticipated motion to dismiss. So Ordered by Magistrate Judge Steven Tiscione on 12/12/2022. (LV) (Entered: 12/12/2022) |
| 12/12/2022 | | ORDER re 27 MOTION for Order to Show Cause filed by Frank Melloni, Michael McGregor, John Mougios, Zachary Giambalvo, Kevin McLaughlin, Shane Mashkow, Renaissance Firearms Instruction, Inc., 25 MOTION for pre motion conference re 13 Amended Complaint, *seeking dismissal* filed by Steven Nigrelli<br><br>Plaintiffs are directed to respond to the motion for pre motion conference, re DE 13, Amended Complaint, seeking dismissal by Steven Nigrelli, Acting Superintendent of N.Y. State Police, DE 25, by 12/19/2022.<br><br>Defendants are directed to respond to the motion for Order to Show Cause filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Attachments: # 1 Declaration of Amy L. Bellantoni Pursuant to Local Rule 6.1(d), # 2 Declaration of Amy L. Bellantoni In Support, # 3 Exhibit NYSP Email, # 4 Exhibit Suffolk County Licensing Instructions and Forms, # 5 Exhibit Sullivan County Pistol Licensing, # 6 Exhibit Chautaqua County Pistol Lice nsing, # 7 Exhibit Erie County Pistol Licensing, # 8 Declaration of Zachary Giambalvo, # 9 Declaration of John Mougios, # 10 Declaration of Shane Mashkow, # 11 Declaration of Kevin McLaughlin, # 12 Declaration of Michael McGregor, # 13 Declaration of Frank Melloni and RFI, # 14 Memorandum in Support), DE 27, by 12/19/2022.<br><br>Ordered by Judge Gary R. Brown on 12/12/2022. (LJ) (Entered: 12/12/2022) |
| 12/13/2022 | 29 | MOTION to Stay re Order,,,,, *or alternatively, for an extension of time to respond to the preliminary injunction motion and for additional pages* by Steven Nigrelli. (Hingerton, Patricia) (Entered: 12/13/2022) |
| 12/13/2022 | 30 | ANSWER to 13 Amended Complaint, by Eric Bowen, Thomas Carpenter, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh. (Zwilling, Arlene) (Entered: 12/13/2022) |
| 12/14/2022 | 31 | RESPONSE to Motion re 29 MOTION to Stay re Order,,,,, *or alternatively, for an extension of time to respond to the preliminary injunction motion and for additional pages* , RESPONSE in Opposition re 29 MOTION to Stay re Order,,,,, *or alternatively, for an extension of time to respond to the preliminary injunction motion and for additional pages* filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Attachments: # 1 Exhibit Notice to Suffolk County) (Bellantoni, Amy) (Entered: 12/14/2022) |
| 12/14/2022 | | ORDER re 29 Motion to Stay and 31 Response. |

| | | |
|---|---|---|
| | | Defendant Steven Nigrelli's, sued in his official capacity as Acting Superintendent of New York State Police, request for an extension of the deadline to respond to plaintiffs' motion for a preliminary injunction to January 6, 2023 as well as the request for a 10-page extension of the Court's page limit for memoranda of law are hereby GRANTED.<br><br>The same deadline extension to respond to plaintiffs' motion for a preliminary injunction shall apply to the Suffolk County Defendants.<br><br>Plaintiffs' application for an additional five pages to respond to the New York State's arguments in their Reply brief is granted.<br><br>The application by defendant Steven Nigrelli, sued in his official capacity as Acting Superintendent of New York State Police,that seeks a stay of that portion of the preliminary injunction motion which raises a constitutional challenge to the Concealed Carry Improvement Act is DEFERRED pending further resolution of this matter.<br><br>Ordered by Judge Gary R. Brown on 12/14/2022. (LJ) (Entered: 12/14/2022) |
| 12/16/2022 | | December 19th initial conference is canceled. So Ordered by Magistrate Judge Steven Tiscione on 12/16/2022. (LV) (Entered: 12/16/2022) |
| 12/19/2022 | 32 | RESPONSE in Opposition re 25 MOTION for pre motion conference re 13 Amended Complaint, *seeking dismissal* filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Attachments: # 1 Exhibit PPB-3 Rev. 08/22 and 06/17) (Bellantoni, Amy) (Entered: 12/19/2022) |
| 01/04/2023 | 33 | MOTION for Extension of Time to File Response/Reply as to 27 MOTION for Order to Show Cause by Eric Bowen, Thomas Carpenter, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh. (Zwilling, Arlene) (Entered: 01/04/2023) |
| 01/06/2023 | | ORDER granting 33 Motion for Extension of Time to File Response/Reply re 33 MOTION for Extension of Time to File Response/Reply as to 27 MOTION for Order to Show Cause . Application granted. Ordered by Judge Gary R. Brown on 1/6/2023. (LJ) (Entered: 01/06/2023) |
| 01/20/2023 | 34 | RESPONSE in Opposition re 27 MOTION for Order to Show Cause -*State Defendant's Memorandum of Law in Opposition to Preliminary Injunction* filed by Steven Nigrelli. (Attachments: # 1 Declaration of Patricia Hingerton in Opposition to Preliminary Injunction, # 2 Ex. 01- Laws and Liberties of Massachusetts, # 3 Ex. 02- Pennsylvania Law 1763, # 4 Ex. 03- Virginia 1756, # 5 Ex. 04- Records of Massachusetts Bay Vol 1 211-212, # 6 Ex. 05- England 1662, # 7 Ex. 06- 1775-76 Massachusetts Acts & Laws 31, # 8 Ex. 07- 1776-77 Pennsylvania Laws 61, # 9 Ex. 08- Maryland 1777, # 10 Ex. 09- North Carolina 1777, # 11 Ex. 10- Virginia 1777, # 12 Ex. 11- Journals of Provincial Congress p.389, # 13 Ex. 12- New York - 1786 Militia Law, # 14 Ex. 13- New York - 1780 Militia Law, # 15 Ex. 14- New York 1782 Militia Law, # 16 Ex. 15- New Jersey 1806 Militia Law, # 17 Ex. 16- Pennsylvania 1822 Militia Law, # 18 Ex. 17- Federal 1892, # 19 Ex. 18- NYC 1881 Ordinances of the City of New York, # 20 Ex. 19- 1878 NYC Proceedings, # 21 Ex. 20- Liber Albus, # 22 Ex. 21- Hawkins Treatise of the Pleas of the Crown 1716 Vol 1, # 23 Ex. 22- Brooklyn, # 24 Ex. 23- Buffalo, # 25 Ex. 24- Elmira, # 26 Ex. 25- Syracuse 1894, # 27 Ex. 26- Troy, # 28 Ex. 27- Lockport, # 29 Ex. 28- Albany, # 30 Ex. 29- NY 1780 Session Laws, # 31 Ex. 30- Omaha Stat, # 32 Ex. 31- Federal 1792, # 33 Ex. 32- New Jersey 1806 Militia Law, # 34 Ex. 33- Virginia 1785 Militia Law, # 35 Ex. 34- Corbett preliminary injunction decision) (Hingerton, Patricia) (Entered: 01/20/2023) |

| | | |
|---|---|---|
| 01/20/2023 | 35 | REPLY in Opposition re 27 MOTION for Order to Show Cause filed by Eric Bowen, Thomas Carpenter, Rodney Harrison, Michael Komorowski, Suffolk County New York, William Scrima, William Walsh. (Attachments: # 1 Exhibit Ex A Giambalvo Pistol License Applicant, # 2 Exhibit Ex B Mougios Pistol License Applicant, # 3 Exhibit Ex C Mashkow Pistol License Applicant, # 4 Exhibit EX D McLauglin Pistol License Applicant, # 5 Exhibit EX E McGregor Pistol License Applicant, # 6 Declaration Komorowski, # 7 Memorandum in Opposition Memorandum of Law in Opposition) (Skorupa, Stacy) (Entered: 01/20/2023) |
| 01/25/2023 | | ORDER re 35 1 - Sealed Document CV, Reply in Opposition,, filed by William Scrima, Eric Bowen, Rodney Harrison, Suffolk County New York, Thomas Carpenter, William Walsh, Michael Komorowski, 34 Response in Opposition to Motion filed by Steven Nigrelli<br><br>Plaintiffs' reply, if any, to the respective defendants' opposition papers must be filed (with courtesy copies delivered to the Courthouse) by close of business January 30, 2023.<br><br>Ordered by Judge Gary R. Brown on 1/25/2023. (LJ) (Entered: 01/25/2023) |
| 01/26/2023 | 36 | MOTION for Leave to File Excess Pages *(2 extra pages) for Plaintiffs' Reply to the State and Suffolk County* by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 01/26/2023) |
| 01/27/2023 | | ORDER granting 36 Motion for Leave to File Excess Pages. Application granted. Ordered by Judge Gary R. Brown on 1/27/2023. (LJ) (Entered: 01/27/2023) |
| 01/27/2023 | 37 | REPLY in Support re 27 MOTION for Order to Show Cause , 35 1 - Sealed Document CV,,, Reply in Opposition,, 34 Response in Opposition to Motion,,,,,, Order,,,,, filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 01/27/2023) |
| 01/27/2023 | 38 | AFFIDAVIT/DECLARATION in Support re 27 MOTION for Order to Show Cause filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Attachments: # 1 Exhibit 1 Komorowski Affidavit and Suffolk County Memo of Law, # 2 Exhibit 2 Mark W. Smith, "Not All History is Created Equal") (Bellantoni, Amy) (Entered: 01/27/2023) |
| 01/27/2023 | 39 | AFFIDAVIT/DECLARATION in Support re 27 MOTION for Order to Show Cause filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 01/27/2023) |
| 02/14/2023 | 40 | MEMORANDUM & ORDER denying 27 Motion for Order to Show Cause: Based on the foregoing, plaintiffs have failed to meet the exacting standard for the issuance of a preliminary injunction, such that their motion must be denied. As noted, defendants have filed a pre-motion application seeking to move for dismissal. The parties are to meet and confer and provide the Court with a full briefing schedule in 60 days. Defendants time to file answers or otherwise move are adjourned pending resolution of said motion. SEE ATTACHED ORDER FOR FURTHER DETAILS. So Ordered by Judge Gary R. Brown on 2/14/2023. (JC) (Entered: 02/14/2023) |
| 02/16/2023 | 41 | NOTICE OF INTERLOCUTORY APPEAL as to 40 Order on Motion for Order to Show Cause,, by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. Filing fee $ 505, receipt number ANYEDC-16415038. (Bellantoni, Amy) (Entered: 02/16/2023) |

| | | |
|---|---|---|
| 02/16/2023 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 41 Notice of Interlocutory Appeal, Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (DC) (Entered: 02/16/2023) |
| 02/17/2023 | 42 | MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)* by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Zachary Giambalvo dated 10/28/2022, # 3 Declaration of Zachary Giambalvo dated 2/10/2023, # 4 Declaration of Zachary Giambalvo dated 2/16/2023/, # 5 Declaration of Kevin McLaughlin, # 6 Declaration of Michael McGregor, # 7 Declaration of Shane Mashkow, # 8 Declaration of Frank Melloni, # 9 Declaration of John Mougios dated 12/2/2022, # 10 Declaration of John Mougios dated 2/16/2023) (Bellantoni, Amy) (Entered: 02/17/2023) |
| 02/17/2023 | 43 | AFFIDAVIT/DECLARATION in Support re 42 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)* filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 02/17/2023) |
| 02/17/2023 | 44 | AFFIDAVIT/DECLARATION in Support re 42 MOTION for Preliminary Injunction *pending interlocutory appeal pursuant to FRAP 8(a)(1)* filed by Zachary Giambalvo, Shane Mashkow, Michael McGregor, Kevin McLaughlin, Frank Melloni, John Mougios, Renaissance Firearms Instruction, Inc.. (Bellantoni, Amy) (Entered: 02/17/2023) |
| 02/21/2023 | | ORDER denying 42 Motion for Preliminary Injunction. Plaintiffs' motion for Preliminary Injunction pending interlocutory appeal pursuant to Fed. R. App. P. 8(a)(1) is denied for the reasons set forth in this Court's Memorandum & Order dated February 14, 2023. *See* DE 40. Ordered by Judge Gary R. Brown on 2/21/2023. (Entered: 02/21/2023) |
| 04/11/2023 | 45 | STIPULATION of Dismissal by Superintendent Steven Nigrelli (Hingerton, Patricia) (Entered: 04/11/2023) |
| 04/12/2023 | 46 | Consent MOTION to Intervene by Letitia James. (Murdukhayeva, Ester) (Entered: 04/12/2023) |
| 04/12/2023 | | STIPULATION AND ORDER re 45 Stipulation of Dismissal filed by Superintendent Steven Nigrelli. The Stipulation of Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) that this action and all claims asserted therein against Defendant Superintendent Steven Nigrelli are dismissed with prejudice is hereby So Ordered.Ordered by Judge Gary R. Brown on 4/12/2023. (LJ) (Entered: 04/12/2023) |
| 04/12/2023 | | ORDER granting 46 Motion to Intervene. The motion of non-party New York State Attorney General Letitia James to intervene in this case for the limited purpose of defending the constitutionality of New York's firearm-licensing laws, pursuant to 28 U.S.C. § 2403(b) and Rule 24(a)(1) of the Federal Rules of Civil Procedure is hereby granted, on consent. Ordered by Judge Gary R. Brown on 4/12/2023. (LJ) (Entered: 04/12/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/17/2023 10:11:03 | | | |
| **PACER Login:** | Amybellantoni | **Client Code:** | |

| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-04778-GRB-ST |
|---|---|---|---|
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his Official Capacity,

Defendants.
---------------------------------------------------------------x

22 Civ. 04778 (GRB)(ST)

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Jury Trial Demanded**

Plaintiffs, ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and on behalf of all similarly situated individuals for their First Amended Complaint respectfully state:

## NATURE OF THE ACTION

1. This is an action for, *inter alia*, declaratory and injunctive relief, presumed compensatory damages in at least a nominal amount for violations of the First, Second, Fourth and Fourteenth Amendments [42 U.S.C. § 1983], economic damages, and punitive damages against the individually named defendants proximately resulting from (i) the enforcement of Suffolk County policies and procedures related to handgun licensing; (ii) the enforcement of

unconstitutional state statutes; and (iii) Suffolk County's failure to train, supervise, and discipline the staff of the Licensing Bureau.

2. The process for applying for and obtaining a handgun license from the Suffolk County Police Department (SCPD) is crushing – and by design. The Suffolk County Defendants intentionally and purposely obstruct the purchase, possession, and carrying of handguns by ordinary citizens, like Plaintiffs.

3. For a new applicant, obtaining a handgun license takes ***between 2-3 years***.

4. SCPD enforces unconstitutional state statutes, including New York's Concealed Carry Improvement Act (CCIA) (Senate Bill 51001), which mandates an in-person interview, disclosure of social media accounts, the name/contact information of significant others, spouse, and cohabitants, the subjective and overbroad attestations of four character references, 18-hour training requirements, and among other things, a catch-all provision requiring any other "information required by the licensing officer that is reasonably necessary and related to the review of the licensing application."

5. As of September 1, 2022, unlicensed citizens seeking applying for an unrestricted concealed carry handgun license must complete the amended New York State Pistol/Revolver Application (PPB-3 08/22), which incorporates unconstitutional state requirements including those enumerated in Penal Law section 400.00(1)(o) and the 18-hour training course required by section 400.00(19).

6. Unlicensed individuals who want to get the CCIA training out of the way while they await the issuance of their handgun license risk arrest and incarceration under an SCPD policy that ignores the state law exemption. Under SCPD policy, any unlicensed individual taking a live-

fire training class with a duly authorized instructor will be arrested and put in jail, as will the instructor.

7. As for licensees whose existing concealed carry[1] license is restricted to 'target shooting', 'hunting', or 'sportsman', SCPD requires filing an amendment application and paying a fee to remove unconstitutional restrictions, rather than deeming the licenses 'unrestricted.' The only reason such licenses were not 'unrestricted' upon issuance was the enforcement of the 'proper cause' requirement banned by the Supreme Court in *Bruen*.

8. SCPD's policy is to apply the CCIA regulations, including the 18-hour training requirement, to existing restricted carry licensees who seek to have their carry restrictions removed; but the CCIA does not apply to existing concealed carry licenses until the renewal period. Put differently, the CCIA only applies at issuance and renewal. SCPD's policy is unconstitutional.

9. Restricted carry licensees who carry outside of their restriction category face a credible threat of arrest, incarceration, license revocation, and other criminal and civil penalties by SCPD and the New York State Police under Penal Law section 400.00(15).

10. As if the provisions of the CCIA were not enough, Penal Law section 400.30 grants free reign to municipalities statewide to implement "any local law, code, ordinance, rule or regulation that is *more restrictive* than any requirement set forth in or established by this article."

11. This action seeks a declaration (1) that Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(19), 400.30, and that portion of section 400.00(4-a) allowing statutory licensing officers 6 months to either issue a license or deny an application made thereunder violate the Second and Fourteenth Amendments; (2) that enforcing Penal Law section 400.00(15) against handgun licensees who carry a handgun registered thereon outside of their license restriction

[1] "CCW."

violates the Second and Fourteenth Amendments; (3) that a licensing process that exceeds 30 days from the presentment of the completed New York State Pistol/Revolver License Application (PPB-3) to the issuance of a license (or denial thereof) violates the Second and Fourteenth Amendments; and that (4) enforcement of a policy that subjects unlicensed individuals and duly authorized firearm instructors to arrest and incarceration in the context of live-fire handgun training violates the First, Second, Fourth, and Fourteenth Amendments.

***Prohibitory Injunction Against Suffolk County Police Commissioner Harrison***

12. Plaintiffs are entitled to a preliminary and permanent injunction against Suffolk County Police Commissioner Rodney Harrison, and all successors, his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with such defendants, who receive actual notice thereof from (1) implementing and enforcing Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(19), 400.30, that portion of section 400.00(4-a) allowing statutory licensing officers 6 months to either issue a license or deny an application made thereunder, and section 400.00(15) against handgun licensees who carry a handgun registered thereon outside of their license restriction; (2) implementing a licensing process that exceeds 30 days between presentment of the completed New York State Pistol/Revolver License Application (PPB-3) and issuance of a license (or denial thereof); (3) compelling applicants to complete the SCPD "Applicant Questionnaire"; (4) requiring applicants to be personally interviewed; (5) continuing to require "proper cause" for the issuance of a concealed carry license; and (6) enforcing a Suffolk County policy that subjects unlicensed individuals who participate in live-fire training with a duly authorized instructor to criminal penalties including arrest and incarceration.[2]

[2] Penal Law § 265.20 exempts unlicensed individuals from criminal penalties for engaging in live-fire training with a duly authorized instructor.

***Prohibitory Injunction Against Acting Superintendent Nigrelli***

13. Plaintiffs are entitled to a preliminary and permanent injunction against Acting Superintendent of the New York State Police Steven Nigrelli and all successors, his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with him, who receive actual notice thereof from (1) publishing, implementing, and enforcing those sections of the New York State Pistol/Revolver Application PPB-3 (Rev. 08/22) that incorporate Penal Law section 400.00(1)(o) [PPB-3 page 2]; and (2) enforcing Penal Law section 400.00(15) against handgun licensees who carry a handgun concealed outside of their license restriction.

***Mandatory Injunction Against Suffolk County Police Commissioner Harrison***

14. Plaintiffs are entitled to a preliminary and permanent mandatory injunction compelling Suffolk County Police Commissioner Rodney Harrison (and all successors) to: (i) provide the New York State PPB-3 application on the Suffolk County Police Department website and local police precincts; (ii) accept the PPB-3 for filing from all applicants upon presentment; (iii) fingerprint applicants upon presentment of the completed PPB-3 or, in the alternative, publish the Suffolk County Police Department ORI number on its website and in local precincts for applicants to submit their fingerprints directly to the New York State Division of Criminal Justice Services; (iv) photograph applicants upon presentment of the completed PPB-3 or, in the alternative, accept 2 statutorily required photographs from applicants upon presentment of the PPB-3; (v) cease publishing information that requires (and requiring) applicants show "proper cause" for the issuance of a concealed carry license; (vi) provide hours of public accessibility outside of the Licensing Bureau's currently restricted hours of Monday-Friday from 9:00 – 4:30 p.m.; and (vii) within 30 days of presentment of the completed PPB-3 application, issue a license

to all applicants eligible to possess firearms under state and federal law and provide ineligible applicants with a written notice specifying the grounds for denial.

**JURISDICTION AND VENUE**

15. Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations, customs, and usages of the State of New York, of rights, privileges or immunities secured by the United States Constitution. This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, 42 U.S.C. §§ 1983 and 1988. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

16. Plaintiffs, ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, and FRANK MELLONI, are all natural persons and residents of those portions of Suffolk County, New York subject to the jurisdiction of the Suffolk County Police Commissioner for the issuance of a New York State pistol license.

17. Plaintiffs Zachary Giambalvo, John Mougios, Shane Mashkow, and Kevin McLaughlin have all submitted to the procedures implemented by the SCPD Licensing Bureau for applying for a New York State handgun license.

18. Plaintiff Michael McGregor applied to the SCPD Licensing Bureau for a handgun license and, ***after 16 months*** (and the institution of a lawsuit to compel the Suffolk County Police Commissioner to issue a determination), Dr. McGregor was finally issued a handgun license restricted to 'sportsman' carry.

19. Plaintiffs Zachary Giambalvo, John Mougios, Shane Mashkow, Kevin McLaughlin, and Michael McGregor all intend to carry a handgun in public for self-defense.

20. Plaintiff Frank Melloni is a duly authorized firearms instructor, certified by the National Rifles Association.

21. Plaintiff RENAISSANCE FIREARMS INSTRUCTION, INC. ("RFI"), is a corporation duly organized under the laws of the State of New York and located in Suffolk County, New York.

22. RFI provides firearms training to individuals through its various instructors, including Frank Melloni. RFI offers an 18-hour training course that meets the requirements of Penal Law § 400.00(19), as enacted by the CCIA.

23. Defendant, SUFFOLK COUNTY, New York (hereinafter the "County"), is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of the State.

24. Defendant, RODNEY HARRISON, (hereinafter "Commissioner Harrison"), is the Police Commissioner of Suffolk County and has held that position since January 11, 2022. Commissioner Harrison is sued in his official capacity only.

25. As the Suffolk County Police Commissioner, Harrison is the statutory "licensing officer"[3] with the authority to issue licenses under Penal Law § 400.00 for the western towns of Suffolk County, New York.

26. Commissioner Harrison is properly named as the individual responsible for ensuring that the requested prospective injunctive relief is carried out. *Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996).

[3] Penal Law § 265.00(10).

27.     Defendant MICHAEL KOMOROWSKI (hereinafter "Lt. Komorowski") is the lieutenant of the Suffolk County Pistol Licensing Bureau and employee of Suffolk County.  Lt. Komorowski is sued herein in his individual and personal capacity only.

28.     Lt. Komorowski is personally involved in and directly responsible for enforcing and implementing the licensing policies and procedures of the SCPD Licensing Bureau. Lt. Komorowski has day-to-day direct supervisory, personal, and directional authority over the police officers and/or investigators assigned to the Pistol Licensing Bureau, including Sgt. Eric Bowen, John Does 1-5 and Jane Does 1-5, including their training on, and day-to-day implementation of, the policies and procedures of the Licensing Bureau.

29.     As set forth herein, and based on Frank Melloni's prior dealings with him, Lt. Komorowski has the authority to, and does, create the policies and procedures of the SCPD Licensing Bureau.

30.     At all times relevant herein, Lt. Komorowski enforced and implemented state statutes and SCPD policies and procedures challenged herein with the intention and/or in deliberate disregard Plaintiffs' (and all similarly situated individuals') Second and Fourteenth Amendment rights.

31.     Lt. Komorowski has arrest powers and the authority to direct SCPD police officers to arrest and confine individuals at his direction.

32.     Defendant Sergeant ERIC BOWMAN (hereinafter "Sgt. Bowman") is assigned to the SCPD Pistol Licensing Bureau and an employee of Suffolk County.  Defendant Bowman is sued herein in his individual and personal capacity only.

33.     Sgt. Bowman has day-to-day direct supervisory and directional authority over the police officers and/or investigators assigned to the Pistol Licensing Bureau, John Does 1-5 and

Jane Does 1-5, including their training on, and day-to-day implementation of, the policies and procedures of the Pistol Licensing Bureau.

34.    At all times relevant herein, Bowman enforced and implemented state statutes and SCPD policies and procedures challenged herein with the intention and/or in deliberate disregard Plaintiffs' (and all similarly situated individuals') Second and Fourteenth Amendment rights.

35.    Relevant to Michael McGregor, and in 2020-2021, defendant WILLIAM SCRIMA (hereinafter "Captain Scrima") was assigned to the SCPD Pistol Licensing Bureau. Captain Scrima had day-to-day direct supervisory and authority over the police officers and/or investigators assigned to the Pistol Licensing Bureau including Sgt. William Walsh, and certain of the John and Jane Does, and Investigator Carpenter, which involved their training on, and day-to-day implementation of, the policies and procedures of the Pistol Licensing Bureau. Defendant Scrima is sued herein in his individual and personal capacity only.

36.    At all times relevant to Plaintiff McGregor herein, Scrima enforced and implemented the state statutes and SCPD policies and procedures challenged herein with the intention and/or in deliberate disregard of McGregor's Second and Fourteenth Amendment right to purchase, possess, and carry handguns.

37.    Relevant to Michael McGregor, and in 2020-2021, Defendant WILLIAM WALSH (hereinafter "Sgt. Walsh") was assigned to the Pistol Licensing Bureau. Sgt. Walsh had day-to-day direct supervisory and directional authority over the police officers and/or investigators assigned to the Pistol Licensing Bureau, including certain of the John and Jane Does 1-5 and Investigator Carpenter, which involved their training on, and day-to-day implementation of, the policies and procedures of the Pistol Licensing Bureau. Defendant Walsh is sued herein in his individual and personal capacity only.

Case 2:22-cv-04778-GRB-ST Document 1 Filed 08/15/22 Page 21 of 49 PageID

38. At all times relevant to Plaintiff McGregor, Sgt. Walsh Scrima enforced and implemented the state statutes and SCPD policies and procedures challenged herein with the intention and/or in deliberate disregard of McGregor's Second and Fourteenth Amendment right to purchase, possess, and carry handguns.

39. Defendant THOMAS CARPENTER ("Inv. Carpenter") has been an applicant investigator in the SCPD Licensing Bureau since December 2009. Defendant Carpenter is sued herein in his individual and personal capacity only.

40. Carpenter has implemented and enforced the SCPD policies and procedures throughout his employment with SCPD, and was the investigator assigned to Plaintiff McGregor's handgun license application.

41. At all times relevant to Plaintiff McGregor herein, Carpenter enforced and implemented the state statutes and SCPD policies and procedures challenged herein with the intention and/or in deliberate disregard of McGregor's Second and Fourteenth Amendment right to purchase, possess, and carry handguns.

42. Defendants JOHN DOES 1-5 and/or JANE DOES 1-5 (the "Does") sued in their individual capacity, were at all times relevant herein, employees of Suffolk County assigned to the Licensing Bureau.

43. The Doe defendants include SCPD employees personally involved in creating, enforcing and/or implementing the unconstitutional state statutes and SCPD policies challenged herein, including without limitation, those designed and intended to circumvent Penal Law § 400.00(4-a); compelling submission of the "Applicant Questionnaire"; withholding publication of the State PPB-3 Application to the public; refusing presentment of the completed State PPB-3

Application; and restricting hours of operation; limiting interview/fingerprinting days to 1 day per week.

44.　　Does 1-5 acted, and failed to act, in deliberate disregard for the presumptively protected constitutional rights of Plaintiffs and all similarly situated individuals.

45.　　To reiterate, Komorowski, Bowman, Scrima, Walsh, Carpenter, and the Does, acting individually and/or in concert, enforced and implemented SCPD policies and procedures challenged herein knowingly, intentionally, and/or in deliberate disregard of Plaintiffs' (and all similarly situated individuals') Second and Fourteenth Amendment rights.

46.　　At all relevant times, the individual Suffolk County Defendants were acting on behalf of, and in furtherance of, their positions as employees of the Suffolk County Police Department.

47.　　Suffolk County is liable for the acts and omissions of each individually named defendant, including the Does, based on the existence of *Monell* liability for the unconstitutional SCPD policies and procedures described herein.

48.　　Defendant STEVEN NIGRELLI is the Acting Superintendent of the New York State Police (NYSP) whose principal place of business is in Albany, New York. Superintendent Nigrelli is sued in his official capacity only.

49.　　As the Acting Superintendent of the NYSP, Nigrelli supervises and oversees the NYSP Pistol Permit Bureau, and is statutorily responsible for creating, publishing, and enforcing use of the New York State Pistol/Revolver Application PPB-3, required by statute to be used by every licensing officer statewide for the licensing process under § 400.00 (except in the City of New York). Penal Law § 400.00(3).

50. Approval of the NYSP Superintendent of Police is required before for any licensing officer may use any application other than the New York State Pistol/Revolver Application PPB-3.[4]

**LEGAL FRAMEWORK**

**I. The First Amendment**

51. Congress shall make no law…abridging the freedom of speech.

52. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347 (1976), *accord*, *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991) (even a temporary abridgment of the First Amendment right to free expression constitutes an irreparable injury).

**II. The Second Amendment**

53. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." The Second Amendment is fully applicable to the states through the Fourteenth Amendment. See, *McDonald v. Chicago*, 561 U.S. 742 (2010).

54. The rights protected by the Second Amendment – the right to possess and carry weapons - are "pre-existing" and "individual rights". They are not "granted" by the government.

> "Putting all of these textual elements together, we find that they **guarantee the individual right to possess and carry weapons in case of confrontation**. This meaning is strongly confirmed by the historical background of the Second Amendment. We look to this because it has always been widely understood that the **Second Amendment, like the First and Fourth Amendments, codified a pre-existing right**. The **very text** of the Second Amendment **implicitly recognizes the pre-existence of the right and declares only that it "shall not**

[4] "Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police." Penal Law § 400.00(3).

> **be infringed**." As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ....

*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (emphasis added).

55. The right to possess and carry weapons for self-defense is presumptively guaranteed. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 2135 (2022) ("In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.") (emphasis added); see also, *Caetano v. Massachusetts,* 577 U.S. __ (2016) (weapons in common use for self-defense are protected within the scope of the Second Amendment).

56. Under the *Bruen* test for analyzing Second Amendment challenges:

> "When the regulated conduct falls within the plain text of the Second Amendment, the Constitution *presumptively protects* that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.
>
> *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126 (emphasis added).

57. Handguns are weapons in common use for self-defense and protected within the scope of the Second Amendment. *Heller*, 554 U.S. at 629.

58. Subjective licensing schemes that imbue discretion in a government official, rather than employing objective criteria, violate the Second and Fourteenth Amendments. "If there be any fixed stars in our constitutional constellation, it is that no official high or petty, shall dictate whether we can exercise our fundamental constitutional rights." Reply Brief for Petitioners, *New York State Rifle & Pistol Assn. v. Bruen*, 2021 WL 943564 citing, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

59. "Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." *Bruen*, 142 S.Ct. at 2162.

60. "Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense ***so long as*** those States employ objective licensing requirements like those used by the 43 shall-issue States." *Ibid.*

61. The *Bruen* Court conditioned the constitutional survival of 'may issue' licensing schemes like New York on the prompt conversion to objective factors "like those used by the 43 shall-issue states." *Bruen*, at 2162. But, of the plethora of additional regulations imposed since the *Bruen* opinion, none convert New York's licensing scheme from its constitutionally prohibitive 'may issue' condition to an objective 'shall issue' one.

62. Rather than comply, the CCIA regulations exacerbate defective and antiquated regulations. Adding to the State-imposed barricades, Suffolk County policies further obstruct the path to the free exercise of conduct protected by the Second and Fourteenth Amendments.

63. Even for those states with "shall issue" licensing schemes[5], the Supreme Court cautioned that <u>lengthy wait times</u> violate the Second and Fourteenth Amendments. *Bruen*, 142 S. Ct. at 2138, FN 9 ("[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, <u>lengthy wait times</u> in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.") (emphasis added).

64. Requiring a license to purchase or possess a firearm is inconsistent with this Nation's historical tradition of firearm regulation, particularly for long guns which have been

[5] https://crimeresearch.org/2022/04/twenty-five-states-have-constitutional-carry/ Twenty-five states do not require a license to possess firearms – deemed "constitutional carry" states. Of the remaining states, 18 are "shall issue" and 7 states are discretionary "may issue" states – New York, New Jersey, California, Massachusetts, Rhode Island, Maryland, Hawaii – and the District of Columbia.

freely owned, possessed, and carried since the mid-1600s.[6] Had it been our Nation's history and tradition to require the People to seek and obtain permission from the government before exercising the preexisting right to 'keep and bear Arms' the Second Amendment's edict prohibiting *infringement* of such conduct would have been in vain. Of course, there is no such historical tradition.

***New York State General Business Law Section 898***
***Private Sale or Disposal of Firearms, Rifles and Shotguns***

65. In New York State, all sales, exchanges, or disposals of firearms, rifles, or shotguns shall be preceded by a National Instant Criminal Background Systems (NICS).[7]

66. Federally licensed firearms dealers (FFLs) are prohibited from allowing the transfer of a firearm to an individual whose NICS check does not either result in a "proceed" response to the dealer or in the event of a NICS "delay" result, thirty calendar days have elapsed since the date the dealer contacted NICS to initiate a NICS check and no "deny" has been received. FFLs are prohibited from transferring a firearm to anyone whose NICS check results in "deny."

67. With certain limited exceptions, no ordinary citizen can even legally rent or 'try out' a handgun before spending hundreds of dollars on a new firearm – even where the individual has a valid handgun license – because every handgun must be registered to that particular individual's handgun license to lawfully possess a particular handgun.

68. There is no historical analogue for such a regulation.

[6] https://www.guns.com/news/2017/07/01/guns-of-the-greatest-revolution-ever
[7] Except where such sale, exchange or disposal is between members of an immediate family. *Id.*

***The New York State Licensing Scheme***

69. In New York, the mere possession of a handgun is a crime. [Penal Law § 265.00, *et seq.*].

70. A conviction of a misdemeanor or a felony under § 265.00, *et seq.* terminates an individual's right to possess and purchase handguns, rifles, and shotguns.[8]

71. Possession of a handgun, even in one's home for self-defense, is a crime punishable under Penal Law section 265.00*, et seq*. See, *People v. Abdullah*, 23 Misc. 3d 232, 233, 870 N.Y.S.2d 886, 887 (Crim. Ct. 2008) (defendant charged with violating § 265.01 for mere possession of an unloaded .25 caliber semi-automatic pistol from inside his home).

72. Simply being charged with an offense under Penal Law 265.00, *et seq.*, even if dismissed, will result in the denial of a license under § 400.00 because the State's licensing s (the "Scheme") is discretionary and subjective.

73. New York has a 'may issue' firearm licensing scheme that imbues licensing officers with "broad discretion" to issue, deny, suspend, and/or revoke licenses. See, "Good Moral Character" section, *infra.*

74. By statute, applicants for any type of license under the Scheme are required to complete the Statewide application created and approved by the Superintendent of the NYSP.

75. No other application or questionnaire is authorized to be imposed on pistol license applicants other than the statewide application approved by the Superintendent of the NYSP. [Penal Law § 400.00(3)].

[8] See, Penal Law sections 265.00(17); 265.01(3); 400.00(1)(c); 18 U.S.C. 922(g).

76. The Superintendent of the NYSP has not approved any applications, forms, or questionnaires for the obtaining a NYS pistol permit, nor has any application for such document been submitted by any jurisdiction, including SCPD.

77. With the enactment of the Concealed Carry Improvement Act (CCIA) on September 1, 2022, the NYSP amended the New York State Pistol/Revolver Application PPB-3 (Rev. 06/16) to incorporate the provisions of § 400.00(1)(o) in PPB-3 (Rev. 08/22).

78. Licensing officers "shall accept for processing" the State Application "upon presentment." Penal Law § 400.00(4-a).

79. Within 6 months of the presentment of the State Application, the licensing officer "shall" issue the license or deny the application with reasons specifically and concisely stated in writing.[9] Penal Law §400.00(4-a).

80. Presentment of the State Application to the statutory licensing officer starts the 6-month statutory clock to either issue the license or deny the application "for reasons specifically and concisely stated in writing." Penal Law § 400.00(4-a).

81. That portion of Penal Law § 400.00(4-a) providing statutory licensing officers 6 months from presentation of the State Application (the PPB-3) to issue a license or deny an application is an unconstitutionally 'lengthy' wait time and violates the Second and Fourteenth Amendments.

[9] 4-a. Processing of license applications. Applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment of such an application to the appropriate authority. Such delay may only be for good cause and with respect to the applicant. In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for.

2 Photographs

82. Each applicant must also "submit one photograph of himself or herself and a duplicate for each required copy of the application. Such photographs shall have been taken within thirty days prior to filing the application." [Penal Law § 400.00(3)].

83. The 2 required photographs may be obtained by the applicant and submitted with the NYS PPB 3. There is no statutory requirement that the licensing officer or its 'duly constituted police authority' photograph the applicant. [Penal Law § 400.00(3)].

Criminal History Background Check

84. Each pistol license applicant must submit to fingerprinting, which must be transmitted to the division of criminal justice services in the executive department in Albany (DCJS) and the federal bureau of investigation.

85. Every law enforcement agency is assigned an ORI number (Originating Agency Identifier), which validates legal authorization to access Criminal Justice Information (CJI) and identifies the agency in all transactions.[10]

86. Upstate, pistol license applicants are provided with the ORI number of the local Sheriff's Office. This allows applicants to submit their fingerprints and obtain their criminal history report (the "Report") directly from DCJS within 3-4 weeks and provide the Report to the licensing officer along with their State Application and photographs.

Mental Health Check

87. In addition to a fingerprint-based criminal history check, the statute requires a search of the "Statewide license and record database"[11] and the records of the appropriate office

[10] https://www.justice.gov/tribal/page/file/1247566/download

[11] See, Penal Law § 400.00.02, discussing the statewide license and record database created and maintained by the division of state police. "All records containing granted license applications from all licensing authorities shall be

of the Department of Mental Hygiene concerning previous or present mental illness of the applicant, which "shall be available for inspection by the investigating officer of the police authority." Penal Law § 400.00(4).

CCIA-Imposed Regulations

88. The CCIA[12] was enacted 8 days after, and in response to, the Supreme Court's opinion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)[13], took effect on September 1, 2022. Gov. Hochul called the already-recessed state legislature back for a special session to pass the CCIA.[14]

89. At Gov. Hochul's August 31, 2022 press conference, Defendant Acting NYSP Superintendent Steven Nigrelli vociferously thanked Governor Hochul as "someone [he] looks up to" for her "leadership on this topic…laser-like focus on ***eradicating guns***, illegal guns, and gun crimes...***we appreciate that at the State Police***." (36:10). *Id.* (emphasis added).

90. Acting NYSP Superintendent Nigrelli and the NYSP will enforce the State's gun laws against everyone who violates them. Nigrelli vowed:

> "Governor, it's an easy message. I don't have to spell it out more than this. We'll have ***zero tolerance***. If you violate this law, you will be arrested. Simple as that. Because the New York State Troopers are ***standing ready to do our job to ensure .. all laws are enforced***." *Id.* (emphasis added).

monthly checked by the division of criminal justice services in conjunction with the division of state police against criminal conviction, criminal indictment, mental health, extreme risk protection orders, orders of protection, and all other records as are necessary to determine their continued accuracy as well as whether an individual is no longer a valid license holder. The division of criminal justice services shall also check pending applications made pursuant to this article against such records to determine whether a license may be granted."

[12] Senate Bill S51001.

[13] https://www.youtube.com/watch?v=gC1L2rrztQs

[14] https://www.youtube.com/watch?v=gC1L2rrztQs

<u>"Good Moral Character" - § 400.00(1)(b)</u>

91. The "very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Bruen*, at 2129 quoting, *Heller*, 554 U.S. at 634. "We then concluded: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Ibid.*

92. The bright line factors for firearms eligibility under state and federal law include felony convictions[15], involuntary commitment in a mental hospital or adjudication as mentally incompetent[16], dishonorable discharge[17], and convictions of 'serious offense' misdemeanors (New York).[18]

93. Prior to the enactment of the CCIA, section 400.00(1) provided that no license shall be issued except for an applicant "(b) of good moral character."

94. With the CCIA amendment to subsection (b), "No license shall be issued or renewed" under section 400.00 except for an individual who is "of good moral character, which, for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." § 400.00(1)(b).

95. Under both the old and new language, the "good moral character" language continues to be anything but objective. The language of section 400.00(1)(b) is a vague, overly broad, and unconstitutionally discretionary. Section 400.00(1)(b) authorizes denial of a license

[15] 18 U.S.C. § 922(g); § 400.00(1)(c).
[16] 18 U.S.C. § 922(g); § 400.00(1)(j), (m).
[17] 18 U.S.C. § 922(g); § 400.00(1)(g).
[18] As defined by § 265.00(17). See, § 265.01; § 400.00(1)(c). See also, 18 U.S.C. § 922(g) prohibiting domestic misdemeanants.

based on a subjective opinion of who has the 'right' "character", can be "trusted", what is an "essential temperament", and whether the applicant has one.

96. The CCIA's language change brings nothing new to New York's licensing regulations; it simply codifies what New York courts have been allowing to take place for decades in a Scheme created under the false belief that handguns are a privilege, the Second Amendment applies to the collective militia and does not apply to the states.[19]

97. On the ground level, subsection (b) is at odds with the very purpose of the Second Amendment – using a firearm in self-defense, which may necessarily require its use to *specifically* "endanger others."

98. Contra *Heller, McDonald,* and *Bruen*, subsection (b) incorporates the *thrice-rejected* interest-balancing rationale[20] where the government's desire to 'protect the public' somehow always ends up outweighing the guaranteed individual rights of the People. *Heller* at 592 ("Putting all of these textual elements together, we find that they **guarantee the individual right to possess and carry weapons in case of confrontation**.") (emphasis).

99. Subsection (b) is a new codification of the old mantra of New York courts touting the State's "substantial and legitimate interest and indeed, a grave responsibility, in insuring [sic] the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one entrusted with a dangerous instrument." *Finley v. Nicandri*, 272 A.D.2d 831, 832, 708 N.Y.S.2d 190, 191 (2000)

[19] *Peterson v. Kavanagh*, 21 A.D.3d 617, 617–18 (3d Dept. 2005) ("Lastly, we reject petitioner's argument that the Second Amendment confers an individual right on him to keep and bear arms. Absent evidence that possession of the pistol bears some reasonable relationship to the preservation or efficiency of a well-regulated militia, no individual right to possess it is conferred (see *Bach v. Pataki*, 289 F.Supp.2d 217, 224–226 (2003)."

[20] *Bruen*, at 2127 citing, *Heller* and *McDonald.*

(revoked, no conviction); *Waskiewicz v. New York City Police Dep't*, 211 A.D.2d 603, 604 (1st Dept. 1995) (revoked for arrest, no conviction).

100.    New York continues to treat possessing and carrying handguns as a government-bestowed privilege, not a right [*Minervini v. Kelly*, 22 A.D.3d 238, 239 (1st Dept. 2005)] that can be "revoked and cancelled at any time." Penal Law § 400.00(11)(a). The CCIA perpetuates this distorted view.

101.    Being charged with a violation or crime, even where charges are dismissed or result in a non-criminal conviction, provides a basis for license revocation. *La Grange v. Bruhn*, 276 A.D.2d 974, 975 (3d Dept. 2000) citing, *Matter of Zalmanov v. Bratton*, 240 A.D.2d 173 (1st Dept. 1997); *Velez v. DiBella*, 77 A.D.3d 670 (2d Dept. 2010) (upholding denial of license based on charges dismissed in defendant's favor, and a non-criminal conviction); accord, *Gonzalez v. Lawrence,* 36 A.D.3d 807, 808 (2d Dept. 2007).

102.    Yet, a licensee is not entitled to a "formal hearing" before a license is revoked. *Pacicca v. Allesandro*, 19 A.D.3d 500, 501 (2d Dept. 2005).

103.    The 'new' language of subsection (b) does nothing to divest the licensing officers of the "broad discretion" imbued by New York courts for decades. *Finley*, at 832 (Respondent is therefore "vested with broad discretion" in determining whether to revoke a pistol permit); *Brookman v. Dahaher*, 234 A.D.2d 615, 616 (3d Dept. 1996).

104.    Indeed, a subjective belief that a licensee "exercise[d] [] poor judgment in the handling of a weapon is a sufficient ground for revocation of a pistol permit." *Brookman v. Dahaher*, 234 A.D.2d 615 (3d Dept. 1996) (upholding revocation because licensee "exhibited disregard for the proper use of a handgun" by wearing his .38 caliber pistol holstered on his person

"in plain view of adults and children in his residential neighborhood" while performing yardwork "in clear violation of the hunting and target practice restrictions on his permit.").

105. Post-*Bruen*, New York has done nothing to bring its firearm laws into compliance with the Constitution; quite the opposite.

Concealed Carry Burden - Section 400.00(1)(o)

106. Section 400.00(1)(o) requires a face-to-face interview with each applicant for a concealed carry license.

107. The face-to-face requirement of § 400.00(1)(o) is inconsistent with this Nation's historical traditions of firearm regulations; there is no historical analogue.

Section 400.00(1)(o)(i) – Relationships, Cohabitants, and Children

108. Section 400.00(1)(o)(i) and PPB- 3 (Rev. 08/22) require CCW applicants to disclose the names and contact information for the applicant's current spouse, or domestic partner, any other adults residing in the applicant's home, including any adult children of the applicant, and whether or not there are minors residing, full time or part time, in the applicant's home.

109. The requirement that a license applicant, like Plaintiffs, disclose personal information about relationships, cohabitants, and children as a condition of or prior to exercising conduct protected by the Second Amendment is inconsistent with this Nation's historical traditions of firearm regulations; there is no historical analogue.

Section 400.00(1)(o)(ii) – No Less Than 4 Character References

110. Section 400.00(1)(o)(ii) and PPB- 3 (Rev. 08/22) require CCW applicants to provide the names and contact information of "no less than four character references" who:

> "can attest to the applicant's good moral character and that such applicant has not engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others."

111.    Section 400.00(1)(o)(ii) is not simply a character reference requirement.

112.    Rather, applicants must obtain a sworn statement from "no less than four" people that aver the applicant has never engaged in *any* acts or made *any* statements that *suggest* they are *likely* to engage in conduct that *would result* in harm to themselves or others."

113.    The information sought under § 400.00(1)(o)(ii) is subjective opinion that, even if false, does not constitute a formal adjudication of any state or federal statutory prohibitor to firearm possession.

114.    The language of § 400.00(1)(o)(ii) is vague, overly broad, without temporal limitations, subjective, and discretionary.

115.    This regulation arbitrarily applies to a concealed carry license, but not to possessing a handgun in the first instance.

116.    Enforcement of § 400.00(1)(o)(ii) discourages, prevents, and otherwise interferes with the exercise of the protected Right. SCPD requires the character references to live in Suffolk County, and they cannot be "relatives either by blood or marriage, active law enforcement officers, husband and wife combinations, or any two (2) or more members of the same family or household."

117.    Because all applicants are subject to a fingerprint-based state and federal criminal background check and mental health check, this regulation is not only inconsistent with our country's traditions, but obsolete in the modern age.

<u>Section 400.00(1)(o)(iv) – Social Media Accounts</u>

118.    Section 400.00(1)(o)(v) requires CCW applicants a list of former and current social media accounts of the applicant from the past three years to confirm the information regarding the applicant's character and conduct as required in subparagraph (ii) of this paragraph.

119. Subsection (o)(iv) pits the First Amendment against the Second; Plaintiffs should not have to choose between two constitutionally protected rights.

120. Section 400.00(1)(o)(v) has no historical analogue.

Section 400.00(1)(o)(iii) and 400.00(19) - - Mandatory Training

121. Section 400.00(1)(o)(iii) requires production of a certification of the mandatory training regulations under § 400.00(19) before a CCW license can issue.

121. Section 400.00(19) provides that before a concealed carry license may issue or be renewed/recertified, the individual must complete "an in-person live firearms safety course conducted by a duly authorized instructor with curriculum approved by the division of criminal justice services and the superintendent of state police, and meeting the following requirements, including at a minimum 18 hours of training, including:

a. a minimum of sixteen hours of in-person live curriculum approved by the division of criminal justice services and the superintendent of state police, conducted by a duly authorized instructor approved by the division of criminal justice services, and shall include but not be limited to the following topics: (i) general firearm safety; (ii) safe storage requirements and general secure storage best practices; (iii) state and federal gun laws; (iv) situational awareness; (v) conflict de-escalation; (vi) best practices when encountering law enforcement; (vii) the statutorily defined sensitive places in subdivision two of section 265.01-e of this chapter and the restrictions on possession on restricted places under section 265.01-d of this chapter; (viii) conflict management; (ix) use of deadly force; (x) suicide prevention; and (xi) the basic principles of marksmanship;

b. a minimum of two hours of a live-fire range training course;

c. proficiency by scoring a minimum of eighty percent correct answers on a written test for the curriculum under paragraph (a) of this subdivision and the proficiency level determined by the rules and regulations promulgated by the division of criminal justice services and the superintendent of state police for the live-fire range training under paragraph (b) of this subdivision.

122.     Under *Bruen*, if the conduct falls under the plain text of the Second Amendment, which this does, the government alone has the burden of justifying its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2126.

123.     The test is not, whether the regulations are "so onerous as to fall within the scope of what …*Bruen* called 'exorbitant.'" *Antonyuk v. Hochul,* No. 122CV0986GTSCFH, 2022 WL 5239895, at *12 (N.D.N.Y. Oct. 6, 2022) citing *Bruen*'s reference to 'shall issue' regimes and the potential for abusive ends through "lengthy wait times and…exorbitant *fees*…" to deny ordinary citizens the right to public carry. *Bruen*, at 2138, n. 9.

124.     The average cost of such training, if one can locate a training facility, is between $400 -$800, plus the cost of ammunition for "a *minimum* of two hours of a live-fire range training course."

125.     There is no historical tradition of government-imposed and costly training regulations on an ordinary person *prior* to or as a *condition* of exercising the Right to bear arms. The CCIA training requirement is patently inconsistent with this Nation's historical traditions and no historical analogue exists – and the plain language of the Right that "shall not be *infringed*."

Penal Law § 400.30

126. Nothing in this article shall be construed to impair or in any way prevent the enactment or application of any local law, code, ordinance, rule or regulation that is more restrictive than any requirement set forth in or established by this article.

127. Section 400.30 has no historical analogue and is inconsistent with this Nation's historical traditions.

**III. The Fourth Amendment**

128. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

129. A local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

**SUFFOLK COUNTY LICENSING BUREAU POLICIES AND PROCEDURES**

130. SCPD's Pistol Licensing Bureau website provides links to the Guide to Obtaining a Suffolk County Pistol License, Answers to Frequently Asked Questions, Online Forms, Register for Pistol License Online, Pistol Licensing Fees, and Pistol License Contact Information.[21]

[21] https://suffolkpd.org/Precincts-and-Specialized-Units/Specialized-Units/Pistol-License-Bureau?/

131. Neither the SCPD website nor the local precincts provide, refer to, or mention the State Application or where to locate it. Nowhere does SCPD inform applicants that the State Application is required to be completed and filed with SCPD obtain a pistol license – a license cannot be granted without the completed State Application.

132. It has been, and continues to be, SCPD policy and procedure to intentionally obstruct and delay the handgun licensing process in deliberate disregard for the constitutional rights of its citizens. The SCPD defendants and Licensing Bureau staff have exhibited and continue to exhibit a deliberate indifference to the Second and Fourteenth Amendment rights of Plaintiffs and all similarly situated individuals.

***Suffolk County Police Department Guide to Obtaining a License***

133. SCPD publishes a "Guide to Obtaining a Suffolk County Pistol License" (the "Guide"), but not an analogous 'Guide' for obtaining a rifle license.

134. Under the Guide, applicants are informed that they must (i) complete the SCPD "Applicant Questionnaire" and deliver it in person or mail it to the Licensing Bureau[22] along with a check or money order for ten dollars ($10.00) made payable to "S.C.P.D."

135. The Guide advises that the applicant will be assigned an investigator and scheduled for an "in-person interview" at the Licensing Bureau, where he also will be fingerprinted and photographed (the "Appointment").

136. The applicant must also bring certain documents to the Appointment. Relevant herein, a NYS Driver License or Non-Driver Identification, recent pay stub or employment identification, Original Birth Certificate or a valid U.S. Passport, voter registration card, utility bill, or tax bill to prove residency in Suffolk County, and another fee of $88.25.

[22] Prior to the recent and ongoing cyber-attack on Suffolk County government, applicants were able complete the Applicant Questionnaire online, but it is unclear whether payment was accepted online.

137. The Guide makes no mention of the required State PPB-3 Application. The only application form identified in the Guide is the Applicant Questionnaire.

138. SCPD policy knowingly and intentionally leads the public to believe that the Applicant Questionnaire is ***the*** handgun license application that commences the 6-month statutory timeframe under Penal Law § 400.00(4-a).

139. Despite the Supreme Court's opinion in *Bruen*, SCPD continues to inform applicants that they will be required to show "proper cause pursuant to Penal Law Section 400.00 Sub. 2(f)"[23] to obtain a concealed carry license.

140. The Guide identifies, *inter alia*, numerous unconstitutional discretionary grounds to deny an application, including "any good cause."

141. The SCPD Licensing Bureau staff has informed one or more Plaintiffs that the wait time to be assigned to an 'investigator' is ***approximately 2 years*** and can be ***up to 3 years***.

142. It is not until the Appointment 2 years later that applicants are provided with (learn about) the PPB-3, which requires obtaining the original signatures of 4 character references; upon completion of the PPB-3, applicants return the PPB-3 to the Licensing Bureau.

143. The statutory 6-month timeframe for issuing a license or denying an application under § 400.00(4-a) begins 'upon presentment' of the State PPB-3 Application.

144. The hours of the Licensing Bureau are Monday-Friday from 9:00 a.m. – 4:30 p.m.

145. The Licensing Bureau only conducts the Appointments (interviews, fingerprinting, and photographing) ***one day per week -*** on Wednesdays.

[23] The SCPD handgun licensing Guide ***still*** provides, "Full carry license, for the purpose of self-protection. If an individual is seeking a Self-Protection License, they will be required to show 'proper cause' pursuant to Penal Law Section 400.00 Sub. 2(f). 'Proper cause' is determined by a review of all relevant information bearing on their claimed need. They must show that they are exposed to extraordinary personal danger, documented by proof of recurrent threats to life or safety requiring authorization to carry a firearm."

146. SCPD policy requires individuals to first obtain a premises handgun license before being able to take the 18-hour concealed carry training required by the CCIA/§ 400.00(19).

147. Penal Law section 265.20(3-a), however, provides an exemption to prosecution under Penal Law 265 for unlicensed individuals who possess a pistol or revolver while undergoing live-fire range training and supervised by a duly authorized instructor pursuant to section 400.00.

148. It is SCPD policy, as communicated by Lt. Michael Komorowski, that any unlicensed individual who engages in live-fire handgun training with a duly authorized instructor – and any instructor providing live-fire training to an unlicensed individual - will be arrested and charged with a crime under Penal Law § 265.00 *et seq.*, irrespective of the state law exemption.

149. Possessing a loaded handgun is a Class C Violent felony that carries mandatory minimum state prison sentence of 3 ½ years.[24]

**MATERIAL FACTS**

150. Each Plaintiff is eligible to possess, purchase, receive, and transfer firearms under state and federal law. No Plaintiff has ever unlawfully used or threatened the use of a firearm.

151. Each Plaintiff followed the procedures of the SCPD to obtain a license to possess and carry a handgun and paid the required filing fee prior to September 1, 2022, the date the CCIA took effect.

152. The 18-hour training programs in and around Nassau and Suffolk County cost between around $400 and $800.

153. Plaintiffs Giambalvo, Mougios, Mashkow, and McLaughlin face a credible threat of arrest and incarceration by Lt. Komorowski and/or other SCPD police officers if they fulfill in the 18-hour training requirement.

[24] Penal Law § 70.00.

154. Plaintiff McGregor faces a credible threat of arrest and incarceration by NYSP and SCPD police officers for carrying his registered handgun outside of his license restriction.

155. If SCPD is allowed to continue its abhorrent policies, Plaintiffs Giambalvo, Mougios, Mashkow and McLaughlin will be unable to lawfully purchase and possess a handgun for ***between 2-3 years***; lawfully carrying a handgun for self-defense will take even longer

156. After already suffering for 16 months through the SCPD licensing process to obtain a restricted concealed carry license, Dr. McGregor should not have to amend his license, or take the CCIA training to lawfully carry a handgun in public for self-defense.

157. Plaintiffs object to enforcement of the SCPD policies detailed herein, as well as Defendants' enforcement of Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(15), 400.00(19), 400.30, and any licensing process that takes more than 30 days after presentment of the PPB-3 to issue a license.

***Zachary Giambalvo***

158. Zachary Giambalvo ("Mr. Giambalvo"), is a resident of Suffolk County with no prohibitors to the possession of firearms.

159. Mr. Giambalvo intends to immediately purchase, possess, and carry a 1911-style platform handgun sold by Camp-Site, a federally licensed firearms dealer located in Huntington, New York.

160. Mr. Giambalvo would have already purchased a 1911-style handgun, but for the fact that he cannot legally purchase or possess a handgun until SCPD issues him a handgun license.

161. Mr. Giambalvo intends to purchase and possess handguns, conduct presumptively protected by the plain text of the Second Amendment, without having to seek and obtain a discretionary license to do so.

162. Mr. Giambalvo intends to obtain a 1911-style handgun legally, without the requirement that he obtain a license or permission to do so, after undergoing a NICS background check, and to thereafter possess that handgun in his home and on his property without obtaining a discretionary handgun license from SCPD.

163. Mr. Giambalvo also intends to carry a handgun concealed in public for self-defense, without having to be subjected to a discretionary licensing scheme, having to provide his social media account information, personal relationship and family information, in-person interview, training requirements, and character references required by the CCIA.

164. To comply with New York law, Mr. Giambalvo subjected himself to the state's licensing scheme. Mr. Giambalvo visited the SCPD website find out how to apply for a handgun license. From the website and the information provided therein, commencement of the application process required submitting the completed Applicant Questionnaire and a $10 filing fee made payable to "SCPD."

165. In February 2020, Mr. Giambalvo submitted his completed Applicant Questionnaire and $10 fee to the SCPD Licensing Bureau.

166. Months later, Mr. Giambalvo contacted the Licensing Bureau to check on the status of his application and was informed that his check was "never received", and he would have to submit another application and $10 fee.

167. Mr. Giambalvo completed another Applicant Questionnaire, which he filed with the Licensing Bureau along with the $10 fee in and around June 2022.

168. By email dated July 19, 2022, the Licensing Bureau informed Mr. Giambalvo, "there is an approximately a 2 year wait before you will hear from an investigator" to schedule the "in person interview."

169. In August 2022, Mr. Giambalvo called the Licensing Bureau to find out when his application would be assigned to an investigator.

170. The woman who answered the phone at the Licensing Bureau, identified herself as "Suzanne" and stated, "it's going to take about ***1 ½ to 2 years*** to get called for an interview."

171. Mr. Giambalvo was not aware that the statutory 6-month timeframe for issuing a license did not begin until presentment of the State Application (PPB-3) because SCPD did not provide the PPB-3 or any indication that it was required to be filed.

172. Even if Mr. Giambalvo had attempted to present the completed PPB-3 to SCPD, SCPD would refuse acceptance and require Mr. Giambalvo to wait for an appointment.

173. Mr. Giambalvo wants to submit the completed PPB-3 application, the 2 required photographs, and his fingerprint-based unsuppressed criminal history report from the Division of Criminal Justice Services to SCPD, but cannot because SCPD does not provide its ORI number and will not accept the PPB-3 upon presentment.

174. Mr. Giambalvo intends to carry a handgun concealed but will not comply with the requirements of Penal Law § 400.00(1)(o) or the "proper cause" requirement identified in the Guide.

175. Mr. Giambalvo objects to waiting more than 30 days from presentment of the completed PPB-3 State Application for SCPD to issue a license.

176. Mr. Giambalvo faces a credible risk of arrest and incarceration by SCPD. While he objects to the training requirements of § 400.00(19), Mr. Giambalvo will attend an approved 18-hour training course knowing that under SCPD policy, as announced by Lt. Komorowski, any unlicensed individual who takes the 18-hour course, which contains a live-fire component, will be arrested by SCPD.

177. Mr. Giambalvo will attend the December 2022 18-hour course in Suffolk County provided by Frank Melloni through his company, Renaissance Firearms Instruction, Inc., and he should not have to choose between exercising a right protected by the Second Amendment or being arrested and jailed.

178. Mr. Giambalvo contacted the Licensing Bureau to see if their position had changed regarding accepting the PPB-3 upon presentment, as required by § 400.00(4-a). The man who answered the phone at the SCPD Licensing Bureau looked for Mr. Giambalvo's application in the system and informed him, "There is nothing else you have to do, just when we get up to you in the filing system."

179. When Mr. Giambalvo asked if he could bring in the completed State Application, he was informed, "The state application doesn't mean anything. That would be for the state troopers or the sheriffs, I don't know what application they use. But the one that you filled out is the one we have here so that's all you need."

180. The application filled out by Mr. Giambalvo is the Applicant Questionnaire – an 'application' not approved by the NYSP, meaning that a year-and-a-half from now when Mr. Giambalvo is fingerprinted and interviewed – unless the injunctive relief sought herein is granted – he will be handed the State Application to complete and file to start the 6-month clock running under Penal Law § 400.00(4-a).

181. Incredibly, not only will the Licensing Bureau not accept the PPB-3 upon presentment, according to the SCPD Licensing Bureau, the statewide PPB-3 license application doesn't even apply to them.

***John Mougios***

182.     John Mougios is a resident of Suffolk County with no prohibitors to the possession of firearms.

183.     Mr. Mougios intends to immediately purchase, possess, and carry a Berretta Px4 Storm from Bensons Gun Shop in Coram, New York, an FFL. Mr. Mougios would have already purchased a Px4 but for the fact that he cannot legally purchase or possess a handgun until SCPD issues him a handgun license.

184.     Mr. Mougios intends to purchase, possess, and carry a handgun for self-defense without having to be subjected to a discretionary licensing scheme, having to provide his social media account information, personal relationship and family information, in-person interview, training requirements, and character references required by the CCIA.

185.     Mr. Mougios intends to carry a handgun concealed but will not comply with the requirements of Penal Law § 400.00(1)(o) or the "proper cause" requirement identified in the SCPD Guide.

186.     Mr. Mougios objects to waiting more than 30 days from presentment of the completed PPB-3 State Application for SCPD to issue a license.

187.     To comply with New York's gun laws, Mr. Mougios subjected himself to the state's licensing scheme.

188.     In 2021, Mr. Mougios visited the SCPD website to identify the process and procedure for applying for a New York State handgun license. From the website information, he learned that the application process required filing a completed Applicant Questionnaire and $10 fee made payable to "SCPD." No other application form was mentioned or provided on the SCPD website.

189. In ***July 2021***, Mr. Mougios completed and submitted the Applicant Questionnaire and the $10 fee to the SCPD Licensing Bureau.

190. Mr. Mougios has not heard from the Licensing Bureau, has not been assigned to an investigator, has not been scheduled for an appointment to be fingerprinted or photographed, has not received the State Application, and will not have such an appointment for ***another year*** based on SCPD procedures.

191. Mr. Mougios wants to submit the completed PPB-3 application, the 2 required photographs, and his fingerprint-based unsuppressed criminal history report from the Division of Criminal Justice Services to SCPD, but cannot because SCPD does not provide its ORI number and will not accept the PPB-3 upon presentment.

***Shane Mashkow***

192. Shane Mashkow ("Mr. Mashkow"), is a resident of Suffolk County; he has no prohibitors to the possession of firearms.

193. Mr. Mashkow intends to immediately purchase, possess, and carry a Glock-19 from Dark Storm Industries in Oakdale, New York (Suffolk County). Mr. Mashkow would have already purchased a Glock-19 from Dark Storm but New York law prohibits the transfer or receipt of a handgun without a handgun license.

194. Even if he purchased a handgun from an FFL (subject to a NICS background check) outside of New York State, Mr. Mashkow would face criminal charges for possessing a handgun in New York without a license – even in his home.

195. Mr. Mashkow objects to being subjected to a discretionary licensing scheme to simply exercise the guaranteed constitutional right to keep and bear arms - conduct presumptively protected by the plain text of the Second Amendment.

196. Mr. Mashkow also intends to carry a handgun concealed and will not comply with the disclosure of information under Penal Law § 400.00(1)(o), like providing his social media accounts, disclosure of personal relationship and family information, an in-person interview, the character references, and the 18-hour training requirements, and the subjective 'moral character' language. Mr. Mashkow also does not want to be at the mercy of a county employee with discretion to require me to provide "any such other information."

197. To comply with New York law, Mr. Mashkow subjected himself to the state's licensing scheme. In 2020, he utilized the SCPD website to learn the process for obtaining a handgun license. The process required submission of a completed Applicant Questionnaire with a $10 filing fee made payable to "SCPD." The only application mentioned and provided on the SCPD website was the Applicant Questionnaire.

198. Mr. Mashkow submitted the completed Applicant Questionnaire and the $10 fee to the Licensing Bureau. Months later, and in and around November/December 2021, Mr. Mashkow called the Licensing Bureau to check on his application.

199. Like Mr. Giambalvo, Mr. Mashkow was informed that his check was "never received" and that he would have to submit another application and $10 fee.

200. Mr. Mashkow completed another Applicant Questionnaire, which he filed with the Licensing Bureau along with the $10 fee in February 2022 – 8 months ago.

201. In July 2022, Mr. Mashkow called and emailed the Licensing Bureau to find out when he would be called in to be fingerprinted.

202. The woman at the Licensing Bureau laughed, then stated that he should get an appointment sometime in ***February 2024***.

203. The email response from the Licensing Bureau on July 14, 2022 indicated the office was "currently processing November/December 2020, there is an extremely long wait for the interview."

203 Mr. Mashkow contacted the Licensing Bureau a few months later and was told that they are currently scheduling interviews for people who submitted the questionnaire in February 2021.

204. Mr. Mashkow was not aware that the statutory 6-month timeframe for issuing a license did not begin until presentment of the State Application (PPB-3). Mr. Mashkow wants to submit the completed PPB-3 application, the 2 required photographs, and his fingerprint-based unsuppressed criminal history report from the Division of Criminal Justice Services but cannot because SCPD does not provide its ORI number and will not accept the PPB-3 until the investigator appointment.

205. Mr. Mashkow works in New York City from Monday-Friday and must leave his residence before 9:00 a.m. and does not return until after 4:30 p.m.

206. If required to be fingerprinted, personally interviewed, and/or photographed at the Licensing Bureau, Mr. Mashkow will have to take time off from work because the Licensing Bureau is only open Monday through Friday from 9:00 a.m. until 4:30 p.m.

207. Mr. Mashkow contacted multiple businesses on Long Island, including Dark Storm Industries in Oakdale, New York (Suffolk County), regarding the 18-hour training required to apply for a concealed carry license. Each business confirmed that a handgun permit is required to take the CCW training. Dark Storm charges $800 for the 18-hour training.

***Kevin McLaughlin***

208. Kevin McLaughlin ("Mr. McLaughlin"), is a resident of Suffolk County and a U.S. Marine reservist. Mr. McLaughlin has no prohibitors to the possession of firearms.

209. Mr. McLaughlin visited the SCPD website to see how to apply for a New York State handgun license. According to the website, the only application required to apply was the Applicant Questionnaire. In July 2022, Mr. McLaughlin filed a completed Applicant Questionnaire with the $10 application fee made payable to "SCPD".

210. Mr. McLaughlin contacted the Licensing Bureau approximately 1 month later to see how long it would be before he was called in to be fingerprinted and was informed that he would not be called in to be fingerprinted for ***approximately 3 years – in and around July 2025.***

211. Mr. McLaughlin wants to submit the completed PPB-3 application, the 2 required photographs, and his fingerprint-based unsuppressed criminal history report from the Division of Criminal Justice Services to SCPD, but cannot because SCPD does not provide its ORI number and will not accept the PPB-3 upon presentment.

***Michael McGregor***

212. Michael McGregor is a resident of Suffolk County and a practicing physician. Dr. McGregor has no prohibitors to the possession of firearms.

213. Dr. McGregor visited the SCPD website to identify the process and procedure for applying for a New York State pistol license. According to the website, the only application required to apply for a handgun license was the "Applicant Questionnaire."

214. Dr. McGregor completed and submitted the Applicant Questionnaire, along with the $10 fee, to the Licensing Bureau on or about November 13, 2020.

215.     About a year later, and on or about October 13, 2021, Dr. McGregor contacted the Licensing Bureau regarding the status of his application and was informed that no decision had been made because the Pistol Licensing Bureau was currently "working on pistol license applications from August 2020."

216.     Dr. McGregor was misled by the SCPD website, the SCPD Guide, and the forms into believing that the Applicant Questionnaire he submitted with his check in November 2020 was the required application that started the 6-month clock under Penal Law § 400.00(4-a).

217.     On December 7, 2021, Dr. McGregor filed a mandamus proceeding in Suffolk County State Supreme Court to mandate then-SCPD police commissioner Stuart Cameron to issue a determination on his handgun license application because more than 6 months had elapsed since the filing of his application and payment of the filing fee.

218.     SCPD moved to dismiss on the grounds that the Mandamus was "premature" because although Dr. McGregor "submitted his Applicant Questionnaire on November 11, 2020," it is not until the "interview takes place [that] Petitioner will be fingerprinted and he will complete the NYS Application. The six-month statutory timeframe…will the commence."

219.     SCPD referred to Dr. McGregor's "***application***" being "assigned to an Applicant Investigator" on November 15, 2021", but the only document they could have been referring to was the "Applicant Questionnaire" because they go on to state "[Dr. McGregor] has yet to be called in for an interview…[which is when Dr. McGregor] will be fingerprinted and he will complete the ***NYS Application***."

220.     Defendant Komorowski's affidavit explained SCPD's licensing policy:

221.     "The submission of the Pistol License Applicant Questionnaire is the first step towards attaining a pistol license. The next step is for the applicant to be called into the Pistol

Licensing Bureau for an interview, during which time the applicant is fingerprinted and a formal New York State Pistol/Revolver License Application (form PPB3 rev. 06/17)[ ] is completed." Under SCPD policy, the "date the NYS Application and fingerprints are completed (the date of the interview), is the date by which the six (6) month time frame as set forth in NYS Penal Law § 400.00(4-a) commences.

222. On January 11, 2022, SCPD contacted Dr. McGregor to schedule an appointment to be interviewed and fingerprinted. When he was only offered Wednesday appointments by Investigator Carpenter, Dr. McGregor asked if there were other days available because Wednesdays conflicted with his work schedule and he would have to take the day off.

223. Investigator Carpenter replied that the Licensing Bureau only schedules interviews and fingerprinting on ***Wednesdays***.

224. Dr. McGregor took the day off from work to be interviewed and fingerprinted by SCPD to obtain a handgun license.

225. On January 25, 2022, the State Supreme Court granted the County's motion to dismiss the mandamus proceeding as 'premature' because the PPB-3 had not yet been filed.

226. On January 26, 2022, SCPD called Dr. McGregor in for the Appointment, where he was given the PPB-3 form, which he took home, completed, obtained signatures from his references, and subsequently presented to SCPD.

227. Dr. McGregor was finally issued a handgun license on March 24, 2022 – ***16 months*** after filing the Applicant Questionnaire and his payment with SCPD.

228. The Suffolk County Defendants' obstruction of Dr. McGregor's right to purchase and possess a handgun in his home for self-defense for 16 months was a wanton, malicious, willful,

knowing, intentional and/or deliberate disregard for and violation of Dr. McGregor's Second and Fourteenth Amendment rights.

229.    Dr. McGregor's handgun license is restricted to carrying during sportsman activities.

230.    Dr. McGregor intends to carry his registered handgun for self-protection outside of his sportsman restriction.

231.    Dr. McGregor faces a credible threat of criminal enforcement by SCPD and NYSP, arrest, incarceration, and other criminal and civil penalties under Penal Law § 400.00(15) for carrying a handgun outside of his license restriction.

232.    Prior to the enactment of the CCIA, and on August 15, 2022, Dr. McGregor filed an Amendment application with Investigator Carpenter and paid the amendment fee of $5 with SCPD to amend his sportsman license to remove his restrictions, consistent with *Bruen*.

233.    Investigator Carpenter told him, "We're doing the amendment that starts it, doesn't change anything right now, it's just a $5 check or money order...to SCPD." "Here's your receipt to show that you started the 'process' and just keep your eyes and ears open for further guidance on the training and all that stuff."

234.    SCPD cashed Dr. McGregor's check on August 17, 2022.

235.    No provision of the CCIA applied before September 1, 2022.

236.    And moreover, the CCIA applies to licenses 'issued or renewed' - not existing concealed carry licenses amended to remove unconstitutional restrictions.

237.    It is SCPD policy to hold applications to remove the unconstitutional restrictions from existing concealed carry licenses until *after* the CCIA requirements, including the 18-hour

training, went into effect and otherwise improperly subject restricted CCW licensees to the CCIA regulations.

***Frank Melloni and RFI***

238. Frank Melloni is an NRA-certified firearms instructor and President of Renaissance Firearm Instruction, Inc. (RFI), located in Suffolk County, New York. After the enactment of the training requirements under the CCIA/Penal Law § 400.00(19), Mr. Melloni created a CCIA-compliant curriculum to train and certify individuals seeking to carry a handgun concealed. Mr. Melloni's CCIA training curriculum encompasses the requirements of Penal Law § 400.00(19), including a live-fire component.

239. RFI offers the 18-hour course to individuals who intend to apply for a concealed carry license, including individuals who have not yet been issued a handgun license.

240. Lt. Komorowski informed Mr. Melloni that, if he conducts live-fire training with individuals who have not yet been issued a handgun license, he and his unlicensed students will be arrested by the SCPD.

241. Mr. Melloni was forced to deregister 4 unlicensed students enrolled in the RFI 18-hour class for November 6, 2022 and refund their payment because of SCPD's policy and Lt. Komorowski's threat.

242. After his conversation with Lt. Komorowski, Mr. Melloni called the licensing bureaus of the Nassau County Police Department and the Suffolk County Sheriff's Office. Both agencies informed Mr. Melloni that, they are following the law as set forth in the Penal Law exemption. Unlike SCPD, neither agency is going to arrest an unlicensed person who possesses a

handgun during the live-fire training, or their trainers because there is a specific exemption in the law.

243.    Implicit in the right to bear arms is the right to engage in training, which includes being instructed and providing instruction. Mr. Melloni and RFI also have a constitutional right to expression, to wit, the firearms training and instruction they provide to the public as protected by the First Amendment.

244.    Mr. Melloni and RFI have suffered constitutional violations and economic loss because of SCPD's policy and Lt. Komorowski's threat of arrest and incarceration in enforcing the SCPD policy, and he will continue to suffer such violations and economic loss so long as SCPD's policy continues.

245.    In December 2022 at Smithtown VOA Gun Club, Mr. Melloni will conduct the 18-hour training with licensed students, and unlicensed students including Mr. Giambalvo, which will include a live-fire handgun component, which subjects him to a credible threat of felony arrest for Criminal Sale of a Firearm in the Third Degree (P.L. § 265.11), a Class D felony, particularly because he has announced in this case his intention to violate the SCPD policy.

246.    Even if the arrest by SCPD is ultimately determined to be unlawful and no prosecution comes from it because there is a statutory exemption for live-fire training, the arrest, fingerprinting, and jailing of Mr. Melloni will cause actual and irreparable harm.

247.    Suffolk County's policies violate the First, Second, Fourth, and Fourteenth Amendments and enforcement of their policies and practices should immediately be preliminarily and permanently enjoined.

248. Other than Dr. McGregor's 2020 handgun license application, no Plaintiff has been assigned to an investigator and, under SCPD's procedures, no Plaintiff will be fingerprinted, photographed, or provided with the State Application until some ***Wednesday*** in ***2024*** at the earliest.

249. The individual Suffolk County defendants' implementation and enforcement of the policies and procedures described herein warrants an award of punitive damages.

250. The SCPD policies and procedures have caused Plaintiffs to suffer, *inter alia,* the presumed violation of their constitutional rights as protected by the First, Second, Fourth, and Fourteenth Amendments, presumed compensatory damages in at least a nominal amount, economic damages, and they have otherwise been rendered sick and sore.

251. The enforcement of the challenged state statutes by the Suffolk County defendants and Acting Superintendent Nigrelli violate the Second and Fourteenth Amendments.

**COUNT I**
**U.S. CONST., AMEND. II and XIV, 42 U.S.C. § 1983**

251. Repeat and reallege paragraphs "1" through and including "250".

252. Under the theory that the defendants are liable to plaintiffs for violations of their preexisting and guaranteed individual rights as protected by the Second Amendment and made applicable to the States through the Fourteenth Amendment, to the U.S. Constitution. 42 U.S.C. §1983.

**COUNT II**
**U.S. CONST., AMEND. IV, 42 U.S.C. § 1983**

253. Repeat and reallege paragraphs "1" through and including "252".

254. Under the theory that Suffolk County, New York is liable to Plaintiffs for violations of the Fourth Amendment for the intentional, deliberate, and conscious choice to fail to train, supervise, and/or discipline the staff of the Suffolk County Licensing Bureau. 42 U.S.C. § 1983.

**COUNT III**
**U.S. CONST., AMEND. IV, 42 U.S.C. § 1983**

255. Repeat and reallege paragraphs "1" through and including "246".

256. Under the theory that Suffolk County, New York is liable to Frank Melloni and Renaissance Firearms Instruction, Inc. for violations of the First Amendment. 42 U.S.C. § 1983.

**COUNT IV**
***MONELL* LIABILITY**

257. Repeats and realleges paragraphs "1" through and including "256".

258. Under the theory that, by creating, maintaining, enforcing, following, and/or applying the unconstitutional policies described herein, the County of Suffolk is liable to the plaintiffs under *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978) for the violations of Plaintiffs' constitutional rights as plead herein, 42 U.S.C. §1983.

WHERFORE, a Judgment and Order is respectfully requested:

- Declaring (1) Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(19), 400.30, and that portion of section 400.00(4-a) allowing statutory licensing officers 6 months to either issue a license or deny an application made thereunder violate the Second and Fourteenth Amendments; (2) Penal Law section 400.00(15) as applied to handgun licensees who carry a handgun registered thereon outside of their license restriction violates the Second and Fourteenth Amendments; (3) that a licensing process that exceeds 30 days from the presentment of the completed New York State Pistol/Revolver License Application (PPB-3) to the issuance of a license (or denial thereof) violates the Second and Fourteenth Amendments; and that (4) enforcement of a policy that subjects unlicensed individuals and

duly authorized firearm instructors to arrest and incarceration in the context of live-fire handgun training violates the First, Second, Fourth, and Fourteenth Amendments.

- Preliminarily and permanently enjoining Suffolk County Police Commissioner Rodney Harrison, and all successors, his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with such defendants, who receive actual notice thereof from (1) implementing and enforcing Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(19), 400.30, that portion of section 400.00(4-a) allowing statutory licensing officers 6 months to either issue a license or deny an application made thereunder, (2) Penal Law section 400.00(15) against handgun licensees who carry a handgun concealed outside of their license restriction; (3) implementing a licensing process that exceeds 30 days between presentment of the completed State Application PPB-3 and issuance of a license (or denial thereof); (4) compelling applicants to complete any form, application or questionnaire other than the PPB-3, including the "Applicant Questionnaire"; (5) requiring applicants to be personally interviewed; (6) continuing to require "proper cause" for the issuance of a concealed carry license; and (7) enforcing a Suffolk County policy that subjects unlicensed individuals who participate in live-fire training with a duly authorized instructor to criminal penalties including arrest and incarceration;

- Preliminarily and permanently enjoining Acting Superintendent of the New York State Police Steven Nigrelli and all successors, his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with him, who receive actual notice thereof from (1) publishing, implementing, and enforcing the requirements set forth in Penal Law section 400.00(1)(o) [page 2 of the PPB-3 (Rev.

08/22]; and (2) enforcing Penal Law section 400.00(15) against handgun licensees who carry a handgun concealed outside of their license restriction;

- Preliminarily and permanently compelling Suffolk County Police Commissioner Rodney Harrison (and all successors) to: (i) publish the New York State PPB-3 application on the Suffolk County Police Department website and local police precincts; (ii) accept the PPB-3 for filing from all applicants upon presentment; (iii) fingerprint applicants upon presentment of the completed PPB-3 or, in the alternative, publish the Suffolk County Police Department ORI number on its website and in local precincts for applicants to submit their fingerprints directly to the New York State Division of Criminal Justice Services; (iv) photograph applicants upon presentment of the completed PPB-3 or, in the alternative, accept 2 statutorily required photographs from applicants upon presentment of the PPB-3; (v) cease publishing information that requires (and requiring) applicants show "proper cause" for the issuance of a concealed carry license; (vi) provide hours of public accessibility outside of the Licensing Bureau's currently restricted hours of Monday-Friday from 9:00 – 4:30 p.m.; and (vii) within 30 days of presentment of the completed PPB-3 application, issue a license to all applicants eligible to possess firearms under state and federal law and provide ineligible applicants with a written notice specifying the grounds for denial.

- Awarding in favor of Plaintiffs and against Suffolk County, New York and the individually named defendants presumed compensatory damages in at least in a nominal amount for violating the Second and Fourteenth Amendments;

- Awarding in favor of Plaintiffs and against Suffolk County, New York presumed compensatory damages in at least in a nominal amount for violating the Fourth Amendment;

- Awarding in favor of Frank Melloni and Renaissance Firearm Instruction, Inc. and against Suffolk County, New York presumed compensatory damages in at least in a nominal amount for violating the First Amendment;

- Awarding against each and every individually named defendant punitive damages as a jury may determine;

- Awarding costs, disbursements, and reasonable statutory attorney's fees pursuant to 42 USC 1988; and

- Granting such other, further, and different relief as to this Court seems just, equitable, and proper.

Dated: October 28, 2022
Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: *Amy L. Bellantoni*
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761 (f)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLOUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his Official Capacity,

Defendants.

**COUNTY DEFENDANTS' ANSWER**

22-cv-04778(GRB) (ST)

**JURY TRIAL DEMANDED**

Defendants, County of Suffolk (sued as "Suffolk County, New York"), Rodney Harrison in his official capacity, Michael Komorowski, Eric Bowen, William Scrima, William Walsh and Thomas Carpenter ("County defendants"), by their attorney, Dennis M. Cohen, Suffolk County Attorney, by Arlene S. Zwilling, Assistant County Attorney, answering plaintiff's First Amended Complaint ("the complaint") respectfully:

1. Aver that the allegations contained in the paragraphs numbered 1, 11 and 15 of the complaint characterize the legal action being brought and purport to invoke the jurisdiction of the Court pursuant to the enumerated statutes and, as such, make no answer

save to demand strict proof thereof and to deny any conduct giving rise to any cause of action thereunder.

2.      Deny, upon information and belief, the allegations contained in the paragraphs numbered 2, 3, 4, 5, 6, 7, 8, 9, 27, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 64, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 246, 247, 248, 249, 250 and 251 of the complaint.

3.      Deny, upon information and belief, the allegations contained in paragraphs of the complaint numbered 10, 12, 13, 14, 26, 46, 47, 48, 49, 50, 52, 58, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124 and 125 of the complaint and refer all questions of law to the Court.

4.      Deny knowledge or information sufficient to form a belief as to the allegations contained in the paragraphs numbered 16, 17, 18, 19, 20, 21, 22, 28, 29, 30, 31, 32, 33, 34, 35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244 and 245 of the complaint.

**AS TO COUNT I**

5. Answering the paragraph numbered 251 of the complaint repeat, reiterate and reallege each and every response to the recited paragraph, with the same force and effect as if the same were set forth at length herein.

6. Deny, upon information and belief, the allegations contained in the paragraph numbered 252 of the complaint.

**AS TO COUNT II**

7. Answering the paragraph numbered 253 of the complaint repeat, reiterate and reallege each and every response to the recited paragraph, with the same force and effect as if the same were set forth at length herein.

8. Deny, upon information and belief, the allegations contained in the paragraph numbered 254 of the complaint.

**AS TO COUNT III**

9. Answering the paragraph numbered 255 of the complaint repeat, reiterate and reallege each and every response to the recited paragraph, with the same force and effect as if the same were set forth at length herein.

10. Deny, upon information and belief, the allegations contained in the paragraph numbered 256 of the complaint.

**AS TO COUNT IV**

11. Answering the paragraph numbered 257 of the complaint repeat, reiterate and reallege each and every response to the recited paragraph, with the same force and effect as if the same were set forth at length herein.

12. Deny, upon information and belief, the allegations contained in the paragraph numbered 258 of the complaint

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**

13. That the complaint fails to state a claim upon which relief can be granted.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE**

14. That the damages sustained by plaintiffs, if any, were caused by plaintiffs' own culpable and/or negligent conduct.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE**

15. That the complaint fails to set forth facts sufficient to constitute a deprivation of any constitutional right or other basis for a civil rights claim.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE**

16. That no policy, statement, ordinance, regulation or decision officially adopted and/or promulgated by defendants or otherwise ratified by defendants authorized a deprivation of plaintiff's constitutional rights.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE**

17. That no custom or usage adopted, followed, endorsed or ratified by defendants authorized a deprivation of plaintiff's constitutional rights.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE**

18. That the doctrines of respondeat superior and vicarious liability do not apply to a civil rights claim.

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**

19. That plaintiffs are guilty of laches and are therefore barred from maintaining this action.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE**

20. That defendants' actions, if any, were justified by the facts and circumstances presented.

**AS AND FOR A NINTH AFFIRMATIVE DEFENSE**

21. That the defendants, at all times complained of, acted reasonably and in good faith in the discharge of their official duties and responsibilities.

22. That defendants acted in what they did solely pursuant to their duties and responsibilities as law enforcement and/or prosecuting officials.

23. That defendants at all times acted in good faith in that they reasonably believed that they were exercising and acting within their statutory and constitutional powers.

24. That in performing such duties and responsibilities, defendants are and were protected by absolute and/or qualified Federal and/or State immunity.

**AS AND FOR A TENTH AFFIRMATIVE DEFENSE**

25. That this action is barred by the doctrines of qualified and/or absolute governmental immunity for discretionary acts.

**AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE**

26. That plaintiffs have an adequate remedy at a law.

WHEREFORE, defendants demand judgment against the plaintiffs dismissing the complaint, together with the costs, disbursements and reasonable attorneys' fees of this action, and for such other and further relief as this Court deems just and proper.

DATED: Hauppauge, New York
December 13, 2022

Yours etc.,

Dennis M. Cohen
Suffolk County Attorney
Attorney for County defendants
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788

By: /s/ Arlene S. Zwilling
Arlene S. Zwilling
Assistant County Attorney

TO: The Bellantoni Law Firm, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his official capacity,

Defendants.
-----------------------------------------------------------------x

22 Civ. 04778 (GRB)(ST)

**DECLARATION OF AMY L. BELLANTONI**

AMY L. BELLANTONI, declares pursuant to 28 U.S.C. § 1746 that:

1. I am the Principal of The Bellantoni Law Firm, PLLC attorneys for the plaintiffs in the above-captioned matter. I am admitted to practice law before the United States District Court for the Southern District of New York. I am also admitted to practice law before the United States District Courts for the Northern and Eastern Districts of New York and the District of Columbia, the Second Circuit Court of Appeals, and the United States Supreme Court.

2. I have personal knowledge of the facts set forth herein based upon a review of the file maintained by my office in this matter, research, and discussions with my clients and others having personal knowledge of the facts giving rise to this litigation and the instant application. If

called as a witness, I could and would testify competently to the truth of the matters set forth herein.

3. I submit this Declaration in support of Plaintiffs' motion for a preliminary and permanent injunction.

4. Attached hereto as Exhibit 1 is a true and accurate copy of the email from the New York State Police Pistol License Bureau dated August 6, 2022.

5. Attached hereto as Exhibit 2 is a true and accurate copy of the Suffolk County Police Department Licensing Bureau Guide to the Pistol License Process.

6. Attached hereto as Exhibit 3 is a true and accurate printout of the instructions for applying for a handgun license in Sullivan County.

7. Attached hereto as Exhibit 4 is a true and accurate printout of the instructions for applying for a handgun license in Chautauqua County.

8. Attached hereto as Exhibit 5 is a true and accurate printout of the instructions for applying for a handgun license in Erie County.

I declare the foregoing to be true and accurate under the penalty of perjury.

Dated: December 11, 2022

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: Amy L. Bellantoni

Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

Case 23-28, Document 64, 02/27/2023, 3506611, Page73 of 230
A69

# EXHIBIT 1

**From:** KINZEL, EMMETT (TROOPERS)
**To:** Amy L. Bellantoni
**Subject:** RE: A few questions...
**Date:** Saturday, August 6, 2022 12:46:28 PM
**Attachments:** image004.png

---

Amy,

1. Outside of NYC, the pistol permit application, PPB-3, is a standard form, approved by the Superintendent of the NYSP. Within the last 3 years the Superintendent has not approved any forms or questionnaires relating to the application of a NYS pistol permit, nor has any application for such document been submitted. The Superintendent does routinely review and approve the form of the pistol permit card submitted to him by the Licensing Officer (not what you were asking, provided as a side note).

2. All LE agencies and courts are assigned an ORI, these numbers are used in the identification of the agency/court in all phases of law enforcement. I'm not sure how they get assigned, I'll have to inquire and get back to you. They appear to use a standard format nationally then assigned specifically by the state, standby on that though.

Emmett

Emmett R. Kinzel
Technical Sergeant, Pistol Permit Bureau

**New York State Police**
1220 Washington Avenue
Building 22
Albany, NY 12226

(518) 464-7128 (office) | emmett.kinzel@troopers.ny.gov
(518) 464-7186 (fax)

www.troopers.ny.gov

---

**From:** Amy L. Bellantoni <abell@bellantoni-law.com>
**Sent:** Saturday, August 6, 2022 11:35 AM
**To:** KINZEL, EMMETT (TROOPERS) <EMMETT.KINZEL@troopers.ny.gov>
**Subject:** A few questions...

*ATTENTION: This email came from an external source. Do not open attachments or click on links from unknown senders or unexpected emails.*

Hello Sgt. Kinzel,

When you have a moment, I have a few questions:

1. Sec 400 solely authorizes the use of a pistol license application that has been approved by the NYSP Superintendent ("Blank applications shall, except in the city of New York, be approved as to form by the superintendent of state police.").

   My questions are: Excluding NYC, has NYSP approved any blank application forms and/or 'questionnaires' for use by any counties in NY other than the PPB 3? And, have any counties asked for approval of their forms and been denied (last 3 years)?

2. Some counties/sheriff offices upstate provide an ORI number for pistol license applicants to obtain their DCJS criminal history report by having their fingerprints run through the IdentoGo company rather than having to come into the sheriff's office or local PD to be fingerprinted.

   My last question is: Do LE agencies automatically have an ORI or is the ORI being provided by the sheriff offices something they had to apply for? If the LE agency has to apply for an ORI, is that request made to the FBI or a NY state agency?

As always, thank you sincerely for your time and assistance,
Amy

Amy L. Bellantoni
Phone: 914.367.0090
Fax: 888.763.9761
www.bellantoni-law.com

2 Overhill Road, Suite 400
Scarsdale, NY 10583

*Need to chat?*
Calendly.com/bellantoni-law

*Si vis pacem para bellum*

---

CONFIDENTIALITY NOTICE: This e-mail, including any attachments, may contain highly sensitive and confidential information. It is intended only for the individual(s) named. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

Case 23-203, Document 64, 04/27/2023, 3506621, Page76 of 230
A72

# EXHIBIT 2

POLICE DEPARTMENT, COUNTY OF SUFFOLK, N.Y.
PISTOL LICENSING BUREAU
30 YAPHANK AVENUE YAPHANK NEW YORK 11980
PHONE: 631-852-6311 FAX: 631-852-6670 SUFFOLK COUNTY WEBSITE: www.suffolkcountyny.gov
OFFICE HOURS: MONDAY TO FRIDAY 9:00 AM TO 4:30 PM

PDCS-4016

# AN OVERVIEW OF THE PISTOL LICENSING PROCESS IN SUFFOLK COUNTY

The following is a guide to the procedure to apply for a New York State Pistol License issued by the Suffolk County Police Department. The Suffolk County Police Department's Pistol Licensing Bureau is located in the John L. Barry Police Headquarters building at **30 Yaphank Ave., Yaphank, NY, 11980**. A comprehensive handbook detailing the rules, regulations, laws, and procedures governing Suffolk County Pistol License holders, as well as answers to many frequently asked questions can be found here:

http://apps.suffolkcountyny.gov/police/forms/PDCS-4000.pdf

Additionally, many of the required forms can be found by clicking on the following link to the Suffolk County Police Department's website:

http://apps.suffolkcountyny.gov/police/onlineforms htm

New York State currently has 59 pistol licensing jurisdictions. Suffolk County is unique because it is the only county in the state that has two (2) separate licensing jurisdictions. The Suffolk County Police Commissioner is the Licensing Officer of the five (5) western towns; Babylon, Islip, Huntington, Smithtown and Brookhaven. The County Sheriff is the Licensing Officer for the remaining towns on the east end of Suffolk County. **If you are a resident of one (1) of the above referenced five (5) western towns of Suffolk County, please consult this guide if you are interested in applying for a pistol license.** For those Suffolk County residents residing in the Towns of **Southold**, **Shelter Island**, **Southampton**, **East Hampton**, or **Riverhead,** please direct all pistol license inquiries to the following address:

Suffolk County Sheriff's Office
Pistol Permits
100 Center Drive Riverhead, New York 11901
Phone 631-852-2233

Website: **http://www.suffolkcountyny.gov/sheriff/Home.aspx**

The Suffolk County Police Department's pistol licensing application process may be concisely summarized as follows:

- Applicants are urged to carefully read the provided list of automatic disqualifications and determine if any are applicable. If any are, the applicant need take no further action as they are ineligible to obtain a pistol license.
- The applicant must decide what type of license she/he desires. Descriptions of each license type are provided in this guide as well as in the Pistol License Information Handbook. Please note that applicants may apply for multiple types of licenses simultaneously, i.e. Sportsman, Business, etc.
- The Applicant Questionnaire must be completed in a thorough and legible manner. It is delivered in person or by U.S. mail to the Pistol Licensing Bureau in accordance with the instructions detailed herein. A check or money order in the amount of $10.00 payable to "S.C.P.D." must accompany the completed Applicant Questionnaire.
- Character references must be provided as detailed in this guide.
- The applicant's photographs and fingerprints are taken as detailed herein.
- The applicant must provide proof of residence as detailed herein.
- The applicant must provide proof of employer as detailed herein.
- The applicant must provide proof of identity as detailed herein.
- The Pistol Licensing Bureau schedules an interview with the applicant. The applicant must present a **money order** in the amount of $88.25 payable to "S.C.P.D." to the Pistol Licensing Bureau at the time of this interview.
- The Pistol Licensing Bureau conducts an investigation in order to determine the applicant's suitability to possess a pistol license.

A more detailed explanation of the pistol license application process follows.

## AUTOMATIC PISTOL LICENSE DISQUALIFIERS PURSUANT TO NEW YORK STATE LAW

License applications will automatically be disapproved for the following reasons:

**1.** Failing to indicate on the application that the applicant has been confined to any hospital or institution, public or private for mental illness.

**2.** Being convicted anywhere of a felony or serious offense.

### SERIOUS OFFENSES, AS DEFINED BY §265.00 (17) OF THE NYS PENAL LAW, ARE AS FOLLOWS:

**PRESENT PENAL LAW**

| | |
|---|---|
| 120.45 | Stalking in the fourth degree |
| 120.50 | Stalking in the third degree |
| 125.60 | Issuing abortional articles. |
| 130.00 | Offenses defined in Art. 130. (Sec Offenses), sections 130.20 Sexual Misconduct; Rape, all degrees; Consensual Sodomy; Sodomy, all degrees; Sexual Abuse, all degrees; Aggravated Sexual Abuse, all degrees; Course of Sexual Conduct Against a Child, all degrees. |
| 140.45 | Possession of Burglar's Tools. |
| 165.25 | Jostling |
| 165.30 | Fraudulent Accosting |
| 165.40 | Criminal Possession of Stolen Property 3rd. |
| 220.00 | Criminal Possession of a Controlled Substance, all degrees; Criminal Sale of a Controlled Substance, all degrees, Criminal Sale of a Controlled Substance in or Near School Grounds, Criminal Possession Hypodermic Instrument; Criminal Injection of a Narcotic Drug; Criminally Using Drug Paraphernalia, all degrees; Criminal Possession of Precursors of Controlled Substances; Criminal Sale of a Prescription for a Controlled Substance. |
| 230.40 | Promoting Prostitution 3rd; |
| 235.00 | Obscenity, and related offenses defined in section 235, sections 235.05 Obscenity 3rd; 235.06 2nd; 235.07 1st; 235.10 Obscenity; presumptions; 235.15 Obscenity or disseminating indecent material to minors 2nd; 235.21 Disseminating indecent material to minors 2nd; 235.22 1st; |
| 240.35.3 | Loitering - public place for engaging, or soliciting to engage with another, in deviate sexual intercourse or other sexual behavior of a deviate nature. |
| 260.10 | Endangering the Welfare of a Child. |
| 265.01 | Criminal Possession of a Weapon 4th; - Possesses any firearm, electronic dart gun, gravity knife, switchblade knife, pilum ballistic knife, cane sword, billy, blackjack, bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star. 265.01 sub.2 Criminal Possession of a weapon 4th; - Possession with intent to use against another, dagger, dangerous knife, dirk, razor, stiletto, imitation pistol. 400.00.11 |

For the purposes of section 400.00, the term Serious Offense shall include a willful failure to obey a lawful Order of Protection issued under article eight of the Family Court Act or section 530.12 of the Criminal Procedure Law, where such willful failure involves the infliction of serious physical injury, or the use or threatened use of a deadly weapon or dangerous instrument.

**OLD PENAL LAW - PRIOR TO SEPTEMBER 1, 1967**

| | |
|---|---|
| 33 | Public Health Law relating to narcotic drugs which was defined as a misdemeanor by section 1751a. |
| 33A | Public Health Law relating to depressant and stimulant drugs defined as a misdemeanor by section 1747b. |
| 106 | Sodomy or rape which was designated as a misdemeanor. |
| 235.20 | Disseminating indecent material to minors. (old 484 sub. h). |
| 405 | Unlawful entry of a building. |
| 408 | Making or Possession of Burglar Instruments. |
| 483 | Endangering life or health of a child. |
| 483 sub.b | Carnal abuse of child over 10 and under 16 years of age. |

690 See Art. 106.

**OLD PENAL LAW - PRIOR TO SEPTEMBER 1, 1967 (continued)**

| | |
|---|---|
| 722 sub.6 | Disorderly Conduct (Jostling.) |
| 722 sub.8 | Disorderly Conduct (Loiters for purpose of committing a crime against nature or other lewdness.) |
| 1308 | Buying or Receiving Stolen Property. |
| 1696 | Aiding Escape From Prison. |
| 1751 sub.a | See Art. 33 |
| 1747 sub.b | See Art. 33A |
| 1897 sub.1 | Illegally using, carrying or possessing a pistol or other dangerous weapon. |

**3.** Having had a license revoked or being under a suspension or ineligibility order issued pursuant to the provisions of section 530.14 of the Criminal Procedure Law (Mandatory and permissive suspension of firearms license and issuance of temporary order of protection by the courts pursuant to subdivision one of section 530.12 or subdivision one of section 530.13) or section 842(a) of the Family Court Act (court order of protection).

**4.** Having been involuntarily committed to a facility under the jurisdiction of an office of the Department of Mental Hygiene pursuant to article nine or fifteen of the Mental Hygiene Law, article seven hundred thirty or section 330.20 of the Criminal Procedure Law, section four hundred two or five hundred eight of the Correction Law, section 322.2 or 353.4 of the Family Court Act, or having been civilly confined in a secure treatment facility pursuant to article ten of the Mental Hygiene Law.

**5.** Having had a guardian appointed pursuant to any provision of state law, based on a determination that as a result of marked subnormal intelligence, mental illness, incapacity, condition or disease, an individual lacks the mental capacity to contract or manage his or her own affairs.

## AUTOMATIC PISTOL LICENSE DISQUALIFIERS PURSUANT TO FEDERAL LAW

**1.** Being convicted of a misdemeanor crime of domestic violence.
**2.** Being a fugitive from justice.
**3.** Being an unlawful user of or addicted to any controlled substance.
**4.** Being an alien who is illegally or unlawfully in the United States.
**5.** Having been discharged from the Armed Forces under dishonorable conditions.
**6.** Being an individual who, having been a citizen of the United States, has renounced his citizenship.
**7.** Being subject to a court order that:

- **(A)** Was issued after a hearing of which such person received actual notice, and at which such person has an opportunity to participate;
- **(B)** Restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
- **(C)** (i) Includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child, or
  (ii) By its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.

## DOMESTIC VIOLENCE

Federal Law prohibits anyone from possessing firearms or ammunition if they are, or have been convicted of a misdemeanor crime of domestic violence. The term misdemeanor crime of domestic violence means "any offense defined as a State or Federal misdemeanor, whether or not explicitly described in a statute as a crime of domestic violence, which has, as its factual basis, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by the victim's current or former domestic partner, parent or guardian." The term, "convicted" is generally defined in the statute as excluding anyone whose conviction has been expunged or been set aside, or anyone who has received a pardon.

## ADDITIONAL REASONS FOR DISAPPROVAL

**The lack of an "automatic bar" in your background does not guarantee the issuance or renewal of a pistol license. There are many other factors that are considered in the investigation into an individual's qualification to possess a pistol license. Reasons for disapproval, other than the above referenced automatic bars include, but are not limited to:**

**1.** Having had a pistol license revoked in the last five years.
**2.** Falsification of any part of the application or accompanying paperwork.
**3.** The concealment or omission of any information during the application process.
**4**. A lack of truthfulness on the application and any accompanying paperwork.
**5.** If the director of community services or his or her designee has made a report pursuant to section 9.46 of the Mental Hygiene Law indicating that the applicant, or a member of his/her household is likely to engage in conduct that would result in serious harm to self or others.
**6.** Lack of good moral character.
**7.** Other good cause.

## CERTIFICATE OF RELIEF FROM DISABILITIES

On occasion, an applicant who was convicted for a felony or serious offense submits, pursuant to Correction Law Section 701, a certificate of relief from disabilities. This certificate neither requires nor prevents the issuance of a pistol license. The Penal Law, Sec. 400(1) provides that a pistol license may not be issued to a person who has been convicted of a felony or serious offense, but Correction Law Sec. 701 states that, once a certificate is granted, the conviction to which it relates may no longer be considered a conviction for purposes of that Penal Law provision. Thus, the certificate removes the absolute disqualification established for convicted persons in Penal Law Sec. 400(1). **This does not mean, however, that the license must be issued.** The applicant's background, including the conviction, may still be evaluated and considered in determining the applicant's qualification to possess a pistol license. The certificate must be checked off in box (C), and the details for box (C) must indicate, "For the purpose of obtaining a pistol license", Correction Law Section 701(3) states: A certificate of relief from disabilities shall not, however, in any way prevent any judicial, administrative, licensing or other body, board or authority from relying upon the conviction specified therein as the basis for the exercise of its discretionary power to suspend, revoke, refuse to issue or refuse to renew any license, permit or other authority or privilege.

If you do not fall into one, or more of the above referenced prohibited categories, you may submit a completed Applicant Questionnaire to the Suffolk County Police Department's Pistol Licensing Bureau in order to initiate the pistol license application process. The process for doing so is as follows:

## LICENSE TYPES

**(1) SPORTSMAN** – (Premise/Dwelling, Target and Hunting) – A Sportsman endorsement entitles a licensee to possess a firearm within his/her home for the purpose of home protection, at a designated firing range for the purpose of target shooting, and in the field while actively engaged in lawful hunting. Firearms may only be transported between your residence and an authorized target shooting range and/or a legal hunting area in New York State. For the purpose of hunting, you are reminded that you must also possess a valid New York State hunting license and comply with DEC hunting regulations.

**(2) BUSINESS** – Licenses which are issued for business carry purposes are limited to the concealed carrying of the firearm while in the normal course of business for which it was issued. A Business Endorsement will be issued only for a documented, legitimate business that, by the nature of the business is more prone to robbery than the general population. If you operate a business from a residence, you will be required to submit proof from the attorney's office of the local village, town or city government stating that the business is not prohibited by zoning or building codes. You must show proof of State and Federal Tax Certificates and a Suffolk County Business Certificate where appropriate.

The requirements for a Business Endorsement are available here:

http://apps.suffolkcountyny.gov/police/forms/Business%20Class%202%20Requirments.pdf

**(3) SECURITY** – **Prior to obtaining a Security Endorsement, you must first apply for and obtain a Sportsman License.** You must be working, in uniform, for a state licensed security company and reside within the five (5) western towns of Suffolk County. The company for which you work must be incorporated in the five (5) western towns of Suffolk, or Nassau County and must be registered with the Suffolk County Police Department Pistol Licensing Bureau. Forty-seven (47) hour and eight (8) hour training courses are required in order to qualify for a Security License. All individuals employed by a security company in an armed capacity must re-qualify with their weapon every twelve (12) calendar months. A copy of your most recent firearm training certificate must be submitted, by mail or in person, to the Pistol Licensing Bureau within ten (10) days of qualification.

The firearm may be carried only:

a) **WHILE ACTUALLY ENGAGED IN EMPLOYMENT**: The firearm may be carried while performing the duties for which the license was issued. This means that you may not carry the firearm at any other time, or for any employment not listed on the license. As the licensing agency, the Suffolk County Police Pistol Licensing Bureau will determine the purposes for which a handgun may be carried in the performance of your duties. These purposes cannot be changed or expanded by your employer without the authorization of the Pistol Licensing Bureau. Further, you are required to keep the Pistol Licensing Bureau informed of all current employers for whom the firearm will be carried.

b) **WHILE TRAVELING FROM RESIDENCE TO PLACE OF EMPLOYMENT**: The firearm may be carried from your residence directly to your place of employment or assignment for that day.

c) **WHILE TRAVELING FROM PLACE OF EMPLOYMENT BACK TO RESIDENCE**: The firearm may be carried from your place of employment directly to your residence.

When transporting the firearm between your residence and place of employment, it **may not** be carried openly.

Carrying a firearm outside of the above restrictions or, for an employer not listed on the license, or any unreasonable delay in responding to work and/or returning home, will equate to a violation of licensing restrictions and punitive action will result. Failure to qualify, or submit evidence of qualification will result in the removal of a security endorsement.

The requirements for a Security Endorsement are available here:

http://apps.suffolkcountyny.gov/police/forms/Security_Class3_Application_Reqs.pdf

**(4) EMPLOYMENT**- **Prior to obtaining an Employment Endorsement, you must first apply for and obtain a Sportsman License.** You must be working in an armed capacity for a town, village, or municipality located within the five (5) western towns of Suffolk County. Forty-seven (47) hour and eight (8) hour training courses are required. All individuals employed by a municipality in an armed capacity must re-qualify with their weapon annually. A copy of your most recent firearm training certificate must be submitted, by mail or in person, to the Pistol Licensing Bureau within ten (10) days of qualification.

The firearm may be carried only:

a) **WHILE ACTUALLY ENGAGED IN EMPLOYMENT**: The firearm may be carried while performing the duties for which the license was issued. This means that you may not carry the firearm at any other time, or for any employment not listed on the license. As the licensing agency, the Suffolk County Police Pistol Licensing Bureau will determine the purposes for which a handgun may be carried in the performance of your duties. These purposes cannot be changed or expanded by your employer without the authorization of the Pistol Licensing Bureau. Further, you are required to keep the Suffolk County Police Department Pistol Licensing Bureau informed of all current employers for whom the firearm will be carried.

b) **WHILE TRAVELING FROM RESIDENCE TO PLACE OF EMPLOYMENT**: The firearm may be carried from your residence directly to your place of employment or assignment for that day.

c) **WHILE TRAVELING FROM PLACE OF EMPLOYMENT BACK TO RESIDENCE**: The firearm may be carried from your place of employment directly to your residence.

When transporting the firearm between your residence and place of employment, it **may not** be carried openly.

Carrying a firearm outside of the above restrictions or, for an employer not listed on the license, or any unreasonable delay in responding to work and/or returning home, will equate to a violation of licensing restrictions and punitive action will result. Failure to qualify, or submit evidence of qualification will result in the removal of an employment endorsement.

The requirements for an Employment Endorsement are available here:

*********************************************

**(5) AUXILIARY POLICE** – The firearm may only be carried while working assigned duties as an auxiliary police officer, while in uniform, with your auxiliary police unit, or traveling directly to or from your residence and your assigned post.

**(6) RETIRED LAW ENFORCEMENT OFFICER**

A) **RETIRED PEACE OFFICER**- Full carry, valid throughout New York State, NOT including New York City.

B) **RETIRED POLICE OFFICER**- Full carry, valid throughout New York State, including New York City.

C) **RETIRED FEDERAL LAW ENFORCEMENT OFFICER**- Full carry, valid throughout New York State, including New York City.

**(7) SELF PROTECTION** - Full carry license, for the purpose of self-protection. If an individual is seeking a Self-Protection License, they will be required to show "proper cause" pursuant to Penal Law Section 400.00 Sub. 2(f). "Proper cause" is determined by a review of all relevant information bearing on their claimed need. They must show that they are exposed to extraordinary personal danger, documented by proof of recurrent threats to life or safety requiring authorization to carry a firearm.

These factors are not all inclusive, and the Police Commissioner and/or his/her designee will consider all evidence, including Suffolk County Police Department records when making a determination whether proper cause exists. It should be noted, however, the mere fact that they have been the victim of a crime or reside or are employed in a "high crime area" does not establish "proper cause" for the issuance of a self-protection license.

If a self-protection license is approved, the Suffolk County Police Pistol Licensing Bureau may withdraw that classification at any time if it finds proper cause no longer exists. Proper cause will have to be demonstrated by the licensee each time the license is renewed and at any time when requested by Licensing Bureau personnel. If proper cause is no longer proven, the license will be changed to a different classification.

The requirements for a Self-Protection License are available here:

http://apps.suffolkcountyny.gov/police/forms/SelfProtectionWorksheet.pdf

## APPLICANT QUESTIONNAIRE

The current Applicant Questionnaire is available here:

http://apps.suffolkcountyny.gov/police/forms/PDCS-4406m.pdf

## ***IMPORTANT***

**Incomplete Applicant Questionnaires, illegible Applicant Questionnaires, or Applicant Questionnaires with unacceptable character references will be rejected and returned to sender. Further, if any part of your Applicant Questionnaire is found to be untruthful, if significant information is omitted, or if written explanations/statements are found to be vague, your application will be DISAPPROVED.**

The Applicant Questionnaire must be prepared by typing or *clearly* printing in **BLACK OR BLUE INK ONLY**. Read these instructions before completing the Applicant Questionnaire in order to minimize errors. All questions **MUST** be answered. All questions are to be answered completely. If you answered *'Yes'* to any of questions #38 through #52, you **MUST** attach a *notarized statement* on paper sized 8½" x 11" explaining each answer(s) in **complete detail**. Applicant Questionnaires submitted without said statements will be rejected and returned to sender.

***FALSE STATEMENTS MADE IN NOTARIZED FORMS ARE PUNISHABLE AS A CLASS 'A' MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE NEW YORK STATE PENAL LAW.***

## ARREST INFORMATION

If you have ever been **arrested**, **charged**, **indicted**, or received a **Field Appearance Ticket**, or **Criminal Summons**, you **must** indicate it on the Applicant Questionnaire, question #18. On the day of your interview, you will be required to submit a *Transcript of Record* from the Court of Record indicating the offense and disposition. Additionally, as indicated above, a *detailed notarized statement* describing the circumstances for each arrest must accompany your Applicant Questionnaire at the time of submission. *You must do this even if the case was dismissed, the record was sealed, or the case was nullified by Operation of Law*. The New York State Division of Criminal Justice Services will report to us **every** instance involving the arrest of an applicant. ***DO NOT RELY ON ANYONE'S REPRESENTATION THAT YOU NEED NOT LIST A PREVIOUS ARREST.*** New York State law provides the authority for the Licensing Officer to inquire into the facts underlying the arrest of an applicant, even if the arrest was terminated in his/her favor.

***FAILURE TO DISCLOSE AND LIST THE ABOVE INFORMATION WILL RESULT IN THE DISAPPROVAL OF YOUR APPLICATION. IF YOU HAVE ANY DOUBTS AS TO WHETHER A PARTICULAR EVENT WAS AN ARREST, YOU MUST ADVISE YOUR INVESTIGATOR OF THE INCIDENT IN QUESTION DURING YOUR INTERVIEW.***

## CHARACTER REFERENCES

Four (4) character references are required. The character references **MUST** be United States Citizens and residents of Suffolk County who have known the applicant for a minimum of one (1) year. References which are **UNACCEPTABLE** are as follows: relatives; either by blood or marriage, active law enforcement officers, husband and wife combinations, or any two (2) or more members of the same family or household. The references chosen **must sign** the Questionnaire in the appropriate area. Additionally, the character references listed on the Applicant Questionnaire will be required to complete a Character Reference Affidavit which **must** be signed in front of a Notary Public. Character Reference Affidavit forms are available here:

http://apps.suffolkcountyny.gov/police/forms/Character_Reference_Affidavit.pdf

## PHOTOGRAPHS

Applicants' photographs will be taken at the time of the interview.

## FINGERPRINTS

Applicants' fingerprints will be taken at the time of the interview.

## PROOF OF RESIDENCE

Applicants must present a voter registration card, utility bill, or tax bill at the time of the interview.

## PROOF OF EMPLOYER

Applicants must present a recent pay stub or current photo ID for any employer listed on the application at the time of the interview.

## IDENTIFICATION

Applicants must submit a copy of their *Birth Certificate* or valid *United States Passport*. If you were born in a foreign country and have become a United States citizen, you **must** produce *naturalization papers*. If you are a resident alien, you **must** bring your *Alien Registration Card.*

## PISTOL LICENSE CONSULTING FIRMS

This department has received complaints concerning misrepresentations and misleading information provided by various firms who indicate that they can assist you in receiving a pistol license or expedite your application. It is this Department's position that the utilization of these firms is unnecessary and that these application instructions are self-explanatory.

## FEES

A TEN DOLLAR ($10.00) check or money order for the pistol license application fee, made payable to "**S.C.P.D."** must accompany your questionnaire**.** In addition, you must bring an EIGHTY-EIGHT DOLLARS and TWENTY-FIVE CENTS ($88.25) ***MONEY ORDER*** made payable to "**S.C.P.D."** on the day of your interview. **No other type of payment will be accepted.** All fees are non-refundable.

## OTHER GENERAL INFORMATION

After completing the Applicant Questionnaire, you may deliver it in person, or by mail to the address listed below. *THE TEN-DOLLAR APPLICATION FEE MUST ACCOMPANY THE QUESTIONNAIRE*. A self-addressed stamped envelope must accompany any request by mail that requires a reply. Following receipt of the questionnaire, an investigator will contact you to schedule an interview appointment.

A complete guide to the application process, as well as answers to many frequently asked questions are available on the Suffolk County Police Department's website. If you have any questions concerning the Applicant Questionnaire or application process that were not answered by utilizing these resources, you can contact the Pistol Licensing Bureau at (631) 852-6311 and someone will assist you.

In the event that your application for a pistol license is disapproved, you will be entitled to appeal that decision by requesting a legal review. Please note that the review of our decision will be limited to determining whether the Licensing Bureau was arbitrary and capricious and whether substantial evidence exists in the record to support the disapproval of your application.

**Personally deliver or mail the completed Applicant Questionnaire to:**

**SUFFOLK COUNTY POLICE DEPARTMENT**
**PISTOL LICENSING BUREAU/APPLICATION**
**30 YAPHANK AVENUE**
**YAPHANK, NEW YORK 11980**

**OFFICE HOURS: MONDAY - FRIDAY, 9:00 AM - 4:30 PM**

Visit us Online at: **www.suffolkpd.org**

Crime Stoppers Confidential Tip Hotline: **1-800-220-TIPS**
Non-Emergencies Requiring Police Response: **(631) 852-COPS**



POLICE DEPARTMENT COUNTY OF SUFFOLK

*ACCREDITED LAW ENFORCEMENT AGENCY*

**PISTOL LICENSE APPLICANT QUESTIONNAIRE INSTRUCTIONS**

**PDCS-4406-2h**

# Instructions for completing the Applicant Questionnaire (PDCS-4406n Rev. 2)

**All Applicant Questionnaires must be typed or printed in black or blue ink ONLY. All questions must be answered clearly and completely. Incomplete or illegible Applicant Questionnaires will NOT be processed and will be returned to the applicant.**

## Questions 1 - 11

Please enter all requested information in the space provided.

## Question 12

Please indicate which of the following licenses you seek:

**SPORTSMAN** – Entitles a licensee to possess a firearm within his or her home for the purpose of home protection, at a firing range for the purpose of target shooting, and in the field while engaged in licensed hunting. Firearms may only be possessed outside your home while being transported between your home and an authorized firing range and/or a legal hunting area in New York State. For the purpose of hunting, you are reminded that you must also possess a valid New York State hunting license.

**BUSINESS** – Entitles a licensee to possess and carry a concealed firearm while in the normal course of the business for which it was issued. A Business License will be issued only for a documented, legitimate business that, by its nature is more prone to robbery than the general population. The specific documents required to apply for a Business License are listed in the Pistol License Handbook. (Please note, if you operate a business from a residence, you will be required to submit proof that such business is in compliance with applicable zoning and/or building codes.)

**SECURITY** – Entitles a licensee to possess and carry a firearm while working, in uniform, for a state licensed security company. Applicants must reside within the five (5) western towns of Suffolk County. The company for which you work must be incorporated in the five (5) western towns of Suffolk, or Nassau County and must also be registered with the Suffolk County Police Department Pistol Licensing Bureau. Specific documentation, training and range qualification requirements for the Security License are listed in the Pistol License Handbook. PLEASE NOTE: Prior to obtaining a Security License, you must first apply for and obtain a Sportsman License.

**EMPLOYMENT**– Entitles a licensee to work in an armed capacity for a town, village, or municipality located within the five (5) western towns of Suffolk County. Employment Licensees must re-qualify with their weapon annually and a copy of your most recent firearm training certificate must be submitted, by mail or in person, to the Pistol Licensing Bureau within ten (10) days of qualification. Specific documentation, training and range qualification requirements for the Employment License are listed in the Pistol License Handbook. PLEASE NOTE: Prior to obtaining an Employment License, you must first apply for and obtain a Sportsman License.

**AUXILIARY POLICE** – Entitles a licensee to possess and carry a firearm while working as a Suffolk County Auxiliary Police Officer, while in uniform, with your auxiliary police unit, or traveling directly to or from your residence and your assigned post.

**RETIRED LAW ENFORCEMENT OFFICER** –

RETIRED PEACE OFFICER- Full carry throughout New York State, **NOT** including New York City.

RETIRED POLICE OFFICER- Full carry throughout New York State, including New York City.

RETIRED FEDERAL LAW ENFORCEMENT OFFICER- Full carry throughout New York State, including New York City.

**SELF PROTECTION** ("Full Carry") - Entitles a licensee to possess and carry a concealed firearm for the purpose of self-protection. This license is only issued upon a showing of 'Proper Cause". As that term is defined under the law, applicants must show that they are exposed to **extraordinary** personal danger, documented by proof of recurrent threats to life or safety. PLEASE NOTE: the mere fact that an applicant has been the victim of a crime or resides, or is employed, in a "high crime area" does not in itself establish "Proper Cause" for the issuance of a Self-Protection License. The specific documents required to apply for a Self-Protection License are listed in the Pistol License Handbook.

**POLICE DEPARTMENT COUNTY OF SUFFOLK**
**PISTOL LICENSE APPLICANT QUESTIONNAIRE INSTRUCTIONS**

**PDCS 4406-2h** 

## Questions 13-17

Please provide the requested descriptive data.

## Question 18

Please indicate whether you have ever been arrested, and if so, enter that information in the boxes provided. If you answer "yes" you must provide a separate, notarized statement explaining **each** arrest in detail (facts, dates, time, location and persons involved).

PLEASE NOTE: If you have **ever** been arrested, charged, indicted, or issued a Field Appearance Ticket or Criminal Summons (other than a traffic/parking ticket) you must disclose and explain it. On the day of your interview, you will be required to submit an official *Certificate of Disposition* from the Court of record, indicating the disposition of the arrest.

***YOU MUST DISCLOSE SEALED ARRESTS!***

The law in New York State provides an exception to the sealing of arrest records when a defendant applies for a handgun license. This means that the Licensing Bureau will be notified of every arrest in your history, no matter how minor it may have been or how long ago it may have occurred. If you fail to disclose a sealed arrest your Application will be **DISAPPROVED**.

## Questions 19-33

Please provide the information requested. If you require additional room, please attach a separate, signed and notarized sheet of paper.

## Question 34

Please list all persons who have lived at your residence during the past year.

## Question 35

Please indicate who will safeguard your handguns should you become incapacitated in any way. The person you choose must be over the age of twenty-one (21), but does not need a pistol license. This person must notify the Licensing Bureau immediately upon learning that you have become incapacitated or have died, and may only safeguard/possess your handguns for the purpose of immediately surrendering same to the Pistol Licensing Bureau.

## Question 36

Please enter the information requested regarding your four (4) chosen Character References. PLEASE NOTE: Only qualified persons may serve as Character References.

**Qualifications**: Character References **must** be residents of Suffolk County who are twenty-one (21) or older and have known the Applicant for at least one (1) year. Character References may **NOT** be related to the Applicant (by blood or marriage), nor may they be active law enforcement officers. Only one member of a family or household may serve as a Character Reference for each Applicant.

## Questions 37-44

Please answer "yes" or "no" and provide additional information on a separately attached sheet of paper where necessary.

## Question 45

Please indicate whether you or anyone in your household has ever been evaluated for any mental health issues. PLEASE NOTE: Mental health evaluation/treatment is NOT always an automatic bar under New York State or Federal Law; however, if you fail to fully disclose this information, your application will be **DISAPPROVED.**

A83

**POLICE DEPARTMENT COUNTY OF SUFFOLK**
**PISTOL LICENSE APPLICANT QUESTIONNAIRE INSTRUCTIONS**

**PDCS 4406-2h**

After completing the Applicant Questionnaire and any additional attachments you may deliver it in person, or mail it to the address listed below. A **check or money order** for ten dollars (**$10.00**) made payable to "S.C.P.D." must accompany your Applicant Questionnaire**.**

When you arrive for your in-person interview you will be fingerprinted and your License photo will be taken. PLEASE BE SURE TO BRING THE FOLLOWING ITEMS WITH YOU:

New York State Driver License or Non-Driver Identification

Recent pay stub or employment identification

Original Birth Certificate or a valid U.S. Passport. If you were born in a foreign country and have become a United States citizen, you must bring your naturalization papers. If you are a resident alien, you must bring your Alien Registration Card.

A voter registration card, utility bill, or tax bill to prove residency in Suffolk County

A *MONEY ORDER* made payable to "**S.C.P.D.**" for **eighty-eight dollars and twenty-five cents ($88.25)**. **No other type of payment will be accepted other than a MONEY ORDER.**

Documentation supporting the types of License you wish to receive (employment verifications, business documents, etc.)

Additional information can be obtained by calling the Pistol Licensing Bureau at (631) 852-6311, or on the web at www.suffolkcountyny.gov/police/

***FALSE STATEMENTS MADE ON THE APPLICATION FORM ARE PUNISHABLE AS CLASS 'A' MISDEMEANORS PURSUANT TO SECTION 210.45 OF THE NEW YORK STATE PENAL LAW.**

***IMPORTANT***

If any part of your Applicant Questionnaire is found to be untruthful, if important information is omitted, or if your written explanations/statements lack detail or are non-responsive, your application will be **DISAPPROVED.**

**Mail completed Applicant Questionnaire to:**

**SUFFOLK COUNTY POLICE DEPARTMENT**
**PISTOL LICENSING BUREAU/APPLICATION**
**30 YAPHANK AVENUE**
**YAPHANK, NEW YORK 11980**

**OFFICE HOURS: MONDAY - FRIDAY, 9:00 AM - 4:30 PM**

**Language Assistance is Available upon Request at No Cost**

Visit us Online at: **www.suffolkcountyny.gov/police/**

Crime Stoppers Confidential Tip Hotline: **1-800-220-TIPS** Non-Emergencies Requiring Police Response: **(631) 852-COPS**

A84

**POLICE DEPARTMENT COUNTY OF SUFFOLK**

*ACCREDITED LAW ENFORCEMENT AGENCY*

**PISTOL LICENSE APPLICANT QUESTIONNAIRE**

**PDCS-4406n Rev. 2**

**PAGE 1 of 2**

| | |
|---|---|
| 1. Last Name: | 7. City and State of Birth |
| 2. First Name: | 8. Citizenship *(Country):* |
| 3. Middle Name: | 9. Driver Lic/Non Driver I.D. number: |
| 4. Suffix: | 10. Alien Registration Number (*If applicable*) |
| 5. Date of Birth: Male ☐ Female ☐ | 11. Marital Status: |
| 6. Social Security Number: | 12. Type of License You Are Applying For: *(See Instructions Page 1)* |

**PHYSICAL DESCRIPTIVE DATA:**

| | | | | | |
|---|---|---|---|---|---|
| 13. HEIGHT *(FEET/INCHES)* | | 14. WEIGHT (*POUNDS*) | | 15. RACE | |
| 16. HAIR COLOR | | 17. EYE COLOR | | 18. ETHNICITY | |

18. Have you ***ever*** been arrested, summoned, charged or indicted ***anywhere*** for ***any*** offense?

**YES** ☐ **NO** ☐

*DO NOT RELY ON ANYONE'S REPRESENTATION THAT AN ARREST WAS SEALED OR REMOVED FROM YOUR RECORD*

**If yes, furnish the following information:**

**YOU MUST DISCLOSE ALL SEALED ARRESTS!**

| DATE | POLICE AGENCY | CHARGE | DISPOSITION | COURT & DATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

19. List all handguns in your possession *(if none, so indicate)*

| MANUFACTURER | MODEL | SERIAL # | CALIBER | PISTOL OR REV | PROPERTY OF |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | | | |
|---|---|---|---|
| 20. Current Employer | | | |
| 21. Employer Address | | | |
| 22. Occupation | | | |
| 23. Nature of Employment | | 24. Business Phone | |

**25. List all prior places of employment (include business name, address, nature of business and phone #)**

**26. PRESENT ADDRESS: include House #, City, Village, Town, State (if other than New York), Zip Code, and Telephone #** (***include mailing address if different)***

Address____________________ City________________ State: New York Zip Code__________

Home Telephone #____________________ Alternate/ Cell Telephone#____________________

Mailing Address________________________________________

**POLICE DEPARTMENT COUNTY OF SUFFOLK**

**PISTOL LICENSE APPLICANT QUESTIONNAIRE** **PDCS-4406n Rev. 2**
**(CONTINUED)**

27. **List all prior places of residence** *(include street address, city, state, and zip code)* **PAGE 2 OF 2**

28. Spouse/ Domestic Partner Name: | D.O.B.: | Telephone #: Cell Phone #:

29. Your Maiden Name and all Previous Married Names (*if applicable*): | 30. If Married, Your Spouse's Maiden Name:

31. Your Mother's Maiden Name *(Last, First)*: | 32.Your Father's Name *(Last, First)*: | 33.Any Other Name(s) You Have Used:

34. Members of your Household *(include person's Name, Phone# and relation to you)*

35. Name and address of person who will safeguard pistol (s) and notify the Pistol Licensing Bureau in case of Applicant's death or disability *(does not need to possess a pistol license)*

Name: Telephone:
Address:

36. Give four (4) character references who can attest to your good moral character – **list references alphabetically and print clearly.** **(S**ee qualifications in instructions.)

| LAST, FIRST, MI | D.O.B. | STREET ADDRESS | CITY, TOWN | TELEPHONE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 37. | Have you ever been named in an Order of Protection (*respondent, petitioner or protected party*) | **YES** ☐ | **NO** ☐ |
| 38. | Have you ever been terminated from any employment, or discharged from the military under other than honorable conditions? | **YES** ☐ | **NO** ☐ |
| 39. | Have you ever undergone treatment for alcohol or drug use? | **YES** ☐ | **NO** ☐ |
| 40. | Have you or any member of your household ever been committed to any facility for the treatment of mental illness? | **YES** ☐ | **NO** ☐ |
| 41. | Have you ever held or applied for a pistol license, dealer's license, or gunsmith license? | **YES** ☐ | **NO** ☐ |
| | **If "yes"** have you ever had such license revoked or cancelled, or an application for such license disapproved? | **YES** ☐ | **NO** ☐ |
| 42. | Do you have any physical condition which could interfere with the safe and proper use of a handgun? | **YES** ☐ | **NO** ☐ |
| 43. | Have you ever been charged, petitioned against, been a respondent or otherwise been involved in a proceeding in Family Court? | **YES** ☐ | **NO** ☐ |
| 44. | Has anyone in your household ever been arrested for a crime? | **YES** ☐ | **NO** ☐ |
| 45. | Have you, or any member of your household, **ever** been **evaluated** or **treated** for **any** mental health issues? | **YES** ☐ | **NO** ☐ |
| 46. | Have you ***ever*** tried, used, possessed or sold controlled substances, marijuana or its derivatives, narcotics, tranquilizers, or anti-depressant medication? If any of these substances were prescribed to you by a doctor, provide that doctor's name, address, and phone number. | **YES** ☐ | **NO** ☐ |
| 47. | Have you ever been denied appointment to a civil service position; federal, state, or local? | **YES** ☐ | **NO** ☐ |
| 48. | Have you ever served in the military? | **YES** ☐ | **NO** ☐ |
| | If yes, have you ever been charged under the Uniform Code of Military Justice? | **YES** ☐ | **NO** ☐ |
| 49. | Have you ever had any license, including, but not limited to, a driver license, pistol license, or liquor license issued by any agency ***denied, revoked, cancelled or suspended?*** | **YES** ☐ | **NO** ☐ |
| 50. | Have you received a traffic summons, or been arrested or convicted for any traffic infraction in the last ***five (5) years***? If yes, please attach a list of the date(s), charge(s), police agency, court, and disposition**.** | **YES** ☐ | **NO** ☐ |

**FALSE STATEMENTS MADE ON THE APPLICATION FORM ARE PUNISHABLE AS CLASS 'A' MISDEMEANOR S PURSUANT TO SECTION 210.45 OF THE NEW YORK STATE PENAL LAW.**

**SIGNATURE OF APPLICANT** **DATE**

Case: 23-34 Document: 64, 02/27/2023, 3506171, Page90 of 230
A86

# EXHIBIT 3




A87

Contact Us | Webmail

meet your GOVERNMENT | find a DEPARTMENT | tools for BUSINESS | tips for VISITORS | find JOBS

How can we help?

Quick Links +

County Clerk

Services Provided
Pistol Permits
Services Offered During COVID-19
Online Records Search
Fees
DMV
Veterans FAVOR Card
Precious Metal & Gems Forms
NYS Firearms License-Public Records Exemption Form

Helpful Links

Sullivan County 2023 Tentative Budget
NEW! Calendar of County Government Events
Info on Hughes Energy Autoclave Proposal
How We're Using ARPA Funds
Make Your DMV Appointment
Watch Legislature Meetings
November/December 2022 County Manager's Newsletter
Latest "Let's Talk Sullivan" Podcast
Freedom of Information Law (FOIL)
Sullivan County 2021 Annual Report
Sullivan County 2022 Adopted Budget Executive Summary
Sullivan County 2022 Adopted Budget Detail
Food Pantry Guide
English
Espanol

# Information Guide: Pistol Permits

## Information Guide: Pistol Permits

On September 1st, 2022, new legislation regarding issuance of Handgun Licenses in New York took effect. The new gun laws change the procedure and requirements for obtaining a Handgun License. We ask for your patience as we interpret the law and apply the changes to forms and procedures. Answers to frequently asked questions can be found by clicking HERE.

Please note that Concealed Carry Pistol Permit holders are now subject to recertification every three (3) years, and five (5) years for other types of licenses.

NEW SERVICE – By appointment

EXPEDITED AMENDMENT PROCESSING

(Excludes Co-registering, Restriction changes and Transfers)

$10.00 plus amendment fees

Make an appointment,

bring your purchase receipt,

proof of NYS Safe Act certification and ID,

And receive your new permit card(s) while you wait.

Click Here for Instructions for Completing a Pistol Permit Application

Click Here for Amendment Instructions and Form

Click Here for Co-Registering Form

1. **How do I get a pistol license application?**
   Applications cannot be printed off website.

   **In person:** With a $5.00 fee
   **By mail:** Sullivan County Clerk, 100 North Street, Monticello, NY 12701. Sullivan County Clerk, 100 North Street, Monticello, NY 12701. Mail requests must provide name, address, telephone number and an $8.00 fee (check or money order made out to Sullivan County Clerk).

2. **What are the requirements?**
   You must reside in New York State, and apply in the county in which you reside.

3. **How old must I be?**
   21 years of age to apply for a license and to also purchase a pistol or semi-automatic rifle.

4. **How much does it cost?**
   There is a $5.00 fee to pick up the application via an appointment, there is an $8.00 fee to mail an application to you, a $10.00 processing fee for the Sullivan County Clerk and approximately a $125.00 fingerprint fee at the time of electronic fingerprinting.

5. **How long does it take to process?**
   Approximately 10 to 12 months on average, but it may take longer for some applications.

6. **For what purpose can I obtain a pistol license?**
   Target shooting, hunting, fishing, hiking, and camping.

7. **What if I want to upgrade my license?**
   You can apply for an upgrade at the Sullivan County Clerk's Office, or fill out and sign this amendment form and mail or drop it off at our office. Upgrades will be granted at the discretion of the Judge.

8. **What if I've been arrested or convicted of a crime before?**
   You must submit a certified copy of disposition.

9. **Must the character references on my application reside in Sullivan County?**
   Yes, your character references must be a legal resident of Sullivan County or an adjoining county.

10. **For how long is the pistol license valid?**
    There is no expiration date on New York State pistol licenses.

11. **Must I be a citizen of the United States to get a pistol license?**
    No, but if you are not a U.S. citizen, you must submit 2 copies of your green card.

12. **When and where can I be fingerprinted?**
    Fingerprints are now being electronically submitted. Call toll-free 877-472-6915, or go on line at uenroll.identogo.com to make an appointment. **When you call you will be required to give an ORI number and location. The ORI number is NY052013J the location is Clerk-Pistol Permit Monticello, NY 12701.**

13. **When and where can I get my pictures taken?**
    Pictures may be taken at the location of your choice. We can take photos as well for a fee of $15.00

14. **What should I do when I move, change my employer, or wish to buy or sell a pistol?**
    Fill out and sign this form and mail or drop it off at our office.

15. **What if one of my pistols is stolen?**
    If a pistol is stolen it must be reported to both the Police and the Pistol License Office in the Sullivan County Clerk's Office.

16. **Can I co-register a pistol with another person?**
    Yes, but it must be listed on each registrant's pistol license and is only allowed between immediate family members. Each Co-Registrant must fill out an amendment form. Also, the original owner of the gun needs to fill out a Co-Registering form (notarized). You can find *these forms here*. Once completed, mail or drop off completed forms to our office.

17. **How many pistols can I own?**
    There is no limit to the number of pistols you can own. However, upon purchase of a 10th pistol, you must submit proof of a locked safe, and submit a sworn affidavit in this regard.

18. **Who should I call if I have further questions?**
    Call the Pistol License Office in the Sullivan County Clerk's Office at (845) 807-0416/0417. The office is located at 100 North Street, Monticello, New York, 12701. Office hours are Monday through Friday 9:00 am – 5:00 pm.

19. **How do I recertify my license under the NYS Safe Act?**
    Under a recent change to New York State Law, people who have concealed carry permits are required to recertify their permit with the New York State Police every three (3) years.

    No change has been made to the recertification requirements for premises restricted permits. People with those permits will continue to recertify with the State Police every five (5) years.

    To help transition from the five-year recertification requirement to the new three-year requirement, anyone who had a concealed carry permit issued before September 1, 2020, will have until August 31, 2023, to recertify. In addition, those individuals who were issued a concealed carry permit or recertified after September 1, 2020, will not become due to recertify under the new law before August 31, 2023, and may therefore wait to recertify until the third year after permit issuance or their last recertification.

    Recertification can only be done online. State Police will no longer accept paper forms.

    It is your responsibility to recertify your permit whether you receive a notification letter or not. Failure to recertify within the required time shall act as a revocation of the permit.

    Recertification can be submitted online at NYS Safe Act.

    NYSP Pistol Permit Bureau can be contacted at 855-529-4867 for further information.

Contact County Clerk

**Pistol Permits**

County Government Center
100 North Street, PO Box 5012
Monticello, NY 12701

View Map

APPOINTMENTS REQUIRED
For Pistol Permit Applications
Call: 845-807-0417 (Amy)
or 845-807-0416 (Barb)

Contact Sullivan County:
100 North Street
Monticello, NY 12701
Phone: (845) 794-3000
Contact Us

Navigation
Government
Departments
Business
Visitors
Jobs

County Connections

© 2022 Copyright Sullivan County. All rights reserved.

Select Language

Case 23-?, Document 64, 02/27/2023, 3506612, Page92 of 230
A88

# EXHIBIT 4

Case 1:23-cv-00208   Document 64   04/27/2023, 35:00:11   Page 93 of 230   PageID #: 226

       
     

YOUR SHERIFF | WARRANTS | INCARCERATED INDIVIDUALS | PISTOL PERMIT | SERVICES | DIVISIONS & TEAMS | NEWS

SITE TOOLS | SEX OFFENDER | ACCIDENT REPORTS | ANIMAL ABUSE | HISTORY | OUR MISSION | CONTACT US

# Pistol Permit



## Chautauqua County

The Pistol Permit office is instrumental in the record keeping of all Pistol Permit activity and files for the County. All pistol permit related transactions go through this office, with an original application being housed in the County Clerk's Office. New York State also receives a copy of the application, as well as one being kept in the Pistol Permit Office. Pistol Permits for Chautauqua County residents are under terms and regulations of NYS laws.

Once an applicant completes an application, pistol safety course & background investigation, final approval /denial of a permit is the decision of Supreme Court Judge Cass or County Court Judge Foley.

★**Due to overwhelming number of questions regarding the new gun laws, we are asking for any questions to be submitted to pistolpermit@sheriff.us and we will respond via email.**★

**Email Pistol Permit Office**

"Please do not call the pistol permit office to check on the status of your application. We have been overwhelmed with applications. We are currently issuing permits that were submitted 6-8 months ago."

## Pistol Permit Tools



Chautauqua Co. Sheriff's Office
Pistol Permit Division
3 North Erie Street
P.O. Box 128
Mayville NY 14757

**Click to see on a map**

### Please note that our process has changed!

### NO WALK-INS, APPOINTMENT ONLY



Give us a call and we will be happy to help you! 716.753.4374

All gun transactions being done via mail and must include - receipt, copy of permit, copy of drivers license, $3.00 per gun per permit fee and self addressed stamped envelope.

All fingerprinting will be completed by IdentoGO - Applicants will no longer be fingerprinted at the Pistol Permit office.



Office Hours:
Mon – Thurs
8:30am – Noon
1pm – 4pm

You must be 21 years of age & be a resident of Chautauqua County to apply for a permit.

Applicants with an arrest within 5 years will be denied!



**Download Application**

**Download Foil Exemption**

## Wondering what to expect?

Obtain a permit application packet by doing one of the following:
- Download the permit application and print it out
- Pick one up at the Pistol Permit office
- Request a packet be mailed by sending a self-addressed, STAMPED business-sized envelope (large enough to fit 8 ½" x 11" paper unfolded)

Take a pistol safe handling class

Make an appointment with IdentoGO and get fingerprinted – $102 fee & mandated NYS/FBI background check (to be paid directly to Identogo)

Complete entire application packet & follow the instructions carefully. Wait at least 48 hours after fingerprinting and make an appointment to be photographed & review your application with the Pistol Permit Clerk. The applicant will pay the final licensing fee - $30 County License fee payable to Chautauqua County Finance Director (cash, check or money order accepted)

Once the application is received, the background process begins. This involves an inquiry by local law enforcement, NYS & the FBI. At the conclusion of the investigation, the application is forwarded to the Licensing Judges for consideration

Once a permit is approved by a Licensing Judge, the Pistol Permit Office will mail the completed permit to the new permit holder. The permit holder may purchase a handgun and/or co-register with another permit holder after this is received



**Make Fingerprint Appt.**

**Enter Instructor Portal**

## eMail the Pistol Permit Clerk

| Name * | Message |
| Email * | |
| Subject | |

**Send**

## PISTOL INSTRUCTION CLASS:
- You must have instruction in the safe handling of pistols
- Firearms Instructor must be certified & County approved
- Certificate must be turned in with the application
- Certificate expires after one (1) year

**Check on Safety Course Dates!**



🐦 **Twitter** Follow    f **Facebook**

■■■■■■■

About Your Sheriff
Academy
Accident Recon
Accident Reports
Accreditation
Address Markers
Administration
Alarm Law
Animal Abuse Registry
Bail
Boater Safety Courses
Booking
Chaplain
Child Seat Safety
Civil
Contact Us
Corrections
Corrections Academy

Court Phone List
Court Security
Crime Scene
Criminal Investigation
Crisis Negotiation Team
Designated Driver Program
Drug Drop Box
Drug Task Force
E911
Finance
Fire Investigation Team
Forensic Investigation Team
Form Library
Gun Safety
Hazardous Devices Team
History
Home
Incarcerated Individuals
Intelligence
Jail

Juvenile
K-9
Kitchen
Medical
Mounted
Marine Patrol
New Warrants
News
Patrol
Personnel Complaint
Pistol Permit
Pistol Permit Instructor Portal
Pistol Safety Course Calendar
Pistol Safety Course
Prisoner Transports
Project Life Saver
Property Check Request
Records
RUOK? Elder Care
School Resource Officers

Sheriff's Welcome
Sex Offender Search
Snowmobile Laws
Snowmobile Patrol
Stop DWI
SWAT
Tech Safety
Tech Services
Ten Featured Wanted
Victim Impact Panel
Visits
Warrant Division
Warrant List
Warrant Tips
Welfare Fraud
WET

IdentoGO

Citizenship
Documents

* Required Fields

Plea e enter your information below Then click 'Next' to continue or 'Cancel' to e it

## Citizenship

*** Country of Birth**

-- Choose One --

*** Country of Citizenship**

-- Choose One --

# EXHIBIT 5

YOUR GOVERNMENT OUR SERVICES DOING BUSINESS OUR COMMUNITY HOW DO I ...
Case 2:22-cv-... Case 23-208, Document 64, 04/27/2023, 3506611, Page96 of 230 PageID #: 229
A92
Welcome to Erie County, NY
Erie County Clerk Michael P. Kearns
Home | Newsroom | Auto Bureau | Land Records | Legal Records | Services | Pistol Permits | Business Center | Public Search | Clerk's Wellness
Erie County Clerk Michael P. Kearns » New Pistol Permit Application Process

# New Pistol Permit Application Process

The Pistol Permit New Application Process is a multi-step process that requires attention to detail. Please follow and read each step in the process carefully.

**Pistol Permit Process Overview**

1. You must be at least 21 years of age and a resident of Erie County.
2. You need to fill out the County PPA-4R (Rev 9/22) & the State PPB-3 (Rev 8/22) Applications. **(No Photo Copies)**
   **Please Note: Your State PPB-3 Application MUST be notarized by a Notary Public or Commissioner of Deeds under "Jurat" on the back.**
3. You must take a Handgun Safety Course (a DD-214 form is acceptable).
4. You can submit the applications to our office in person or by mail (click here for details).
5. You need to be fingerprinted **prior** to submitting your pistol permit application. Fingerprinting should be done no more than 30 days before submission if possible.
   - Book a fingerprint appointment at https://uenroll.identogo.com/workflows/151Z1G
   - or Call 1-877-472-6915
   - Our Service Code for getting printed is 151Z1G
   - Our ORI Number is NY931040Z
6. You will undergo various background checks by NYS, FBI and an interview by local police.
   - Please review the FBI Privacy Statement, Title 28 CFR 50.12 notice, applicant privacy rights, and agency privacy requirements
7. Your references must all be reachable and will also undergo various background checks and an interview.
8. Your application is then submitted to one of the Licensing Judges for consideration.
9. You will be notified by mail of your approval or denial.
10. If approved, you can then purchase and/or co-register a handgun.

**Obtaining an Application Packet**

- You may pick up the application packet in person in the Pistol Permit Office / Clerk's Administration Office.
- You may obtain an application packet by calling our office and requesting one be mailed to you.
- You can download the application packet digitally from our Forms & Resources section.

**Rules For Filling Out An Application Packet**

Filling out the required paperwork correctly can save a lot of time in the application process. Please read all the instructions carefully. The Application consists of 2 forms, The Erie County PPA-4R and the NYS PPB-3.

1. Please read the first page of the Erie County Application. It lists all the steps necessary to complete accurately.
2. The State Application PPB-3 form. **(No Photo Copies)**
3. Please get fingerprinted no more than 30 days before submission of your application.
4. Photos can be taken in the Pistol Permit Office when you turn in your completed application ($10) or can be taken anywhere passport photos are available.
5. Please include all Certificates of Disposition if you have ever been arrested. Failure to disclose any arrests will result in an immediate denial of your pistol permit.

**Rules for Character Reference**

The Erie County Pistol Permit Department works with numerous law enforcement agencies as part of the application process. Each police agency has its own requirements concerning acceptable references. Please note, the applicant must be aware of their city, town or village of RESIDENCE, (NOT mailing address), because their local police department is the agency, which will handle the background checks of the applicant and references. All four references MUST be contacted to process your application if one or more do not respond to repeated attempts by law enforcement it will result in a denial.

Below is a list of acceptable references, for each jurisdiction:

**AMHERST:** At least 2 references must live in Amherst, the other 2 may live anywhere in Erie County.

**EAST AURORA:** At least 2 references must live in East Aurora, the other 2 may live anywhere in Erie County.

The Erie County Pistol Permit Department CANNOT make exceptions to the above requirements; those must be made by an authorized person at the specific police department. Applicants who live in any other towns, villages and cities with either their own police agency or that are served by the Erie County Sheriff's Department, may use anyone in Erie County as a reference.

REGARDLESS OF POLICE AGENCY, NO REFERENCES CAN BE RELATIVES OF THE APPLICANT OR EMPLOYEES OF THE ERIE COUNTY SHERIFF'S DEPARTMENT.

THIS INFORMATION IS SUBJECT TO CHANGE AT ANY TIME, WITHOUT PRIOR NOTICE.

**What to bring when you come in to submit your Application**

1. Certificate of completing safe handling of firearms instruction from an NYS certified instructor dated no longer than five (5) years.
2. PPB-3 completed and notarized with four (4) references signed by all references.
3. PPA-4R completed with the same four (4) references as listed on the PPB-3.
4. A copy of your NYS Drivers License or Non-Drivers ID.
5. A copy of your Social Security Card or W-2 that lists your Social Security Number.
6. Documents required for a Business Protection Permit.
7. Proof of citizenship and/or immigration document(s) IF BORN OUTSIDE OF U.S.
8. Certificate of Dispositions for **ALL** arrests including **SEALED** cases and DWI (except traffic infractions).
9. Check or Money Order for $20 made out to "Erie County Clerk" for the application processing fee.

**Online Services**

- Auto Bureau Reservations
- Employment Opportunities
- E-Recording Land Records
- E-Filing Court Matters
- Renew Local
- Public Search
- Become A Registered User
- Add Funds to Escrow
- Escrow Account Portal

**Other Services**

- Auto Bureau
- Land Records
- Legal Records
- Hunting & Fishing Licenses
- Notary Information
- Passports
- Pistol Permits
- Starting a Business
- Veterans

**Frequently Requested**

- Public Search
- Record Request
- Records Kept by the County Clerk
- FAQ (Frequently Asked Questions)
- Approved Legal Publication List
- Schedule of Fees
- E-Filing Protocols
- Conveyance Form (Notice of Sale)

**Contact**

Phone: (716) 858-8785
Contact Us

Erie County Clerk's Office
92 Franklin Street
Buffalo, New York 14202

Contact Us & Hours
Auto Bureau Location & Hours
FOIL Request

ERIE.GOV | Site Map | Contact Us | Accessibility

Username: * Password: * Log in

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually,

Defendants.
---------------------------------------------------------------x

22 Civ. 04778 (GRB)(ST)

**DECLARATION OF ZACHARY GIAMBALVO**

ZACHARY GIAMBALVO, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of policies and procedures of the Suffolk County Police Department and certain state statutes that are violating my right to purchase, possess, and carry a handgun for self-protection.

3. I am a resident of Suffolk County, New York. I have no prohibitions or disqualifications to the lawful purchase, receipt, possession, or ownership of firearms.

4.      I intend to immediately purchase, possess, and carry a 1911-style platform handgun sold by Camp-Site, a federally licensed firearms dealer (FFL) located in Huntington, New York. I would have already purchased a 1911 but for the fact that New York law requires a handgun license to purchase, possess and carry a handgun and I cannot do either until the Suffolk County Police Department Licensing Bureau issues my handgun license.

5.      Because the Second Amendment plainly states that I have the right to 'keep and bear arms', it is unconstitutional for me to have to seek permission and be subject to any wait time, particularly one that exceeds 30 days. Every FFL requires a NICS background check, which I have passed when purchasing long guns and will continue to pass. There is no reason for a license requirement at all.

6.      But to comply with New York's laws, I applied to the Suffolk County Police Department Licensing Bureau (SCPD) for a handgun license so that I could lawfully purchase, possess, and carry a handgun.

7.      I looked up the requirements and the application process on the SCPD Licensing Bureau website and followed the instructions. The only application provided on the website was the "Applicant Questionnaire" and the application process as described required that I submit the completed Applicant Questionnaire with a $10 check or money order made payable to "SCPD", which I did in February 2020.

8.      Months later, I contacted the Licensing Bureau to check on the status of my application and was told that my check was "never received", and that I would have to submit another application and $10 fee, which I did.

9.      On July 19, 2022, the Licensing Bureau informed Mr. Giambalvo, "there is an approximately a 2 year wait before you will hear from an investigator for the in person interview."

Attached hereto as Exhibit 1 is a true and accurate copy of the email from the SCPD Pistol Licensing Bureau.

10.    In August 2022, I called the Licensing Bureau to find out when my application would be assigned to an investigator. The woman who answered the phone at the Licensing Bureau, identified herself as "Suzanne" and stated, "it's going to take about a year and a half to 2 years to get called for the interview." A true and accurate copy of the digital recording of the conversation is attached hereto as Exhibit 2.

11.    I later learned that there was a state-imposed 6-month deadline for handgun license, which is also too much of a delay to exercise a protected constitutional right.

12.    I also learned that some of the sheriff offices upstate provide their law enforcement Originating Agency Identifier number (ORI) so that handgun license applicants can get their unsuppressed fingerprint-base criminal history report and turn it in with their PPB-3 State Application. If I have to be licensed, and SCPD is either too busy, understaffed, or just doesn't care to move the process along, I want to be able to speed this process up.

13.    If SCPD provided its ORI number, I would get the DCJS report, the 2 statutorily required photographs, complete a PPB-3 State application and present all 3 to the Licensing Bureau. Because I have no disqualifiers to firearm possession, there is no reason why a license could not issue within 30 days.

14.    I am not going to provide the information required by the CCIA under § 400.00(1)(o), including my social media account information, the names and contact information for any domestic partner or adults and children I live with, or be subject to an in-person interview.

15.    I am also not going to ask my character references for an affidavit that requires them to swear under oath that I have not "engaged in any acts, or made any statements that suggest they are likely to engage in conduct that would result in harm to themselves or others." Not that I

have done anything like that, but how would any applicant's character references know that information unless they were with that person every second of the day for their whole life? And what qualifies as an act or statements that "suggest" a particular result? The whole section is open to subjective interpretation and, like the social media disclosure, puts my First Amendment rights in conflict with the exercise of my Second Amendment rights.

16. I have been around firearms for many years, I grew up around firearms, I learned firearms safety at a young age, and I go target shooting (rifle) with my friends regularly.

17. When I am finally issued a handgun license and am able to purchase handguns, I will undoubtedly and regularly go to the range to go target shooting with them.

18. I am planning to take the 18-hour concealed carry training course required by the CCIA in December 2022 and provided by Frank Melloni through Renaissance Firearms Instruction, Inc. (RFI). The 18-hour course contains a live-fire component, which I will also complete.

19. Because SCPD has not issued my handgun license yet, I face credible threat of arrest and incarceration by SCPD Lt. Komorowski and/or other SCPD police officers. I learned that SCPD will arrest unlicensed individuals who engage in live-fire training by a duly authorized instructor, even though that is allowed under the Penal Law.

20. I should not have to choose between exercising a right protected by the Second Amendment or being arrested and put in jail.

21. Upon issuance of my license (and purchase of a 1911), I will carry a handgun on my person for self-defense regularly.

22.     If I were to be arrested, even if the charge is dismissed, I will be ineligible to obtain a handgun or semiautomatic rifle license from SCPD in the future, which will cause me irreparable harm.

23.     I again contacted the Licensing Bureau to see if their position had changed regarding accepting the PPB-3 upon presentment, as required by law. The man who answered the phone at the SCPD Licensing Bureau looked for my application in the system and informed me, "There is nothing else you have to do, just when we get up to you in the filing system."

24.     When I asked if I could bring in a completed New York State Application (PPB-3), the man said, "The state application doesn't mean anything. That would be for the state troopers or the sheriffs, I don't know what application they use. But the one that you filled out is the one we have here so that's all you need." According to the Licensing Bureau, the statewide PPB-3 license application doesn't even apply to them.

25.     SCPD apparently just does whatever it wants, without regard to the Penal Law or the Constitution.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 28, 2022

Zachary Giambalvo

Case 23-208, Document 64, 04/27/2023, 3506112, Page102 of 230
A98

# EXHIBIT 1

From SCPD Pistol Licensing • SCPDPistolLicensing@suffolkcountyny.gov

To Zachary Giambalvo • zjgiambalvo@gmail.com

Date Jul 19, 2022, 9:19 AM

Standard encryption (TLS).
View security details

We received your payment on 6/23/22 – there is approximately a 2 year wait before you will hear from an investigator for the in person interview.

# EXHIBIT 2

DIGITAL RECORDINGS SERVED AND SUBMITTED TO THE COURT IN HARD COPY FORMAT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**DECLARATION OF JOHN MOUGIOS**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his Official Capacity,

Defendants.
--------------------------------------------------------------x

JOHN MOUGIOS, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of policies and procedures of the Suffolk County Police Department and certain state statutes that are violating my right to purchase, possess, and carry a handgun for self-protection.

3. I am a resident of Suffolk County, New York. I have no prohibitions or disqualifications to the lawful purchase, receipt, possession, or ownership of firearms.

4. I intend to immediately purchase, possess, and carry a Berretta Px4 Storm from Bensons Gun Shop, an FFL located in Coram, New York. I would have already purchased a Px4 but for the fact that I cannot legally purchase or possess a handgun until SCPD issues my handgun license.

5. I should not have to, and will not, be subjected to a discretionary licensing scheme where I have to, among other things, provide my social media account information, personal relationship and family information, undergo an in-person interview, the 18-hour training requirements, and the character reference information required by the CCIA.

6. I intend to carry a handgun concealed for self-defense without being subject to the "proper cause" requirement rejected by *Bruen*, but SCPD apparently is not abiding by the Constitution because the SCPD guide to obtaining a pistol license still contains the 'proper cause' requirement for issuing a concealed carry license.

7. In 2021, I visited the SCPD website to identify the process and procedure for applying for a New York State handgun license.

8. In **July 2021**, I submitted the completed Applicant Questionnaire and $10 fee to SCPD. There was no other application available to fill out or even mentioned.

9. I have not heard anything from the Licensing Bureau, no investigator has been assigned to my application, I have not been scheduled for an appointment to be fingerprinted or photographed, have not been provided with the State Application, and will not have my appointment for ***up to another year*** based on SCPD procedures.

10. I would submit my completed PPB-3 application, the 2 required photographs, and my fingerprint-based unsuppressed criminal history report from the Division of Criminal Justice

Services to SCPD, but I cannot because SCPD does not provide the information necessary for me to obtain my criminal history report and will not accept the PPB-3 upon presentment.

11. The state requirement that a license issue within 6 months from filing the State application should be enjoined, as should SCPD's lengthy licensing procedure. Any firearm licensing process that takes more than 30 days is too long to wait to exercise a preexisting right.

12. I also object to the 18-hour training requirement before being able to carry a handgun for self-defense, and I will not comply.

13. I received an Honorable Discharge after serving for 6 years in the New York Army National Guard where I was assigned to Bravo Company, 1/69th Infantry Division. In service, I received extensive firearms training and over 2½ years of experience as a Team Leader conducting live fire exercises and teaching basic infantry tactics and weapons safety courses. I should not have to spend time and money on additional firearms training.

14. More importantly, protecting myself with a handgun is a guaranteed individual right of mine that cannot be conditioned on, or delayed, by such a regulation.

15. I also object to providing character references. Before a firearms license is issued, I will have submitted to a fingerprint-based background investigation through the federal and state databases, which will reveal whether I have any state and/or federal disqualifiers to firearm possession, which I do not. My right to possess handguns and protect myself and my family is not dependent on third parties – whether that means disclosing my application to them, seeking their recommendation, or otherwise. It also violates my rights to be forced to disclose to third parties that I am applying for a firearm license and/or that I possess and/or carry firearms.

16. I intend to carry a handgun concealed for self-protection, but I will not comply with the disclosure of information like providing my social media accounts, personal relationships

Case: 23-49, 02/27/2023, DktEntry: 35.1, Page 108 of 230

and family information, an in-person interview, or the subjective 'moral character' language. I also do not want to be at the mercy of a county employee with discretion to require me to provide "any such other information" as the new regulations allow. None of that information has any relevance to the fact that I have no disqualifiers under state or federal law to the purchase, receipt, transfer, or possession of firearms.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 2, 2022

John Mougios

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**DECLARATION OF SHANE MASHKOW**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually,

Defendants.

---------------------------------------------------------------x

SHANE MASHKOW, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of policies and procedures of the Suffolk County Police Department and certain state statutes that are violating my right to purchase, possess, and carry a handgun for self-protection.

3. I am a resident of Suffolk County, New York and I have no prohibitions or disqualifications to the lawful purchase, receipt, possession, or ownership of firearms.

4.      I intend to immediately purchase, possess, and carry a Glock-19 from Dark Storm Industries in Oakdale, New York (Suffolk County).  I would have already purchased a Glock-19 from Dark Storm but for SCPD's delays in issuing my handgun license. New York law prohibits the transfer or receipt of a handgun without a handgun license.

5.      Even if I purchased a handgun from an FFL (subject to a NICS background check) outside of New York State, I could not possess or carry it to protect myself in New York because I would face criminal charges for possessing a handgun without a license – even in my home.

6.      I object to being subjected to a discretionary licensing scheme to simply exercise my guaranteed constitutional right to keep and bear arms - conduct presumptively protected by the plain text of the Second Amendment.

7.      I also intend to carry a handgun concealed for self-protection, but I will not comply with the disclosure of information under Penal Law § 400.00(1)(o), like providing my social media accounts, personal relationships and family information, an in-person interview, the character reference information, the 18-hour training requirements, or the subjective 'moral character' language. I also do not want to be at the mercy of a county employee with discretion to require me to provide "any such other information" as the new regulations allow. None of that information has any relevance to the fact that I have no disqualifiers under state or federal law to the purchase, receipt, transfer, or possession of firearms.

8.      To be issued a handgun license in New York, an extensive background check is conducted – my fingerprints will be checked in the New York and federal databases for any disqualifying events, which there are none. No other government-imposed criteria should interfere with my right to purchase, possess, and carry a handgun for self-defense.

9. To comply with New York law, in 2020 I applied for a handgun license to my local licensing officer, the SCPD Licensing Bureau. I went to the SCPD website find out what needed to be done. The process required me to submit the application with a $10 filing fee made payable to "SCPD." The only application mentioned and provided on the SCPD website was the Applicant Questionnaire.

10. I completed and submitted the Applicant Questionnaire and the $10 fee to the Licensing Bureau. Months later, and in and around November/December 2021, I called the Licensing Bureau to check on my application, and I was told that my check was "never received" and that I would have to submit another application and $10 fee.

11. I completed another Applicant Questionnaire and filed it with the Licensing Bureau along with another $10 fee in February 2022 – 8 months ago.

12. In July 2022, I called Licensing Bureau to find out when I would be called in to be fingerprinted. The woman at the Licensing Bureau laughed, then told me that I should get an appointment sometime in ***February 2024***.

13. I also emailed the Licensing Bureau for the same information; the Licensing Bureau responded on July 14, 2022 indicating that office was "currently processing November/December 2020, there is an extremely long wait for the interview."

14. I contacted the Licensing Bureau a few months later and was told that they are currently scheduling interviews for people who submitted the questionnaire in February 2021.

15. I was not aware that the statutory 6-month timeframe for issuing a license did not begin until presentment of the State Application (PPB-3). I would gladly submit the completed PPB-3 application, the 2 required photographs, and obtain my own my fingerprint-based unsuppressed criminal history report from the Division of Criminal Justice Services but SCPD

does not provide the ORI number for obtaining the report and it is my understanding that they will not accept the PPB-3 upon presentment, so submitting it would be futile.

16. I work in New York City every day, Monday through Friday. I leave my home before 9:00 a.m. and I do not return until after 4:30 p.m. The Licensing Bureau is only open Monday through Friday from 9:00 a.m. until 4:30 p.m. If required to be fingerprinted, personally interviewed, and/or photographed at the Licensing Bureau, I will have to take time off from work just to be able to exercise a guaranteed constitutional right. I should either be able to provide the required documents – fingerprint report, PPB-3 and photographs – by mail or, if in person, at a time outside of banker's hours. SCPD is a police station after all.

17. I have contacted multiple businesses on Long Island, including Dark Storm Industries in Oakdale, New York (Suffolk County), regarding the 18-hour training required to apply for a concealed carry license. Each business confirmed that a handgun permit is required to take the CCW training.

18. The fees range from around $400 to $800 (Dark Storm's fee), which is not a nominal amount of money to have to spend to exercise a constitutional right. For certain, I plan to train regularly at the gun range, at my own pace and financial ability. But to prevent me from protecting myself with a handgun until I satisfy a government-imposed condition is an obvious infringement and violates the Second Amendment.

19. The SCPD regulations and state statutes challenged in our complaint and this motion should be preliminarily and permanently enjoined.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 31, 2022

[signature]
Shane Mashkow

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**DECLARATION OF KEVIN MCLAUGHLIN**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually,

Defendants.
---------------------------------------------------------------x

KEVIN MCLAUGHLIN, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of policies and procedures of the Suffolk County Police Department and certain state statutes that are violating my right to purchase, possess, and carry a handgun for self-protection.

3. I am a resident of Suffolk County and a U.S. Marine reservist. I have no prohibitors under state or federal law to the purchase, receipt, possession, or transfer of firearms. As soon as I am legally able, I intend to purchase, possess, and carry a handgun for self-defense.

4. In 2022, I visited the SCPD website to obtain an application and learn about the process for obtaining a New York State handgun license. I printed out and completed the application, which was called the Applicant Questionnaire, and submitted it with the $10 application fee made payable to "SCPD" on July 1, 2022.

5. I contacted the Licensing Bureau around August 2022 to see how long it would be before I would be called in to be fingerprinted. The Licensing Bureau told me that I would not be called in to be fingerprinted for ***approximately 3 years – in and around July 2025.*** If the State is not going to comply with constitutional carry, then any licensing process that takes more than 30 days should be enjoined as violating the Second Amendment. Every purchase of a firearm in New York goes through an FFL; a background check is done on the spot. If the individual is disqualified, the sale is denied. If not, the sale is approved. The process takes less than 15 minutes. There is no reason why the SCPD licensing process needs to take so long.

6. If I have the information from SCPD to obtain my own unsuppressed fingerprint based criminal history report from the Division of Criminal Justice Services, I would submit the report, a completed PPB-3 application, and the 2 required photographs to SCPD immediately. As SCPD does not provide its ORI number and will not accept the PPB-3 upon presentment.

7. While I object to all of the regulations enacted under the Concealed Carry Improvement Act, which did nothing to 'improve' the right to carry a handgun, I make specific mention of the 18-hour training requirement. As a U.S. Marine reservist, I have extensive firearms training and will not spend money and time to attend the 18-hour training course. Protecting myself with a handgun is a guaranteed right and cannot be conditioned on or delayed by such a regulation,

nor should I be forced to spend hundreds of dollars to simply exercise that right.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 28, 2022

___________________________________

Kevin McLaughlin

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually,

Defendants.
---------------------------------------------------------------x

22 Civ. 04778 (GRB)(ST)

**DECLARATION OF MICHAEL MCGREGOR**

MICHAEL MCGREGOR, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of policies and procedures of the Suffolk County Police Department and certain state statutes that are violating my right to purchase, possess, and carry a handgun for self-protection.

3. I am a resident of Suffolk County, New York and a practicing physician. I have no prohibitions or disqualifications to the lawful purchase, receipt, possession, or ownership of firearms.

4. In 2020, I visited the Suffolk County Police Department website to obtain information about applying for a New York State license to purchase, possess, and carry a handgun. According to the website, the only application required to apply for a handgun license was the "Applicant Questionnaire." No other application was provided or even mentioned.

5. Around November 13, 2020, I completed and submitted the Applicant Questionnaire, along with the $10 fee, to the Licensing Bureau.

6. Around October 13, 2021, I contacted the Licensing Bureau to follow up on the status of my application. I was informed that no decision had been made because the Pistol Licensing Bureau was currently "working on pistol license applications from August 2020."

7. The information published on the SCPD website led me to believe that the Applicant Questionnaire I submitted with my check in November 2020 was the required application that started the 6-month clock under the state statute.

8. On December 7, 2021, my attorney filed a mandamus proceeding in Suffolk County State Supreme Court to mandate the SCPD Police Commissioner to issue a determination on my application because more than 6 months had elapsed since its filing and the law requires SCPD to issue a license or denial within that time frame.

9. Suffolk County filed a motion to dismiss the proceeding, arguing that it was "premature" because the SCPD Applicant Questionnaire does not start the 6-month clock –the clock does not start running until the interview takes place and I am given the State Application.

10. As the lawsuit was pending, and likely because we filed a lawsuit, I was contacted by Investigator Carpenter on January 11, 2022, to schedule an appointment to be interviewed and fingerprinted.

11. All of the dates offered by Inv. Carpenter were Wednesdays, which presented a conflict with my work schedule. I asked Inv. Carpenter for an appointment that did not fall on a Wednesday because I would have to take off from work, but he replied that Wednesdays are the only days of the week that the Licensing Bureau schedules interviews and fingerprinting.

12. With no other options, I took the day off from work to be interviewed and fingerprinted by SCPD to obtain a license to exercise a right that is guaranteed by the Constitution.

13. On Wednesday, January 26, 2022, the day after the New York Supreme Court granted the County's motion to dismiss the Mandamus as 'premature' because the State Application had not yet been filed, I met with Inv. Carpenter.

14. I was interviewed and fingerprinted by Inv. Carpenter who also gave me the New York State Pistol/Revolver License Application (PPB-3) to take home, complete, and have signed by each of my 4 references, which I did.

15. I filed the completed State Application PPB-3 with SCPD.

16. On March 24, 2022 – ***16 months*** after filing the Applicant Questionnaire and paying the SCPD filing fee – I was finally issued a handgun license.

17. I wanted an unrestricted concealed carry license, but because SCPD required everyone to establish 'proper cause' and a special need greater than anyone else in society, applying for an unrestricted carry would be futile.

18. The handgun license I was issued in March 2022 is a concealed carry handgun license restricted to sportsman, which allows me to purchase and possess handguns, and carry a handgun during sporting and target shooting activities.

19. After the *Bruen* decision in June 2022, I expected that the restrictions on my concealed carry license would automatically be deemed moot. But SCPD policy requires that

restricted concealed carry licensees file an amendment and pay yet another fee to remove unconstitutional restrictions that were only imposed because of a now-banned unconstitutional 'proper cause' requirement.

20. Notwithstanding the absurdity, on August 15, 2022 I went to SCPD to present the amendment form and pay the fee. I told Inv. Carpenter that I was filing to have my restrictions removed and he informed me that the amendment form and check "starts it" but "doesn't change anything right now", meaning that I have applied for the ability to carry concealed to defend myself and paid the fee, but nothing has changed – despite *Bruen*.

21. Inv. Carpenter gave me my receipt "to show that you started the 'process'" and told me to "keep [my] eyes and ears open for further guidance on the training and all that stuff."

22. By 'training and all that stuff' Inv. Carpenter was referring to the 18-hour training requirement required by the Concealed Carry Improvement Act (CCIA) – which would not take effect for another 2 weeks on September 1, 2022.

23. I have a New York State concealed carry handgun license - I object to having to take any additional steps to exercise my right to carry a handgun for self-defense.

24. I also will not take the 18-hour class required by the CCIA.

25. I go target shooting about once a month for 2-3 hours on average, usually at Blue Mountain in Courtlandt Manor if weather is nice or Coyne Park in Yonkers in the evenings or inclement weather. I fully intend to continue range practice to stay proficient with my handgun, but my right to self-protection cannot be conditioned on government permission. I am also not going to turn over my social media accounts, or who I live with and am married to, and the Licensing Bureau should not have discretion to create their own local rules – SCPD already

disregards the state's laws, allowing them free reign to create 'more restrictive' regulations will further destroy our Second Amendment rights.

26. I am going to carry my handgun in public for self-protection outside of my sportsman restriction on a regular basis – with or without being issued an amended license. I should not be subject to criminal penalties for doing so.

27. Of course, I have no intention of carrying a handgun in locations that the Supreme Court has identified as sensitive, like polling places, schools, and courthouses.

28. I know that I face a credible threat of arrest by SCPD and NYSP for carrying my registered handgun outside of my license restriction, but I should not have to choose between engaging in constitutionally protected conduct and being arrested.

29. The Suffolk County defendants created an absolute bar to my ability to purchase, possess, and carry a handgun for self-defense for over 16 months and are continuing to prohibit my right to protect myself when I leave the house.

30. The Court should, respectfully, preliminarily and permanently enjoin Defendants' enforcement of the criminal statutes against licensed handgun owners, like myself, for carrying outside of my restriction – conduct protected by the plain text of the Second Amendment.

31. Restricted concealed carry licensees should not be subjected to the provisions of the CCIA until renewal, if at all.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 28, 2022

Michael McGregor

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**DECLARATION OF FRANK MELLONI**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, STEVEN NIGRELLLI, in his official capacity,

Defendants.
--------------------------------------------------------------x

FRANK MELLONI, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of the Suffolk County Police Department policy to arrest any person who engages in a live-fire handgun training program who does not have a New York State handgun license, including their instructors.

3. I am an NRA-certified firearms instructor and President of Renaissance Firearm Instruction, Inc. (RFI), located in Suffolk County, New York. RFI provides firearms training to

students through NRA-certified instructors on a wide-variety of skills and practices, including the NRA Basic Pistol Course.

4. After the enactment of the New York State Concealed Carry Improvement Act (CCIA), I created an 18-hour CCIA-compliant curriculum to train and certify individuals seeking to apply for, or renew, a New York State concealed carry handgun license. My CCIA training curriculum encompasses the requirements of Penal Law § 400.00(19), including the required 2-hour live-fire component (the "18-hour course"). The 18-hour course encompasses the NRA Basic Pistol Course, and otherwise meets the minimum standards required by the New York State Division of Criminal Justice Services.

5. RFI offers the 18-hour course to the public, including individuals who have not been issued a New York State handgun license.

6. I am duly authorized to instruct, supervise, and administer the 18-hour training course and to issue the requisite certificate required to obtain a New York State concealed carry handgun license [Penal Law § 400.00(1)(o)(iii)] to students who have successfully completed the course.

7. While individuals cannot legally possess a handgun in New York without a New York State handgun license, Penal Law section 265.20 (3-a) [1] provides an exception to New York's criminal statutes.

8. I advertise the 18-hour course on the RFI website, which contains a registration link for students to sign up for the training. The training is held at the Smithtown VOA Gun Club in Smithtown, New York (Suffolk County).

[1] 3-a. Possession of a pistol or revolver by a person undergoing live-fire range training pursuant to section 400.00 of this chapter while such person is undergoing such training and is supervised by a duly authorized instructor. N.Y. Penal Law § 265.20.

9. The November 6, 2022 class had 18 registered students, including individuals who did not have a New York State handgun license. For unlicensed students, pistols and ammunition are made available during the live-fire training component, which is directly supervised by authorized and certified instructors, including myself.

10. On October 24, 2022, I was forced to cancel the registration of 4 unlicensed individuals who had paid and signed up for the November 2022 18-hour class, and refund their payment, which caused economic harm to myself and RFI. I have since canceled numerous registrations of unlicensed individuals for the 18-hour class for the reasons set forth below.

11. The reason I was forced to deregister the unlicensed students was the verbal threat that I received from Lt. Michael Komorowski of the Suffolk County Police Department. Lt. Komorowski informed me that SCPD will “arrest anybody who handles a pistol or revolver without a New York State pistol permit.”

12. Lt. Komorowski went so far as to say that SCPD is “not honoring” the exemption outlined in Penal Law § 265.20(3-a), which clearly allows for training before a permit is issued, as it is part of the application process.

13. After my conversation with Lt. Komorowski, I called the licensing bureaus of the Nassau County Police Department and the Suffolk County Sheriff’s Office.

14. Lt. Timpano (Nassau County) and Investigator Dunn (Sheriff’s Office) both informed me that their agencies are following the law as set forth in the Penal Law exemption.

15. Unlike SCPD, neither agency is going to arrest an unlicensed person who possesses a handgun during the live-fire training, or their trainers because there is a specific exemption in the law.

16. Implicit in the right to bear arms is the right to engage in training, which includes being instructed in the use of firearms. As I have the right to keep and bear arms, I also have the right to train others in the proper use of firearms. I also have the right to expression, which I exercise in the context of providing firearms training.

17. I am informed that plaintiff Zachary Giambalvo is still waiting for his handgun license to be issued by SCPD and that he is going to attend my December 2022 18-hour class, including the live-fire component.

18. I will instruct Mr. Giambalvo at the December 2022 18-hour class on all of the training requirements, including the live-fire component – whether he has received his handgun license or not.

19. I face a credible threat of enforcement of SCPD's unconstitutional policies and felony arrest for facilitation and/or aiding and abetting the possession of a loaded firearm, particularly because I have announced in this case my intention to violate the SCPD policy.

20. Even if the arrest by SCPD is ultimately determined to be unlawful and no prosecution comes from it because there is a statutory exemption for live-fire training, being arrested, fingerprinted, and incarcerated is an actual and irreparable harm.

21. Other than Mr. Giambalvo, I will not register or provide training to any other unlicensed students for the 18-hour class until the SCPD policy is enjoined for fear of my arrest and theirs, which will constitute a continuing violation of my constitutional rights.

22. Both I and RFI have suffered and will continue to suffer constitutional violations and economic loss because of SCPD's policy so long as the threat of enforcement continues.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December , 2022

__*Frank Melloni*_ 12/07/2022__________
Frank Melloni and on behalf of
Renaissance Firearms Instruction, Inc.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**[PROPOSED] ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his official capacity,

Defendants.
--------------------------------------------------------------x

Upon the accompanying Plaintiffs' Memorandum of Law in Support of its proposed Order to Show Cause for a Preliminary Injunction dated December 8, 2022, the Declaration of Amy L. Bellantoni sworn to on the 8th day of December, 2022; the Declaration of Zachary Giambalvo sworn to on the 28th day of October, 2022 with exhibits; the Declaration of John Mougios sworn to on the 2nd day of December, 2022; the Declaration of Shane Maskow sworn to on the 31st day of October, 2022; the Declaration of Kevin McLaughlin sworn to on the 28th day of October, 2022; the Declaration of Frank Melloni sworn to on the 7th day of December, 2022 and upon all the pleadings and other papers filed in this action; and the Court, having reviewed the Memorandum of Law, supporting Declarations, and exhibits submitted therewith, and having found sufficient reason being alleged and good cause appearing therefore, it is hereby

ORDERED that Defendant Suffolk County Police Commissioner Rodney Harrison, and all successors, his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with him who receive actual notice thereof ("Suffolk County") shall (i) provide the New York State PPB-3 application on the Suffolk County Police Department website and local police precincts; (ii) accept the PPB-3 for filing from all applicants upon presentment; (iii) fingerprint applicants upon presentment of the completed PPB-3 or, in the alternative, publish the Suffolk County Police Department ORI number (Originating Agency Identifier) on its website and in local precincts for applicants to submit their fingerprints directly to the New York State Division of Criminal Justice Services (DCJS) and accept the resulting DCJS Report upon presentment of the PPB-3; (iv) photograph applicants upon presentment of the completed PPB-3 or, alternative, accept 2 statutorily required photographs from applicants upon presentment of the PPB-3; (v) provide hours of public accessibility outside of the Licensing Bureau's currently restricted hours of Monday-Friday from 9:00 – 4:30 p.m.; and (vi) within 30 days of the presentment of the completed PPB-3 application, issue a handgun license to all applicants eligible to possess firearms under state and federal law, including Plaintiffs; and it is further

ORDERED that Suffolk County shall be enjoined from implementing and enforcing (i) Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(19), that portion of section 400.00(4-a) allowing statutory licensing officers 6 months to either issue a license or deny an application made thereunder; (ii) Penal Law section 400.00(15) against handgun licensees who carry a handgun registered thereon outside of their license restriction; (iii) a licensing process that exceeds 30 days between presentment of the completed New York State Pistol/Revolver License Application (PPB-3) and issuance of a license (or denial thereof); (iv) a policy that requires applicants to be

personally interviewed; (v) a policy that subjects unlicensed individuals who participate in live-fire training with a duly authorized instructor, and their instructors, to criminal penalties including arrest and incarceration; and it is further

ORDERED that Suffolk County be so enjoined until such time as the Court resolves Plaintiffs' application for permanent relief in this case; and it is further

ORDERED that sufficient cause having been shown, service of this Order and all of the papers submitted in support thereof shall be made on Defendants' counsel deemed effective if it is completed by electronic mail on or before the ____ of December, 2022; and it is further

ORDERED that Defendants' answering papers on the motion for a preliminary injunction, if any, shall be filed with the Clerk of this Court and served upon the attorneys for Plaintiffs via ECF, by no later than ___________, 2022, and that any reply papers submitted by Plaintiffs shall be filed and served by ECF by ____________, 2022.

**IT IS SO ORDERED**

Dated: ___________, 2022 ______________________________

Central Islip, New York United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLOUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his Official Capacity,

Defendants.

**DECLARATION OF ARLENE S. ZWILLING CV22-4778 (GRB) (ST)**

Arlene S. Zwilling, an attorney duly admitted to practice law before this Court and the courts of the State of New York affirms as follows under penalty of perjury:

1) I am an Assistant County Attorney in the office of Dennis M. Cohen, Suffolk County Attorney, attorney for defendants County of Suffolk, Harrison, Komorowski, Bowen, Scrima, Walsh and Carpenter, defendants in this civil rights action pursuant to 42 U.S.C. § 1983.

2) Attached as Exhibit A is the Suffolk County Police Department's Pistol Licensing Bureau (the "PLB") file for plaintiff Zachary Giambalvo. On its first page, which is his application for a sportsmen's pistol license, plaintiff Giambalvoe states under penalty of perjury that he has been arrested and or summonsed seven times, including two arrests for assault, one for menacing and criminal contempt and one for urninating in a public place.

The application is dated June 22, 2022 on the third unnumbered page. His declaration is dated October 28, 2022, little more than 3 months later.

3) Attached as Exhibit B is the PLB's file for plaintiff John Mougios. The file indicates that he has been arrested or summonsed four times. As can be seen on the third unnumbered page, his application is dated July 6, 2021. His declaration is dated December 2, 2022.

4) Attached as Exhibit C is the PLB file for plaintiff Shane Mashkow. His application is dated December 20, 2021. His declaration is dated October 31, 2022.

5) Attached as Exhibit D is the PLB file for plaintiff Kevin McLaughlin. His application is dated June 28, 2022 (see third unnumbered page). His unsigned declaration is dated October 28, 2022, three months later.

6) Attached as Exhibit E is the PLB's file for plaintiff Michael McGregor. His application to convert his sportsman's license to a full carry license (first page) is dated January 26, 2022. His declaration is signed October 28, 2022, slightly more than 3 months after the Supreme Court's decision in *New York State Rifle & Pistol Ass 'n. v. Bruen*, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

Dated: Hauppauge, New York
January 20, 2023

/s/ Arlene S. Zwilling

Arlene S. Zwilling

Suffolk County Ex. A
Giambalvo Pistol License File
(FILED UNDER SEAL BELOW)

Suffolk County Ex. B
Mougios Pistol License File
(FILED UNDER SEAL BELOW)

Suffolk County Ex. C
Mashkow Pistol License File
(FILED UNDER SEAL BELOW)

Suffolk County Ex. D
McLaughlin Pistol License File
(FILED UNDER SEAL BELOW)

Suffolk County Ex. E
McGregor Pistol License File
(FILED UNDER SEAL BELOW)

A2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLOUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his Official Capacity,

Defendants.

**DECLARATION OF MICHAEL KOMOROWSKI**

**CV22-4778 (GRB) (ST)**

STATE OF NEW YORK )
ss.:
COUNTY OF SUFFOLK )

Michael Komorowski, having been duly sworn, deposes and says:

1) I am a defendant in this action brought by plaintiffs Giambalvo, Mougios, Mashkow, McLoughlin, McGregor, Melloni and Renaissance Firearms Instruction. Inc. pursuant to 42 U.S.C. § 1983.

2) I am employed as a lieutenant with the Suffolk County Police Department, currently assigned as Commanding Officer of the Pistol Licensing Bureau ("PLB").

3) I understand that plaintiffs claim that the PLB hours are insufficient because it is supposedly open for interviews only weekdays from 9:00 A.M. to 4 P.M.

4) Plaintiffs are incorrect. The PLB is open and conducts licensing interviews weekdays from 8 A.M. to 11 P.M. The counter for the public to file license amendments is also open weekdays from 9:00 A.M. to 4:30 P.M.

MICHAEL KOMOROWSKI

Sworn to before me this
12th day of January 2023

Notary Public, State of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

-against-

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his official capacity,

Defendants.
--------------------------------------------------------------x

22 Civ. 04778 (GRB)(ST)

**DECLARATION OF AMY L. BELLANTONI IN REPLY**

AMY L. BELLANTONI, declares pursuant to 28 U.S.C. § 1746 that:

1. I am the Principal of The Bellantoni Law Firm, PLLC attorneys for the plaintiffs in the above-captioned matter. I am admitted to practice law before the United States District Court for the Southern District of New York. I am also admitted to practice law before the United States District Courts for the Northern and Eastern Districts of New York and the District of Columbia, the Second Circuit Court of Appeals, and the United States Supreme Court.

2. I have personal knowledge of the facts set forth herein based upon a review of the file maintained by my office in this matter, research, and discussions with my clients and others having personal knowledge of the facts giving rise to this litigation and the instant application. If

called as a witness, I could and would testify competently to the truth of the matters set forth herein.

3. Attached hereto as Exhibit 1 is a true and accurate copy of the Affidavit of Lt. Michael Komorowski and Suffolk County Memorandum of Law submitted in the matter of *McGregor v. Cameron*, Index No. 622716/2021 (Suffolk Cnty. Sup. Ct).

5. Attached hereto as Exhibit 2 is a true and accurate copy of the biographical background of Mark W. Smith and his publication, "Not all History is Created Equal."

I declare the foregoing to be true and accurate under the penalty of perjury.

Dated: January 27, 2023

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By: Amy L. Bellantoni

Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
---------------------------------------------------------------X
In the Matter of MICHAEL P. MCGREGOR,

Petitioner,

Index No.: 622716/2021

For an Order of Mandamus Pursuant to CPLR 7803(1) To Compel a Determination Pursuant to Penal Law § 400.00(4-a)

**AFFIDAVIT IN SUPPORT OF MOTION TO DISMISS**

-against-

STUART CAMERON, in his Official Capacity as Acting Police Commissioner and Pistol Licensing Officer,

Respondent.
---------------------------------------------------------------X

State of New York )
ss.:
County of Suffolk )

MICHAEL KOMOROWSKI, having been duly sworn, deposes and says:

1. I am currently employed as a Lieutenant in the Pistol Licensing Bureau of the Suffolk County Police Department ("Pistol Licensing Bureau") and have been so employed in such capacity for the past four (4) years. I have been employed by the Suffolk County Police Department for the past 30 years.

2. I make this affidavit in support of the Respondent's Motion to Dismiss the Verified Petition of Petitioner Michael P. McGregor ("Petitioner" or "McGregor") pursuant to CPLR §§ 3211(a)(1) and (7) because: (1) it is barred by documentary evidence, and (2) it fails to state a cause of action.

3. Due to COVID, the Suffolk County Police Department Pistol Licensing Bureau did not conduct new applicant interviews between March 2020 and June 2020, and between December 2020 and April 2021. This caused a significant back-log of applicant questionnaires waiting to be assigned to Applicant Investigators for interviews. In addition, in 2020, 6213 Pistol License Applicant Questionnaires were submitted, and in 2021, 3019 Pistol License Applicant Questionnaires were submitted. This number is in stark comparison to the years 2017, 2018, and 2019, when the average for submitted Pistol License Questionnaires was 2100 per year.

4. On or about November 11, 2020, Petitioner submitted to the Pistol Licensing Bureau, a Pistol License Applicant Questionnaire (form PDCS 4406n Rev.2), a redacted copy of which is annexed hereto as Exhibit A.

5. The submission of the Pistol License Applicant Questionnaire is the first step towards obtaining a pistol license. The next step is for the applicant to be called into the Pistol Licensing Bureau for an interview, during which time the applicant is fingerprinted and a formal New York State Pistol/Revolver License Application (form PPB 3 rev. 06/17) ("NYS Application") (annexed hereto as Exhibit "B") is completed. The fingerprints are forwarded to New York State and the NYS Application is investigated.

6. According to Penal Law §400.00 (4-a), the Suffolk County Pistol Licensing Bureau has six (6) months to act upon the Petitioner's completed NYS Application. The six (6) month period starts to run once Petitioner is interviewed, during which time he will be fingerprinted and he will complete the NYS Application. Accordingly, the date the NYS Application and fingerprints are completed (the date of the interview), is the date by which the six (6) month time frame as set forth in NYS Penal Law § 400.00(4-a) commences.

7. On November 15, 2021, Petitioner's matter was assigned to an Applicant Investigator. It is anticipated that Petitioner will be called in for an interview within the next several months.

8. Since Petitioner's NYS Application will not be completed until he is interviewed and fingerprinted, his petition and writ of mandamus seeking to compel the immediate determination of his application for a New York State Pistol License is premature and must, therefore, be dismissed.

MICHAEL KOMOROWSKI

Sworn to before me this
day of December 2021

State of New York
Notary Public

Regina Jean DeRocco
Notary Public, State of New York
NO. 01DE6259615
Qualified in Suffolk County
Commission Expires April 16, 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

---------------------------------------------------------------X

In the Matter of MICHAEL P. MCGREGOR,

Petitioner,

Index No.: 622716/2021

For an Order of Mandamus Pursuant to CPLR 7803(1) To Compel a Determination Pursuant to Penal Law § 400.00(4-a)

Assigned Justice:
Hon. Kathy G. Bergmann

-against-

STUART CAMERON, in his Official Capacity as Acting Police Commissioner and Pistol Licensing Officer,

Respondent.

---------------------------------------------------------------X

**RESPONDENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

DENNIS M. COHEN
Suffolk County Attorney
*Attorney for Respondent*
H. Lee Dennison Building
100 Veterans Memorial Hwy.
P.O. Box 6100
Hauppauge, New York 11788
(631) 853-5822

By: Hope Senzer Gabor
Assistant County Attorney

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted in support of the Respondent, STUART CAMERON, in his Official Capacity as Acting Police Commissioner and Pistol Licensing Officer's motion to dismiss the Petitioner's Petition seeking a Writ of Mandamus for and Order and Judgment, pursuant to CPLR §§ 3211(a)(1) and (7). The Petition is premature, and therefore must be dismissed in its entirety because: (1) it is barred by documentary evidence, and (2) it fails to state a cause of action.

Petitioner filed a Verified Petition and "Writ of Mandamus to Compel the Immediate Determination of Petitioner's Application for a New York State Pistol License" (NYSCEF Doc. No. 1) (Exhibit "C"), accompanied by a Memorandum of Law (NYSCEF Doc. No. 4), claiming that Respondent is in violation of New York State Penal Law § 400.00 (4-a). As argued below, the Petition must be dismissed as premature. Petitioner has not yet completed the Application for a New York State Pistol/Revolver License Application, which will be completed at the time of his interview, and, since his interview has yet to be conducted, the six (6) month time period as set forth in Penal Law § 400.00 (4-a) has not yet commenced.

## ARGUMENT

## POINT I

## THE STANDAND SET FORTH IN CPLR §3211 DEMANDS DISMISSAL OF THIS ACTION

A motion to dismiss pursuant to CPLR §3211 will be granted where, as here, the moving party establishes entitlement to dismissal as a matter of law.

CPLR §3211 (a) provides in relevant part:

> 3211. (a) Motion to dismiss cause of action. A party may move for judgment dismissing one or more causes of action asserted against him on the grounds that:
>
> 1. a defense is founded on documentary evidence, or…
>
> 7. the pleading fails to state a cause of action.

CPLR §3211 (a)(1) and (7) .

On a motion to dismiss, the sole issue before the Court is whether the facts alleged in the Complaint fit any cognizable legal theory. The standard is whether the plaintiff has a cause of action, not whether the complaint states a cause of action. *Leon v. Martinez*, 84 N.Y.2d 83, 87-88 (1994); see also, *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561 (2005). It is well established that on a motion to dismiss, the Court's task is to determine "whether, accepting as true the factual averments of the Complaint, plaintiff can succeed upon any reasonable view of the facts stated (*internal citations omitted*)." *People v. New York City Transit Authority*, 59 N.Y.2d 343, 348 (1983). Conclusory allegations, however, are insufficient to survive a motion to dismiss. See, *Godfrey v. Spano*, 13 N.Y.3d 358, 373 (2009).

In this case, as discussed in detail below, Petitioner cannot succeed based on any reasonable view of the facts, the reasons being independent and sufficient on their own, because: (i) there is documented proof that Petitioner has not yet completed the New York State Pistol Licence Application (he only filed a Pistol License Applicant Questionnaire) and (ii) Petitioner fails to plead a cause of action against Respondent. Accordingly, the Petition must be dismissed in its entirety.

## POINT II

## THE PETITION IS PREMATURE AND THEREFORE MUST BE DISMISSED

### A. Documentary Evidence

A motion to dismiss pursuant to CPLR 3211(a)(1), on the ground that the action is barred by documentary evidence: "may be appropriately granted only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." *Goshen v. Mutual Life Ins. Co. of New York,* 98 N.Y. 2d 314, 326, 774 N.E. 2d 1190, 746 N.Y.S.2d 858 (2002), *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.* 37 N.Y. 3d 169, 174, 117 N.E. 3d 1192, 1194, 150 N.Y.S. 3d 79, 83 (2021).

As set forth in his Verified Petition, Petitioner is under the mistaken belief that he filed a New York State Application for a Pistol/Revolver License, when, in fact, he only took the first step in the process. On or about November 11, 2020, Petitioner submitted to the Pistol Licensing Bureau, a Pistol License Applicant Questionnaire (form PDCS 4406n Rev.2) ("Applicant Questionnaire") a copy of which is annexed to the affidavit of Lt. Michael Komorowski as Exhibit "A". This is not the New York State Application for a Pistol/Revolver License, (form PPB 3 rev. 06/17) ("NYS Application") which is annexed to the affidavit of Lt. Komorowski as Exhibit "B".

As explained in Lt. Komorowski's Affidavit, the reflief sought by Petitioner is premature. Petitioner took the first step in the process for obtaining a pistol license by submitting a Pistol License Applicant Questionnaire. The next step will take place when the Petitioner is called into the Pistol Licensing Bureau for an interview, during which time he will be fingerprinted and the formal NYS Application is completed. The fingerprints are forwarded to New York State and the NYS Application is investigated. (Komorowski Affidavit ¶ 5). In accordance with Penal Law §400.00 (4-a), the Suffolk County Pistol Licensing Bureau has six (6) months to act upon the Petitioner's completed NYS Application. The six (6) month period starts to run once Petitioner is interviewed, during which time he will be fingerprinted and he will complete the NYS Application.

(Komorowski Affidavit ¶ 6). Since this time period has not yet commenced, the Pettition is premature and must therefore, be dismissed as a matter of law.

The documentary evidence clearly illustrates that Petitioner submitted his Applicant Questionnaire on November 11, 2020. (Komorowski Affidavit Exhibit “A”). The documentary evidence also shows that Petitioner’s NYS Application is not complete until such time as he is interviewed and fingerprinted. (Komorowski Affidavit Exhibit “B”). Although on November 15 2021, Petitioner’s application was assigned to an Applicant Investigator, Petitioner has yet to be called in for an interview (Komorwski Affidavit ¶ 7). Once the interview takes place, Petitioner will be fingerprinted and he will complete the NYS Application. The six month statutory time-frame, and pursuant to Penal Law §400.00 (4-a), will then commence. The Suffolk County Pistol Licensing Bureau has six (6) months from that date to act upon the Petitioner’s completed NYS Application. (Komorowski Affidavit ¶ 6).

In a similar matter, this Court (Hon. James Hudson) dismissed a CPLR Article 78 petition seeking the remedy of mandamus to compel the issuance of a pistol permit. In that case, Petitiioner had not fully completed his application for a pistol license and the Court determined that the Petition was premature due to the fact that the six (6) month statutory time period set forth in NYS Penal Law § 400.00 (4-a) had not yet expired. Annexed hereto as Exhibit “D” is a copy of the decision, *McCarthy v. Sini,* Index No.: 006103/2016 (Sup. Ct. Suf. Cty., September 15, 2016). Same here; since Petitioner has not yet completed the NYS Application, the Petition is premature and therefore, must be dismissed.

**CONCLUSION**

In view of the foregoing, it is respectfully submitted that the Petition be dismissed in its entirety as premature, together with such other and further relief this Court may deem just, proper, and equitable.

Dated: Hauppauge, New York
December 28, 2021

DENNIS M. COHEN
Suffolk County Attorney

By: *Hope Senzer Gabor*
Hope Senzer Gabor
Assistant County Attorney
*Attorney for Respondent*

100 Veterans Memorial Hwy.
P.O. Box 6100
Hauppauge, New York 11788
(631) 853-5822



A148

THE KING'S COLLEGE NEW YORK CITY
ABOUT ADMISSIONS ACADEMICS STUDENT LIFE NEWS & EVENTS INFO FOR APPLY GIVE STUDY ONLINE

# Mark W. Smith

Senior Fellow of Law and Public Policy; Presidential Scholar

HOME › ACADEMICS › FACULTY › MARK W. SMITH

CONTACT

msmith@tkc.edu

EDUCATION

J.D.
New York University School of Law

B.S. Economics
University of South Carolina

Professor Mark W. Smith is a Presidential Scholar and a Senior Fellow in Law and Public Policy at The King's College. Professor Smith is also a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology at the University of Oxford. He is a former adjunct professor of law at the University of Kansas School of Law, where he researched and taught a course on constitutional law, the Second Amendment, and related topics.

Professor Smith's academic interests include:

- English and early-American legal history.
- The Second Amendment's right to keep and bear arms.
- The appropriate role of text, history, and tradition in interpreting the Bill of Rights.
- The legitimacy of the "tiers of scrutiny" framework in American constitutional law.
- The potential role of David Hackett Fischer's *Historians' Fallacies: Toward a Logic of Historical Thought* as a potential methodology for solving debates about the proper application of America's history to resolve complex questions of constitutional interpretation.
- The proper relationship between the Supreme Court and the lower federal courts in the hierarchical federal judiciary.
- The use of "lawfare" in the American legal system.

Professor Smith's research at Oxford involves identifying legal landmines at scientific and medical departments at the world's leading universities and scientific institutes. He seeks to develop best practices for scientists, researchers and medical professionals, and to combine relevant practical concerns with more theoretical legal and other considerations.

Professor Smith is a highly sought out public policy expert. *Policy Experts: Insider Guide to Public Policy Experts and Organizations*, and the *Journalist's Guide to Legal Policy Experts*, list Professor Smith as a public policy expert on subjects touching on American constitutional law.

Professor Smith has lectured and presented widely at academic and scholarly conferences, and spoken at the Yale Law School, Harvard Law School, Princeton University, Columbia Law School, NYU School of Law, and the Wharton Business School (MBA) at the University of Pennsylvania. He is regular speaker at the Federalist Society's National Lawyers Convention held each year in Washington, D.C.

Professor Smith is a New York Times bestselling author and a former editor of the *New York University Environmental Law Journal* and a former guest editor of the *Harvard Journal of Law and Public Policy*. Professor Smith's recent work has been published in the *Harvard Journal of Law & Public Policy*, the *Catholic University Law Review*, the *Texas Tech Law Review*, the *Pepperdine Law Review*, the *Arizona State University Corporate and Business Law Journal*, the *Oklahoma Law Review*, the *Seton Hall Legislative Journal*, and elsewhere. Professor Smith's article, "BIG DATA COMES FOR TEXTUALISM: THE USE AND ABUSE OF CORPUS LINGUISTICS IN SECOND AMENDMENT LITIGATION," was recently listed on the Social Science Research Network's (SSRN) Top Ten download list for the Legal Scholarship Network's categories of Constitutional & Statutory Interpretation, Judicial Review, and Law & Rhetoric. The abstract of Professor Smith's paper, which has been accepted for publication in the *Drake Law Review*, may be found here.

In addition to his research and writing efforts as a Senior Fellow, Professor Smith also serves as the Legal Academic Research Director of the Project on Criminal Justice Reform.

CAREER HISTORY

Professor Smith has been called "[a] powerhouse lawyer," a "rising public intellectual," and a "high-stakes, high-profile Wall Street litigator." His victories in the courtroom have captured the cover of *The New York Times* and his legal work has been reported throughout the country. Professor Smith has appeared as an expert legal analyst on CNN, CNBC, Bloomberg Television, CourtTV, the Fox News Channel, the Fox Business Channel, Newsmax, and MSNBC. He has also appeared in the *New York Times*, the *Washington Times*, the *Wall Street Journal*, the *Washington Free Beacon*, *Human Events*, and the *Washington Examiner*. He has appeared on numerous national radio shows including the *Ben Shapiro Show*, the *Lars Larson Show*, the POTUS Channel (Sirius XM) and the Patriot Channel (Sirius XM).

Following his graduation from the New York University School of Law, Professor Smith served as a law clerk for the Honorable D. Brook Bartlett, a judge for the United States District Court for the Western District of Missouri. Upon the completion of his clerkship, he joined the firm of Skadden, Arps, Slate, Meagher & Flom as an associate. He then moved to the firm of Kasowitz Benson Torres & Friedman LLP, where he was an equity partner. In 2007, he founded the firm of Smith Valliere PLLC, which had offices on Madison Avenue and at Rockefeller Plaza in midtown Manhattan. In 2015, Smith Valliere PLLC was named the Small Law Firm of the Year in New York City by *SmartCEO Magazine*.

Professor Smith is a member of the Bar of the United States Supreme Court. He has tried jury and bench trials in state and federal court. He has tried cases involving complex synthetic derivative financial products, real estate transactions, large corporate raiding efforts, partnership disputes and international commodity trades. As co-counsel in a federal jury trial, Professor Smith won a million-dollar judgment in a precedent-setting civil rights case that a cover story in The New York Times proclaimed to be the largest of its kind in New York history. He also tried the largest no-fault insurance trial in U.S. history for $23 million and represented New York businesses in a multi-billion-dollar challenge to New York's participation in the "cap and trade" scheme called the Regional Greenhouse Gas Initiative. Professor Smith represented Texas state legislators as amicus counsel before the United States Supreme Court, and represented African American women seeking to start hair braiding businesses in a highly publicized constitutional challenge to New York state's economic regulations. He represented a former United States Ambassador to Venezuela in a major federal lawsuit involving racketeering claims arising from alleged foreign corruption.

Outside of the courtroom, Professor Smith is a sought-after advisor to companies and individuals seeking to avoid "legal landmines," i.e., activities that might lead to costly disputes or legal liability. He has counselled clients engaged in a wide variety of commercial transactions and business dealings including companies conducting business internationally. He has also advised clients in connection with matters involving employment, commercial transactions, licensing, agency, assignment, intellectual property, film financing, publishing, settlements, and secured lending arrangements, and has counselled bestselling authors, corporate executives, entrepreneurs, bank trustees, bloggers, music organizations, attorneys, and celebrities.

SELECTED PUBLICATIONS

BOOKS

*First They Came for the Gun Owners.* New York, New York (2019)

*#Duped.* New York, New York (2018)

*Disrobed.* New York, New York. Random House Crown Forum (2006)

*The Official Handbook of the Vast Right Wing Conspiracy* (2004)

*2006 Midterm Edition: The Official Handbook of the Vast Right Wing Conspiracy*

*2008 Presidential Election: The Official Handbook of the Vast Right Wing Conspiracy*

SELECTED ACADEMIC ARTICLES

Mark W. Smith, Dan M. Peterson, *Big Data Comes for Textualism: The Use and Abuse of Corpus Linguistics in Second Amendment Litigation*, SSRN-id3887060 (2021) (forthcoming Drake L. Rev. Spring 2022).

Mark W. Smith, *Second-Class Rights and Second-Class Americans: Applying Carolene Products Footnote 4 and the Court's Enforcement of Nationally Accepted Norms Against Local Outlier Jurisdictions in Second Amendment Enforcement Litigations*, 70 Cath. U. L. Rev. 83 (2021).

Mark W. Smith, *"Assault Weapon" Bans: Unconstitutional Laws for a Made-Up Category of Firearms*, 43 Harv. J. of L. and Pub. Pol'y 357 (Spring 2020).

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and His Influence on the Founders: Understanding the Meaning and Purpose of the Second Amendment's Right to Keep and Bear Arms*, 2020 Pepperdine L. Rev. 71 (2020).

Mark W. Smith, *Violence in the Streets? Hardly. Even Under the "Tiers of Scrutiny" Approach to Judicial Review, State Actors Cannot Justify Restricting the Right to Carry Firearms Based on Contemporary Criminological Studies*, 53 Texas Tech L. Rev., SSRN-id3545087 (2020).

Mark W. Smith, *A Judicial Teaching Point: The Lesson of the Late Justice John Paul Stevens in Sony v. Universal City Studios as a Response to Civil Lawfare*, 1 Arizona State Univ. Corporate and Business L. J. 71 (2020).

Mark W. Smith, *Fischer's Fallacies and Firearms in America: What Can David Hackett Fischer's Historical Fallacies and Paradigms Teach Us About the Constitutional Text, History and Tradition?* SSRN-id544522 (Aug. 2,2020).

Mark W. Smith, *Civil Liberties in a Post- 9/11 World*, Seton Hall. Legis. J. (2002).

Mark W. Smith, *Caucus Reform? Primary Reform? Delegate Reform? Lessons from the 2016 Political Party Presidential Nominating Process: A 50-State Review of the Legal and Political Mechanisms Deployed by the Republican Party for Selecting Delegates to the 2016 Republican National Convention*, SSRN-id3540486 (2015).

Mark W. Smith, *A Congressional Call to Arms*, 49 Okla. L. Rev. 295 (1996).

*Heller v. District of Columbia's "Common Use" Test: How Does this Standard of Review Hold Up to the Modern American Gun Culture?* SSRN-id3538052 (2018).

Mark W. Smith, *Textualism, Originalism, Populism and the Most Fundamental Constitutional Right: Why the Supreme Court Should Invoke Constitutional Protections to Protect Local Minorities in the Second Amendment Context*, SSRN-id3537756 (2019).

TIME AT KING'S: MARCH 2016 TO PRESENT

Sign up for The King's Insider

Enter your email address*

PLUS, SEND ME NEWS FOR ALUMNI PARENTS

SUBMIT

ABOUT

Through its commitment to the truths of Christianity and a biblical worldview, The King's College seeks to transform society by preparing students for careers in which they help to shape and eventually lead strategic public and private institutions, and by supporting faculty members as they directly engage culture through writing and speaking publicly on critical issues.

BACK TO THE TOP

CONNECT
NEWS AND EVENTS
STORIES
CONTACT

56 Broadway • New York, NY 10004
212.659.7200 • 888.969.7200

CAMPUS HOURS
M-F 8:00AM–10:00PM
SAT: 12:00PM–10:00PM
SUN: CLOSED

STUDENT UNION HOURS
M-F 8:00AM–10:00PM
SAT: 12:00PM–10:00PM
SUN: CLOSED

RESOURCES
CONSUMER INFO
CAMPUS SAFETY
TITLE IX
PRIVACY POLICY
WEBSITE ACCESSIBILITY
STAFF DIRECTORY
FACULTY DIRECTORY
STUDENT HANDBOOK

© The King's College 2022 - All rights reserved

**WORKING DRAFT – Subject to change**

# "Not all History is Created Equal":

# In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868

Mark W. Smith

***

Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, Oxford University; Presidential Scholar and Senior Fellow in Law and Public Policy, The King's College; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law. He also hosts the Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and issues. He is the author of multiple books including *First They Came for the Gun Owners: The Campaign to Disarm You and Take Your Freedoms* (Bombardier Books 2019) and *#Duped: How the Anti-gun Lobby Exploits the Parkland School Shooting—and How Gun Owners Can Fight Back* (Post Hill Press 2018).

Electronic copy available at: https://ssrn.com/abstract=4248297

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ... 1

I. 1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT. ... 7

A. The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government. ... 7

B. The meaning of a constitutional provision is fixed when it is adopted. ... 9

C. The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions. ... 10

D. All three of the Supreme Court's substantive interpretations of the Second Amendment assess its meaning and scope by looking at the Founding period. ... 15

E. Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868. ... 17

F. If later understandings contradict the original understanding of the text, the original understanding controls. ... 27

G. The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of McDonald. ... 31

II. 1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE BILL OF RIGHTS. ... 33

A. It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they were incorporating against the states all of the provisions of the first eight amendments. ... 33

B. The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause. ... 40

C. The individual right to bear arms in the Second Amendment was understood the same way in 1868 as in 1791. ... 41

III. THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE. ... 45

A. Professor Lash's approach is theoretically unsound and unlikely to be adopted. ... 46

Electronic copy available at: https://ssrn.com/abstract=4248297

B. Professor Amar's approach contains similar flaws and his theories have been rejected by Heller ........ 51

CONCLUSION ........ 57

Electronic copy available at: https://ssrn.com/abstract=4248297

**INTRODUCTION**

In June of 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*,[1] its most significant case interpreting the scope of the Second Amendment since the landmark decision in *District of Columbia v. Heller* in 2008.[2] *Bruen* was a major victory for the constitutional right to keep and bear arms. One consequence of the decision has been to send the gun control movement scrambling for new ways to undercut the right to bear arms in a post-*Bruen* world. Opponents of the Second Amendment have seized upon a short passage by Justice Thomas, author of the *Bruen* opinion, to argue in the lower courts that an originalist interpretation requires courts to look at the meaning of the Second Amendment (and thus, logically, all provisions of the Bill of Rights) when the Fourteenth Amendment was ratified in 1868, not in 1791 when the Bill of Rights was ratified. This approach, if accepted, would revolutionize not only Second Amendment law, but also the Court's entire Bill of Rights jurisprudence. It is nonsensical, contrary to the Supreme Court's precedents, and contradicts the express text of *Bruen*.

Before looking at what the *Bruen* opinion said (or did not say) on that subject, *Bruen* itself needs to be placed in context. *Heller* held that the Second Amendment confirms an individual right to keep and bear arms for lawful purposes such as self-defense. It also rejected the use of a means-ends balancing test, such as levels of scrutiny, and instead relied on a "text, history, and tradition" test.

In the fourteen years between *Heller* and *Bruen*, most of the lower federal courts largely disregarded *Heller*'s historical methodology and instead applied a two-part interest balancing

[1] 142 S.Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

test. The first part of the test looked at whether a particular ban or restriction fell within the scope of the Second Amendment. If it did, the second part of the test was invoked, and the lower courts usually applied an "intermediate scrutiny" balancing test to render the Second Amendment's protections ineffectual. That remained true even after the Court held in *McDonald v. City of Chicago*[3] that the Second Amendment is a fundamental individual right that is incorporated against states and localities by the Fourteenth Amendment's Due Process Clause.

*Bruen* changed all of that. The Court expressly rejected balancing tests. In the words of the Court, the second step was "one step too many."[4] *Heller* and *McDonald*, the Court stated, "do not support applying means-end scrutiny in the Second Amendment context."[5] Rather, Second Amendment cases must be firmly rooted in the text and history of that Amendment. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," the Court held. To overcome that presumption, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[6] That means that the government has the burden of showing that there were reasonably close historical analogues to the present-day restriction that is challenged.[7]

But at what point in history should courts look to determine if there were laws or restrictions analogous to those being challenged? Immediately after *Bruen* was decided,

---

[3] 561 U.S. 742 (2010).

[4] *Bruen*, 142 S.Ct. at 2127.

[5] *Id.*

[6] *Id*. at 2127, 2130.

[7] *Bruen* established several important principles for the Second Amendment. In addition to striking down the two-part test for the Second Amendment, it established that the Second Amendment protects the carrying of weapons outside the home. It held that carry permit or license systems are unconstitutional if they vest discretion in state or local officials instead of being based on objective criteria. It also outlined the proper methodology for applying the Second Amendment based upon reasoning by historical analogy.

Electronic copy available at: https://ssrn.com/abstract=4248297

government defendants (and their anti-gun amici) in Second Amendment cases began to argue that in litigation against states and localities, as opposed to litigation against the federal government, the relevant time period is not 1791, when the Second Amendment was ratified, but 1868, when the Fourteenth Amendment was ratified.[8]

Here is the passage in *Bruen* on which they base this argument. After reviewing the historical methodology to be employed by courts in future Second Amendment cases, the Court made a final observation that:

> Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [citations omitted] And we have *generally assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791.* See, *e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).
>
> We also *acknowledge* that there is an *ongoing scholarly debate* on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they

[8] See, *e.g.*, Br. of Def. John Harrington in Support of his Motion for Summary Judgment 24, *Worth v. Harrington*, No. 0:21-CV-01348, Doc. 49 (D. Minn. Aug. 4, 2022) ("Especially relevant … are laws that were in effect around the time the Fourteenth Amendment, which made the Second Amendment applicable to the States, was ratified); Electronic Amicus Letter Br. of Everytown for Gun Safety 2, *Lara v. Commissioner Pennsylvania State Police*, No. 21-1832, Doc. 61 (3d Cir. Aug. 2, 2022) ("the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states."); [Proposed] Amicus Br. of Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction 7, *Antonyuk v. Bruen*, No. 1:22-cv-00734, Doc. 33 (N.D.N.Y. Aug. 18, 2022) ("Thus, when the people chose to extend the Bill of Rights to the states in 1868, their understanding of the scope of each right should control the originalist analysis today."). The specific arguments made in these and similar cases are discussed in Part G, below.

Electronic copy available at: https://ssrn.com/abstract=4248297

readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings").[9]

That portion of the opinion concluded that: "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[10]

That has led gun control advocates to treat the issue of whether 1791 or 1868 is the relevant time period as an open question and to argue for 1868. Undoubtedly that is because there were more laws concerning firearms on the books in 1868 than there were in 1791, and thus more opportunities to find historical "analogues" to restrict individual rights. Also, the Reconstruction period is unusual in American history because the North was occupying the South with military force, and the South was trying to disarm the newly freed blacks. Such actions during that period are therefore not representative of either the Founding period or of the American historical tradition.

But 1791 vs. 1868 is not an open question. That the Founding period is the correct time to determine the original public meaning of an individual right is not a mere "assumption," as Justice Thomas stated in his respectful nod to the "ongoing scholarly debate." It is an integral and controlling part of the Court's Bill of Rights jurisprudence. As shown in this article, when history must be consulted to determine meaning, it has been the universal practice of the Court to look at the Founding period and relevant antecedents to determine original public understanding. No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it

---

[9] *Bruen*, 142 S.Ct. at 2137-38 (emphasis added). The SSRN article by Professor Lash has now been published as Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (Summer 2022).

[10] *Id*. at 2138.

Electronic copy available at: https://ssrn.com/abstract=4248297

is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791.

The Supreme Court has held that the meaning of the Constitution, including the Bill of Rights, is fixed at the time it was adopted, not later. A provision of the Bill of Rights has only one meaning, whether applied against the federal government or the states. And the time period for determining that single meaning, when history must be examined, is 1791. That is true of the three cases cited in the passage quoted above from *Bruen;* it is true of all of the Supreme Court's Second Amendment cases beginning with *Heller*, including *Bruen* itself; and it is true of Supreme Court cases examining other rights provisions of the Bill of Rights. The Court has also clearly stated that if a later interpretation differs from the original meaning at the time of ratification of the Bill of Rights, the later interpretation must yield.

As shown in detail below, the cases cited by post-*Bruen* defendants or amici in Second Amendment litigation were either abrogated by *Bruen* itself, resulted from a misreading (later corrected) of the *McDonald* decision by a single Circuit Court of Appeals, or were those which cited to that mistaken decision.

Even if one examines the period of ratification of the Fourteenth Amendment, there is no evidence that the ratifiers thought the existing rights in the Bill of Rights somehow changed in meaning. Rather, the Fourteenth Amendment's purpose was to include African Americans within the protections granted to citizens and to protect their rights against encroachments by the states. In fact, it did not take long for the Supreme Court to decide that "privileges or immunities" of citizens of the United States were a very limited set of rights indeed.

This article concludes with a description of the scholarly positions of Professors Lash and Amar regarding use of the year 1868 to determine the meanings of the Bill of Rights. Professor

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

Lash's position would require a complete overturning of Supreme Court's Bill of Rights jurisprudence. Professor Amar's position is different, and his concerns, especially regarding the Second Amendment, may have been resolved by *Heller*, which was decided ten years after his cited book was published.

Electronic copy available at: https://ssrn.com/abstract=4248297

## I. 1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT.

### *A. The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government.*

The key to understanding why *only* 1791 is the proper year for determining the original public meaning of the Second Amendment, or of any other right of individuals enumerated in the Bill of Rights, is found in *Bruen* itself: "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."[11] The Court does not apply two different versions of the Second Amendment, or two versions of other incorporated provisions of the first eight amendments in the Bill of Rights. Specifically, it does not apply one meaning when invoked against potential federal infringement and a different meaning when invoked against a potential state or locality infringement.

This has been a fundamental principle of Bill of Rights jurisprudence for more than five decades.[12] That an incorporated right has only a single meaning was made crystal clear in *McDonald*, which quoted *Malloy v. Hogan* as establishing that the Court has:

> abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court."[13]

Instead, as *McDonald* noted, the *Malloy* Court "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment

[11] *Bruen*, 142 S.Ct. at 2137 (emphasis added).

[12] The concept that the federal government and state governments are restrained equally by the First Amendment, and by the incorporated First Amendment, appears to go back even further. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states *as incompetent as Congress* to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (emphasis added).

[13] *McDonald*, 561 U.S. at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 5–6 (1964)).

Electronic copy available at: https://ssrn.com/abstract=4248297

according to the same standards that protect those personal rights against federal encroachment.'"[14] The meaning of a provision of the Bill of Rights is *identical* whether applied against the states or the federal government. Similarly, the Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."[15]

*McDonald* discussed one anomalous case, *Apodaca v. Oregon*,[16] which when *McDonald* was decided allowed state criminal defendants to be convicted of a serious crime by a 10-2 vote rather than only by a unanimous jury as the Sixth Amendment requires in federal trials. That case has since been overruled in *Ramos v. Louisiana*, with the Court noting that it has "long explained … that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government."[17] As a case decided just one year earlier stated, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."[18] That means, however it is interpreted, the Second Amendment must apply *equally* against the states and the federal government.

---

[14] *McDonald*, 561 U.S. at 765-66 (quoting *Malloy*, 378 U.S. at 10, and further citing *Mapp v. Ohio*, 367 U.S. 643, 655–656 (1961); *Ker v. California*, 374 U.S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U.S. 108, 110 (1964); *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Duncan v. Louisiana*, 391 U.S. 145, 149, 157–158 (1968); *Benton v. Maryland*, 395 U.S. 784, 794–795 (1969); and *Wallace v. Jaffree*, 472 U.S. 38, 48–49 (1985)).

[15] *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

[16] 406 U.S. 404 (1972).

[17] *Ramos v. Louisiana,* 140 S.Ct. 1390, 1397 (2020).

[18] *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (incorporating the Excessive Fines Clause).

Electronic copy available at: https://ssrn.com/abstract=4248297

*B. The meaning of a constitutional provision is fixed when it is adopted.*

*Bruen* explained that the Constitution's "meaning is fixed according to the understandings of those who ratified it…."[19] Since the Bill of Rights is part of the Constitution and was ratified just three years after the unamended Constitution went into effect, its meaning was fixed as of that time. Noting that the "Constitution can, and must, apply to *circumstances* beyond those *the Founders* specifically anticipated,"[20] *Bruen* quoted from *United States v. Jones*,[21] which concluded that installation of a tracking device on a vehicle was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added).[22] Circumstances may change, but the central meaning is fixed.

The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence. As Justice Thomas noted in his concurrence in *McIntyre v. Ohio Elections Comm'n*:[23]

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721 (1838).

---

[19] *Bruen,* 142 S.Ct. at 2132.

[20] *Id.*

[21] 565 U.S. 400, 404–405 (2012).

[22] *Id*. (emphasis added).

[23] 514 U.S. 334, 359 (1995) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

Thus, as long ago as 1838, the concept of a "historically fixed meaning" was an accepted proposition. It remained an accepted proposition in 1905 when *South Carolina v. United States* was decided and has remained so to the present day.

*C. The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions.*

As the above passages demonstrate, the relevant time period for ascertaining the *single* meaning of a provision of the Bill of Rights, as applied to the states and to the federal government, is the ratification of those amendments at the time of the Founding, not the time of incorporation of the right into the Fourteenth Amendment. *Bruen* recognized that the "Second Amendment's *historically fixed meaning*" must date, like the Amendment itself, to 1791, when the Court reaffirmed *Heller*'s finding that the right applies to new circumstances, specifically that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence *in the 18th century.*'"[24]

In the passage from *Bruen* quoted above regarding the "assumption" that 1791 is the relevant time period, the Court cited three cases, all of which looked to the time of ratification of specific amendments in 1791 to determine their original public meaning: *Crawford v. Washington*, 541 U.S. 36 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) (First Amendment). Those cases all involve applications against the states of incorporated provisions of the Bill of Rights. The *Bruen* opinion stated that the Court had "assumed" in those cases that the Founding was the relevant time period. But, as those cases show, the Founding period is

[24] *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

expressly stated to be the period to be examined to determine the meaning of the provisions in question.[25]

*Crawford* is a Confrontation Clause case. Finding that the text alone did not resolve the specific meaning and purposes of that Clause, the Court observed that "[w]e must therefore turn to the historical background of the Clause to understand its meaning."[26] The Court then examined pertinent English legal history, colonial laws and practices, the common law as understood at the time of the Founding, comparable provisions in eighteenth century state constitutions, and some early nineteenth century cases and commentary to determine its meaning. Throughout its historical review, the Court repeatedly used expressions such as:

- "…*the Framers* would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify..."
- "The *founding generation's* immediate source of the concept, however, was the common law..."
- referring to certain evils "…that English law's assertion of a right to confrontation was meant to prohibit; and that the *founding-era rhetoric* decried. The Sixth Amendment must be interpreted with this focus in mind."
- "…ex parte examinations might sometimes be admissible under modern hearsay rules, but *the Framers* certainly would not have condoned them."

---

[25] See also *Heller*, 554 U.S. at 576-77 (stating that the normal meaning of the words in the Second Amendment excludes meanings "that would not have been known to ordinary citizens *in the founding generation.*" (emphasis added).

[26] *Crawford*, 541 U.S. at 43.

Electronic copy available at: https://ssrn.com/abstract=4248297

- [the Sixth Amendment] "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established *at the time of the founding*..."
- "…the *common law in 1791* conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."
- "We do not infer from these that *the Framers* thought exceptions would apply even to prior testimony."
- "Our cases have thus remained faithful to *the Framers' understanding:*"
- "…we do not think *the Framers* meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence..." [27]

There is no indication whatsoever in *Crawford* that when the Sixth Amendment is applied through the Fourteenth Amendment to a state, the public understanding of the Sixth amendment at the time of ratification of the Fourteenth Amendment determines its meaning or changes the 1791 meaning. And the Supreme Court's reliance on Founding-era history in *Crawford* was not a mere "assumption"; it was inseparable from its holding.

The second case cited is *Virginia v. Moore,*[28] a Fourth Amendment case, where the protection of that Amendment was asserted against a state's actions. The issue was whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law.[29] The Court looked to the Founding era for guidance:

---

[27] *Id.* at 36, 43, 50, 51, 54, 56, 59, 61 (emphasis added).

[28] 553 U.S. 164 (2008).

[29] *Id.* at 166 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

> In determining whether a search or seizure is unreasonable, we begin with history. We look to the *statutes and common law of the founding era* to determine the norms that the Fourth Amendment was meant to preserve.[30]

The Court stated that it was "aware of no historical indication that *those who ratified the Fourth Amendment* understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."[31] Instead, the "immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that *English judges had employed against the colonists*."[32] Emphasizing the focus on the Founding period, the Court continued, "[n]o early case or commentary, to our knowledge, suggested the Amendment was intended to incorporate subsequently enacted statutes," and "[n]one of the early Fourth Amendment cases that scholars have identified sought to base a constitutional claim on a violation of a state or federal statute concerning arrest."[33]

According to the Court, this is "not a case in which the claimant can point to 'a clear *answer [that] existed in 1791* and has been generally adhered to by the traditions of our society ever since.'"[34] As with *Crawford*, there was no indication in *Virginia v. Moore* that the understanding of the ratifiers of the Fourteenth Amendment was relevant or should even be considered.

In the third case, *Nevada Comm'n on Ethics v. Carrigan*,[35] the issue was whether a provision of the state's Ethics in Government Law requiring legislators to recuse themselves from voting on certain measures violated the First Amendment. The Court held that it did not

---

[30] *Id.* at 168 (emphasis added).

[31] *Id.* (emphasis added).

[32] *Id.* at 166-69 (citations omitted) (emphasis added).

[33] *Id.* at 169.

[34] *Id.* at 170-71 (quoting *Atwater v. Lago Vista*, 532 U.S. 318, 345 (2001) (cleaned up) (emphasis added).

[35] 564 U.S. 117 (2011).

Electronic copy available at: https://ssrn.com/abstract=4248297

because voting by legislators does not implicate a personal right of free speech, but is an exercise of legislative power on behalf of the citizenry. One of the arguments in support of that conclusion was that such recusal laws had existed at the time of the Founding and were not considered to be restraints on speech.

As with *Crawford* and *Moore*, the Court never even considered whether the scope of the First Amendment meaning should be determined by the understanding of the ratifiers of the Fourteenth Amendment. Instead, it looked to the Founding period to determine whether a law requiring recusal violated the right to freedom of speech or expression. The Court noted that "Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws *existed in 1791* and have been in place ever since."[36] The Court found that recusal rules like the one at issue in the case have existed since the founding of the Republic:

> "*[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning*,'" *Printz v. United States*, 521 U.S. 898, 905 (1997) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723–724 (1986)). *That evidence is dispositive here. Within 15 years of the founding*, both the House of Representatives and the Senate adopted recusal rules. The House rule—to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 10 (1997)—was adopted within a week of that chamber's first achieving a quorum.[37]

The Court observed that "The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate" in 1801.[38] It also looked to recusal requirements for federal judges as early as 1792.[39]

[36] *Id*. at 122 (emphasis added).

[37] *Id.* (emphasis added).

[38] *Id.* at 123.

[39] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4248297

When the Supreme Court looks at history to determine the intent of ratifiers, it always looks to the Founding era as the period of sole or primary relevance. In addition to the three cases cited by *Bruen*, decisions under the Second Amendment, and all of the other amendments that have been incorporated, look to the Founding period.[40]

*D. All three of the Supreme Court's substantive interpretations of the Second Amendment assess its meaning and scope by looking at the Founding period.*

There have been three Supreme Court cases—*Heller*, *Caetano*, and *Bruen*—that have applied the substantive meaning of the Second Amendment. *McDonald* surveyed the importance of the right to keep and bear arms over our nation's history to determine if it should be incorporated through the Fourteenth Amendment. But *McDonald* did not attempt to expound on its exact substantive meaning because Chicago's handgun ban was clearly unconstitutional under *Heller* if the Second Amendment was incorporated. *Heller*, *Caetano*, and *Bruen* all used the Founding period to determine the scope and meaning of the Second Amendment.

*Heller* first analyzed the meaning of the text of the Second Amendment by examining sources that either preceded 1791 or were close enough in time thereafter to validly ascertain what the language meant to the Founding generation.[41]

While it is unnecessary to review every citation by *Heller* as evidence of meaning in the Founding era, a few examples will illustrate the point. The Court stated that in interpreting the Second Amendment's text, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.' Normal meaning may of course include an idiomatic

[40] The Seventh Amendment has not been incorporated generally against the states because it is a provision governing trials in federal courts.

[41] *Heller*, 554 U.S. 577-592.

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning, but it excludes secret or technical meanings that would not have been known to *ordinary citizens in the founding generation*."[42]

To ascertain the meaning of "militia," the Court stated: "As we will describe below, the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range."[43] *Heller* looked at the *colonial* militia, not the militia as it existed in 1868 or some later period.

For the meaning of "arms," *Heller* looked exclusively at mid- to late eighteenth-century dictionaries and sources, such as Samuel Johnson's famed dictionary.[44] It concluded that "The term was applied, *then as now*, to weapons that were not specifically designed for military use…."[45] "Then" refers to the Founding period. The Court concluded that "Although one *founding-era* thesaurus limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms.'"[46]

Regarding the meaning of "keep," the Court again cited Johnson's Dictionary, with a confirmatory reference to the early Webster definition. The opinion noted that "The phrase 'keep arms' was not prevalent in the written documents *of the founding period* that we have found," but cited three examples, all of which preceded 1791.[47] The Court construed "bear" in the same way, stating, "from our review of *founding-era sources*, we conclude that this natural meaning [which the Court had adopted] was also the meaning that 'bear arms' had in the 18th

---

[42] *Id.* at 576-77 (citations omitted) (emphasis added).

[43] *Id.* at 580.

[44] The opinion did contain a "see also" reference to Noah Webster's 1828 dictionary, but it was merely cited as "similar." It also cited *State v. Duke*, 42 Tex. 455, 458 (1874), but noted only that that case cited state court decisions construing "arms."

[45] *Heller*, 554 U.S. at 581 (emphasis added).

[46] *Id.* (emphasis added).

[47] *Id.* at 583 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

century."[48] In the end, the Court concluded that it was "adopt[ing] . . . the original understanding of the Second Amendment" as its definitive interpretation.[49] That can only mean the understanding that prevailed at its ratification.

*Caetano* applied the Second Amendment against the Commonwealth of Massachusetts.[50] Although this *per curiam* opinion did not itself engage in historical analysis, it expressly relied on *Heller*'s language and reasoning, which were rooted in the Founding period. There was no suggestion by the Court that 1868 was the proper date, or that the understanding of the ratifiers of the Fourteenth Amendment was even pertinent, much less controlling.

*Bruen* again confirmed that the time of ratification of the Bill of Rights is the pertinent period. Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[51] The Second Amendment was adopted in 1791, so that should be conclusive.

*E. Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868.*

As described in *Bruen*, the meaning of a constitutional provision is fixed when adopted. That includes the provisions of the Bill of Rights, which have the same meaning when incorporated against the states as when they apply directly to the federal government. In numerous cases involving all of the amendments in the Bill of Rights that have been incorporated, the relevant time period has been held to be the Founding period. None has looked

---

[48] *Id.* at 584 (emphasis added).

[49] *Id.* at 625.

[50] *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

[51] *Bruen*, 142 S.Ct. at 2136.

Electronic copy available at: https://ssrn.com/abstract=4248297

primarily to the post-Civil War period to determine the scope of a provision within the Bill of Rights. To the extent late 19th century interpretations have been discussed in these cases, it was never because the understandings of the ratifiers of the Fourteenth Amendment were found to prevail over those of the Founders in 1791. Instead, discussions of late 19th century history are treated as confirmation of the 1791 understanding. While the list here cannot be exhaustive, some examples will illustrate.

*First Amendment:*

The *Nevada Commission on Ethics* case was one of the three cases cited by Justice Thomas as showing that the Court had "assumed" that 1791 is the proper period for determining the scope and meaning of a provision of the Bill of Rights.[52] As described above, it was alleged in that case that Nevada had infringed on respondent's right of freedom of speech. The Court looked to the Founding period, and an unbroken tradition since then, to determine that the conduct in question was not speech protected by the First Amendment.

In *Near v. Minnesota*,[53] applying the principles of the First Amendment regarding freedom of the press against a state, the Court heavily emphasized the historical understanding of freedom of the press in 1791 when striking down a state law that imposed prior restraint on a publication deemed a "public nuisance." The Court stated that "The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as *historically conceived and guaranteed.*"[54] It alluded to the struggle in England over prior restraints before the Founding era, quoted from Blackstone's *Commentaries* on the nature of the right, cited an early Massachusetts case regarding the meaning of the right, relied on

[52] *Id.* at 2137-38.

[53] 283 U.S. 697 (1931).

[54] *Near*, 283 U.S. at 713.

Electronic copy available at: https://ssrn.com/abstract=4248297

Madison's Report on the Virginia Resolutions to show differences between the right in England and in America, and included an extensive excerpt from that Report.[55] This was, of course, a case relying on incorporation against a state, but there was no mention of 1868 as purportedly being the relevant time period for ascertaining the meaning of freedom of the press.

The famous case of *Reynolds v. United States*[56] presented the question of whether a federal statute governing the Territory of Utah could prohibit bigamy without violating the Free Exercise Clause. Although the case was purely federal, the Supreme Court turned to history at the time of the Founding and before, to determine the meaning of religion and the scope of the right. The Court noted that:

> The word 'religion' is not defined in the Constitution. We must go elsewhere, therefore, to ascertain its meaning, and nowhere more appropriately, we think, than to *the history of the times in the midst of which the provision was adopted*. The precise point of the inquiry is, what is the religious freedom which has been guaranteed.[57]

The Court then reviewed some colonial history in which religious freedom was circumscribed, and considered in detail a dispute concerning a bill in Virginia in 1784, regarding which James Madison:

> prepared a 'Memorial and Remonstrance,' which was widely circulated and signed, and in which he demonstrated 'that religion, or the duty we owe the Creator,' was not within the cognizance of civil government. [citation omitted]. At the next session the proposed bill was not only defeated, but another, 'for establishing religious freedom,' drafted by Mr. Jefferson, was passed.[58]

The Court considered Jefferson's bill and his views about religious freedom and reviewed the treatment of that subject in the Constitutional Convention and during the period of

[55] *Id*. at 713-17.

[56] 98 U.S. 145 (1878).

[57] *Reynolds*, 98 U.S. at 163.

[58] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

ratification of the Bill of Rights.[59] There was no hint that the public understanding of the First Amendment in 1868 was important, let alone that passage of the Fourteenth Amendment somehow retroactively changed the meaning of the Free Exercise Clause.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,[60] a case involving a dispute between a religious school and a teacher who was a "minister" at the school, the EEOC brought suit against the school, alleging that the minister had been unlawfully terminated because she had threatened litigation under the Americans with Disabilities Act.[61] The Court reviewed English, colonial, and Founding era evidence as to the extent to which American governments could be involved in personnel decisions in religious institutions.[62] It noted that "It was against this background that the First Amendment was *adopted.*"[63] Among other things, "the *founding generation* sought to foreclose the possibility of a national church…."[64] "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."[65]

In a recent free exercise case, *Fulton v. City of Philadelphia*,[66] the Court's majority opinion found it unnecessary to perform a historical analysis to determine the meaning of the First Amendment's text because the case could be decided under existing precedents. However,

[59] *Id.*

[60] 565 U.S. 171 (2012).

[61] *Id.* at 179-80.

[62] *Id.* at 182-83.

[63] *Id*. at 183

[64] *Id*.

[65] *Id*. at 184.

[66] 141 S.Ct. 1868 (2021).

Electronic copy available at: https://ssrn.com/abstract=4248297

Justice Alito, joined by Justices Thomas and Gorsuch, concurred in the judgment, and wrote a lengthy analysis of the text and historical meaning of the Free Exercise Clause, which focused nearly entirely on the meaning in 1791.[67] After quoting key words from the First Amendment, the concurrence noted that those "words had essentially the same meaning *in 1791* as they do today."[68] Justice Alito wrote that, following *Heller*'s lead, "we must ask whether the Free Exercise Clause protects a right that was known *at the time of adoption to have defined dimensions.*"[69] He noted that "critical state ratifying conventions approved the Constitution on the understanding that it would be amended to provide express protection for certain fundamental rights, and the right to religious liberty was unquestionably one of those rights."[70] Because of deeper constitutional scholarship in recent years, "we are now in a good position to examine how the free-exercise right was understood *when the First Amendment was adopted.*"[71]

*Lynch v. Donnelly*, a case involving whether a municipality could include a creche as part of its Christmas display, said that interpretation of the Establishment Clause should comport with "what history reveals was the contemporaneous understanding of its guarantees."[72] It looked to the actions of the First Congress in 1789 in determining the meaning of that clause: "In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid chaplains for the House and

---

[67] *Fulton*, 141 S.Ct. at 1894-912.

[68] *Id*. at 1896.

[69] *Id*. at 1899.

[70] *Id*. at 1901.

[71] *Id.* at 1899.

[72] *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).

Electronic copy available at: https://ssrn.com/abstract=4248297

Senate."[73] The time of the ratification of the Fourteenth Amendment played no such role in interpreting the right.

*Fourth Amendment:*

As described above, another of the three cases cited by Justice Thomas in support of the Court's looking to the time of the Founding was *Virginia v. Moore*, a Fourth Amendment case. As noted, that case relied on the "statutes and common law of the founding era," and sought to determine the understanding of "those who ratified the Fourth Amendment."[74] Other cases applying the Fourth Amendment against the states have similarly looked to the Founding period, not the time of ratification of the Fourteenth Amendment.

In *Wyoming v. Houghton*, the Court said that to determine whether government action violates Fourth Amendment rights, "we inquire first whether the action was regarded as an unlawful search or seizure under the common law *when the Amendment was framed.*"[75] Similarly, in *Wilson v. Arkansas*, the Court stated that in evaluating the scope of Fourth Amendment rights, "we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law *at the time of the framing*."[76] *Houghton* and *Wilson*, like *Moore*, both applied the Fourth Amendment to states, but not a word was mentioned regarding 1868 being the proper time for assessing the scope or meaning of the right.

---

[73] *Id.* at 674.

[74] *Virginia v. Moore*, 553 U.S. at 168.

[75] 526 U.S. 295, 299 (1999) (emphasis added).

[76] 514 U.S. 927, 931 (1995) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

*Fifth Amendment:*

In *Benton v. Maryland*,[77] the case that incorporated the Fifth Amendment's Double Jeopardy Clause against the states, the Court performed a brief review of the history of that concept's inclusion in American law, especially noting the Founding period. The right to be free of multiple prosecutions:

> became established in the *common law of England long before this Nation's independence*. [citations omitted]. As with many other elements of the common law, it was carried into the jurisprudence of this Country through the medium of Blackstone, who codified the doctrine in his Commentaries…. Today, every State incorporates some form of the prohibition in its constitution or common law…. [The underlying principle against double jeopardy] has *from the very beginning been part of our constitutional tradition*.[78]

Similarly, in *Gamble v. United States*,[79] the Court recently examined the meaning of the "dual-sovereignty" doctrine in Fifth Amendment double jeopardy jurisprudence. The text of the Fifth Amendment protects individuals from being twice put in jeopardy "for the same offence." Accordingly, the Court looked at the meaning of the word "offence" in the Founding period and found that it "was commonly understood *in 1791* to mean 'transgression,' that is, 'the Violation or Breaking of a Law.'"[80] The Court continued, "As *originally understood*, then, an 'offence' is defined by a law, and each law is defined by a sovereign. So where there are two sovereigns, there are two laws, and two 'offences.'"[81] Although *Gamble* was a federal case, the Court

[77] 395 U.S. 784 (1969).

[78] *Id.* at 795-96 (emphasis added).

[79] 139 S.Ct. 1960 (2019) (citations omitted, emphasis added).

[80] *Id.* at 1965 (emphasis added).

[81] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

recognized that through incorporation the very same principles applied to the state court proceedings under which Gamble had already been convicted.[82]

*Sixth Amendment:*

*Crawford v. Washington*,[83] described above, was a Sixth Amendment Confrontation Clause case and one of the three cases noted by Justice Thomas in *Bruen* to have "assumed" that the Founding period is the relevant time for determining the scope of provisions of the Bill of Rights. It repeatedly relied on evidence regarding the Framers, 1791, and the Founding period.

In *Ramos v. Louisiana*,[84] the Court considered whether the incorporated Sixth Amendment right to a jury trial in state criminal cases requires a unanimous verdict. The Court looked at precedents arising from before the Founding period, and practices around the time the Sixth Amendment was ratified:

> The requirement of juror unanimity emerged in 14th century England and was soon accepted as a vital right protected by the common law. As Blackstone explained, no person could be found guilty of a serious crime unless "the truth of every accusation ... should ... be confirmed by the unanimous suffrage of twelve of his equals and neighbors…."[85]
>
> This same rule applied in the *young American States.* Six State Constitutions explicitly required unanimity. Another four preserved the right to a jury trial in more general terms. But the variations did not matter much; consistent with the common law, state courts appeared to regard unanimity as an essential feature of the jury trial.[86]

The Court further recognized that it was the original time of ratification that was pertinent for determining the meaning of trial by jury, explaining that:

---

[82] *Gamble*, 139 S.Ct. at 1963, 1979.

[83] *Crawford v. Washington*, 541 U.S. 36 (2004).

[84] 140 S.Ct. 1390 (2020).

[85] *Id*. at 1395.

[86] *Id*. at 1396 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

> It was against this backdrop that James Madison drafted and *the States ratified the Sixth Amendment in 1791.* By that time, unanimous verdicts had been required for about 400 years. If the term "trial by an impartial jury" carried any meaning at all, it surely included a requirement as long and widely accepted as unanimity.[87]

In other Sixth Amendment cases, the Court has also looked to the Founding period to determine the scope, meaning, or importance of various provisions of that Amendment. *See*, *e.g.*, *Powell v. Alabama,*[88] (right to counsel; examining scope of right at English law in Founding period, Blackstone's rejection of English limitations on the right, and inclusion of right to counsel in early American constitutions); *Klopfer v. North Carolina*[89] (right to speedy trial; reviewing early English law, Magna Carta, Coke's *Institutes* and the American familiarity with them at the time of the Founding, Virginia's 1776 Declaration of Rights, and early state constitutions); *In re Oliver*,[90] (right to public trial; relying on "our English common law heritage" and state constitutions in most of the original states); *Duncan v. Louisiana,*[91] (right to jury trial in all state criminal cases in which such right would exist in federal court; reviewing early English history and English Bill of Rights, Blackstone, Stamp Act Congress, First Continental Congress, Declaration of Independence, and constitutions of original states); *Washington v. Texas,*[92] (Compulsory Process Clause; stating that the Framers included this clause to overcome certain limits on who could testify at common law).

[87] *Id*. (emphasis added).

[88] 287 U.S. 45, 60-67 (1932).

[89] 386 U.S. 213, 223-25 (1967).

[90] 333 U.S. 257, 266–268 (1948).

[91] 391 U.S. 145, 151-54 (1968).

[92] 388 U.S. 14, 20, 23 (1967).

Electronic copy available at: https://ssrn.com/abstract=4248297

*Eighth Amendment:*

In *Timbs v. Indiana*, to determine whether the Excessive Fines Clause was incorporated against the states, the Court examined early English legal history from the time of Magna Carta, Blackstone, the abuses by the Stuart kings, the English Bill of Rights, and colonial and state constitutions.[93] It noted that the statements in the English Bill of Rights that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted," were adopted almost verbatim first by the Virginia Declaration of Rights and then in the Eighth Amendment itself.[94] The Court did discuss the period around ratification of the Fourteenth Amendment, but only to note that then 35 of the 37 states had prohibitions against excessive fines, but that abuses of fines to control black people nevertheless continued.[95] As in *McDonald*, the inclusion of post-bellum nineteenth century developments in the Court's historical review was aimed only at determining that the right is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition."[96] There was no suggestion that 1868 was the primary period to determine the meaning of the clause, or that its meaning was somehow changed by the process of incorporation. Indeed, given the deep roots into English and American history not only of the principle but the very language prohibiting excessive fines, that would have been an untenable exercise.

The author has not found, and litigants in post-*Bruen* litigation have so far not pointed to, a *single* Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or

---

[93] 139 S.Ct. 682, 687-88 (2019).

[94] *Timbs,* 139 S. Ct. at 688.

[95] *Id*. at 688-99.

[96] *Id.* at 687 (quoting *McDonald*).

Electronic copy available at: https://ssrn.com/abstract=4248297

meaning of a provision of the Bill of Rights.[97] The Second Amendment is not a "second class right"[98] and there is no reason for it to be treated differently from the other provisions of the Bill of Rights in this respect. In addition, adoption of 1868 as the proper focus for determining the meaning of the Second Amendment would mean that the Supreme Court was utterly wrong in looking to the Founding period in *Heller*, *Caetano*, and *Bruen*.

*F. If later understandings contradict the original understanding of the text, the original understanding controls.*

*Heller*, *McDonald*, and *Bruen* all considered some amount of 19th century history. *McDonald* did so not to discern the meaning or scope of the right to keep and bear arms, but rather to determine whether it has historically been considered "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."[99] *Caetano* relied on the Founding-era research and principles announced in *Heller*. But both *Heller* and *Bruen* engaged in extensive historical analysis and provided some clear guideposts regarding the proper uses of post-Civil War history.

The post Founding-era history examined by *Heller* and *Bruen* was used by the Court only to confirm rather than to contradict the Founding era understanding. Regarding *Heller*, the *Bruen* Court observed that:

> we made clear in *Gamble*[100] that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century

---

[97] Litigants have cited lower court decisions that they claim have done this, and I discuss the errors in those claims in Part IG.

[98] *McDonald*, 561 U.S. at 780, 781-87.

[99] *McDonald*, 561 U.S. at 767.

[100] *Gamble v. United States,* 139 S.Ct. 1960 (2019).

Electronic copy available at: https://ssrn.com/abstract=4248297

evidence was "treated as mere confirmation of what the Court thought had already been established."[101]

*Bruen* itself found that the text of the Second Amendment plainly covers the right to carry arms in public.[102] It also carefully noted that "to the extent later history contradicts what the text says, the text controls."[103] It adopted the view of then-Judge Kavanaugh in a D.C. Circuit Second Amendment case that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."[104] And, obviously, the insistence by some scholars and advocates that 1868 should control, is only of importance if they believe they can show that the 1868 understanding was *different* from the 1791 understanding. But if the 1868 understanding is different from that of 1791, it must be rejected because it is inconsistent with the text and the original meaning that "is fixed according to the understandings of those who ratified it."[105]

But even if the arguments that 1868 trumps 1791 did not conflict with *Heller*, *Caetano*, and *Bruen*, and the Court's entire incorporation jurisprudence—which they plainly do—the Court would give them little weight in any event, due to the sheer remoteness in time of any post-Civil War statements, understandings, or legal developments. The Court warned against giving "post-enactment history more weight than it can rightly bear," and reaffirmed *Heller*'s observation that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much

[101] *Bruen*, 142 S.Ct. at 2137 (quoting *Gamble*, 139 S.Ct. at 1975-76).

[102] *Id.* at 2134.

[103] *Id*. at 2137.

[104] *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

[105] 142 S. Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4248297

insight into its original meaning as earlier sources."[106]  In fact, faced with twentieth-century evidence that *did* contradict the Founding-era evidence, the *Bruen* Court rejected that evidence, stating that the Court will not:

> address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.[107]

Justice Barrett, concurring in *Bruen*, also cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."[108]  That is quite right—*Bruen*'s analysis forecloses that type of reasoning.

An example of the errors that can occur when courts engage in such "freewheeling reliance" on mid-to late 19th century analogues is contained in a recent temporary restraining order enjoining enforcement of some of New York State's new restrictions on carry enacted after the *Bruen* decision.[109]  In that case, the District Court let stand a ban on carrying concealed firearms in places of worship, with some exceptions for keeping the peace, despite the fact that *Bruen* did not include places of worship in its list of "sensitive places."[110]  The District Court relied on only six "analogues," which were state statutes enacted between 1870 and 1890.[111] But these alleged analogues come far too late, as indicated by *Bruen* itself and by Justice Barrett's concurrence in *Bruen*.  To illustrate, in 1740, South Carolina required that "every white male

---

[106] *Id.* at 2136–37 (quoting *Heller*, 554 U.S. at 614).

[107] *Id.* at 2154 n.28.

[108] *Id.* at 2163 (Barrett, J., concurring).

[109] *Antonyuk v. Hochul*, No. 1:22-CV-0986, Doc. 27 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*").

[110] *Bruen*, 142 S.Ct. at 2133.

[111] *Antonyuk II* at 33 n.25.

Electronic copy available at: https://ssrn.com/abstract=4248297

inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who…is…liable to bear arms in the militia of this Province," who shall "go and resort to any church or any other public place of divine worship," must "carry with him a gun or a pair of horse-pistols…with at least six charges of gunpowder and ball."[112] In 1770, Georgia required that "every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia…and resorting…to any church…shall carry with him a gun, or a pair of pistols." Each man was required to "take the said gun or pistols with him to the pew or seat," and these arms were to "be fit for immediate use and service."[113]

As discussed, all Supreme Court cases on the Bill of Rights have looked to the Founding Period for determining meaning, not to the late 19th century. If there is no analogue in the Founding period, one cannot jump—as the New York court did—to the late 19th century to look for analogues in the first place. Justice Barrett in her concurrence pointedly quoted from *Espinoza v. Montana Dept. of Revenue,* 140 S.Ct. 2246, 2258-2259 (2020), which stated that a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment.[114] If such a practice cannot establish a pertinent American tradition for the First Amendment, it cannot do so for the Second Amendment, either.

---

[112] 7 David J. McCord, Statutes at Large of South Carolina 417-19 (Columbia, S.C.: A.S. Johnston, 1840) (enacted 1740, re-enacted 1743).

[113] Horatio Marbury and William A. Crawford, Digest of the Laws of the State of Georgia, 241-42 (1802) (law of Feb. 27, 1770, § 1).

[114] *Bruen*, 142 S.Ct. at 2163.

Electronic copy available at: https://ssrn.com/abstract=4248297

*G. The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of McDonald.*

The briefs supporting the pro-gun control litigants in the *Worth*, *Lara*, and *Antonyuk* cases, *supra* n.8, rely on Court of Appeals cases that supposedly establish that the time of ratification of the Fourteenth Amendment is the key time period for determining the scope and meaning of the Second Amendment. Even a cursory review of those cases belies that contention.

The amicus brief by Everytown for Gun Safety in *Lara* offers a more robust argument than the defendant's brief in *Worth*. It contends that for the historical inquiry:

> the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Several circuits reached this conclusion in applying the first step of the pre-*Bruen* framework.[115]

For this proposition, it provides the following footnote:

> *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is [to] a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *criticized on other grounds by Bruen,* 142 S. Ct. at 2124, 2126-27; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp*., 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments) (quoting *Ezell*).[116]

Taking these in order, *Gould* was not "criticized on other grounds" by *Bruen*. *Gould* was entirely abrogated by *Bruen*. It is a legal nullity. The *Ezell* quote is accurate. The problem there is that *McDonald* did not state that if the claim involves a state or local law where the "scope"

[115] Amicus Letter Br. of Everytown for Gun Safety, *Lara v. Comm'r Pa. State Police*, No. 21-1832, Doc. 61, at 2 (3d Cir. Aug. 2, 2022).

[116] *Id.* at 2–3.

Electronic copy available at: https://ssrn.com/abstract=4248297

question asks how the right was understood when the Fourteenth Amendment was proposed and ratified. The Seventh Circuit in Ezell simply got it wrong. For this proposition, it cites "*McDonald*, 130 S.Ct. at 3038–47."[117] But there is no such holding in those pages of *McDonald*. They are simply part of the Court's historical survey of why the right is "fundamental," and do not specify 1868 as the time period to determine the extent of the right. *Bruen* certainly did not read *McDonald* that way and instead focused on 1791 in an approach that it asserted was consistent with all its other Second Amendment precedents, *McDonald* included. And the Seventh Circuit changed course shortly after *Ezell* was decided, observing that "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*."[118]

*Greeno* simply quoted the mistaken language in *Ezell*, apparently without investigating its accuracy.[119] It was also a somewhat cursory "plain error" review in a criminal case because the defendant had not raised the Second Amendment issue at trial.[120] The *Drummond* case did not hold that 1868 is the proper date. It merely stated, without any elaboration or citation of authority, that "[f[or the rim-fire rifle rule, the question is if the Second and Fourteenth Amendments' ratifiers approved regulations barring training with common weapons in areas where firearms practice was otherwise permitted."[121] It then cited authorities from 1825, 1885, and 1895 as part of its analysis, but did not attempt to determine what the ratifiers of the Fourteenth Amendment may have understood the right's scope to be in 1868.[122] The citation to

[117] *Ezell*, 651 F.3d at 702.

[118] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

[119] 679 F.3d at 518.

[120] *Id*. at 516.

[121] 9 F.4th at 227.

[122] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

*Binderup* is to a concurrence, not the Court's opinion, and it, too, merely recites the mistaken language of *Ezell*.[123]

In short, litigants arguing for 1868 as the proper date for historical inquiry in incorporation cases would have the lower courts overlook the unbroken line of Supreme Court cases that the right must be the same against both the federal government and the states; that the right is fixed when the relevant Bill of Rights provision is adopted; and that the Founding period is the relevant period for determining the meaning of the Constitution generally and for particular provisions of the Bill of Rights. In opposition to these firm and consistent holdings by the Supreme Court, they offer one abrogated opinion by one Court of Appeals, a single Court of Appeals opinion that clearly made a mistake that was later corrected, and a series of cases that relied on that mistake apparently without further investigation.

## II. 1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE BILL OF RIGHTS.

### A. *It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they were incorporating against the states all of the provisions of the first eight amendments.*

If those who advocate for 1868 as the proper year for determining the meaning of the Second Amendment were to prevail, an important consequence must be faced. There is no reason for the Second Amendment to be different from any other provision of the Bill of Rights in this respect. It is not a "second class right" as *McDonald* pointedly observed.[124] So, if those advocates were to be successful, consistent application of the doctrine of incorporation must look to 1868 for the public meaning of all of the provisions of the Bill of Rights, not just the Second

[123] 836 F.3d at 362.

[124] 561 U.S. at 780, 781–87.

Electronic copy available at: https://ssrn.com/abstract=4248297

Amendment. Furthermore, those meanings must displace the original understandings of 1791. As shown above, both of these propositions are flatly contradicted by well-settled Supreme Court lines of precedent.

But there is a further problem. If the understanding of the ratifiers of the Fourteenth Amendment of each provision of the Bill of Rights must take precedence, then we must be certain that those ratifiers understood that they were incorporating all of the provisions of the Bill of Rights against the states, and that those rights had a particular, different meaning to them at the time. This is not only contrary to logic and precedent, but as a practical matter impossible, or nearly so.

The Fourteenth Amendment does not state that it is applying the first eight amendments against the states. It does not even mention the Bill of Rights. Furthermore, the Due Process Clause was not the principal or stated means by which the Fourteenth Amendment sought to give protection to black freedmen to exercise the right to keep and bear arms. The operative language considered critical at the time was the Citizenship Clause in the first sentence of Section 1 of the Fourteenth Amendment, coupled with the Privileges or Immunities Clause in the second sentence. Together, they read:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States….[125]

The first sentence was arguably necessary to overcome the holding of the infamous *Dred Scott* case, which held that African Americans were not citizens of the United States and

[125] U.S. CONST. AMEND. XIV, § 1.

Electronic copy available at: https://ssrn.com/abstract=4248297

therefore could not bring suit in federal courts, among other things.[126] The second sentence was to protect the privileges or immunities of citizens against state infringement.

But what did "privileges or immunities of citizens of the United States" mean? Throughout the Congressional debates on the Fourteenth Amendment, the Civil Rights Act of 1866, and other Congressional enactments for which the Fourteenth Amendment was intended to provide constitutional authority, contradictory and vague accounts were given by members of Congress and others of the Amendment's meaning and effect.

Let us recall the state of the law regarding the Bill of Rights then. In *Barron v. Baltimore*, the Supreme Court held that the Fifth Amendment's Takings Clause provided a limit only on the federal government and not on actions by state or local governments.[127] It was widely, though not universally, assumed thereafter that none of the provisions of the first eight amendments in the Bill of Rights applied against the states. In fact, that had been the prevailing view even before *Barron*. At the time of ratification of the Fourteenth Amendment, was it clear that that Amendment was meant to reverse *Barron* and apply all of the protections in the Bill of Rights against the states? If that was not clear at the time, the ratifiers of the Fourteenth Amendment would have had no occasion to reconsider their understandings of the Bill of Rights, including the Second Amendment.

The first difficulty in looking at the likely understanding of the ratifiers of 1868 is that "privileges and immunities" already had a widely accepted meaning. Article IV, Sec. 2, the Comity Clause of the Constitution, provides that "[t]he Citizens of each State shall be entitled to

---

[126] *Dred Scott v. Sandford*, 60 U.S. 393 (1857). Also, had African Americans been considered citizens, *Dred Scott* presented a parade of horribles that would have ensued, including that it would give them the right "to keep and carry arms wherever they went." *Id.* at 417. As Justice Thomas observed for the Court in *Bruen*, "even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, 142 S.Ct. at 2151.

[127] *Barron ex rel. Tiernan v. City of Baltimore*, 32 U.S. 243, 250–51 (1833).



Electronic copy available at: https://ssrn.com/abstract=4248297

all Privileges and Immunities of Citizens in the several States."[128] The opinion of Supreme Court Associate Justice Bushrod Washington, sitting as a member of a circuit court, was widely quoted to interpret the meaning of "privileges and immunities." In *Corfield v. Coryell* he wrote:

> The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal; and an exemption from higher taxes or impositions than are paid by the other citizens of the state; may be mentioned as some of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental: to which may be added, the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities….[129]

Notably absent from this list is any direct reference to the provisions making up the Bill of Rights. Of course, the Bill of Rights was not written or ratified until after the adoption of the Constitution. But Justice Washington wrote this passage in 1823. If "privileges and immunities" encompassed all of the provisions in the first eight amendments, it seems at least somewhat

[128] U.S. CONST. art. IV, § 2.

[129] 6 F. Cas. 546, 551–52 (E.D. Pa. 1823).

Electronic copy available at: https://ssrn.com/abstract=4248297

strange that he did not describe any of the specific rights named in the Bill of Rights or state analogues to those rights.[130]

In debating the Civil Rights Bill of 1866, 42 U.S.C. § 1981, Senator Lyman Trumbull of Illinois (co-author of the Thirteenth Amendment and Chairman of the Senate Judiciary Committee) quoted the portion of the *Corfield* decision set forth above.[131] The Fourteenth Amendment, of course, was thought by some to be necessary to provide constitutional authority for the Civil Rights Act. Trumbull described the first section of the bill, which declared all persons of African descent to be citizens of the United States, and noted that there "shall be no discrimination in civil rights or immunities" among the inhabitants of any state "on account of race, color, or previous condition of slavery," as "the basis for the whole bill."[132] The other provisions contained only "necessary machinery" for enforcement. After reading aloud the passage from *Corfield*, Trumbull stated that it enumerates "the very rights belonging to a citizen of the United States which are set forth in the first section of this bill."[133] It was anything but clear from Trumbull's speech that "privileges or immunities" or "civil rights or immunities" was meant to include wholesale the first eight amendments in the Bill of Rights.

When the Fourteenth Amendment itself was presented to the Senate on behalf of a Joint House and Senate Committee, Senator Jacob Howard took a contrasting position. He again quoted the passage from *Corfield* as constituting "privileges and immunities," but then said that "to these should be added the personal rights guaranteed and secured by the first eight

[130] The Comity Clause of Art. IV, Sec. 2, was meant to preclude states from denying to citizens of other states the rights, processes, and privileges afforded its own citizens within its boundaries. That would mean only those privileges or rights held by citizens as part of state law and would not include provisions such as those in the federal Bill of Rights that were designed to prevent federal overreach.

[131] CONG. GLOBE, 39th Cong., 1st Sess. 474–75 (1866).

[132] *Id.*

[133] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments of the Constitution; such as the freedom of speech and of the press; the right of the people to peaceably assemble and petition the government for a redress of grievances; … the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner," and so forth down through the remaining amendments.[134] He continued: "The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees."[135]

Howard's opinion that "privileges or immunities" embraced the first eight amendments was by no means universal.[136] Sen. Thomas Hendricks of Indiana stated that he had not "heard any Senator accurately define, what are the rights and immunities of citizenship" or that "any statesman has very accurately defined them." He described the terms as "not very certain" and "vague."[137] Senator Reverdy Johnson of Maryland favored the citizenship and due process clauses, but stated that "I think it quite objectionable to provide that 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' simply because I do not understand what will be the effect of that."[138] Rep. Benjamin Boyer of Pennsylvania found Section 1 "objectionable also in its phraseology, being open to ambiguity and admitting of conflicting constructions."[139]

---

[134] *Id*. at 2765.

[135] *Id*. at 2766.

[136] Indeed, that was news to Justice Felix Frankfurter in 1947. In his concurring opinion in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 467–68 (1947), Justice Frankfurter wrote: "Not until recently was it suggested that the Due Process Clause of the Fourteenth Amendment was merely a compendious reference to the Bill of Rights whereby the States were now restricted in devising and enforcing their penal code precisely as is the Federal Government by the first eight amendments."

[137] CONG. GLOBE, 39th Cong., 1st Sess. 3039 (1866).

[138] *Id.* at 3041.

[139] *Id*. at 2467.

Electronic copy available at: https://ssrn.com/abstract=4248297

If the very members of Congress that were debating the Fourteenth Amendment disagreed as to its meaning, or found it "vague" and open to "conflicting constructions," then determining how the ratifiers in the states in 1868 understood the meanings of each of the provisions of the first eight amendments in 1868, particularly when it was unclear that those eight amendments were being incorporated wholesale against the states, is a very fraught endeavor (as well as an unjustified one).

There is also a practical difficulty in determining what the state ratifiers in 1868 may have understood. There were thirty-seven states in 1868. Few records exist on the ratification of the Fourteenth Amendment. What little exists is found in messages of governors who submitted the Fourteenth Amendment to their state legislatures, legislative debates (which were recorded in only Pennsylvania and Indiana), and committee reports (Massachusetts, Texas, and Wisconsin). One controversy was whether the Constitution already protected basic rights versus whether the Fourteenth Amendment was necessary. Voting rights were discussed, which had generally been held to be a political right conferred by a constitution or statute, rather than a natural civil right.[140]

Finally, whatever the meaning of "privileges or immunities," it is clear that the Fourteenth Amendment, and legislation that preceded and followed it, were meant to curb abuses of the rights of African Americans. It is also clear that the drafters and ratifiers of the Fourteenth Amendment wanted to enforce those rights *against the states*. They were not inventing new rights or changing what those rights meant. The proponents of the Fourteenth Amendment simply wanted the same civil rights that white people already had to be extended to African

[140] See STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS 67–70 (Updated ed. 2010).

Electronic copy available at: https://ssrn.com/abstract=4248297

Americans and to prevent states from denying or infringing those rights or applying the laws in a discriminatory fashion.

None of this is intended to cast doubt on the doctrine of incorporation, the Court's incorporation through the Due Process clause, or incorporation of the Second Amendment, all of which have been decided. It is only to point out that anyone seeking to determine the specific understanding by ratifiers of the Fourteenth Amendment in 1868 of each provision of Bill of Rights is likely to be chasing a chimera. Using a time period so long after the Founding should not be done for the Second Amendment or for any other specific rights in the first eight amendments.

*B. The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause.*

Although there was disagreement in Congress about what "privileges or immunities" meant, the biggest disagreement was with the Supreme Court. In fact, the Supreme Court rejected the proposition that the Amendment incorporated the Bill of Rights at the first opportunity it had to do so. In the *Slaughter-House Cases*, the Court held that the "privileges or immunities" language in the Fourteenth Amendment included only rights that depended on federal citizenship, including:

> to come to the seat of government to assert any claim he may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions. He has the right of free access to its seaports, through which all operations of foreign commerce are conducted, to the subtreasuries, land offices, and courts of justice in the several States.[141]

The Court further stated that:

> Another privilege of a citizen of the United States is to demand the care and protection of the Federal government over his life, liberty, and property when on

[141] *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

Electronic copy available at: https://ssrn.com/abstract=4248297

> the high seas or within the jurisdiction of a foreign government. Of this there can be no doubt, nor that the right depends upon his character as a citizen of the United States. The right to peaceably assemble and petition for redress of grievances, the privilege of the writ of habeas corpus, are rights of the citizen guaranteed by the Federal Constitution. The right to use the navigable waters of the United States, however they may penetrate the territory of the several States, all rights secured to our citizens by treaties with foreign nations, are dependent upon citizenship of the United States, and not citizenship of a State. One of these privileges is conferred by the very article under consideration. It is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State.[142]

Although the First Amendment right to peaceably assemble and petition for redress of grievances is included, no other rights under the Bill of Rights are mentioned, and the Court did not suggest that all of the rights in the first eight amendments are protected from violation by the states.

Even though there was widespread agreement in Congress that the Fourteenth Amendment and contemporaneous legislation was meant to prevent the disarming of African Americans, there is little evidence that the ratifiers of that amendment had in mind specific meanings for all of the first eight amendments, much less that those meanings differed from the original meanings of 1791. There wasn't even agreement on which rights in the Bill of Rights would be incorporated. Thus, any attempt to shift the relevant period for determining the meaning of the Bill of Rights from 1791 to 1868 will be fraught with difficulty, as well as having no basis in logic or in the Supreme Court's incorporation jurisprudence.

C. *The individual* right *to bear arms in the Second Amendment was understood the same way in 1868 as in 1791.*

The debate about whether 1791 or 1868 is the critical year ultimately only has significance if there were important differences in the understandings of the ratifiers between those two time periods. But in the discourse that led to the Fourteenth Amendment, the right to

[142] *Id.* at 79–80.

Electronic copy available at: https://ssrn.com/abstract=4248297

keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states.

Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866. Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[143] He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms…."[144] Accordingly, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms."[145]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[146] Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[147] The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[148]

---

[143] CONG. GLOBE, 39th Cong., 1st Sess. 517 (1866).

[144] *Id*. at 657.

[145] *Id.* at 654.

[146] *Id.* at 371.

[147] *Id.* at 1182.

[148] *Id.* at 3210.

Electronic copy available at: https://ssrn.com/abstract=4248297

A common theme in the media was that freedmen had the right to bear arms because they were part of "the people." The *American Citizen*, a Pennsylvania newspaper, quoted the Second Amendment and wrote: "Now what is here meant by 'the people' – Webster defines it as 'the body of persons who compose a community, town, city or nation….'" So defined, "not a black person in the South, or anywhere else in the country, can be excluded under it from the right to bear arms," and "if the negro be not included in the militia, they are peculiarly the 'people' of the nation, and under the words of the Constitution are entitled to bear arms."[149]

Far from changing the meaning of the right to keep and bear arms, the Civil Rights Act and the Freedmen's Bureau Act, precursors of the Fourteenth Amendment, used phraseology taken from Blackstone with which the Founders were familiar. Representative James Wilson, Chairman of the Judiciary Committee, explained the background to the Civil Rights Bill's phraseology "civil rights and immunities" and "full and equal benefit of all laws and proceedings for the security of person and property …."[150] He equated those rights and immunities with those enumerated by Blackstone, on which the Founders also relied:

> Blackstone classifies them under three articles, as follows:
>
> 1.     The right of personal security; which, he says, "Consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."
>
> 2.     The right of personal liberty; and this, he says, "Consists in the power of locomotion, of changing situation, or moving one's person to whatever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law."
>
> 3.     The right of personal property; which he defines to be, "The free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the law of the land."[151]

---

[149] *The Right to Bear Arms*, AMERICAN CITIZEN (Butler, Pa.), Nov. 7, 1866, at 4.

[150] CONG. GLOBE, 39th Cong., 1st Sess. 1117 (1866).

[151] *Id*. at 1118.

Electronic copy available at: https://ssrn.com/abstract=4248297

Representative Wilson had the Second Amendment partly in mind when he stated that every right enumerated in the federal Constitution is "embodied in one of the rights I have mentioned, or results as an incident necessary to complete defense and enjoyment of the specific right."[152] Indeed, the Freedmen's Bureau Act explicitly declared that:

> the right…to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.[153]

The same Blackstonian concepts basic to the Founders, including the right to bear and use arms, were thus inherited and applied by the drafters of the Fourteenth Amendment. There was no change in the meaning of the right itself; instead, there was a change to who could exercise the right and who was prevented from restricting its exercise.

That the nature of the right was viewed as unchanging in 1868 is well illustrated by the Supreme Court's nearly contemporaneous decision in *United States v. Cruikshank*.[154] There the Court explained that private infringement of the right to assemble was not a subject for federal enforcement:

> The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government…. It was not, therefore, a right granted to the people by the Constitution. The government of the United States when established found it in existence, with the obligation on the part of the States to afford it protection. As no direct power over it was granted to Congress, it remains … subject to State jurisdiction.[155]

[152] *Id*. at 1118–19.

[153] Freedmen's Bureau Act of 1866, §14, 14 Stat. 173, 176–77 (1866) (emphasis added).

[154] 92 U.S. 542 (1875).

[155] *Id*. at 551.

Electronic copy available at: https://ssrn.com/abstract=4248297

The Court found the counts of the indictment alleging private infringement of the right to bear arms under the Second Amendment to be "equally defective," explaining:

> The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the Amendments that has no other effect than to restrict the powers of the national government….[156]

Like the right to assemble, the right to bear arms was a pre-existing and unchanged right not "granted" by the Constitution but guaranteed against infringement.

Thus, the Supreme Court in 1875 viewed the right to keep and bear arms as having the same contours as at the Founding period, which saw the right in the same terms. Just as the authors or ratifiers of the Second Amendment sought to guarantee a pre-existing right, the ratifiers of the Fourteenth Amendment sought only to *extend* that protection, not change the right itself.

## III. THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE.

As previously noted, the *Bruen* opinion stated that the Court has "assumed" that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. The opinion went on to acknowledge that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."[157] The only two sources cited for the existence of this debate were Kurt Lash,

---

[156] *Id*. at 553.

[157] *Bruen*, 142 S. Ct. at 2138.

Electronic copy available at: https://ssrn.com/abstract=4248297

*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022) and A. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

As described below, Professor Lash frankly seeks to use 1868 as the definitive period for determining the meaning and scope of all incorporated provisions of the Bill of Rights. His proposal is not just a radical departure from the Supreme Court's incorporation jurisprudence that has been so carefully fought over and eventually worked out over a period of many decades. Instead, it candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights.

Professor Amar's approach is more nuanced. In the work cited, he proposes to rely more heavily on what he believes to be the changed 1868 meaning of the Second Amendment in particular. But any necessity for that is undermined by the decision in *Heller* (2008), a decade after Professor Amar's book was published (1998).

*A. Professor Lash's approach is theoretically unsound and unlikely to be adopted.*

Professor Lash believes that if a provision of the Bill of Rights meant something different to the ratifiers of the Fourteenth Amendment than it did to the ratifiers of the Bill of Rights, the 1868 meaning must control. At the outset of his article, he describes the conundrums that positing a different meaning in 1868 would create. "Do incorporated rights have the same meaning and scope as their counterparts in the 1791 amendments, or does the original Free Speech Clause have a different meaning and scope than the 'incorporated' Free Speech Clause?"[158] He contends that if the meanings are different, originalists "seem forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable

[158] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1440 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings."[159] This is simply not the case. If it turns out that a later meaning has ostensibly departed from the original meaning, one must reject the later meaning, as Supreme Court principles discussed above instruct, and apply the original meaning to the states.

Noting, as set forth in Part IA, above, that the Supreme Court has definitively and repeatedly held that the rights against the federal government and the states must be the same, Lash inquires: If the meanings must be the same, "are the original 1791 meanings carried *forward* into the 1868 amendment, or are the understandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal government by way of 'reverse incorporation'?"[160] But as just explained, this is a problem exclusively of Lash's own making, which is divorced from the actual intentions of the ratifiers of the Fourteenth Amendment. They did not intend to alter the content of the Second Amendment—they just wanted to extend its protections to all citizens against encroachments by state governments.

Lash's answer to his own question is that rights as understood in 1868 must be "reverse incorporated" into the Bill of Rights. He states that there is only "one Freedom of Speech Clause—the one the people spoke into existence in 1791 but then *respoke* in 1868."[161] The drafters' views are secondary at best, according to Lash, because "the legally operative understanding must be that of the ratifiers. Only the latter counts as the voice of the people."[162] He argues that "[w]hen the people adopted the Fourteenth Amendment, they readopted the

[159] *Id.* at 1441.

[160] *Id.* at 1440 (emphasis in original).

[161] *Id.* at 1441.

[162] *Id.* at 1443.

Electronic copy available at: https://ssrn.com/abstract=4248297

original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."[163]

There are many issues with this approach. Until now, "reverse incorporation" has never involved using 1868 meanings of incorporated Bill of Rights provisions to revise or replace the original meanings of the Bill of Rights at the time of the Founding. In *Brown v. Bd. of Educ. of Topeka, Kan.*,[164] the Court declared school segregation unconstitutional based on the Fourteenth Amendment's Equal Protection Clause. But a companion case, *Bolling v. Sharpe,*[165] concerned school segregation in the District of Columbia, a federal enclave. The original Bill of Rights lacked an equal protection clause. So, the Warren Court read the Fourteenth Amendment's Equal Protection Clause back into the Due Process Clause of the Fifth Amendment. It was, plainly, a limited, *ad hoc* device for sidestepping a constitutional impediment to reaching the desired result.[166] So, "reverse incorporation" doesn't have much of a pedigree and it has not been applied in other contexts.

There are at least five major problems with Professor Lash's approach.

First, his analysis is completely contrary to Supreme Court precedents. As noted in Part IB, above, constitutional meanings are fixed when they are ratified, and that includes the Bill of Rights, which was ratified in 1791. Further, when it has been necessary to consult history to determine the meaning of incorporated provisions of the Bill of Rights, every Supreme Court case has considered the Founding era to be the determinative period even though later evidence

---

[163] *Id.* at 1441.

[164] 347 U.S. 483 (1954).

[165] 347 U.S. 497 (1954).

[166] Note that the Equal Protection Clause of the Fourteenth Amendment was an express protection spelled out in Section 1. The Court did not use the ostensible meaning of an incorporated provision of the Bill of Rights to change the original meaning of that provision. Reverse incorporation has not extended past inserting "equal protection" into the Fifth Amendment's Due Process Clause. See *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200 (1995).

Electronic copy available at: https://ssrn.com/abstract=4248297

is sometimes examined for confirmation. And if later practice or understanding conflicts with the original understanding, the original understanding must prevail.

Second, there is no compelling, principled basis for concluding that the 1868 meaning, if different, ought to prevail. Is it just because 1868 is later in time than 1791? That does not preclude using the original meaning of the Bill of Rights, and simply applying those meanings to additional persons and entities: that is, in favor of African Americans, and against the states. And in fact, that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate. See Part IIC, above.

Third, it is untrue that the ratifiers "spoke into existence" Bill of Rights provisions in 1791, but then "respoke" them in 1868. Although "spoke into existence" and "respoke" are intriguing metaphors, that is not what happened. Most of the provisions of the first eight amendments were either considered natural rights or rights inherited by Englishmen at common law and then carried forward, possibly somewhat modified, into the new Republic. The Bill of Rights was largely a confirmation of existing rights, not an original grant of rights. And the drafters of the Fourteenth Amendment did not "respeak" them; they extended their protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

In fact, "speaking" is a particularly inapt metaphor for Lash to choose, when there is *no* textual evidence in the Fourteenth Amendment that it was revising the Bill of Rights. As the Court explained in *Heller*, constitutional provisions must be given their "normal and ordinary" meaning, which "may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."[167]

[167] 554 U.S. at 576–77.

Electronic copy available at: https://ssrn.com/abstract=4248297

Lash is essentially arguing for a secret, unspoken meaning, hidden in the Fourteenth Amendment.

Fourth, Lash's "reverse incorporation" relies on the Privileges or Immunities Clause of the Fourteenth Amendment to incorporate the provisions of the Bill of Rights against the states. The *Slaughterhouse Cases*[168] relegated the Privileges or Immunities Clause to a relative backwater, and *Cruikshank*[169] declined to use that Clause to incorporate First and Second Amendment rights. Although there is respectable opinion that regards the Privileges or Immunities Clause as a better vehicle for incorporation than the Fourteenth Amendment Due Process Clause, the Court has refused the invitation to recast its incorporation jurisprudence under the rubric of the Privileges or Immunities Clause. When counsel proposed during oral argument in *McDonald* that the Privileges or Immunities Clause was the proper vehicle for incorporation, Chief Justice Roberts warned that, "Of course, this argument is contrary to the Slaughter-House Cases, which have been the law for 140 years … it's a heavy burden for you to carry to suggest that we ought to overrule that decision."[170]

Finally, Lash himself suggests the reason his proposal is unlikely to find acceptance. He writes that the "1868 respeaking of the Bill of Rights…transforms 'reverse incorporation' from a proposition about equal protection and a single clause of the Fifth Amendment into a proposition about the entire content of the Bill of Rights."[171] One suspects that the Supreme Court will not want to have the entirety of its Bill of Rights jurisprudence "transformed" retroactively based

[168] 83 U.S. at 79.

[169] 92 U.S. at 554–57.

[170] Transcript of Oral Argument at 4, *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ( No. 08-1521).

[171] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1441–42 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

upon an unnecessary, unjustified, and unprecedented reliance on 1868 as the focus for determining meaning and scope of the Bill of Rights.

*B. Professor Amar's approach contains similar flaws and his theories have been rejected by Heller.*

Turning to Professor Amar's book,[172] his emphasis on 1868[173] is more subtle and less drastic than the wholesale reverse incorporation proposed by Lash. Amar proposes a theory of "refined incorporation" that would allegedly reconcile the different approaches to incorporation proposed by Justices Hugo Black, William Brennan, and Felix Frankfurter.[174] He commends Justice Black's view "that *all* of the privileges and immunities of citizens recognized in the Bill of Rights" are incorporated through the Fourteenth Amendment.[175] But he does not recognize all of the provisions of the Bill of Rights as "privileges or immunities of citizens," stating that some are more akin to rights of states, and others are "alloyed provisions," part citizen right and part state right, that may have to undergo "refinement and filtration" before their citizen-right elements can be "absorbed" by the Fourteenth Amendment.[176] He also contends that other provisions of the Bill of Rights may become "less majoritarian and populist, and more libertarian, as they are repackaged in the Fourteenth Amendment as liberal civil rights—'privileges or immunities' of individuals—rather than republican political 'right[s] of the people' as in the original Bill."[177] He disagrees with the formulation by Justice Brennan that the key

---

[172] A. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

[173] Professor Amar typically refers to 1866, the year the Fourteenth Amendment was drafted and proposed by Congress to the states for ratification.

[174] Amar at xiv.

[175] Amar at xiv (emphasis in original).

[176] *Id.*

[177] *Id.* at xiv-xv.

Electronic copy available at: https://ssrn.com/abstract=4248297

question for incorporation is whether the right is "fundamental."[178] He also disagrees with Justice Frankfurter's "insistence" that incorporation turned on "abstract conceptions of 'fundamental fairness' and 'ordered liberty' as the sole litmus tests for incorporation."[179] Thus, his "refined incorporation" differs in critical respects from the Court's current test, as stated in *McDonald*: whether the right "is fundamental to our scheme of ordered liberty, or as we have said in a related context, whether this right is 'deeply rooted in this Nation's history and tradition.'"[180]

Amar observes that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment," that provisions in the Bill of Rights may be "transformed when they come into contact with the Fourteenth Amendment," and that in some cases, "the gravitational pull of the Fourteenth Amendment has altered the trajectory of the original Bill."[181] This is contrary to *Bruen*'s asseverations that the Constitution's "meaning is fixed according to the understandings of those who ratified it."[182]

Moreover, Amar's book was written ten years before *Heller* was decided, and his specific analysis of the Second Amendment rests on foundations that were rejected by *Heller*. In his book, Amar spends eighteen pages summarizing his view on "the military amendments" (Second and Third Amendments) as he thinks they were seen at the time of the Founding. He writes that:

> As with our First Amendment, the text of the Second is broad enough to protect rights of private individuals and discrete minorities; but, as with the First, the Second's core concerns are populism and federalism. At heart, the amendment reflects a deep anxiety about a potentially abusive federal military….[183]

---

[178] *Id*. at xiv.

[179] *Id.*

[180] 561 U.S. at 767 (citations omitted) (emphasis omitted).

[181] Amar at xv.

[182] 142 S. Ct. at 2132.

[183] Amar at 46.

Electronic copy available at: https://ssrn.com/abstract=4248297

He goes on to discuss standing armies and the Founders' distrust of them. He states unequivocally that "[t]he ultimate right to keep and bear arms belongs to 'the people,' not the states," and that "'the people' at the core of the Second Amendment are the same people at the heart of the Preamble and the First Amendment."[184] Thus, he recognizes the individual right to arms, but claims that at the time of the Founding protection of such rights was not the main purpose. Indeed, "to see the un-Reconstructed amendment as primarily concerned with an individual right to hunt or to protect one's home is like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge or to have sex."[185] The contrast between *Heller*'s conclusion that protecting one's home was a central component of the right, and Amar's view, is stark.

Like Lash, he believes that the meaning of the right to keep and bear arms had been transformed by the time of the Fourteenth Amendment. Originally, the right was "intimately connected with federalism concerns about a federally controlled standing army that might seek to overawe state-organized militias."[186] He observes that, "By contrast, in 1866, John Bingham, Jacob Howard, Thaddeus Stevens and company were hardly in the mood to rail against a federal standing army; these men, after all, wanted to use precisely such an army to reconstruct recalcitrant southern states."[187] Furthermore, "the people" in Amar's view corresponded roughly with the militia, and "political rights" such as voting rights, service on juries, and eligibility for public office, were (like service in the militia) largely limited to white males. But the Privileges

[184] Amar at 51.

[185] Amar at 49.

[186] Amar at 216.

[187] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4248297

or Immunities Clause "spoke of all citizens, pointedly including women and children…."[188] Thus, the rights protected by the Privileges or Immunities Clause focused on "civil rights," not "political rights." Even though the right to keep and bear arms was a paradigmatic "privilege" of "citizens of the United States," the "right in 1789 and the right in 1866 meant different things," according to Amar.[189]

He concludes:

> Indeed, as the Second Amendment illustrates, the very same words "the right…to keep and bear arms" take on a different coloration and nuance when they are relabeled "privileges or immunities of citizens" rather than "the right of the people," and when they are severed from their association with a well-regulated militia. To recast the textual point as a historical one, the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789. Mechanical incorporation [Amar's term for due process incorporation as advocated by Justice Black] obscured all this and, indeed, made it easy to forget *that when we "apply" the Bill of Rights against the states today, we must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the Bill of 1789.*[190]

Thus, in a more subtle and less extreme way, Amar agrees with Lash that the time of the Fourteenth Amendment is more important than the Founding period for determining the meaning of incorporated provisions of the Bill of Rights.

It is unclear, at best, whether Amar's distinction between 1868's relabeling the right as a privilege or immunity of citizens, and 1791's the "right of the people" in connection with the militia, has any continuing relevance in Second Amendment interpretation. At the time of Amar's book, the Second Amendment had not been incorporated, and was generally held by lower courts to relate only to militia service. The Court's opinion in *Heller* carefully recognized the role of the citizen militia in the colonies and early Republic, but it accurately determined that

[188] *Id.*

[189] Amar at 257.

[190] Amar at 223 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

the right was an individual right for self-defense as well, the position for which Amar seems to be contending. Thus, *Heller* may have largely dispelled Amar's concerns about the nature of the right. Critically, however, these findings in *Heller* did not depend in any way on the understandings of the ratifiers in 1868, but looked to that general time period only as confirmation of the nature of the right as both militia-related and individual, just as it considered some antebellum interpretations as confirmation.

Amar's analysis may be rejected on grounds similar to (though not identical with) those on which Lash's may be rejected: he relies on the Privileges or Immunities Clause for incorporation; that reliance leads him to differ from the Supreme Court as to what, exactly, is incorporated; and the test for incorporation is different from the Supreme Court's test. He does not directly address whether the provisions of the Bill of Rights differ in substance when applied against the federal government or against the states, though he seemingly believes that they may be different, stating that it is "[h]arder to understand" Brennan's "insistence that once a provision of the Federal Bill was deemed incorporated, it applied identically in state and federal proceedings."[191] But that question has long ago been resolved by the Court.

So both Lash and Amar would shift the focus to 1868 rather than 1791, though Amar doesn't expressly state, as Lash does, that the 1868 understanding must displace the 1791 understanding. Gun control proponents will undoubtedly latch on to these positions, as the briefs cited above do, to argue that more extensive restrictions on firearms in 1868 (and no doubt thereafter) as opposed to the Founding are the proper historical analogues when evaluating the constitutionality of present-day gun laws. But the reasoning behind the approaches of both of these scholars flies in the face of many decades of settled Supreme Court precedent. The Court

[191] Amar at 222.

Electronic copy available at: https://ssrn.com/abstract=4248297

Case: 23-1261, Document 64, 08/27/2023, 3560611, Page208 of 230

is unlikely to reverse itself on its fundamental incorporation doctrine principles and case law, and the lower courts are bound by those decisions. The alleged "scholarly dispute" about the proper time for determining the meaning of an incorporated provision of the Bill of Rights really consists of one scholarly dissent and one partial scholarly dissent from Supreme Court jurisprudence that has definitively resolved this issue.

Electronic copy available at: https://ssrn.com/abstract=4248297

**CONCLUSION**

The Supreme Court has held that provisions of the Bill of Rights have only a single meaning, whether applied against the federal government or against the states. That meaning is fixed at the time of adoption; that is, in 1791. What a provision of the Constitution meant then, it means now, even though circumstances might change.

The three cases cited by the *Bruen* opinion for the "assumption" that 1791 is the critical period all relied on Founding era history extensively and as an integral part of their analyses. All Supreme Court cases that have engaged in historical review of the Second Amendment to determine its meaning have looked to 1791 as the primary period. Any examination of later periods has been done only to confirm the conclusion already reached regarding the original meaning at the Founding. As the review in this article of Supreme Court cases construing other provisions of the Bill of Rights shows, the Founding period is the exclusive period for determining meaning. The Supreme Court has never looked to 1868 as the primary period for determining the meaning of provisions of the Bill of Rights, and its decisions generally do not even mention that period. Neither litigants nor the scholars mentioned in the Court's reference to the "ongoing scholarly debate" have pointed to a single Supreme Court case which determined the meaning of a provision of the Bill of Rights based primarily on the time of ratification of the Fourteenth Amendment, and to the exclusion of the 1791 understanding.

The lower court cases cited by litigants in current litigation were either abrogated by *Bruen* or relied on a mistake (later corrected) in the Seventh Circuit's *Ezell* decision.

Reliance on the ostensible public understanding of the Fourteenth Amendment when it was ratified—even if such an approach did not contradict existing Supreme Court precedent regarding the determinative period—is fraught with difficulty. It is unclear that the ratifiers of the Fourteenth Amendment thought that they were incorporating all of the first eight

Electronic copy available at: https://ssrn.com/abstract=4248297

amendments against the states. The Fourteenth Amendment doesn't mention the Bill of Rights, and there were conflicting interpretations at the time regarding what that amendment meant and did. Most notably, the Supreme Court in the *Slaughterhouse Cases* and the *Cruikshank* case immediately disagreed with what some of the proponents of the Fourteenth Amendment believed to be its effect. In any event, there is little or no evidence that the ratifiers of the Fourteenth Amendment believed that the Second Amendment meant anything different than it had meant since the Founding.

The "ongoing scholarly debate" about whether 1868 is the proper year amounts to little. Professor Lash's approach, in addition to being theoretically unsupported, would upset the entire Supreme Court jurisprudence on the Bill of Rights. Professor Amar's approach has likely been rendered unnecessary by *Heller.*

In short, it can be said with confidence that the Supreme Court will not adopt 1868 as the primary or determinative period for construing the meaning of the Second Amendment or any other provisions of the Bill of Rights. For that reason, it is inadvisable, to say the least, for the lower courts to look to 1868 --rather than 1791-- when searching for historical analogues to justify modern-day gun control laws.

Electronic copy available at: https://ssrn.com/abstract=4248297

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**DECLARATION OF KEVIN MCLAUGHLIN**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually,

Defendants.
--------------------------------------------------------------x

KEVIN MCLAUGHLIN, declares pursuant to 28 U.S.C. § 1746 that:

1. I am a plaintiff in the above-captioned matter. I make this Declaration of my own personal knowledge and if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2. I submit this Declaration in support of Plaintiffs' application to preliminarily and permanently enjoin enforcement of policies and procedures of the Suffolk County Police Department and certain state statutes that are violating my right to purchase, possess, and carry a handgun for self-protection.

3. I am a resident of Suffolk County and a U.S. Marine reservist. I have no prohibitors under state or federal law to the purchase, receipt, possession, or transfer of firearms. As soon as I am legally able, I intend to purchase, possess, and carry a handgun for self-defense.

4. In 2022, I visited the SCPD website to obtain an application and learn about the process for obtaining a New York State handgun license. I printed out and completed the application, which was called the Applicant Questionnaire, and submitted it with the $10 application fee made payable to "SCPD" on July 1, 2022.

5. I contacted the Licensing Bureau around August 2022 to see how long it would be before I would be called in to be fingerprinted. The Licensing Bureau told me that I would not be called in to be fingerprinted for ***approximately 3 years – in and around July 2025.*** If the State is not going to comply with constitutional carry, then any licensing process that takes more than 30 days should be enjoined as violating the Second Amendment. Every purchase of a firearm in New York goes through an FFL; a background check is done on the spot. If the individual is disqualified, the sale is denied. If not, the sale is approved. The process takes less than 15 minutes. There is no reason why the SCPD licensing process needs to take so long.

6. If I have the information from SCPD to obtain my own unsuppressed fingerprint based criminal history report from the Division of Criminal Justice Services, I would submit the report, a completed PPB-3 application, and the 2 required photographs to SCPD immediately. As SCPD does not provide its ORI number and will not accept the PPB-3 upon presentment.

7. While I object to all of the regulations enacted under the Concealed Carry Improvement Act, which did nothing to 'improve' the right to carry a handgun, I make specific mention of the 18-hour training requirement. As a U.S. Marine reservist, I have extensive firearms training and will not spend money and time to attend the 18-hour training course. Protecting myself with a handgun is a guaranteed right and cannot be conditioned on or delayed by such a regulation,

Case 23-44 Document 35 Page 213 of 230 05/26/2023

nor should I be forced to spend hundreds of dollars to simply exercise that right.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 28, 2022

Kevin McLaughlin

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
CLERK
2:18 pm, Feb 14, 2023
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

----------------------------------------------------------X

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

- against –

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his Official Capacity,

Defendants.

----------------------------------------------------------X

**MEMORANDUM AND ORDER**

Civil Action
No. 22-4778 (GRB)(ST)

**GARY R. BROWN, United States District Judge**:

In this action filed pursuant to 42 U.S.C. §1983, plaintiffs bring claims on behalf of themselves and a putative class against Suffolk County, various employees and officials thereof and the Acting Superintendent of the New York State Police Department relating to certain recently-enacted New York State pistol licensing provisions and a bevy of County policies and practices implementing those provisions. Presently before the Court is an application for a preliminary injunction[1] directing a broad spectrum of measures, ranging from enjoining officials from enforcing criminal statutes to extending the operations of the Suffolk County Police

[1] In their papers, plaintiffs claim to be seeking "preliminary and permanent" relief, *see, e.g.*, Docket Entry ("DE") 27-14 at 1; given the procedural posture of the case, such references are assumed to be erroneous.

Department Licensing Bureau beyond the hours of 9 a.m. to 4:30 p.m.[2] to render obtaining a pistol permit more convenient. For the reasons that follow, none of the plaintiffs can satisfy the demanding requisites for preliminary relief, and the motion must be DENIED.

*Procedural History*

This action was commenced through the filing of a "Complaint for Declaratory and Injunctive Relief" on August 15, 2022. DE 1. Summonses were issued on August 23, 2022. DE 5. On October 28, 2022, plaintiffs filed an amended complaint, adding the state defendant[3] as well as asserting constitutional challenges to the state statutory scheme. DE 8. Defendants were served in late November 2022. DE 16-23. On December 9, 2022, defendant Steven Nigrelli, Acting Superintendent of the New York State Police (the "Superintendent"), initiated a motion to dismiss by filing a pre-motion letter arguing that plaintiffs lack standing, no injury was traceable to the Superintendent and that the claims were barred by the Eleventh Amendment. DE 25. On December 11, 2022 – about four months after the case was commenced – plaintiffs filed the instant motion for a preliminary injunction. DE 27.

*Relevant Facts*

The pertinent facts relating to each plaintiff include the following:

*Plaintiffs Giambalvo, Mougios, Mashkow & McLaughlin*

Each of these four plaintiffs, between February 2020 and July 2022, completed and filed an "Applicant Questionnaire" with the Suffolk County Police Department ("SCPD"), paying a $10 fee. *See* DE 27-8 through 27-11. This questionnaire initiated the licensing procedure to obtain a

[2] On this motion, the County submits evidence demonstrating that the Pistol Licensing Bureau opens at 8:00 a m. DE 35-6 at 1-2.

[3] On November 7, 2022, plaintiffs moved for leave to amend the caption of the First Amended Complaint, DE 8, because, due to a ministerial error, Acting Superintendent of the New York State Police Steven Nigrelli was not identified in the caption, DE 11. The motion was granted, and on November 17, 2022, the First Amended Complaint was filed with the corrected caption. DE 13.

New York State handgun carry permit. *Id.* Each was advised that the next step in this process involves fingerprinting and an interview. *Id.* Representatives of the SCPD advised each of these four plaintiffs – both orally and in writing – that the wait for an appointment to complete these steps was somewhere between one and three years. *Id.*

In sworn statements, each of these plaintiffs also averred that they have not and would not comply with various aspects of the licensing process. *See* Giambalvo Decl., DE 27-8 ¶ 14 (indicating refusal to provide social media account information and identity of cohabitants or submit to an interview), *id.* ¶ 15 (refusal to submit affidavits from character references); Mougios Decl., DE 27-9 ¶ 12 (refusal to attend firearms training), *id.* ¶ 15 (refusal to provide character references), *id.* ¶ 16 (refusal to provide social media accounts, personal relationships and family information or submit to an interview); Mashkow Decl., 27-10 ¶ 7 (will not comply with disclosure of personal information, training or interview requirements); McLaughlin Decl., DE 27-11 ¶ 7 ("objects" to all requirements and will not comply with firearms training requirements).

*Plaintiff McGregor*

In November 2020, Michael McGregor, a practicing physician, completed an "Applicant Questionnaire" and paid the $10 fee to seek a handgun permit under the previous statutory scheme. DE 27-12 ¶ 5. He contacted the Licensing Bureau in October 2021 for an update and was advised that there was a substantial backlog. *Id.* ¶ 6. Unsatisfied with the response, in December 2021, McGregor's attorney filed a "mandamus proceeding" in state court because of the perceived failure of authorities to comply with the statutory six-month deadline for issuing a permit or denial. *Id.* ¶ 8. McGregor reports that the County moved to dismiss, arguing that the 6-month clock does not commence until the applicant is interviewed by the SCPD. *Id.* ¶ 9.

In January 2022, McGregor was contacted by an investigator to schedule an interview. *Id.* ¶ 10. McGregor applied for, and received, a "concealed carry handgun license restricted to sportsman" in March 2022, permitting him only to carry in furtherance of target shooting and competitive activities. *Id.* ¶ 18. In August 2022, McGregor applied for an amendment to remove the "sportsman" restrictions of his license. *Id.* ¶ 20. He has not yet received the amendment.

Part of the requirements for the amendment to the license is an 18-hour firearms training class. Dr. McGregor avers that he will not take the training required by state law. *Id.* ¶ 24. He also refuses to provide state authorities with his social media accounts or identify his marital partner or other cohabitants. *Id.* ¶ 25. He also avers that he intends to carry a handgun "outside of my sportsman restriction on a regular basis – with or without being issued an amended license." *Id.* ¶ 26.

*Plaintiffs Melloni and Renaissance Firearm Instruction, Inc. (RFI)*

Melloni, the President of RFI, is an NRA-certified firearms instructor who offers training through the company. DE 27-13 ¶ 3. Melloni created an 18-hour curriculum that complies with the New York State Concealed Carry Improvement Act (CCIA) and includes two hours of live-fire training. *Id.* ¶ 4. Melloni avers that in October 2022, he had to cancel an agreement with four individuals who had registered for the class because they did not currently hold a pistol permit. *Id.* ¶ 10. Melloni reports that the basis for this cancellation was a statement made by defendant Michael Komorowski advising that the SCPD would arrest individuals taking live-fire training if they did not hold a permit. *Id.* ¶ 11. According to Melloni, Komorowski stated that the SCPD would "not honor[]" an exemption contained in NY Penal Law §265.20(3-a) which allows for live-fire training before a permit is issued, as such training is part of the permitting process. *Id.* ¶ 12.

Melloni avers that he and RFI have suffered "economic loss" because of these circumstances. *Id.* ¶ 22.

Based on these facts, plaintiffs seek a preliminary injunction that seeks two categories of relief. The first category, broadly aimed at procedural and administrative mechanisms surrounding applications for handgun permits (together, the "Procedural Provisions"), seeks to direct defendants to:

> (i) provide the New York State PPB-3 application on the Suffolk County Police Department website and local police precincts;
> (ii) accept the PPB-3 for filing from all applicants upon presentment;
> (iii) fingerprint applicants upon presentment of the completed PPB-3 or, in the alternative, publish the Suffolk County Police Department ORI number (Originating Agency Identifier) on its website and in local precincts for applicants to submit their fingerprints directly to the New York State Division of Criminal Justice Services (DCJS) and accept the resulting DCJS Report upon presentment of the PPB-3;
> (iv) photograph applicants upon presentment of the completed PPB-3 or, alternative, accept 2 statutorily required photographs from applicants upon presentment of the PPB-3;
> (v) provide hours of public accessibility outside of the Licensing Bureau's currently restricted hours of Monday-Friday from 9:00 – 4:30 p.m.; and
> (vi) within 30 days of the presentment of the completed PPB-3 application, issue a handgun license to all applicants eligible to possess firearms under state and federal law.

DE 27 at 2. Relatedly, plaintiffs seek an order barring Suffolk County from implementing the following procedures:

> (iii) a licensing process that exceeds 30 days between presentment of the completed New York State Pistol/Revolver License Application (PPB-3) and issuance of a license (or denial thereof);
>
> (iv) a policy that requires applicants to be personally interviewed;

*Id.* at 2-3.

The second category of relief sought by defendants (collectively, the "Enforcement Provisions") seeks to enjoin Suffolk County from "implementing and enforcing" certain aspects of the CCIA, including the following:

> Suffolk County shall be enjoined from implementing and enforcing
>
> (i) Penal Law sections 400.00(1)(b), 400.00(1)(o), 400.00(19), that portion of section 400.00(4-a) allowing statutory licensing officers 6 months to either issue a license or deny an application made thereunder;
>
> (ii) Penal Law section 400.00(15) against handgun licensees who carry a handgun registered thereon outside of their license restriction;[and]
>
> (v) a policy that subjects unlicensed individuals who participate in live-fire training with a duly authorized instructor, and their instructors, to criminal penalties including arrest and incarceration . . .

*Id.* This opinion follows.

***Discussion***

*Standard for the Award of a Preliminary Injunction*

It is axiomatic that a preliminary injunction represents an extraordinary exercise of a court's authority and thus requires an exacting showing. The Second Circuit recently reiterated the standard of review for a motion for preliminary relief in the face of allegations that government regulation impinged on constitutional rights:

> Issuance of a preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S. Ct. 2207, 171 L.Ed.2d 1 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, at 129 (2d ed. 1995)). Preliminary injunctive relief "should not be routinely granted." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (quoting *Medical Soc. of State of N.Y. v. Toia*, 560 F.2d 535, 537 (2d Cir. 1977)). When deciding whether to issue a preliminary injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008).
>
> To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must

> demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (internal quotation marks omitted). The movant must also show that the balance of equities supports the issuance of an injunction. *See Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279-80 (2d Cir. 2021) (denying preliminary relief to plaintiffs claiming religious challenge to COVID-19 vaccine mandate). That decision further noted that "we have consistently applied the likelihood-of-success standard to cases challenging government actions taken in the public interest pursuant to a statutory or regulatory scheme, including in cases involving emergency regulations and orders." *Id.* at 279 n.13 (citing *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020); *Alleyne v. New York State Educ. Dep't*, 516 F.3d 96, 99–101 (2d Cir. 2008)). Finally, plaintiffs face a "'heightened standard where [ ] an injunction is mandatory' — in other words, it seeks a change to the status quo, as opposed to a prohibitory preliminary injunction that merely maintains the status quo." *Yafai v. Cuccinelli*, No. 20 Civ. 2932 (AT), 2020 WL 2836975, at *3 (S.D.N.Y. June 1, 2020) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). As plaintiffs seek largely mandatory injunctive relief, this heightened standard plainly applies to such requests. DE 13 at 4-6.

*The Failure of Plaintiffs Giambalvo, Mougios, Mashkow, McLaughlin and McGregor to Establish Likelihood of Success as to the Procedural Provisions*

While the parties have taken a "kitchen sink" approach to this litigation, urging the Court to consider, among other things, the propriety of centuries-old regulatory measures as analogues for New York's CCIA, the instant application may be resolved on far more narrow grounds. Plaintiffs Giambalvo, Mougios, Mashkow, McLaughlin and McGregor each have unequivocally expressed their intent, in sworn declarations, to refuse to comply with various requisites of New

York's handgun permit process, including their unambiguous refusal to participate in mandated (1) firearms training, (2) disclosure of the identity of cohabitants and family members and (3) disclosure of their social media accounts.  DE 27-8 through 27-12.  Indeed, even in their complaint, plaintiffs state that they will not submit to the requirements of the State's permit scheme.  *See, e.g.*, DE 13 ¶¶ 174, 185, 196.  McGregor takes this one step further, stating his intention to carry his handgun outside the restrictions of his current permit.  *Id.* ¶ 230.

While the precise parameters of a state's ability to regulate handgun ownership remains the subject of developing law, some things are beyond dispute.  One is that rights to possess and carry handguns protected by the Second and Fourteenth Amendment are expressly limited to "ordinary, law-abiding, adult citizens."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2119 (2022); *id.* at 2150 ("law-abiding citizens with ordinary self-defense needs"); *id. at* 2156 ("law-abiding, responsible citizens").  The right to bear arms in public is "subject to certain reasonable, well-defined restrictions."  *Id.* at 2156 (citing *D.C. v. Heller*, 554 U.S. 570, 581 (2008)).  In a non-exclusive list, the Supreme Court noted that these permissible restrictions "limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials."  *Id.* at 2156; *cf. id.* at 2138 ("Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms.").

As a result, certain state handgun licensing regimes are constitutionally permissible. As *Bruen* expressly notes, that case does not preclude the maintenance of "shall-issue" permitting regimes.  142 S. Ct. at 2138, n.9.  ("To be clear, nothing in our analysis should be interpreted to

suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes"). These state law handgun permit provisions "often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* As Justice Kavanaugh stated in a concurrence joined by the Chief Justice, state licensing authorities "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 ("the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."). Indeed, in their complaint, plaintiffs acknowledge that the State may maintain objective permitting standards.[4] DE 13 ¶ 59.

In order to establish standing to challenge the State's licensing system, plaintiffs must demonstrate that they have complied with the requisites of that system. As the Second Circuit has held, a plaintiff who "failed to apply for a gun license in New York [ ] lacks standing to challenge the licensing laws of the state." *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012). In a subsequent decision, the Circuit explained:

> "'As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy.'" *Decastro,* 682 F.3d at 164 (quoting *Jackson-Bey*, 115 F.3d at 1096; and citing *Allen v. Wright*, 468 U.S. 737, 746, 104 S. Ct. 3315, 82 L.Ed.2d 556 (1984), and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-68, 92 S. Ct. 1965, 32 L.Ed.2d 627 (1972)). Accordingly, we have held that, absent a showing of futility, a person who has "failed to apply for a gun license in New York . . . lacks standing to challenge the licensing laws of the state," *Decastro*, 682 F.3d at 164.

[4] While plaintiffs attempt to characterize these requirements as perfunctory, this may not be the case. On this motion, the County has submitted documents suggesting that at least two plaintiffs have criminal records. *See* Zwilling Decl., DE 35 ¶¶ 2, 3; DE 35-1 at 1; DE 35-2 at 9, 10 (Giambalvo subject to arrest and summons seven times, including two arrests for assault, an arrest for menacing and criminal contempt; Mougios subject to arrest or summons four times, including an arrest for drug possession and one following a drunken dispute with a police officer). Moreover, Giambalvo has been treated for painkiller addiction, and has had a driver's license suspended, while Mougios and McLaughlin admit to illicit drug use. DE 35-1 at 3, 5; DE 35-2 at 11; DE 35-4 at 4.

*Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 121 (2d Cir. 2020), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022). Thus, while such failure may be excused if application would be "futile," *Decastro*, 682 F.3d at 164, plaintiffs have not even attempted to make such a showing. Rather, plaintiffs have undermined any showing of a likelihood of success on the merits as, due to their refusal to comply with the requisites of the licensing process, they cannot qualify for a permit, and the State can, consistent with the mandates of *Bruen* and *Heller*, deny their applications. "Mere objection or antipathy to the law does not constitute a showing of futility." *Libertarian Party*, 970 F.3d at 116. Hence, the issues raised by these plaintiffs prove inconsequential, as their failures – including their refusal to engage in mandatory firearms training – ensures that they cannot legally qualify for a carry permit under constitutionally permissible requisites.

*Plaintiffs Melloni and RFI Cannot Articulate Irreparable Harm as to the Procedural Provisions*

Neither Melloni[5] nor RFI claim violation of their Second Amendment rights – their economic claims, if viable, are derivative of those of others. Principally, Melloni and RFI attempt to join in the application for preliminary relief based on the economic loss of several students who could not take live-fire training. However, since these sums, as set forth, amount to a few thousand dollars, such losses are, by their very nature compensable by money damages, such that these plaintiffs cannot qualify for preliminary relief. *See We The Patriots USA*, 17 F.4th at 294 ("It is well settled [ ] that . . . economic harm resulting from employment actions is typically compensable with money damages"). Thus, even assuming they have standing to proceed (a proposition that

[5] Melloni also theorizes that, if he were to provide live-fire training to unlicensed individuals (something he has refused to do), he could be subject to arrest for aiding and abetting a criminal violation. This claim is far too attenuated and speculative.

seems dubious), neither Melloni nor RFI can establish irreparable injury. Thus, their application must fail.

*Injunctions Against Arrest and Prosecution under State Law*

Plaintiffs lack standing as to the Enforcement Provision of the proposed injunction, sought only against the County. Notably, this is not the first time that plaintiffs' counsel has sought such relief in this Court. In an earlier action, this Court ruled noted:

> The relief sought here also treads on separation of powers concerns, in that the judiciary generally cannot issue injunctions to "interfere with the free exercise of the discretionary powers of [prosecutors] in their control over criminal prosecutions." *In re Seizure of All Funds in Accts. in Names Registry Pub. Inc.*, 68 F.3d 577, 582 (2d Cir. 1995) (reversing injunction preventing government inquiry into suspected violations) (quoting *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301 (5th Cir. 1987)). Worse yet, this case seeks a determination from this Court interpreting state criminal laws without the benefit of, and in anticipation of, potential interpretations by state courts in contemplated criminal proceedings. Plaintiffs would have this Court usurp the functions of state judges and juries [ ]. It is difficult to imagine an act that could further offend the principles of comity.

*Does 1-10 v. Suffolk Cnty., New York*, No CV 21-3409 (GRB), 2021 WL 2634734, at *3 (E.D.N.Y. June 26, 2021), *aff'd*, 2022 WL 2678876 (2d Cir. 2022). The Supreme Court has observed that:

> [T]hose seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments. This Court has never recognized an unqualified right to pre-enforcement review of constitutional claims in federal court. In fact, general federal question jurisdiction did not even exist for much of this Nation's history. *See Mims v. Arrow Financial Services*, LLC, 565 U.S. 368, 376, 132 S. Ct. 740, 181 L.Ed.2d 881 (2012). And pre-enforcement review under the statutory regime the petitioners invoke, 42 U.S.C. § 1983, was not prominent until the mid-20th century. See *Monroe v. Pape*, 365 U.S. 167, 180, 81 S. Ct. 473, 5 L.Ed.2d 492 (1961); *see also* R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's *The Federal Courts and the Federal System* 994 (7th ed. 2015). To this day, many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L.Ed.2d 172 (2011) (First Amendment used as a defense to a state tort suit).

[ ] As our cases explain, the "chilling effect" associated with a potentially unconstitutional law being "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit. *Younger v. Harris*, 401 U. S. 37, 42, 50–51, 91 S. Ct. 746, 27 L.Ed.2d 669 (1971). Instead, this Court has always required proof of a more concrete injury and compliance with traditional rules of equitable practice. *See Muskrat*, 219 U.S. at 361, 31 S. Ct. 250; *Ex parte Young*, 209 U.S. at 159–160, 28 S.Ct. 441. The Court has consistently applied these requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right. The petitioners are not entitled to a special exemption.

[P]re-enforcement challenges like the one the Court approves today may be available in federal court to test the constitutionality of those laws. Again, too, further pre-enforcement challenges may be permissible in state court and federal law may be asserted as a defense in any enforcement action. [ ] But one thing this Court may never do is disregard the traditional limits on the jurisdiction of federal courts just to see a favored result win the day. At the end of that road is a world in which "[t]he division of power" among the branches of Government "could exist no longer, and the other departments would be swallowed up by the judiciary." 4 *Papers of John Marshall* 95 (C. Cullen ed. 1984).

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537–38 (2021).

In *Does 1-10*, the Second Circuit examined the application of the concrete injury requirement in highly analogous circumstances, holding:

Determining whether a plaintiff has alleged a "credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015). To establish standing for a preenforcement challenge, an "allegation of future injury will be sufficient only if 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Fears of prosecution may not, for instance, be "imaginary or speculative." *Vance*, 802 F.3d at 384 (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979)). Further, the imminence requirement is not "evident where plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible.'" *Id.* (quoting *Babbitt*, 442 U.S. at 298–99).

The circumstances at issue here do not suggest that Does suffered, or are at a substantial risk of suffering, an injury in fact. Does allege that, in a letter dated May 20, 2021, the Suffolk County Police Department notified them, among other things, that the Delta Level Defense CT4-2A is "not in compliance with the New York State Penal Law" and that Does "may be subject to arrest and criminal

> charges" if they "fail to present the weapon to the Suffolk County Police Department within . . . fifteen days" from receipt of the letter. Complaint ¶ 28 (emphasis omitted). Does did not present their firearms during the fifteen-day grace period, and continue in possession of their firearms today—over one year after receipt of the letters. Importantly, Does do not allege (and have not notified this Court or the district court) that any individual Doe has been arrested or had their firearm forcibly confiscated for failing to comply with the Suffolk County Police Department's request in the year since it was made, or even that any purchaser of the Delta Level Defense CT4-2A has been arrested or had their firearm forcibly confiscated by Suffolk County. Indeed, at oral argument, Does acknowledged that Suffolk County has not so much as contacted any individual Doe about the firearms since sending the May 20, 2021 letter. Based on Does' factual pleadings and the subsequent developments (or lack thereof) in this case, Does have not established that their prosecution is likely, *see Vance*, 802 F.3d at 384, or otherwise that the threatened injury is certainly impending or that there is a substantial risk that they will be harmed, *see Dorce*, 2 F.4th at 95. As such, Does have not alleged that they are at an imminent risk of suffering an injury in fact. They thus lack standing to obtain their requested relief.

*Does 1-10*, 2022 WL 2678876, at *2–3.

Much the same can be said of the allegations concerning potential arrest in the instant case. While plaintiffs attempt to cast a wide net, seeking broad injunctive relief against enforcement of a variety of provisions, there is nothing suggesting that any plaintiff has been arrested or prosecuted or that there is otherwise a substantial risk of such action. Instead, the lynchpin of plaintiffs' claims are certain stray comments allegedly made by individual law enforcement officers, which, if made, may well have been taken out of context. By way of example, plaintiff Melloni avers, with respect to the exception provided under state law for unlicensed individuals to handle firearms when supervised during training under certain circumstances, that defendant Komorowski stated that the SCPD is "not honoring" that exception. DE 27-13 at 3, ¶ 12.[6] This comment poses a far less concrete threat than that faced by plaintiffs in *Does 1-10*, insofar as those plaintiffs received written correspondence from the police that they "may be subject to arrest and criminal charges," if they

[6] To the extent that Komorowski made an oral threat that an arrest could be made in contravention of state law, such an action would be highly inadvisable, and would most certainly result in serious consequences.

failed to present their weapons for inspection, and plaintiffs had failed to do so. 2022 WL 2678876, at *2–3. Thus, the plaintiffs here lack standing, as they have failed to articulate a sufficiently tangible threat of arrest.

Furthermore, plaintiffs seek injunctive relief against the County under the umbrella of "enforcement," a gloss that obscures the critical difference between arrest and prosecution. However, plaintiffs cannot seek any relief regarding potential prosecution based upon a failure to join the proper parties. As the Second Circuit has held:

> When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county. *McGinley v. Hynes*, 51 N.Y.2d 116, 123, 432 N.Y.S.2d 689, 412 N.E.2d 376 (1980), *cert. denied*, 450 U.S. 918, 101 S. Ct. 1364, 67 L.Ed.2d 344 (1981); *Davis Constr. Corp. v. County of Suffolk, supra*, 112 Misc.2d at 664, 447 N.Y.S.2d 355; *Brenner v. County of Rockland, supra*, 92 Misc.2d at 835, 401 N.Y.S.2d 434; *Zimmerman v. City of New York*, 52 Misc.2d 797, 799, 276 N.Y.S.2d 711 (1966). Every indictment "constitutes an accusation on behalf of the state as plaintiff and must be entitled 'the people of the state of New York' against a designated person, known as the defendant." CPL § 1.20(1).
>
> It is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender. *People v. Di Falco*, 44 N.Y.2d 482, 486–87, 406 N.Y.S.2d 279, 377 N.E.2d 732 (1978); *Johnson v. Town of Colonie*, 102 A.D.2d 925, 926, 477 N.Y.S.2d 513 (1984) (mem.); *Zimmerman v. City of New York, supra*, 52 Misc.2d at 801, 276 N.Y.S.2d 711; *Hassan v. Magistrates' Court*, 20 Misc.2d 509, 511, 191 N.Y.S.2d 238 (1959), *appeal dismissed*, 10 A.D.2d 908, 202 N.Y.S.2d 1002, motion for leave to appeal dismissed, 8 N.Y.2d 750, 201 N.Y.S.2d 765, 168 N.E.2d 102, cert. denied, 364 U.S. 844, 81 S. Ct. 86, 5 L.Ed.2d 68 (1960). "The responsibilities attendant the position of [district attorney] necessitate 'the exercise of completely impartial judgment and discretion.'" *People ex rel. Doe v. Beaudoin*, 102 A.D.2d 359, 365, 478 N.Y.S.2d 84 (1984) (quoting *People v. Di Falco, supra*, 44 N.Y.2d at 487, 406 N.Y.S.2d 279, 377 N.E.2d 732). The State of New York reserves the right to fill vacancies and establish minimum salaries so as to ensure that district attorneys will be freely independent to act in this impartial manner. No county policy can require them to act otherwise.
>
> As pointed out above, an elected district attorney's powers and duties in connection with the prosecution of a criminal proceeding are the same as those of an Assistant Attorney General appointed to handle such a prosecution. A county has no right to establish a policy concerning how either official should prosecute violations of

> State penal laws. *Zimmerman v. City of New York, supra*, 52 Misc.2d at 801, 276 N.Y.S.2d 711; *Pitler*, *supra*, 41 Fordham L.9Rev. at 527. Indeed, it would be a violation of a district attorney's ethical obligations as counsel for the State in a criminal proceeding to permit himself to be influenced in the performance of his duties by so-called policies of a county.

*Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988). Thus, even if plaintiffs had stated a credible threat of prosecution, which they have not, such relief cannot be sought against the County.

*Conclusion*

Based on the foregoing, plaintiffs have failed to meet the exacting standard for the issuance of a preliminary injunction, such that their motion must be denied. As noted, defendants have filed a pre-motion application seeking to move for dismissal. The parties are to meet and confer and provide the Court with a full briefing schedule in 60 days. Defendants' time to file answers or otherwise move are adjourned pending resolution of said motion.

**SO ORDERED.**

Dated: February 14, 2023
Central Islip, New York

/s/ Gary R. Brown__________
GARY R. BROWN
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

Plaintiffs,

22 Civ. 04778 (GRB)(ST)

-against-

**NOTICE OF INTERLOCUTORY APPEAL**

SUFFOLK COUNTY, New York, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, JOHN DOES 1-5, Individually and JANE DOES 1-5, Individually, Acting Superintendent of the New York State Police STEVEN NIGRELLI, in his official capacity,

Defendants.
---------------------------------------------------------------x

PLEASE TAKE NOTICE that the plaintiffs, ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, and RENAISSANCE FIREARMS INSTRUCTION, INC., hereby appeal to the United States Court of Appeals for the Second Circuit from the attached Memorandum and Order dated February 14, 2023 of the Hon. Gary R. Brown denying Plaintiffs' motion for a Preliminary Injunction, and each and every part thereof that was and is contrary to and/or

prejudices the plaintiffs' rights, claims, and interests.

Dated: February 16, 2023
Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

__________/s/___________________________

Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761 (f)
abell@bellantoni-law.com