# 23-208

## United States Court of Appeals
## for the Second Circuit

ZACHARY GIAMBALVO,

*Plaintiffs-Appellants,*

v.

SUFFOLK COUNTY, NEW YORK,

*Defendants-Appellees.*

*(Caption continues inside front cover.)*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR INTERVENOR-APPELLEE
## NEW YORK STATE ATTORNEY GENERAL

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Intervenor-Appellee
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: May 25, 2023

(*Caption continues from front cover.*)

JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

*Plaintiffs-Appellants*,

v.

POLICE COMMISSIONER RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER, Individually, SUPERINTENDENT STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his Official Capacity,

*Defendants-Appellees*,

JOHN DOES 1-5, Individually, JANE DOES 1-5, Individually,

*Defendants*,

NEW YORK STATE ATTORNEY GENERAL,

*Intervenor-Appellee.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUE PRESENTED ................................................................................ 3

STATEMENT OF THE CASE .................................................................. 3

    A.   Legal Background ................................................................... 3

        1.   The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* ................................... 3

        2.   New York's Concealed Carry Improvement Act .............. 5

    B.   Procedural Background ........................................................... 7

        1.   The complaint ................................................................... 7

        2.   The preliminary injunction motion................................... 9

        3.   The district court's denial of the preliminary injunction motion.............................................................. 11

        4.   Plaintiffs' voluntary dismissal of the claims against the State................................................................ 13

STANDARD OF REVIEW........................................................................ 13

SUMMARY OF ARGUMENT ................................................................. 15

ARGUMENT ............................................................................................. 18

    NEW YORK'S FIREARM LICENSING REQUIREMENTS ARE CONSISTENT WITH THE SECOND AMENDMENT ........................................ 18

i

**Page**

A. The Challenged Requirements Do Not Implicate the Second Amendment's Text. ..................................... 18

B. The Licensing Requirements Are Consistent with the Historical Tradition of Firearm Regulation. ......................... 23

    1. The good-moral-character requirement is consistent with the historical tradition of firearm regulation. ........ 24

    2. The in-person interview requirement is consistent with the historical tradition of firearm regulation. ........ 28

    3. The information disclosure requirements are consistent with the historical tradition of firearm regulation. ....................................................................... 30

    4. The training requirement is consistent with the historical tradition of firearm regulation. ....................... 37

CONCLUSION ....................................................... 41

# TABLE OF AUTHORITIES

**Cases**                                            **Page(s)**

*Antonyuk v. Hochul,*
No. 22-cv-0986, 2022 WL 16744700
(N.D.N.Y. Nov. 7, 2022) ...................................................... 30, 32-33, 39

*Burg v. Gosselin,*
591 F.3d 95 (2d Cir. 2010) ................................................... 19

*Caswell v. Calderon,*
363 F.3d 832 (9th Cir. 2004) ............................................... 19

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ............................................................. 27

*Fields v. City of Tulsa,*
753 F.3d 1000 (10th Cir. 2014) ........................................... 18

*Frey v. Nigrelli,*
No. 21-cv-05334, 2023 WL 247337 (S.D.N.Y. Mar. 13, 2023) ........... 28

*Green Haven Prison Preparative Meeting of Religious Soc'y of
Friends v. New York State Dep't of Corr. & Cmty. Supervision,*
16 F. 4th 67 (2d Cir. 2021) .................................................. 13

*Kansas v. Hendricks,*
521 U.S. 346 (1997) ............................................................. 19

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ............................................... 23-24

*Koons v. Platkin,*
No. 22-cv-7463, 2023 WL 3478604 (D.N.J. May 16, 2023) ........... 30, 34

*Libertarian Party of Erie County v. Cuomo,*
970 F.3d 106 (2d Cir. 2020) ................................................ 10, 20

*McCarthy v. S.E.C.,*
406 F.3d 179 (2d Cir. 2005) ................................................ 15

| Cases | Page(s) |
|---|---|

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ............................................................... 27

*National Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir. 2023) ........................................27-28

*New York State Rifle & Pistol Ass'n v. Bruen,*
142 S. Ct. 2111 (2022) .................................................. passim

*Planned Parenthood Minn. N.D., S.D. v. Rounds,*
686 F.3d 889 (8th Cir. 2012) ................................................ 18

*Sussman v. Crawford,*
488 F.3d 136 (2d Cir. 2007) ................................................. 14

*Torcivia v. Suffolk County,*
17 F.4th 342 (2d Cir. 2021) .................................................. 33

*United States v. Salerno,*
481 U.S. 739 (1987) ..........................................................14-15

*United States v. Sitladeen,*
64 F.4th 978 (8th Cir. 2023) ............................................18-19

*Velazquez v. Legal Servs. Corp.,*
164 F.3d 757 (2d Cir. 1999) ................................................. 15

*We The Patriots USA, Inc. v. Hochul,*
17 F.4th 266 (2d Cir. 2021) .................................................. 14

## Constitution

U.S. Const. amend. II ................................................................ 19

## Laws & Regulations

*Federal*

28 U.S.C. § 2403 ....................................................................1-2

## Laws & Regulations                                    Page(s)

*New York*

Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.) ............................ 5

Penal Law
  § 265.03...................................................................................... 3
  § 265.20................................................................................. 3, 6
  § 400.00........................................................................... passim
  § 400.30......................................................................... 6, 8, 15

9 N.Y.C.R.R. §§ 6059.1-6059.4 ........................................... 7, 22

*States (alphabetical)*

Ala. Code § 13A-11-75 .................................................... 36

Alaska Admin. Code tit. 13, § 30.070 ............................ 39

Ariz. Rev. Stat. § 13-3112................................................. 39

Ark. Code Ann. § 5-73-309 ............................................ 39

Cal. Penal Code § 26165 ................................................. 39

Colo. Rev. Stat. § 18-12-203 ......................................... 39

Conn. Gen. Stat. § 29-28 ............................................ 22, 39

D.C. Code § 7-2509.02 .................................................... 39

Del. Code Ann. tit. 11, § 1441 .................................... 22, 39

Fla. Stat. § 790.06............................................................ 39

Ga. Code Ann. § 16-11-129............................................. 22

Haw. Rev. Stat. § 134-2 ................................................... 39

Idaho Code § 18-3302 ...................................................... 39

## Laws & Regulations                                    Page(s)

*States*

430 Ill. Comp. Stat. 66/75 (2022) .............................................. 39

Ind. Code § 35-47-2-3 ............................................................ 22

Iowa Code § 724.9 (2022) ....................................................... 39

Kan. Stat. Ann. § 75-7c04 ...................................................... 39

Ky. Rev. Stat. Ann. 237.110 .................................................... 39

La. Stat. Ann. § 40:1379.3 ...................................................... 39

Me. Rev. Stat. Ann. tit. 25, § 2003 .......................................... 39

Md. Code Ann., Pub. Safety § 5-306 ........................................ 39

Mass. Gen. Laws ch. 140, § 131P ............................................. 39

Mich. Comp. Laws § 28.425b .................................................. 39

Minn. Stat. § 624.714 ............................................................ 39

Mo. Rev. Stat. § 571.111 (2022) .............................................. 39

Mont. Code Ann. § 45-8-321 ................................................... 39

Neb. Rev. Stat.
   § 69-2432 ........................................................................ 39
   § 69-2433 ........................................................................ 39

Nev. Rev. Stat. § 202.3657 ..................................................... 39

N.J. Admin. Code § 13:54-2.4 .................................................. 39

N.M. Stat. Ann. § 29-19-7 ...................................................... 39

N.C. Gen. Stat. § 14-415.12 .................................................... 39

N.D. Cent. Code § 62.1-04-03 ................................................. 39

**Laws & Regulations**                                    **Page(s)**

*States*

Ohio Rev. Code Ann. § 2923.125 ................................................ 39

Okla. Stat. tit. 21, § 1290.12 ................................................... 39

Or. Rev. Stat. § 166.291 ......................................................... 39

11 R.I. Gen. Laws
   § 11-47-11 ..................................................................... 22
   § 11-47-15 ..................................................................... 39

S.C. Code Ann. § 23-31-215 ..................................................... 39

Tenn. Code Ann. § 39-17-1366 ................................................. 39

Tex. Gov't Code Ann. § 411.174 .............................................. 39

Utah Code Ann. § 53-5-704 ..................................................... 39

Va. Code Ann. § 18.2-308.02 ................................................... 39

W. Va. Code § 61-7-4 ............................................................. 39

Wis. Stat. § 175.60 ................................................................ 39

Wyo. Stat. Ann. § 6-8-104 ...................................................... 39

**Miscellaneous Authorities**

Assembly Sponsor's Mem. A41001 (2022),
   https://nyassembly.gov/leg/?default_fld=&leg_video=
   &bn=A41001&term=2021&Memo=Y ...................................... 6

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
   49 Law & Contemp. Probs. 143 (1986) ................................. 25

**Miscellaneous Authorities**                                                         **Page(s)**

Federal Bureau of Investigation, *Making Prevention a Reality:
Identifying, Assessing, and Managing the Threat of Targeted
Attacks* (2015), https://www.fbi.gov/file-repository/making-
prevention-a-reality.pdf/view ............................................................. 34

J. Reid Meloy et al., *The Concept of Leakage in Threat
Assessment*, 29 Behav. Sci. L. 513 (2011) ........................................... 34

Saul Cornell & Nathan DeDino, *A Well Regulated Right:
The Early American Origins of Gun Control*,
73 Fordham L. Rev. 487, 492 (2004) ........................................... 25, 37

Saul Cornell, *History and Tradition or Fantasy and Fiction:
Which Version of the Past Will the Supreme Court Choose in*
NYSRPA v. Bruen?, 49 Hast. Const. L.Q. 145 (2022) ........................ 26

Senate Sponsor's Mem. S51001 (2022),
https://www.nysenate.gov/legislation/bills/2021/s51001 ..................... 6

Texas House of Representatives Investigative Comm. on the Robb
Elementary Shooting, Interim Report, 88th Leg. (2022),
https://house.texas.gov/_media/pdf/committees/reports/87interim/
Robb-Elementary-Investigative-Committee-Report.pdf ................. 34-35

## PRELIMINARY STATEMENT

In July 2022, the New York Legislature enacted the Concealed Carry Improvement Act (CCIA) to update New York's firearm licensing and possession laws following the U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiffs are individuals and a firearm training business challenging aspects of Suffolk County's firearm licensing process and the constitutionality of the CCIA's licensing requirements. The U.S. District Court for the Eastern District of New York (Brown, J.) denied plaintiffs' motion for a preliminary injunction. The Attorney General of the State of New York submits this brief as intervenor in support of affirmance.[1]

Because the Attorney General's intervention is limited to the constitutionality of the CCIA's licensing provisions, *see* 28 U.S.C.

---

[1] The operative complaint included claims against Acting Superintendent of the New York State Police Steven Nigrelli. After this appeal was filed, plaintiffs dismissed with prejudice their claims against the Acting Superintendent, leaving no state defendant in the case. Because plaintiffs continue to challenge the constitutionality of the CCIA's licensing requirements, the Attorney General intervened as of right in the district court pursuant to 28 U.S.C. § 2403(b) for the limited purpose of defending the constitutionality of those requirements and moved for leave to do the same in this appeal.

§ 2403(b), this brief addresses only that issue. If this Court concludes, as the district court correctly held, that plaintiffs lack standing to proceed with their constitutional claims, it need not (and should not) address the constitutionality of the challenged statutory provisions. This brief also takes no position on plaintiffs' challenges to the County's firearm-licensing policies or practices to the extent those challenges do not involve the constitutionality of the underlying state statutes.

If the Court reaches the merits of plaintiffs' constitutional challenges, it should affirm the denial of the preliminary injunction because the CCIA's licensing requirements do not violate the Second Amendment. As an initial matter, the challenged requirements do not implicate the plain text of the Second Amendment because they restrict firearm carrying only by those who are *not* the law-abiding, responsible citizens protected by the Second Amendment. To the extent historical evidence is necessary to support the challenged requirements, it is well established that laws aimed at preventing persons who pose a danger to public safety from possessing firearms are part of the historical tradition of firearm regulation. Laws requiring those using firearms to engage in mandatory training are likewise supported by historical tradition.

2

## ISSUE PRESENTED

Whether the district court properly denied plaintiffs' motion for a preliminary injunction prohibiting enforcement of the CCIA's licensing requirements.

## STATEMENT OF THE CASE

**A.    Legal Background**

### 1.    The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*

Like dozens of States, New York requires a license to carry a concealed handgun in public. *See, e.g.*, Penal Law §§ 265.03 (criminalizing possession of loaded handgun), 265.20(a)(3) (exempting license holders). New York law has long set forth basic eligibility criteria for a license to carry a concealed handgun in public, including being at least twenty-one years old, not having a felony record, and otherwise having "good moral character." *See* Penal Law § 400.00(1)(a)-(c). Until recently, New York also required demonstrating "proper cause" to obtain a concealed-carry license. *Id.* § 400.00(2)(f) (effective through June 23, 2022). In *New York State Rifle & Pistol Association v. Bruen*, the U.S. Supreme Court concluded that insofar as "proper cause" demanded showing "a special

3

need for self-defense," this requirement infringed the Second Amendment right of law-abiding, responsible citizens to carry arms in public for self-defense, since it was not "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. 2111, 2122, 2130-31 (2022).

*Bruen* recognized the necessity and constitutionality of modern firearms regulation, explicitly clarifying that "nothing in [its] analysis" was meant "to suggest the unconstitutionality" of "shall-issue" licensing regimes. *Id.* at 2138 n.9. These laws "often require applicants to undergo a background check or pass a firearms safety course" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

*Bruen* also cautioned that its standard was not intended to be a "regulatory straightjacket" and made clear that governments were not required to identify "historical twin[s]" or "dead ringer[s]" to support modern regulations. *Id.* at 2133. The Court recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and further underscored that "the Constitution can, and must,

4

apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. As the Court recognized, in some cases, historical analogies will be "relatively simple to draw," while "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. Accordingly, when "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

### 2. New York's Concealed Carry Improvement Act

On July 1, 2022, New York's Legislature passed the CCIA, which removed the proper-cause requirement that *Bruen* declared unconstitutional and made several other changes to New York's firearm licensing and possession laws. *See* Ch. 371, 2022 N.Y. Laws (N.Y. Legis. Retrieval Sys.) (eff. Sept. 1, 2022). As relevant here, the CCIA made more precise the longstanding requirement of "good moral character" for a handgun license; this is the provision under which the State has denied licenses to people with criminal records and other evidence of a propensity for violence. The CCIA defined the term "good moral character" to mean "having the essential character, temperament and judgement necessary

to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b).

To aid the licensing officer in determining whether an applicant meets the good-moral-character requirement, every applicant is required to "meet in person with the licensing officer for an interview," *id.* § 400.00(1)(o), and to submit statutorily specified information, including the identity of other adult household members, disclosure of whether minor children live in their home, character references, a listing of social media accounts, and other information determined to be reasonably necessary, *id.* § 400.00(1)(o)(i)-(v). Applicants are also required to complete eighteen hours of firearm safety training, including two hours of live-fire instruction, *id.* § 400.00(1)(o)(iii), (19). While undergoing live-fire training, applicants are exempted from liability for unlicensed carry if they are supervised by a duly authorized instructor. *Id.* § 265.20(a)(3-a). Local governments may establish additional requirements. *Id.* § 400.30.

A license "shall be issued" to anyone satisfying the licensing requirements. Penal Law § 400.00(2); *see also* Assembly Sponsor's Mem. A41001 (2022); Senate Sponsor's Mem. S51001 (2022). Licensing officers must act on an application for a license within six months or provide a

6

written reason for the delay. *See* Penal Law § 400.00(4-b). If an application is denied, the licensing officer must explain in writing the reasons for the denial, and an applicant has the right to appeal the decision and to introduce additional evidence in support of their application at the appeal hearing. *See id.* § 400.00(4-a); 9 N.Y.C.R.R. §§ 6059.1-6059.4.

## B.   Procedural Background

### 1.   The complaint

On August 15, 2022, plaintiffs Zachary Giambalvo, John Mougios, Shane Mashkow, Kevin McLaughlin, and Michael McGregor, individuals residing in Suffolk County seeking concealed-carry firearm licenses, filed this lawsuit under 42 U.S.C. § 1983. Plaintiffs did not challenge the CCIA, which had been enacted but had not yet gone into effect. Instead, plaintiffs' complaint focused on the Suffolk County Police Department's (SCPD) licensing procedures, which they contended delayed the license application process. (*See* Appellant's Appendix (A.) 3; Compl. at 2, (Aug. 15, 2022), EDNY ECF No. 1.)

At the time of the complaint, Giambalvo, Mougios, Mashkow, and McLaughlin had each initiated the process to apply for a concealed-carry firearm license by submitting an "applicant questionnaire" and fee to

7

SCPD, as required by SCPD, but had not been scheduled for an interview or completed the state application form. (*See* A. 43, 47-48, 50.) McGregor, who already had a license restricted to hunting and target shooting when the first complaint was filed, had applied for an amendment to obtain an unrestricted license, which had not been adjudicated. (A. 53.)

On November 17, 2022, more than four months after the CCIA was enacted and more than two months after it took effect, plaintiffs amended their complaint to add claims against Acting Superintendent of the New York State Police Steven Nigrelli challenging the CCIA's requirements as unconstitutional. As relevant here, the amended complaint facially challenged the CCIA's good-moral-character requirement, the training requirement, the in-person interview, and the requirement that an applicant submit statutorily required information. *See* Penal Law § 400.00(1)(b), (1)(o), (19). Plaintiffs' amended complaint also challenged the CCIA provision permitting local regulations that establish additional requirements, Penal Law § 400.30, and several aspects of New York's licensing scheme long predating the CCIA, including the requirement that licensing officers act on an application for a license within six months of receiving it or give the applicant written notice of the reason for the

delay, *id.* § 400.00(4-b), and the provision declaring it a misdemeanor to violate any provision of New York's licensing regulations, *id.* § 400.00(15).[2] (*See* A. 57-59.) In the amended complaint, plaintiffs contended that they did not intend to comply with certain CCIA requirements during the ongoing application process, including the training requirement, the information disclosure requirements, and the in-person interview. (A. 43, 47-48, 50, 53.)

## 2.   The preliminary injunction motion

On December 11, 2022, plaintiffs moved for a preliminary injunction against enforcement of the CCIA's licensing provisions and the SCPD's alleged policies of prohibiting live-fire training and delaying the license application process. Suffolk County and Acting Superintendent Nigrelli opposed the motion.

As relevant here, Acting Superintendent Nigrelli responded to plaintiffs' claims challenging the CCIA's licensing requirements, arguing

---

[2] The amended complaint also added claims against Suffolk County alleging that SCPD officers were threatening to arrest unlicensed applicants who participated in CCIA-mandated live-fire training as part of the application process, including a claim brought by Renaissance Firearms Instruction, Inc., and its owner, Frank Melloni. (A. 15, 57-58.)

that plaintiffs lacked standing as to those claims because they had not "applied for and been denied a license" at the time their complaint was filed, nor had they shown that their applications "'would have been futile,'" as this Court's precedent requires. *See Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 116 (2d Cir. 2020), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111 (quoting *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012)). Acting Superintendent Nigrelli likewise argued that plaintiffs failed to show injury stemming from the remaining CCIA provisions. For example, plaintiffs challenged the requirement that licensing officials act on an application within six months of receiving it, but the only injuries they claimed resulted from SCPD's alleged delay in providing applications and scheduling interviews, not the six-month time limit imposed by state law. (*See* State Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("State Mem.") at 7-10, 27 (Jan. 20, 2023), EDNY ECF No. 34.)

On the merits, Acting Superintendent Nigrelli argued that plaintiffs were unlikely to succeed on their claim that the CCIA's licensing requirements violated their right to bear arms. He explained that the licensing requirements, which deny licenses only to citizens who are not law-

abiding and responsible, do not implicate the Second Amendment's text. And even if the Second Amendment's text did apply to plaintiffs' claims, he explained that the CCIA's provisions were amply supported by historical evidence showing a longstanding and widespread American tradition of disarming individuals deemed threats to public safety or lacking the moral character to be entrusted with firearms. (*See* State Mem. at 11-27; Decl. of Patricia M. Hingerton in Opp'n to Prelim. Inj. ("Hingerton Decl.") (Jan. 20, 2023), EDNY ECF No. 34-1; Hingerton Decl., Exs. 1 to 34, EDNY ECF Nos. 34-2 to 34-35.)

### 3. The district court's denial of the preliminary injunction motion

On February 14, 2023, the district court denied plaintiffs' motion. As relevant here, the district court held that plaintiffs lacked standing to challenge the CCIA's licensing requirements because none of the plaintiffs had been denied a license, nor had they shown that applying would be futile.[3] (A. 218-219.) The court reasoned that plaintiffs' claims that they

---

[3] According to plaintiffs, Mougios' application was denied by SCPD for failing to provide character references on February 17, 2023, after the district court rendered its decision. Br. for Pls.-Appellants (Br.) at 3 n.6.

would not comply with the CCIA's requirements were "'[m]ere objection or antipathy to the law,'" which "'does not constitute a showing of futility.'" (A. 219 (quoting *Libertarian Party*, 970 F.3d at 116).) In addition, the court found that plaintiffs failed to establish that they faced an imminent risk of arrest, as required for a pre-enforcement challenge to state law. (A. 221-223.) And because plaintiffs had not sued the district attorney, they could not seek an injunction prohibiting prosecution. (A. 223-224.) In any event, the court concluded that the CCIA's requirements are constitutional because the Second Amendment's text permits "'reasonable, well-defined restrictions'" on the right to bear arms. (A. 217-218 (quoting *Bruen*, 142 S. Ct. at 2156).)

Plaintiffs filed a notice of appeal on February 16, 2023, and sought an injunction pending appeal in both the district court and this Court. Both courts denied the motion for injunctive relief. *See* Order (Apr. 25, 2023), CA2 ECF No. 58. (*See* Order (Feb. 21, 2023), EDNY; A. 10.)

### 4. Plaintiffs' voluntary dismissal of the claims against the State

On April 11, 2023, plaintiffs voluntarily dismissed their claims with prejudice against Acting Superintendent Nigrelli, the sole state defendant. (*See* Notice of Voluntary Dismissal (Apr. 11, 2023), EDNY ECF No. 45.) However, plaintiffs represented that they still intended to challenge the facial constitutionality of the CCIA's licensing requirements. Accordingly, the Attorney General intervened as of right in the district court pursuant to 28 U.S.C. § 2403(b) for the limited purpose of defending the constitutionality of New York's firearm licensing laws (*see* A. 10) and moved for leave to do the same in this appeal, *see* Mot. (Apr. 12, 2023), CA2 ECF No. 50.

## STANDARD OF REVIEW

On appeal from an order denying injunctive relief, this Court reviews the district court's legal holdings de novo and its ultimate decision for abuse of discretion. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F. 4th 67, 78 (2d Cir. 2021).

13

To obtain a preliminary injunction against a statute's or rule's enforcement, "the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir.), *clarified by* 17 F.4th 368 (2d Cir. 2021), *and cert. denied*, 142 S. Ct. 2569 (2022). A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (quotation marks omitted).

Plaintiffs bear a particularly heavy burden in this case for two reasons. First, where, as here, a preliminary injunction "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party is under a heightened standard to show a "clear or substantial" likelihood of success. *Id.* at 140 (quotation marks omitted). Second, plaintiffs assert a facial challenge to the CCIA's requirements, which is "the most difficult challenge to mount successfuly" because plaintiffs must establish that "no set of circumstances exist under which" the CCIA's requirements would be valid. *United States v.*

14

*Salerno*, 481 U.S. 739, 745 (1987); *see also Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 763 (2d Cir. 1999), aff'd, 531 U.S. 533 (2001).

## SUMMARY OF ARGUMENT

The statutory licensing requirements at issue in this case do not violate the Second Amendment.[4] At the outset, the requirements are consistent with the plain text of the Second Amendment, which limits the right to bear arms to "the people," defined as "'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). The CCIA's good-moral-character requirement reflects the same limitation, requiring applicants to have the "essential character [and]

---

[4] On appeal, plaintiffs' facial challenges are limited to the good-moral-character provision and the in-person interview, information disclosure, and training requirements, Penal Law § 400.00(1)(b), (1)(o), (19). The good-moral-character provision and information disclosure requirement are also at issue in *Antonyuk v. Hochul*, No. 22-2908 (2d Cir.) (argued on Mar. 20, 2023).

Plaintiffs have abandoned their challenges to the requirement that officials act on an application within six months, the provision declaring it a misdemeanor to violate the State's licensing provisions, and the provision permitting local officials to establish additional licensing requirements, *id.* §§ 400.00(4-b), (15), 400.30. *See* Br. at 13-14 & n.16, 21-24. *See also, e.g.*, *McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005).

temperament" to possess and carry a firearm safely, Penal Law § 400.00(1)(b). The in-person interview and information disclosure requirement merely facilitate the licensing officer's determination of whether applicants have met the CCIA's statutory good-moral-character standard. And the training requirement similarly supports the licensing officer's assessment of whether the applicant can be entrusted to use firearms safely. Accordingly, because the licensing requirements operate to ensure that licenses are denied only to those who are *not* law-abiding and responsible, the requirements do not implicate the plain text of the Second Amendment. That conclusion alone defeats plaintiffs' facial challenge to these provisions.

In any event, the challenged provisions are consistent with the historical tradition of firearms regulation. Laws from the colonial era and close in time to the ratification of the Fourteenth Amendment demonstrate a longstanding historical practice of disarming those deemed to be dangerous. Those historical precedents support the CCIA's good-moral-character requirement, which justifies denying a license only to applicants who have not demonstrated the "essential character [and] temperament" to use firearms safely, and the supporting information

16

disclosure and interview provisions, which are used to determine whether an applicant has met the good-moral-character requirement.

Additional historical evidence supports each of the challenged requirements. For example, in the colonial era and later, those seeking to carry arms were required to appear in person to swear a loyalty oath or demonstrate suitability, as with the CCIA's in-person interview requirement. The CCIA's information disclosure requirements are likewise supported by historical laws from a range of time periods and jurisdictions determining dangerousness (and thus suitability to carry a firearm) based on information about a person's reputation in the community, associates, and past conduct. Finally, founding era laws requiring citizens to appear regularly for training in state militias support the CCIA's firearm safety training requirement.

# ARGUMENT

## NEW YORK'S FIREARM LICENSING REQUIREMENTS ARE CONSISTENT WITH THE SECOND AMENDMENT

### A. The Challenged Requirements Do Not Implicate the Second Amendment's Text.

The government's obligation to defend a firearms regulation as "consistent with this Nation's historical tradition of firearm regulation" is triggered only "[w]hen the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. For example, the Supreme Court in *Bruen* "canvassed the historical record" to confirm that plaintiffs made this predicate showing before shifting the burden to the government to provide historical support for the challenged proper-cause restriction. *Id.* at 2127, 2130. If a regulation does not implicate the Second Amendment's text, it may be upheld on that ground alone.[5] *See United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023).

Here, the district court properly concluded (A. 217-218) that the CCIA's licensing provisions do not implicate the "plain text" of the Second

---

[5] This approach is consistent with the analytical approach to other constitutional claims. *See, e.g., Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014) (free exercise claim); *Planned Parenthood Minn. N.D., S.D. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012) (freedom of speech

(*continued on the next page*)

Amendment because they do not restrict the right of law-abiding and responsible persons to carry arms for self-defense. The Supreme Court has been clear that "the people" whose right to carry arms in self-defense is guaranteed by the Second Amendment are "'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); U.S. Const. amend. II. Conversely, those who are not law-abiding, responsible citizens fall outside "'the people' entitled to keep and bear arms." *Sitladeen*, 64 F.4th at 986.

The CCIA's good-moral-character requirement precludes possession of firearms only by persons who lack "the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b). That definition tracks the Second Amendment's exclusion of those who are not law-abiding and responsible from "the people" entitled to keep and bear arms. Applicants who do not meet the good-moral-character requirement—those who would be likely to use a weapon in a

------

claim); *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (unconstitutional seizure claim); *Caswell v. Calderon*, 363 F.3d 832, 837-38 (9th Cir. 2004) (equal protection claim); *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (ex post facto claim).

19

manner that endangers themselves or others—are, by definition, not law-abiding and responsible. *See Libertarian Party*, 970 F.3d at 127-28. Accordingly, only applicants who have no Second Amendment right to keep and bear arms are denied a license under the CCIA's good-moral-character requirement.

The remaining licensing requirements at issue here are intended to ensure that licensees are law-abiding and responsible. The CCIA's requirement that applicants disclose certain information, including character references, the identity of the applicant's spouse or domestic partner and cohabitants, a list of social media accounts, and any other information "reasonably necessary" to the licensing officer in reviewing the application, Penal Law § 400.00(1)(o)(i), (ii), (iv), (v), facilitate a licensing officer's assessment of whether an applicant meets the statutory good-moral-character standard. So too with the in-person interview requirement, *id.* § 400.00(1)(o), which allows a licensing officer to assess whether the information presented in the application accurately represents the applicant. The training requirement, *id.* § 400.00(1)(o)(iii), (19), which requires an applicant to take a course addressing firearm safety, safe storage of firearms, state and federal gun laws, and conflict

de-escalation, *id.* § 400.00(19), is designed to ensure that an applicant will carry a firearm in a responsible manner that does not endanger themselves or others.

Plaintiffs' argument that any requirement for a firearm license necessarily implicates the text of the Second Amendment (Br. for Pls.-Appellants (Br.) at 20) is meritless. The Supreme Court has never held that a person has the right to carry a firearm without being subject to a licensing scheme. To the contrary, the Court has indicated that shall-issue licensing schemes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," and are therefore constitutional. *See Bruen*, 142 S. Ct. at 2138 n.9 (quotation marks omitted); *see also id.* at 2161-62 (Kavanaugh, J., concurring). While *Bruen* found that New York's prior "proper cause" requirement was within the scope of the Second Amendment because it burdened the right of law-abiding, responsible citizens to bear arms by denying them licenses if they did not show a particularized need for self-defense, *id.* at 2134, the licensing requirements at issue here impose no such burden.

21

Plaintiffs also miss the mark in contending that the CCIA's licensing requirements afford licensing officials an unconstitutional degree of discretion. *See* Br. at 21-24. To the contrary, the CCIA requires licensing officers to consider specific and defined criteria, Penal Law § 400.00(1)(o), and a license "shall be issued" to anyone satisfying the licensing requirements, *id.* § 400.00(2). Upon reviewing an applicant's materials, officers must either "grant the application" or "deny the application for reasons specifically and concisely stated in writing," which may be challenged on appeal. *Id.* § 400.00(4-a), (4-b); *see also* 9 N.Y.C.R.R. §§ 6059.1-6059.4. Moreover, comparable requirements are a feature of numerous other "shall-issue" licensing regimes referenced in *Bruen* as examples of licensing regimes that did not afford officers undue discretion. *See* 142 S. Ct. at 2123 n.1; *see also, e.g.*, Ind. Code § 35-47-2-3(g)(2) (applicant must be "of good character and reputation"); Ga. Code Ann. § 16-11-129(d)(4) ("of good moral character"); Del. Code Ann. tit. 11, § 1441(a) (same); Conn. Gen. Stat. § 29-28(b)(2) ("suitable person to receive such permit"); 11 R.I. Gen. Laws § 11-47-11 ("suitable person to be so licensed").

Accordingly, this Court may affirm the denial of plaintiffs' preliminary injunction motion on the ground that the challenged CCIA requirements do not implicate the Second Amendment's text.

## B. The Licensing Requirements Are Consistent with the Historical Tradition of Firearm Regulation.

In any event, the CCIA's licensing requirements are also supported by the nation's historical tradition of firearm regulation. Specifically, the historical record confirms that a "legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety," *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting), because the person "belongs to a dangerous category or bears individual markers of risk," *id.* at 451. The good-moral-character provision and related licensing requirements serve the same purpose.

1. **The good-moral-character requirement is consistent with the historical tradition of firearm regulation.**

For centuries, jurisdictions across America have enacted laws that disarm individuals deemed threats to public safety or lacking the moral character to be entrusted with firearms.[6] Colonial-era laws forcibly disarmed members of groups perceived to be dangerous unless they swore a loyalty oath. (*See* Hingerton Decl., Ex. 3 at 36 (1756 Virginia law); *id.*, Ex. 4 at 212 (1637 Massachusetts law).) The tradition of disarming those who appeared disloyal continued in the founding era. Massachusetts' founding-era law, for example, required those who might be "notoriously disaffected to the Cause of America" to appear in person and take an oath of allegiance. (Hingerton Decl., Ex. 6 at 32 (1776 Massachusetts law). Those who refused were reported within twenty-four hours to a justice of the peace and subsequently stripped of all "Arms, Ammunition, and warlike Implements." (*Id.* at 33.) Similar laws in many States required

---

[6] Several of the historical antecedents cited in this brief contain race-based or religion-based assessments of dangerousness. The unfortunate reality is that the seventeenth-, eighteenth-, and nineteenth-century laws to which *Bruen* directs the constitutional inquiry often codified prejudices that existed at the time. This has not prevented courts from treating such laws as relevant to ascertaining the historical understanding of the scope of the Second Amendment. *See, e.g.*, *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting).

citizens to take a loyalty oath or suffer disarmament and disqualification from positions of civil and military trust. (*See id.*, Ex. 7 at 63 (1777 Pennsylvania law); *id.*, Ex. 8 § XVII (1777 Maryland law); *id.*, Ex. 9 at 231 (1777 North Carolina law); *id.*, Ex. 10 at 282 (1777 Virginia law); *id.*, Ex. 11 at 389 (1776 New York law).) Early militia-mustering laws provide another example of disarmament of those deemed to be unfit to bear arms. (*See, e.g.*, *id.*, Ex. 15 at 563 (1806 New Jersey law); *id.*, Ex. 16 at 340 (1822 Pennsylvania law).) Together, these laws reflect an early tradition of disarming persons who are deemed dangerous based on their conduct, associates, or reputation. *See, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986).

Around the time the Fourteenth Amendment incorporated the Second Amendment against the States in 1868, jurisdictions nationwide enforced licensing requirements to advance the same purpose of keeping firearms out of the hands of individuals deemed dangerous. In New York City, for instance, an individual who wanted to carry a pistol for his protection had to appear for an in-person interview with a local officer.

25

(Hingerton Decl. Ex. 19 at 60 (1878 ordinance).) If, based on this interview, the officer was "satisfied that the applicant is a proper and law-abiding person," the officer would recommend that the individual receive a permit. (*Id.*) Similar requirements that applicants for a pistol permit appear in person were enacted in municipalities throughout New York State, among many other places. (*See*, *e.g.*, *id.*, Ex. 17 at 116-17 (1892 District of Columbia ordinance); Ex. 22 (1880 Brooklyn ordinance); *id.*, Ex. 23 at 176 (1891 Buffalo ordinance, enacted by the New York State legislature); *id.*, Ex. 24 (1892 Elmira ordinance); *id.*, Ex. 25 at 243 (1892 Syracuse ordinance); *id.*, Ex. 26 at 425 (1905 Troy ordinance); *id.*, Ex. 27 at 337 (1913 Lockport ordinance); *id.*, Ex. 28 at 845 (1905 Albany ordinance).)[7]

Plaintiffs offer no substantive response to this wealth of evidence, which is sufficient to defeat any constitutional challenge to the good-moral-character requirement and the supporting provisions. At most,

---

[7] *See also* Br. of *Amicus Curiae* Patrick J. Charles in Supp. of Neither Party, Appendix at 2-45, *Bruen*, 142 S. Ct. 2111 (No. 20-843) (listing similar nineteenth-century ordinances from jurisdictions in fourteen other States); Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in* NYSRPA v. Bruen*?*, 49 Hast. Const. L.Q. 145, 168-170 & fig. 1 (2022) (identifying many jurisdictions across the country with similar laws).

plaintiffs argued below (Pls.' Reply Mem. of Law ("Pls.' Reply") at 9-12 (Jan. 27, 2023), EDNY ECF No. 37), that evidence from the time of the ratification of the Fourteenth Amendment is irrelevant to the historical understanding of the Second Amendment. Plaintiffs are incorrect.

The Supreme Court has repeatedly considered nineteenth-century sources in Second Amendment cases. For example, *District of Columbia v. Heller* describes evidence of post-ratification understanding of a right as a "critical tool of constitutional interpretation." 554 U.S. 570, 605 (2008) And *McDonald v. City of Chicago* exhaustively retraced Reconstruction-era public understanding of the right to bear arms to support the Supreme Court's conclusion that the Fourteenth Amendment incorporated the Second Amendment against the States. 561 U.S. 742, 770-78 (2010). *Bruen* likewise examines nineteenth-century evidence at length. *See* 142 S. Ct. at 2145-56.

Indeed, the only appellate court to address the issue since *Bruen* has concluded historical evidence from the time of the ratification of the Fourteenth Amendment is not only relevant, but even "more probative of the Second Amendment's scope than" evidence from the founding era, at least as to challenges to state laws. *See National Rifle Ass'n v. Bondi*, 61

F.4th 1317, 1322-23 & n.9 (11th Cir. 2023) (surveying support for this position from "prominent judges and scholars—across the political spectrum"); *see also Frey v. Nigrelli*, No. 21-cv-05334, 2023 WL 2473375, at *5 (S.D.N.Y. Mar. 13, 2023). In any event, as discussed above (at 24-25), the historical record includes ample evidence from the colonial and founding eras supporting the disarmament of dangerous persons. For that reason, the good-moral-character requirement is supported by historical tradition even under plaintiffs' improperly cramped analytical framework.

### 2. The in-person interview requirement is consistent with the historical tradition of firearm regulation.

The CCIA's requirement that an applicant appear for an in-person interview, Penal Law § 400.00(1)(o), is additionally supported by a longstanding tradition of evaluating a person's dangerousness by requiring them to appear in person. The colonial-era laws disarming groups perceived to be dangerous allowed individual citizens to avoid disarmament by appearing in person to address their perceived disloyalty before "two or more justices of the peace." (*See* Hingerton Decl., Ex. 3 at 36 (1756 Virginia law); *see also id.*, Ex. 4 at 212 (1637 Massachusetts

law).) Founding-era loyalty laws also directed in-person appearances to swear an oath before a justice of the peace. (*See id.*, Exs. 6-11 (1776-1777 Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia, and New York laws).) Pennsylvania's law, for example, required inhabitants to take an oath before a justice of the peace in the county in which he resided and stated that anyone who refused to take the oath would be disarmed. (*See id.*, Ex. 7 at 62-63.) State and federal militia mustering laws from the same period also required citizens to regularly appear in person for training. (*See id.*, Exs. 12, 15, 16, 31, 33 (1785-1822 New York, New Jersey, Pennsylvania, federal, and Virginia laws).)

In addition, local ordinances enacted close to the time of the ratification of the Fourteenth Amendment required applicants to appear in person to apply for a pistol license or permit. (*See id.*, Exs. 17, 19, 22-28 (ordinances from the District of Columbia, New York City, Brooklyn, Elmira, Syracuse, Troy, Lockport, and Albany).) Brooklyn's law, for instance, required applicants to apply "to the officer in command of the station house of the precinct" where the applicant resided. (*Id.*, Ex. 22.) The officer, "if satisfied that the applicant [was] a proper and law abiding person" recommended the applicant for approval for a permit. (*Id.*)

29

As each of these laws demonstrate, the CCIA's in-person interview requirement is consistent with a historical tradition of requiring those seeking to carry firearms to appear in person to confirm that they are law-abiding and responsible. Even district courts that have taken narrow views of the Second Amendment's historical scope have rejected challenges to in-person interview requirements. *See, e.g.*, *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 WL 16744700, at *58 (N.D.N.Y. Nov. 7, 2022) (challenge to in-person interview requirement not likely to succeed based on historical tradition); *Koons v. Platkin*, No. 22-cv-7463, 2023 WL 3478604, at *28 (D.N.J. May 16, 2023) (same).

### 3. The information disclosure requirements are consistent with the historical tradition of firearm regulation.

The CCIA's requirement that applicants provide certain information, including character references, the identity of the applicant's spouse or domestic partner and cohabitants, a list of the applicant's social media accounts, and any other information "reasonably necessary" to the licensing officer in reviewing the application, Penal Law § 400.00(1)(o)(i), (ii), (iv), (v), is justified by a longstanding historical tradition of using information about an individual's reputation in the community,

associates, and past conduct to determine whether the individual is law-abiding and responsible.

For example, the colonial-era Virginia and Massachusetts laws discussed above disarmed individuals who were reputed or suspected to be part of groups the community deemed dangerous. (*See* Hingerton Decl., Ex. 3 at 36 (1756 Virginia law); *id.*, Ex. 4 at 211 (1637 Massachusetts law).) In the founding era, Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia, and New York likewise disarmed or barred from positions of military trust individuals perceived to be "disaffected" or disloyal to the cause of the United States. (*See id.*, Exs. 6-11 (1776-1777 Massachusetts, Pennsylvania, Maryland, North Carolina, Virginia, and New York laws).) These laws demonstrate a historical tradition of relying on information about an individual's reputation in the community and past conduct to determine who should be disarmed.

Around the time of the ratification of the Fourteenth Amendment, States and localities enacted laws explicitly limiting permission to carry firearms to citizens of good reputation. New York City, Brooklyn, and Jersey City, for example, enacted ordinances requiring a "written endorsement" or "recommendation" to obtain a permit to carry a pistol.

*See Antonyuk*, 2022 WL 16744700, at \*49 n.81 (citing 1871 Jersey City law and 1881 New York City law). (*See* Hingerton Decl., Ex. 22 (1880 Brooklyn ordinance).) Delaware likewise required a "written certificate of five or more respectable and judicious citizens of the neighborhood" that the applicant was of "fair character" for certain firearm permits. *See Antonyuk*, 2022 WL 16744700, at \*49 n.81 (citing 1832 Delaware law). And other localities permitted concealed carry only by "well known and worthy citizens, or person of good repute." (*See* Hingerton Decl. Ex. 30 at 70 (1881 Omaha ordinance).) These laws and ordinances relied directly on information about a person's reputation in the community to determine who should be permitted to carry arms.

In addition, the local pistol permitting ordinances from the same period discussed above allowed licensing officers to seek information from applicants about their suitability. New York City's ordinance, for example, required the licensing officer to be "satisfied" that the applicant was "law-abiding," suggesting that the licensing officer was permitted to question the applicant before issuing a permit. (*See* Hingerton Decl., Ex. 19.) Other localities enacted similar requirements. (*See id.*, Exs. 22, 24, 26, 28 (Brooklyn, Elmira, Troy, and Albany ordinances).) *See also* Br.

32

of *Amicus Curiae* Patrick J. Charles in Supp. of Neither Party (citing Montclair, New Jersey ordinance with the same requirement.)

Each of the CCIA's information disclosure requirements serve the same purpose as these historical laws: using information about an applicant's reputation in the community, associates, and past conduct to determine whether the applicant is law-abiding and responsible. For example, the disclosure of character references and cohabitants facilitates inquiries to the applicant's close associates to assist in identifying red flags that may cast doubt on the applicant's ability to use firearms safely.[8] These requirements are supported by the historical tradition of relying on information about a person's reputation obtained from their community, including historical licensing laws specifically requiring references or recommendations in order to obtain a firearm license. See *supra* 31-32. *See also Antonyuk*, 2022 WL 16744700, at *50 (challenge to character

---

[8] It is particularly important to ensure that those in the applicant's home do not cast doubt on the applicant's ability to use firearms safely, because domestic violence is among the most common misuses of firearms. *See*, *e.g.*, *Torcivia v. Suffolk County*, 17 F.4th 342, 359 (2d Cir. 2021), *cert. denied*, 143 S. Ct. 438 (2022).

reference requirement not likely to succeed based on historical tradition); *Koons*, 2023 WL 3478604, at *28 (same).

The CCIA's requirement that applicants provide the licensing officer with a list of recent social-media accounts, "to confirm the information" provided by the applicant's character references, Penal Law § 400.00(1)(o)(iv), likewise allows licensing officers to assess applicants' past conduct, associates, and reputation to confirm that the applicant is law-abiding and responsible. In modern times, social media usage is often critical evidence of whether an applicant is law-abiding and responsible. Research demonstrates that social media is a frequent forum for "leakage," the communication to a third party of an intent to do future harm using a firearm. *See e.g.*, J. Reid Meloy et al., *The Concept of Leakage in Threat Assessment*, 29 Behav. Sci. L. 513, 514 (2011); FBI, *Making Prevention a Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks* at 34-35, 49-50 (2015). For example, an investigative report found that shortly before the Uvalde, Texas, elementary school shooter acquired a firearm and killed 21 children and educators, he posted threats, gruesome videos and images, and other material reflecting a fascination with school shootings on social media. *See* Texas

House of Representatives Investigative Comm. on the Robb Elementary

Shooting, Interim Report, 88th Leg. (2022). Information from social

media, which may not be available from other sources, is a powerful tool

to assist licensing officers in assessing whether an applicant will safely

use a firearm.

Finally, the CCIA's requirement that an applicant provide any

"other information required by the licensing officer that is reasonably

necessary and related to the review of the licensing application," Penal

Law § 400.00(1)(o)(v), is supported by the same historical tradition of

permitting licensing officials to seek information necessary to determine

whether someone is responsible and law-abiding. For example, many

local pistol licensing ordinances from the time of the ratification of the

Fourteenth Amendment required the licensing officer to be "satisfied"

that the applicant was "a proper and law-abiding person," suggesting

that the licensing officer was permitted to question the applicant. See

*supra* 32-33.

Notably, this provision does not permit an open-ended inquiry by

the licensing officer. Instead, officers are limited to information that is

"reasonably necessary" and "related to the review if the licensing

application," such that it will aid the officer in determining whether an applicant meets the good-moral-character requirement. Indeed, other States with licensing regimes approved in *Bruen* include similar provisions. *See, e.g.*, Ala. Code § 13A-11-75(d)(2) ("If the sheriff cannot determine whether [an enumerated factor] applies to the applicant, the sheriff may request additional information from the applicant.").

To the extent plaintiffs contend, as they did below (Pls.' Reply at 12-15), that these historical laws and ordinances are insufficiently similar to the CCIA's information disclosure requirements, *Bruen* "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. That is particularly true where, as with the social media requirement, firearm regulations implicate "dramatic technological changes." *Id.* at 2132. Even if the exact information requested by these provisions is not "a dead ringer" for historical precursors, the provisions are "relevantly similar," *id.* at 2132-33. The information disclosure requirements authorize the collection of the same kind of associate and reputational information used to inform disarmament and licensing determinations for centuries and

36

use that information for the same purpose: to determine whether the applicant is law-abiding and responsible.

### 4. The training requirement is consistent with the historical tradition of firearm regulation.

The CCIA's requirement that an applicant undergo eighteen hours of firearm training, Penal Law § 400.00(1)(o)(iii), (19), is consistent with a long tradition of requiring those using firearms to be trained to use them safely. In particular, founding-era state and federal law required able-bodied men to serve in state militias and participate in frequent, mandatory firearm training. (*See* Hingerton Decl., Ex. 16 at 325 (1822 Pennsylvania law); *id.*, Ex. 29 at 239 (1780 New York law); *id.*, Ex. 31 at 273 (1792 federal law); *id.*, Ex. 32 (1806 New Jersey law); *id.*, Ex. 33 at 19 (1785 Virginia law).) *See also* Cornell & DeDino, *supra*, at 508-10.

These early mandatory training requirements were substantial. New York, for example, required militia members to convene at least four times a year for "training . . . to the use of arms," which was deemed necessary for militia members' "instruction and improvement." (*Id.*, Ex. 29 at 239.) Virginia likewise required companies of its militia to muster once every two months for exercise and training. (*Id.*, Ex. 33 at 11, 16.)

Pennsylvania and New Jersey, in turn, required militia members to train at least three times a year. (*Id.*, Ex. 16 at 333; *id.*, Ex. 32 at 540.) New Jersey's law further provided that at each training session, militia members could be trained "under arms" up to "six hours" each day. (*Id.*, Ex. 32 at 565.)

In addition to the time commitment, which interrupted citizens' daily life multiple times each year, militia training could require significant travel. New York exempted citizens living in certain counties from training requirements due to the difficulty and expense of travel, but only if they lived "at a greater distance than thirty miles" from the mustering ground. (*Id.*, Ex. 12 at 234.) Virginia similarly exempted December and January from the bimonthly training requirement, presumably because travel would have been difficult in those months. (*See id.*, Ex. 33 at 11.)

Consistent with the robust historical tradition of training requirements, *Bruen* explicitly acknowledged that it did not intend to cast doubt on shall-issue licensing regimes that required firearm training. *See* 142 S. Ct. at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue regimes may require a license applicant to undergo . . .

training in firearms handling."). Indeed, the vast majority of States—at least 41—have such requirements.[9]

Relying on *Bruen* and the historical precedents discussed above, multiple courts in this circuit have concluded that the CCIA's training requirement is supported by historical tradition. *See* Tr. of Oral Arg., *Corbett v. Hochul*, No. 22-cv-05867 (S.D.N.Y. Nov. 29, 2022), ECF No. 75; *Antonyuk*, 2022 WL 16744700, at *56. In *Corbett*, after examining the State's evidence of historical militia training requirements, the court

---

[9] *See* Alaska Admin. Code tit. 13, § 30.070(a)(1)(A); Ariz. Rev. Stat. § 13-3112(N); Ark. Code Ann. § 5-73-309(13); Cal. Penal Code § 26165(a), (c); Colo. Rev. Stat. § 18-12-203(1)(h); Conn. Gen. Stat. § 29-28(b); D.C. Code § 7-2509.02(a)(4); Del. Code Ann. tit. 11, § 1441(a)(3); Fla. Stat. § 790.06(2)(h); Haw. Rev. Stat. § 134-2(g); Idaho Code § 18-3302(9); 430 Ill. Comp. Stat. 66/75(b) (2022); Iowa Code § 724.9 (2022); Kan. Stat. Ann. § 75-7c04(b); Ky. Rev. Stat. Ann. 237.110(4)(i); La. Stat. Ann. § 40:1379.3(C); Me. Rev. Stat. Ann. tit. 25, § 2003(1)(E)(5); Md. Code Ann., Pub. Safety § 5-306(a)(5); Mass. Gen. Laws ch. 140, § 131P(a); Mich. Comp. Laws § 28.425b(7)(c); Minn. Stat. § 624.714(2a); Mo. Rev. Stat. § 571.111 (2022); Mont. Code Ann. § 45-8-321(3); Neb. Rev. Stat. §§ 69-2432, 69-2433(10); Nev. Rev. Stat. § 202.3657(3)(c); N.J. Admin. Code § 13:54-2.4(b); N.M. Stat. Ann. § 29-19-7; N.C. Gen. Stat. § 14-415.12(a)(4); N.D. Cent. Code § 62.1-04-03(1)(d), (2); Ohio Rev. Code Ann. § 2923.125(B)(3); Okla. Stat. tit. 21, § 1290.12(A)(2); Or. Rev. Stat. § 166.291(1)(f); 11 R.I. Gen. Laws § 11-47-15; S.C. Code Ann. § 23-31-215(A)(5); Tenn. Code Ann. § 39-17-1366(b)(4); Tex. Gov't Code Ann. § 411.174(a)(7); Utah Code Ann. § 53-5-704(8); Va. Code Ann. § 18.2-308.02(B); W. Va. Code § 61-7-4(e); Wis. Stat. § 175.60(4)(a); Wyo. Stat. Ann. § 6-8-104(b)(vii).

concluded that the CCIA's eighteen-hour training requirement "appears to be consistent with, and even more lenient than, the training requirements of the 18th and 19th centuries." Tr. of Oral Arg. at 27, No. 22-cv-05867, ECF No. 75.

Plaintiffs' argument that the CCIA's training requirement is unduly burdensome because it requires applicants to pay fees associated with training (Br. at 9, 23-24) is also rebutted by historical evidence. New York's militia members were required to equip themselves with a musket and ammunition "at [their] own expen[s]e" (Hingerton Decl., Ex. 12 at 228) as well as bear the expense of taking time away from their employment to train in the militia. Federal law contained a similar requirement. (*Id.*, Ex. 31 at 271.) Virginia likewise required militia members to equip themselves and provided that militia members would not be paid for training but only for times of "active service." (*Id.*, Ex. 33 at 12, 19.) As those laws indicate, it was common historically for States to require those using firearms to bear the cost of training. *See also* Tr. of Oral Arg. at 27, *Corbett*, No. 22-cv-05867, ECF No. 75.

In sum, a long historical tradition of requiring citizens to appear regularly and at their own expense for firearm training supports the CCIA's firearm safety training requirement.

## CONCLUSION

This Court should affirm the district court's order denying a preliminary injunction.

Dated:  New York, New York
         May 25, 2023

                             Respectfully submitted,

                             LETITIA JAMES
                               *Attorney General*
                               *State of New York*
                             Attorney for Intervenor-Appellee

By:   */s/ Sarah Coco*
                             SARAH COCO
                             Assistant Solicitor General

BARBARA D. UNDERWOOD        28 Liberty Street
 *Solicitor General*                 New York, NY 10005
ESTER MURDUKHAYEVA         (212) 416-6312
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
   *of Counsel*

41

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alenette B. Jordan, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,801 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Alenette B. Jordan*