# 23-208-cv

## United States Court of Appeals
### for the
### Second Circuit

ZACHARY GIAMBALVO, JOHN MOUGIOS, SHANE MASHKOW, KEVIN MCLAUGHLIN, MICHAEL MCGREGOR, FRANK MELLONI, RENAISSANCE FIREARMS INSTRUCTION, INC., and all similarly situated individuals,

*Plaintiffs-Appellants,*

v.

SUFFOLK COUNTY, NEW YORK, Police Commissioner RODNEY HARRISON, in his Official Capacity, MICHAEL KOMOROWSKI, Individually, ERIC BOWEN, Individually, WILLIAM SCRIMA, Individually, WILLIAM WALSH, Individually, THOMAS CARPENTER,, Individually, Superintendent STEVEN NIGRELLI, Acting Superintendent of the New York State Police, in his Official Capacity,

*Defendants - Appellees*,

JOHN DOES 1-5, Individually, JANE DOES 1-5, Individually,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................... i

I. CHALLENGING UNCONSTITUTIONAL REGULATIONS DOES NOT CAUSE FIREARMS 'INELIGIBILITY'................................... 1

II. ARTICLE III THRESHOLD IS LOW ................................................ 2

III. NO APPLICATIONS ARE PROCESSED FOR 2-3 YEARS ......................... 3

IV. APPELLEES ARE OBLIGATED TO THE U.S. CONSTITUTION, NOT NEW YORK STATE ............................................................... 6

    A. The Lower Court's Speculation Was an Abuse of Discretion.................... 7

    B. Refusing to Enjoin 2-3 Year Delays Was an Abuse of Discretion ............. 9

V. LIKELIHOOD OF SUCCESS ON THE MERITS ............................................ 9

VI. MELLONI AND RFI HAVE STANDING..................................................... 10

VII. THE LOWER COURT IMPROPERLY REACHED FACTUAL CONCLUSIONS THAT CONTRADICT UNCONTESTED DECLARATIONS.................................................................. 12

REPLY TO STATE INTERVENOR...................................................... 14

I. "NO LICENSE SHALL BE ISSUED EXCEPT…" ......................................... 14

II. APPELLANTS' CONDUCT IS PROTECTED BY THE PLAIN TEXT........ 15

III. THE STATE MISUNDERSTANDS *BRUEN* ...................................... 18

IV. THE CCIA FAILED TO REMOVE THE 'BROAD DISCRETION' IMBUED IN LICENSING OFFICERS........................................... 19

V. THE STATE FAILED TO JUSTIFY THE CCIA........................................... 21

A. The Lower Court Conducted No *Bruen* / Historical Tradition Test....... 21

B. 1791 is the Only Relevant and Binding Historical Reference .............. 21

C. Section 400.00(1)(b) is Not Simply About "Moral Character" .............. 22

D. No Historical Analogue Exists for 400.00(1)(b) .................................... 24

E. No Tradition of In-Person Interview or Disclosure Requirements
§400.00(1)(o)(i), (ii), (iv), and (v) .......................................................... 25

F. Militia Statutes Do Not Regulate Firearms
§400.00(1)(o)(iii), (19)............................................................................. 27

CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abekassis v. New York City, New York*,
  477 F. Supp. 3d 139 (S.D.N.Y. 2020) .................................................. 16

*Aubin v. Columbia Cas. Co.*,
  272 F. Supp. 3d 828 (M.D. La. 2017) ..................................................... 9

*Bassaw v. United Indus. Corp.*,
  482 F. Supp. 3d 80 (S.D.N.Y. 2020) ...................................................... 2

*Breedlove v. Suttles*,
  302 U.S. 277 (1937) ........................................................................... 30

*Brewer v. W. Irondequoit Cent. Sch. Dist.*,
  212 F.3d 738 (2d Cir.2000) ................................................................. 12

*Connecticut ex rel. Blumenthal v. Crotty*,
  346 F.3d 84 (2d Cir. 2003) .................................................................... 9

*Craig v. Boren*,
  429 U.S. 190 (1976) ............................................................................ 12

*Crawford v. Washington*,
  541 U.S. 36 (2004) .............................................................................. 22

*Dark Storm Indus. LLC v. Cuomo*,
  471 F. Supp. 3d 482 (N.D.N.Y. 2020) .................................................. 11

*Doe v. U.S. Immigr. & Customs*,
  490 F. Supp. 3d 672 (S.D.N.Y. 2020) .................................................. 12

*Grossman v. City of Portland*,
  33 F.3d 1200 (9th Cir. 1994) ................................................................. 8

*Guillemard-Ginorio v. Contreras*,
  490 F.3d 31 (1st Cir. 2007) .................................................................... 8

*Harper v. Virginia State Bd. of Elections*,
  383 U.S. 663 (1966) ............................................................................ 30

*In re Agent Orange Prod. Liab. Litig.*,
  373 F. Supp. 2d 7 (E.D.N.Y. 2005) ...................................................... 7

*Jackson v. Anderson*,
  149 A.D.3d 933 (2d Dept. 2017) ........................................................ 20

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .............................................................. 23

*Lawrence v. Reed*,
  406 F.3d 1224 (10th Cir. 2005) ............................................................ 8

*Lederman v. United States*,
  291 F.3d 36 (D.C. Cir. 2002) ................................................................ 9

*Leonard v. Robinson*,
  477 F.3d 347 (6th Cir. 2007) ................................................................ 8

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
  370 F.3d 275 (2d Cir. 2004) ................................................................. 1

*McDonald v. City of Chicago*, Ill.,
  561 U.S. 742 (2010) ............................................................................. 6

*Nevada Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ........................................................................... 22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ............................................................... 6, 7, 10

*Parker v. Randall*,
  120 A.D.3d 946 (4th Dept. 2014) ....................................................... 21

*Range v. Att'y Gen. United States of Am.*,
  2023 WL 3833404 (3d Cir. June 6, 2023) .......................................... 17

*Ricciardone v. Murphy*,
    159 A.D.3d 1200 (3d Dept. 2018) ........................................................................ 20

*Ross v. Bank of Am. N.A. (USA)*,
    524 F.3d 217 (2d Cir. 2008) ................................................................................... 2

*Sewell v. City of New York*,
    182 A.D.2d 469 (1st Dept. 1992) ........................................................................ 21

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ............................................................................................. 14

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................. 14

*Teixeira v. Cty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) ...............................................................................11

*Torcivia v. Suffolk*,
    17 F.4th 342 (2d Cir. 2021) ................................................................................. 27

*Tzumi Innovations LLC v. Regan*,
    557 F. Supp. 3d 499 (S.D.N.Y. 2021) ................................................................... 1

*United States v. Cruikshank*,
    92 U.S. 542 (1876) ............................................................................................... 20

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) ................................................................................. 3

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) ............................................................................... 18

*United States v. SCRAP*,
    412 U.S. 669 (1973) ............................................................................................. 3

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ............................................................................................. 3

iii

*Virginia v. Moore*,
  553 U.S. 164 (2008) ...................................................................... 22

*Vives v. City of New York*,
  405 F.3d 115 (2d Cir. 2005) ........................................................ 9

**Statutes**

18 U.S.C. 922(g) ................................................................. 17, 18, 24
18 U.S.C. 922(g)(1).................................................................... 18
18 U.S.C. §922 (g)(7)................................................................. 26
18 U.S.C. § 922(g)(8).................................................................. 18
18 U.S.C. § 2384 ....................................................................... 26

I.  **CHALLENGING UNCONSTITUTIONAL REGULATIONS DOES NOT  CAUSE FIREARMS 'INELIGIBILITY'**

Using twisted logic, the County presses the view that challenging an unconstitutional firearm regulation renders an individual 'ineligible' to exercise their Second Amendment rights. [County Br. at 8-10].

Under the County's theory, to establish Article III standing Appellants would have to perform the very acts they are seeking to enjoin – comply with regulations that cannot survive the *Bruen* test before one could establish standing to challenge their enforcement. According to the County, Appellants must first suffer the irreparable harm they are seeking to avoid.

In the County's world, the State could inject its licensing scheme with any number of virulent firearm regulations; forcing compliance to establish standing to levy a constitutional challenge, yet causing the very harm the Second Amendment was drafted to prevent - government interference with the right to possess and carry Arms.

"Shall not be infringed" is unqualified statutory text.

Performing the objected-to-acts would also deprive Appellants of the injunctive and declaratory relief they are seeking. See, e.g., *Tzumi Innovations LLC v. Regan*, 557 F. Supp. 3d 499, 508–09 (S.D.N.Y. 2021) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement ....") citing, *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,

1

370 F.3d 275, 284 (2d Cir. 2004). And had Appellants complied and turned over confidential and/or personal information, spent money on and completed the training classes, and were then issued a license, the County would be arguing that they suffered no harm because they ultimately got a license – thereby avoiding challenges to force-fed regulations that violate the plain text of the Second Amendment.

## II.      ARTICLE III THRESHOLD IS LOW

The standard for establishing Article III standing is low. See, *Bassaw v. United Indus. Corp.*, 482 F. Supp. 3d 80, 85 (S.D.N.Y. 2020) (acknowledging that Article III standing "is a low threshold") quoting, *Ross v. Bank of Am. N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008). And while this Circuit has held that Article III standing requires submission to the regime in the first instance, Appellants have complied. 'Standing' in this context requires no more than filing an application and submitting to photographs and a fingerprint-based background check to ensure the applicant has no prohibitors to firearm possession.[1] Challenging various internal components of the regime requires nothing more.

The premise of Article III being this: standing on the sidelines complaining will not establish standing because "the federal courts have abjured appeals to their

---

[1] Having to 'demonstrate' to the government one's worthiness *prior to* being granted permission to exercise a *preexisting* right is inconsistent with the Amendment's plain text. No other Amendment is treated this way. Even violent criminals enjoy the wide-open application of the Fourth and Fifth Amendments; the evil released into the world from suppression hearings far exceeds any justification for stripping non-prohibited people of the right to defend themselves.

authority which would convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders."[2]

The County's view corrupts the intention behind Article III. Appellants are invested in this action – they have submitted to the licensing scheme and have a direct stake in the outcome of a judicial review of the challenged firearm regulations.

Appellants are suffering an injury-in-fact directly connected to SCPD that will be redressed by enjoining the County's (i) abhorrent 2-3 year licensing delay; (ii) enforcement of the challenged CCIA provisions[3]; and (iii) enforcement of a County policy threatening the arrest of unlicensed individuals who take the State-required 18-hour course.[4]

## III.  NO APPLICATIONS ARE PROCESSED FOR 2-3 YEARS

Lost on the County and the lower court is the fact that SCPD will not even *process* applications (take fingerprints, photographs, assign an investigator) for approximately 2 years from commencing the application process [A99], at which time the 'investigation' begins, and at some future point in time a decision is made.

This delay **precludes** Appellants' ability to engage in protected conduct.

---

[2] *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) quoting, *United States v. SCRAP*, 412 U.S. 669, 687 (1973).

[3] The County confuses §1983 liability with being named as a proper party for enjoining the enforcement of challenged statutes. The County *is* the source of Appellants' harm; only by enjoining the County licensing officer's enforcement of the CCIA will Appellants receive redress.

[4] The County's reliance on *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) is misplaced. Decastro neither applied for a license nor claimed futility. Moreover, Appellants do not express 'antipathy' toward the CCIA, they refuse to comply.

The County uses various non-stationary goalposts to categorize SCPD's licensing delays, but two indisputable facts remain: (i) SCPD concedes that its licensing process takes 2-3 years [A99; A100]; and (ii) no Appellant received a prompt determination[5] from SCPD after commencing the application process. [A93-A116; A207-209].

The preliminary injunction motion at issue was filed on December 11, 2022. No Appellant had been fingerprinted, photographed, nor had an investigator assigned to process the application. John Mougios applied in **July 2021**; Zachary Giambalvo applied in **February 2020**[6] [A94]; Shane Mashkow applied in **Summer 2021**[7] [A107]; Kevin McLaughlin applied in **July 2022** [A208].[8]

Michael McGregor applied to simply remove the restrictions on his sportsman carry license in **August 2022** – and it still waiting. [A114-115].[9]

At a minimum, McLaughlin had been waiting 5 months when the motion was filed below but was told by SCPD that he would not be fingerprinted until **July 2025**

---

[5] To be clear, Appellants are seeking a **30-day** requirement, not "3 months" as the County incorrectly represents. [County Br. at 9].

[6] In July 2022, SCPD claimed they "never received" Mr. Giambalvo's payment; his application was resubmitted in July 2022.

[7] In winter 2021, SCPD claimed they "never received" Mr. Mashkow's payment; his application was resubmitted in February 2022.

[8] Mougios, Mashkow, and Giambalvo applied for a "Sportsman" restriction, which is the only concealed carry license SCPD would issue, until *Bruen* struck the "proper cause" requirement for an unrestricted license. [County Br. at 9].

[9] McGregor's amendment application was filed **post-*Bruen*** [A115 at ¶ 20] and not, as the County incorrectly represents, pre-*Bruen*. [County Br. at 10]. The County's citations to the Appendix do not support their representation.

4

[A208] – and **then** the background investigation begins.[10] By that time, the entire CCIA could be stricken as unconstitutional, but McLaughlin continue to suffer irreparable harm from SCPD's lengthy licensing delays.

Under an objective licensing scheme, fingerprints, photographs, and a mental health check are **the *only* criteria** required to ascertain whether an applicant is firearms disqualified.

A full federal background check through NICS[11] when an individual purchases a firearm from a gun store/FFL to determine firearms eligibility **takes less than 5 minutes**.

If New York is going to impose a licensing requirement – an infringement imposed by **less than half of the states** in this county[12, 13] – there is no cognizable reason the licensing process should take more than 30 days.

In 1791, the ability to purchase, possess, and/or carry weapons did not require a 'license' or any other form of government permission - or involvement. The Amendment codified a *preexisting* right. And while licensing is a violation in the first instance, delays exceeding 30 days cannot stand, particularly where there is **only**

---

[10] That the applications were filed pre-*Bruen* is immaterial to SCPD's substantial licensing delays. [County Br. at 9].

[11] National Instant Criminal Background Check System.

[12] https://crimeresearch.org/2023/04/nebraska-becomes-the-27th-constitutional-carry-state/
It's not called "Constitutional Carry" for nothing.

[13] South Carolina is moving forward with legislation approving Constitutional Carry, which would raise the number of Constitutional Carry states to 28. https://www.wistv.com/2023/02/23/south-carolina-house-oks-permitless-carry-handguns/

**a 5-minute delay to obtain the same information** required to purchase a rifle or shotgun.

No waiting period is required for an individual to exercise the rights protected by the First Amendment; the Second Amendment cannot be held to a different standard. "The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022) quoting, *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 780 (2010) (plurality opinion).

Delaying the exercise of a guaranteed preexisting right *to any degree* violates the plain text Second Amendment. Appellants' suggested 30-day limit was generous.

## IV.   APPELLEES ARE OBLIGATED TO THE U.S. CONSTITUTION, NOT NEW YORK STATE

> "In the Third Reich all power of the state was centered in Hitler; yet
> his orders did not serve as a defense at Nuremberg."[14]

Appellees' attempt to wash their hands of liability because they 'cannot' issue licenses to applicants who do not abide by the CCIA is legally and factually unsound.[15]

---

[14] *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 64 (E.D.N.Y. 2005), as amended (Mar. 28, 2005), aff'd sub nom. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (2d Cir. 2008).
[15] County Br. at 12.

**First,** the County has done nothing to speed up its processing time since the filing of this action below. **Second,** a prompt decision on Appellants' applications would have resulted in the issuance of a license before the CCIA even took effect. **Third,** an injunction of the CCIA would obviate the County's theory; and **Fourth,** Appellees have a primary obligation to the U.S. Constitution, not unconstitutional state laws *designed* to circumvent the Second Amendment.[16]

### A. The Lower Court's Speculation Was an Abuse of Discretion

The lower court abused its authority by speculating that SCPD would deny Appellants' applications because SCPD has no obligation to enforce patently unconstitutional firearm regulations.

Some laws are so patently unconstitutional that the courts will require officials to "second-guess the legislature and refuse to enforce an unconstitutional statute— or face a suit for damages if they don't." *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005).

While cases like *Lawrence* address 'qualified immunity', they enforce the fact that reliance on statutes authorizing conduct patently violative of fundamental

---

[16] In her August 31, 2022 public address, Gov. Hochul lauded herself and her "partners" in the yearlong project with New York City, NYPD Commissioner and "advocates" like the Gifford Law Center and "Everytown for Gun Safety" with whom she has "been joined at the hip" who were "helpful in the whole process of writing legislation (the CCIA) that we believe is responsive to the Supreme Court decision [in *Bruen*]". She informed that, for over a year, she and her "partners" worked to counter the *Bruen* decision and she "was ready for it." Had the Supreme Court not decided *Bruen*, Gov. Hochul confessed, "we would not be having this conversation." (2:41). https://www.youtube.com/watch?v=gC1L2rrztQs

constitutional principles does not immunize official conduct. *Lawrence*, at 1232 (We do not grant qualified immunity where the official attempts to hide behind a statute that is " 'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws) quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994)(individuals cannot always be held immune for the results of their official conduct simply because they were enforcing policies or orders promulgated by those with superior authority); see also, *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40–41 (1st Cir. 2007)*; Leonard v. Robinson*, 477 F.3d 347, 359, 361 (6th Cir. 2007); *Vives v. City of New York*, 405 F.3d 115, 118 (2d Cir. 2005); *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2d Cir. 2003)); *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002); *Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 839 (M.D. La. 2017) ("[N]o reasonable officer could rely on Louisiana's public intimidation statute to arrest a person who threatens to have them fired.").

Contrary to the County's belief, licensing officials ***are*** 'free to disregard' the licensing statute – particularly if the regulations are unconstitutional.

The reality is, when a license is approved, no one has standing to challenge the decision; licensing officers can approve whichever application they desire without consequence. The idea that a licensing officer 'must' comply with any provision of § 400.00 is a fallacy – a shield to violate individual rights.

8

There is no oversight for licensing officers. Challenges only arise after an adverse decision. No legal recourse exists against a licensing officer who adhered to the plain text of the Second Amendment. Political recourse, yes; legal recourse, no.

### B. Refusing to Enjoin 2-3 Year Delays Was an Abuse of Discretion

By refusing to enjoin SCPD's lengthy licensing delays, the lower court abused its discretion. Irrespective of whatever final decision SCPD might reach, it is painfully obvious that a 2-3 year delay to *even process* an application is repugnant to the Second Amendment. The lower court improperly and significantly delayed a final determination of Appellants' applications, delayed their right to seek further redress in the event of a denial, and ensured they would continue to suffer irreparable harm for the violation of their constitutional rights.

## V.   LIKELIHOOD OF SUCCESS ON THE MERITS

The County's confused analysis of Appellants' likelihood of success on the merits on their Second Amendment claims should be rejected.

The likelihood of success prong required the lower court to assess the merit of Appellants' Second Amendment violations: (i) SCPD's lengthy licensing process; (ii) CCIA requirements under Penal Law section 400.00(1)(o); and (iii) SCPD's arrest policy for unlicensed trainees, which it failed to do.

Every challenge to a regulation implicating the Second Amendment requires analysis under the *Bruen* test, where the plaintiff demonstrates that the conduct being

regulated falls within the plain text of the Second Amendment and the burden of justifying the regulations is placed squarely on the government's shoulders. See, *Bruen*, at 2126 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.").

The lower court failed to conduct *any* analysis of Appellants' likelihood of success on the merits of their Second Amendment claims. Instead, it improperly accepted the CCIA as gospel and concluded that Appellants were damned for not obeying it.

## VI. MELLONI AND RFI HAVE STANDING

Implicit in the Second Amendment right is the corresponding market of goods and services related to the exercise of that right. Without manufacturers of firearms, ammunition, and accessories the rights protected by the Second Amendment would be severely restricted, if not ultimately lost altogether. And that market includes gun ranges and firearm instructors.

It is quite ironic that the County argues in favor of mandated firearms training, but against Article III standing for a firearms trainer seeking to challenge a policy threatening to arrest people who engage in the mandated firearms training.

If unlicensed "applicants cannot receive handgun licenses… without completing the State's application process" [County Br. at 15], which includes completing the 18-hour course, then the training instructors for that 18-hour course have standing to challenge SCPD's policy threatening to arrest unlicensed participants.

"[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Dark Storm Indus. LLC v. Cuomo*, 471 F. Supp. 3d 482, 493 (N.D.N.Y. 2020) quoting, *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)) (cases cited).[17]

The County misses the mark – the harm to Melloni and RFI is not purely economic. As a provider *to individuals* of Second Amendment-protected services that *every individual* is <u>required</u> by the CCIA to complete, Melloni and RFI have derivative standing to assert the subsidiary right to access to the State-mandated training on behalf of their students and potential students.

Enjoining the County's policy will once again open the door for unlicensed Suffolk County residents to obtain the training required by the State to exercise the right to carry a firearm for self-defense. Their 'prosecution' is not required; the

---

[17] See also, Appellants' Opening Brief at 29-30.

credible threat of arrest is sufficient to confer standing. See, *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 683 (S.D.N.Y. 2020) (recognizing low threshold for alleging a credible threat of arrest)[18] – even a false arrest.

## VII. THE LOWER COURT IMPROPERLY REACHED FACTUAL CONCLUSIONS THAT CONTRADICT UNCONTESTED DECLARATIONS

Try as they might, Appellees failed to justify the lower court's factual conclusions – reached without a court hearing and in the face of sworn declarations unchallenged by the County.

Melloni's sworn declaration avers that Lt. Komorowski personally told him that any unlicensed person who takes Melloni's 18-hour course will be arrested by SCPD. Melloni stopped teaching unlicensed people the 18-hour course and canceled their registrations and future registrations for fear they would be arrested by SCPD. Lt. Komorowski submitted a Declaration below contradicting the operating hours of the licensing bureau – but nowhere in Lt. Komorowski's Declaration did he deny making that statement to Melloni. [A132-133]. Though Komorowski's statement is **uncontested**, the lower court refused to take the information as true, *again* speculating about what SCPD may or may not do.

---

[18] SCPD's made-up policies have already resulted in arrests for conduct legal under the Penal Law. https://www.newyorkcriminalattorneyblog.com/was-a-licensed-gun-dealer-arrested-for-selling-others-in-new-york/ Prosecution is not a requirement; being arrested, incarcerated, and fingerprinted – even if later dismissed – causes actual and irreparable harm. See, *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir.2000) (The law is well-settled that plaintiffs establish irreparable harm through "the allegation of fourth amendment violations.").

It was again 'speculation' for the lower court to guess that Lt. Komorowski really did not mean what he said. Taken at face value, the uncontested threatened conduct should have been enjoined to *ensure* that no one would be arrested. Instead, the threat remains over Suffolk County residents who cannot complete the training required for a concealed carry license. Now, they are forced to apply for a **premises license**, wait 3 years to obtain the license, then take the 18-hour class, and reapply for a concealed carry license that may be issued 2-3 years later – a **5-6 year process for a concealed carry license**.

This idea that 'no one has been arrested, so no credible threat of enforcement exists'[19] is rubbish.[20]

No one has been arrested because the training classes for unlicensed students have been canceled because of the threat of arrest under the County's policy. SCPD's barrier to Second Amendment protected conduct will continue in the absence of an injunction.

---

[19] County Br. at 18, 20.

[20] The threat of future enforcement is sufficient to confer Article III standing. See, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (when subject to threat of enforcement, actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law) citing, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (not necessary that petitioner first expose himself to actual arrest <u>or</u> prosecution to challenge a statute as unconstitutional).

## REPLY TO STATE INTERVENOR

## I. "NO LICENSE SHALL BE ISSUED EXCEPT…"

Out of the gate, the State misleads this Court. Setting up the false premise that New York is a shall-issue regime – when it so obviously remains an 'outlier may-issue regime' rebuked by the Supreme Court in *Bruen* - the State represents that Penal Law 400 provides, "A license 'shall be issued'…" [State Br. at 6, 22] but cites 400.00(2), which only concerns the type of license to be issued *only if* an applicant can clear the hurdles erected by part (1)'s "eligibility" requirements:

> "Eligibility. **No license shall be issued or renewed** pursuant to this section except by the licensing officer and then only after investigation and finding that all statements in a proper application for a license are true. **No license shall be issued or renewed** except for an applicant…"[21] who meets the various criteria of subsection (1), which include several subjective and discretionary factors including the "moral character" clause required by (1)(b).

The use of subjective and discretionary factors in firearms licensing was actively rebuked by the Supreme Court in *Bruen*. *Bruen*, at 2138 n. 9. (rejecting "features that typify proper-cause standards New York's" requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion").

New York is *not* a shall-issue regime, not even close. Full stop.

---

[21] Penal Law § 400.00(1).

14

## II.   APPELLANTS' CONDUCT IS PROTECTED BY THE PLAIN TEXT

The State turns the *Bruen* test on its head.

The *Bruen* test is straightforward:

> "…when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.
>
> Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Bruen*, at 2126.

Under *Heller* and *Bruen*, the Second Amendment's plain text covers Appellants' conduct – possessing and carrying firearms. *Heller*, at 592 (the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation"); *Bruen*, at 2135 (the "Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.").[22]

From here, the government must justify its regulations.

But the State adds its *own* step – before the *Bruen* test even gets started.

---

[22] No part of the Second Amendment plain text 'excludes' anyone from its protections. State Br. at 19.

The State conducts a moral analysis of the individual *before* the *Bruen* test is even applied [State Br. at 18-19] – a standard reminiscent of the "intermediate scrutiny" test[23] abrogated in *Bruen* and replaced by the *Bruen* test. *Bruen*, at 2125-2131.

In the State's world, your moral character must be assessed and given a 'thumbs up' by the government *before* the Second Amendment even applies to you. Here, 'the People' are *outside* of the Second Amendment looking in, and may only enter at the government's say-so.

This theory defiles the plain text and Supreme Court jurisprudence. Elitism at its core.

The Constitution presumptively protects the rights of "the People."

> "But *Heller* said more; it explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset. So the Second Amendment right, *Heller* said, presumptively belongs to all Americans."[24]

---

[23] *Abekassis v. New York City, New York*, 477 F. Supp. 3d 139, 157 (S.D.N.Y. 2020), judgment vacated, appeal dismissed, No. 20-3038, 2021 WL 852081 (2d Cir. Mar. 4, 2021) (therefore, the § 5-10 regulatory scheme validly serves the important government interest of protecting the safety and security of the public by ensuring only law-abiding, responsible citizens possess firearms.").
[24] *Range v. Att'y Gen. United States of Am.*, No. 21-2835, 2023 WL 3833404, at *3 (3d Cir. June 6, 2023) (cleaned up) (detailing 4 legal grounds for reaching its conclusion).

16

Whether an individual thereafter forfeits that right is a separate question. And constitutional challenges to regulations that impose forfeitures of Second Amendment rights, like 18 U.S.C. 922(g), are subject to scrutiny under the *Bruen* test.

In *Range*, supra, an en banc panel of the Third Circuit considered whether the Second Amendment rights of a convicted misdemeanant who were being violated by his disqualifying status under 18 U.S.C. 922(g)(1).

Rejecting the government's argument that, by virtue of his misdemeanor conviction, Range was not a 'law-abiding, responsible citizen' and not entitled to the Second Amendment's protections, the Third Circuit turned to the plain language of *Heller*:

> "But *Heller* said more; it explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset. So the Second Amendment right, *Heller* said, presumptively belongs to all Americans."

*Range*, at *3 (cleaned up) (detailing 4 legal grounds for reaching its conclusion).

The *Range* court went on to find that because the government failed to prove "a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights." *Range*, at *8. See also, *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023) (vacating conviction after finding 18 U.S.C. § 922(g)(8) has no historical

analogue because "§922(g)(8)'s ban on possession of firearms is an "outlier[ ] that our ancestors would never have accepted.").

Applying the State's logic, the Third Circuit would not have even reached the text, history, and tradition analysis because Range's misdemeanor conviction would have presumptively established that the Second Amendment did not apply to him. The *Bruen* test is straightforward; the State cannot avoid its obligation to justify its regulations under a text, history, and tradition analysis.

## III. THE STATE MISUNDERSTANDS *BRUEN*

The State attempts to impute constitutionality to its regulations arguing they "are intended to ensure that licensees are law-abiding and responsible." [State Br. at 20]. A means-end justification in direct conflict with the *Bruen* opinion and not part of the *Bruen* test.

Only by demonstrating that the State's regulations are consistent with the text, history, and tradition tied to 1791 can a court conclude that the individual's conduct falls outside of the Second Amendment's "unqualified command." *Bruen*, at 2126.

To the extent that modern regulations conflict with the plain text of the Second Amendment, the text controls. *Bruen*, 2137.

The State also misreads *Bruen* as an endorsement of the constitutionality of licensing regimes generally and, from there, presumes that every part of its licensing regime passes constitutional muster.

18

**First,** discussed more fully below, *Bruen* did not declare licensing - even shall-issue regimes – to be *de facto* constitutional. **Second,** no licensing scheme would survive the *Bruen* test because there was no government permission required to possess and/or carry firearms in the Founding Era. The right to possess and carry weapons is a ***preexisting*** natural human right that *Heller* and *Cruikshank* rightly observed was not 'granted' by the Constitution.[25]

**Third,** Appellants are not challenging the entire licensing scheme, only certain requirements thereunder, each of which the State must justify under the *Bruen* test.

## IV. THE CCIA FAILED TO REMOVE THE 'BROAD DISCRETION' IMBUED IN LICENSING OFFICERS

The State would have this Court believe that "the CCIA requires licensing officials to consider specific and defined criteria" to determine whether an individual is 'eligible' for a license. Not so.

Before *Bruen*, courts all over this state recognized that section 400.00 affords licensing officers "broad discretion in ruling on permit applications and may deny an application for any good cause." *Jackson v. Anderson*, 149 A.D.3d 933, 934 (2d Dept. 2017) (upholding denial of amendment to <u>add guns to an existing pistol license</u>

---

[25] *Heller*, at 592 (As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed…".).

19

based on his criminal history, even though the majority of the arrests were dismissed or resolved in his favor because the licensing officer can consider "the underlying circumstances surrounding those arrests in denying the application") (citing cases); *Ricciardone v. Murphy*, 159 A.D.3d 1200, 1200–01 (3d Dept. 2018) (licensing officers have broad discretion in ruling on applications and may deny them for any good cause) (citing cases); *Parker v. Randall*, 120 A.D.3d 946, 947 (4ᵗʰ Dept. 2014) (licensing officer has broad discretion to grant or deny a permit under Penal Law § 400.00(1)) (citing cases); *Sewell v. City of New York*, 182 A.D.2d 469, 472 (1ˢᵗ Dept. 1992) (The possession of a handgun license is a privilege rather than a right; the New York City Police Commissioner has broad discretion to grant licenses in accordance with the provisions of Penal Law 400.00 and may revoke and cancel any license at any time under § 400.00(11)) (citing cases).

And after *Bruen*, the same "broad discretion" remains.

The CCIA was not a move toward constitutional compliance, it added new hurdles for applicants and licensees to clear. The *Bruen* Court rebuked any discretion in the licensing process – yet the State did nothing to eliminate it.' The 'guaranteed individual right' remains a subjective and discretionary 'privilege' in New York State.[26]

---

[26] The cognitive disconnect comes through in the State's claim that there is such a thing as an 'unconstitutional degree of discretion." [State Br. at 22]. ***Any degree*** of discretion violates the Second Amendment. "The very enumeration of the right takes out of the hands of government –

## V.   THE STATE FAILED TO JUSTIFY THE CCIA

### A.  The Lower Court Conducted No *Bruen* Test / Historical Tradition

By not reaching the merits of Appellants' challenges to the CCIA, the lower court failed to hold the State to its burden of justifying the challenged CCIA provisions. We ask that the Court conduct such inquiry here and find that the State has failed to justify its regulations.

### B.  1791 is the Only Relevant and Binding Historical Reference

The scope of the protection afforded by the Second Amendment, as with all other constitutional rights, is "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, at 2137-38 citing, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).[27] The Bill of Rights does not have separate meanings for the state and federal governments.

If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding remained consistent with the

---

even the Third Branch of Government - the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, at 634 (emphasis in original).

[27] Several of the "numerous cases involving all of the amendments in the Bill of Rights" that look to the Founding Period as the "temporal focal point [and] not when the amendments were incorporated into the Fourteenth Amendment can be found at Bellantoni Dec., Ex. 2 at 17-30.

public understanding in 1791.[28], [29] "But to the extent later history contradicts what the text says, the text controls."[30]

### C. Section 400.00(1)(b) is Not Simply About "Moral Character"

The State begins its historical justification citing a dissenting opinion from a case abrogated by *Bruen*, that was decided pre-*Bruen*, using the 'intermediate scrutiny test' rebuked by *Bruen*,[31] to introduce its historical analysis justification for § 400.00(1)(b). The State's substantive arguments are just as vacuous.

To begin, section 400.00(1)(b) is not simply a "good moral character" provision. Section (1)(b) provides,

> "no license shall be issued or renewed except for" an individual who the licensing officer 'feels' is "of good moral character, which, for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others."

---

[28] A152-53; *Bruen*, at 2137.

[29] The following Hingerton exhibits fall outside of the Founding Era timeframe: Exs. 1, 3, 4, 5 (1600s); Exs. 17, 18, 19, 20, 22, 23, 24, 25, 30 (mid-late 1800s); and Exs. 26, 27, 28 (1900s). The following regulations fall within the Founding Era time period or immediately prior thereto and relate to disarmament for refusing to swear an oath of allegiance to America (Exs. 6, 7, 8, 9, 10, 11); or mandatory state or federal militia service (Exs. 12, 13, 14, 15, 16, 31, 32, 33). Exhibit 2 is a Pennsylvania statute prohibiting the sale of weapons and ammunition to Native Americans, which alone does not establish a National 'tradition'; and Exs. 5, 21 are to be disregarded as they are Statutes from England.

[30] *Bruen*, at 2137.

[31] State Br. at 23 quoting, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), abrogated by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

"Good moral character" was always a requirement under section (1)(b) but until the CCIA largely defined by caselaw. After *Bruen*, the State could have defined it objectively as meaning "any individual who is not prohibited from possessing firearms under 18 U.S.C. 922(g), Penal Law 265.00(17), or by the events and conditions set forth in this section."

Section 400.00(1) already contains objective prohibitors to gun possession that track most of the disqualifiers in 18 U.S.C. 922(g), and New York's "serious offense" misdemeanors under 265.00(17) –objective factors.

But none of the objective prohibitors provides ***discretion*** over firearm licenses. So, instead of eliminating the "good moral character" factor, the State doubled down after *Bruen* and created a definition that prohibits the issuance of any for self-defense purposes.

**First,** determining whether an individual has "the essential **character, temperament and judgement** necessary **to be entrusted with a weapon** and to use it only in a manner that does not endanger oneself or others" is a purely subjective and discretionary assessment requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion" – "features that typify" New York's now-stricken "proper cause" requirement. *Bruen*, at 2138.

23

**Second, t**he statute **prohibits** the issuance of a license to use a firearm in self-defense. Even if the licensing officer 'feels' that an applicant or licensee has "the essential character, temperament and judgement necessary to be entrusted with a weapon" – **no license shall be issued or renewed unless** the licensing officer feels that the individual will use a firearm "**only in a manner that does not endanger oneself or others**."

Using a firearm in self-defense will absolutely endanger another person – <u>as it should and was intended to do</u>. The CCIA's reimagined 'moral character' clause is in direct conflict with the Second Amendment.

### D. No Historical Analogue Exists for 400.00(1)(b)

**First**, the State identifies no historical analogue for 400.00(1)(b)'s prohibition of the use of firearms for self-defense – an obvious contravention of the Second Amendment.

**Second,** the 'loyalty oath' statutes from the 1600s (outside of the Founding Era) concerning "Papists" who would not swear a loyalty oath to America (Virginia law) and men (specifically identified in the statute) accused of sedition, took guns away – they did not prevent possession in the first instance. And, if the men admitted their offense or justified it, they **would have their property returned** (Massachusetts).[32] The 1777 Pennsylvania and North Carolina laws required all

---

[32] Hingerton Dec. Ex. 3, Ex. 4; Ex. 6.

24

**white males over the age of 18** (VA) or **free males over 16** (NC) – not the general population of 'the People' - to swear a loyalty oath and renounce Great Britain or suffer **extrication from society,** not just loss of firearm rights, including holding public office, jury service, buying/selling land, etc. – hardly an historical analogue to (1)(b).[33]

 **Third,** the loyalty oath laws are more analogous to the 'Oath of Enlistment' required to join the U.S. Military[34] and 400.00(1)(h), which already prohibited issuing a license to anyone who has renounced his or her citizenship to the United States[35]; and treason/sedition[36] are felonies, convictions of which are disqualifiers under state and federal law.[37] And the NJ (1806) and PA (1822) law applied to military offenses and courts-martial – an historical analogue to § 400.00(1)(g), not (1)(b).

### E. No Tradition of In-Person Interview or Disclosure Requirements §400.00(1)(o)(i), (ii), (iv), and (v)

 The State's attempt to tie loyalty oath laws to (1)(o)'s requirement that applicants be "personally interviewed" by the licensing officer, fails for the same reasons. Again, the refusal to swear an oath to protect this country removed all civil

---

[33] Hingerton Dec. Ex. 7.
[34] https://www.army.mil/values/oath.html
[35] 18 U.S.C. §922 (g)(7) also makes it unlawful for any person who has renounced his citizenship to possess firearms and there is no exception for subsequent naturalization.
[36] 18 U.S.C. § 2384.
[37] Hingerton Dec. Ex. 15 and Ex. 16.

rights; the possession and carriage of arms *preexisted* the loyalty oath laws – the right was presumed.

Here, Appellants are forced to seek permission to even *obtain* a handgun.[38] It is paradoxical that statutes punishing a lack of patriotism are being used against those who seek to exercise the rights birthed from this country's patriotic triumph. The State's references to local ordinances are likewise disqualified. See, footnote 29.[39]

Using one's former and current social media posts[40] to "confirm" an applicant's "character and conduct" is abhorrently subjective and bleeds into the rights protected by the First Amendment. The Constitution does not countenance "thought police" or "Minority Report"-type prophesies. And leaving the door wide open to obtain "any other information"[41] to satisfy a licensing officer's 'gut feeling' about whether to issue a license further illustrates the CCIA's unconstitutionality.

The State's reference to Alabama as an "approved" licensing regime misunderstands the Court's reference to shall-issue regimes. While the Court lauded

---

[38] 400.00(1)(b), unlike (1)(o), applies to all licenses – home possession and concealed carry.

[39] By its reference to *Torcivia v. Suffolk*, 17 F.4th 342, 359 (2d Cir. 2021), cert. denied, 143 S. Ct. 438 (2022) (which involved a domestic 'incident' with no allegation of 'violence'), the State presses the 'public safety' means-end justifications rejected by the Supreme Court three times now. See, *Heller, McDonald,* and *Bruen*.

[40] 400.00(1)(o)(iv).

[41] 400.00(1)(o)(v).

the *objective factors* implemented therein, no analysis of any particular requirement within those regimes was conducted under the *Bruen* test. See "F" below.

The State makes much ado of one's 'reputation' as a means of disarmament – but the only regulations proffered concern a refusal of white men to swear allegiance to America's defense and reject Great Britain – potential seditionists. As noted above, not a historical analogue because, among other reasons, the laws did not apply to 'the People' – a group that includes women and non-whites.

Last, disarmament regulations that stripped violators of ***all guns and civil rights*** do not justify barring non-disqualified people from possessing and carrying ***handguns***. There is no historical analogue.

### F. Militia Statutes Do Not Regulate Firearms §400.00(1)(o)(iii), (19)

The militia statutes are not historical analogues to firearms regulations – they **do not regulate firearms at all**. Like present-day U.S. military and enlistment statutes, the militia statutes regulated the states' national guard.

The militia statutes also did not apply to the general population[42,43], are not comparable to the 18-hour curriculum in substance or purpose[44], did not result in the loss of firearm rights if one did not appear for training (only a fine)[45], **and required participants to bring their own guns.**[46] Meaning that the **general possession and carriage of firearms was *presumed*.**[47]

Militia requirements for a subset of the population are no historical analogue to firearms regulations for the entire population. Failure to appear for training resulted in a monetary fine between 6-16 pounds; failure to take the 18-hour course results in a ban on the right to carry handguns for self-defense.

The purpose of the militia statutes – establishment of a state army with military formations, ranks, divisions, brigades, regiments, battalions, and companies; generals, majors, adjutants, quartermasters, and lieutenants; commissioned and non-commissioned officers; horse troops; courts martial; and the

---

[42] Hingerton Ex. 16 (1847) falls outside of the historical timeframe,

[43] *Id.* Ex. 29 [males aged 16-60 (237), except Quakers (245)]; Ex. 31 to "provide for the **National Defence**" [white males between 18-45]; Ex. 32 ["An Act for **Establishing a Military** Force", white males between 18-45 with numerous exceptions listed (536)]; Ex. 33 for "disciplining the militia and **guarding against invasions and insurrections**" [free males 18-50, many exceptions (10)].

[44] The statutes describe the requirements for service, what arms and equipment to bring, ranks, chain of command, military equipment, tours of duty, and purpose to be "exercised, trained, and disciplined, for their instruction and improvement" for "**sudden invasion by the enemy, or insurrection, within the state.**" *Id.* Ex. 29 (240-244); accord, Ex. 31-33.

[45] *Id.* Ex. 29 (240) but "desertion" was punished by "execution." (242).

[46] *Id.* Ex. 29 at 238; Ex. 31 at 271; Ex. 33 at 12.

[47] There was also no "moral character" assessment for militia service. *Id.* Ex. 29, 31-33.

ability to be called for battle by the President of the United States – have no recognizable comparison to the requirements of 400.00(1)(o) and (19).[48]

New York continues to place the interests of the government above the rights of the individual. Prohibiting the exercise of a constitutional right until you pay between $400 and $800, travel to a facility, sit in a classroom for 16 hours, take and pass a **written test** – very reminiscent of the poll taxes stricken as unconstitutional[49] – achieve a score of at least 80% on **topics that have nothing to do with handling a firearm**[50], pay for enough ammunition to take you through 2 hours of live-fire training at the gun range, spend 2 hours at the gun range, and take a performance test at the range that includes a **subjective** proficiency assessment are **repugnant to the plain text of the Second Amendment**, which protects a **preexisting** right.

*Bruen*'s reference to an amicus brief that listed various licensing requirements in shall-issue states, including firearms training, was intended to contrast "New York's may-issue regime [that] grants open-ended discretion to licensing officials…" *Bruen*, at 2162. *No* text, history, and tradition analysis was performed, and no endorsement of the 'constitutionality' of any shall-issue requirement was

---

[48] 18-Hour Training Minimum Standards:
https://troopers.ny.gov/system/files/documents/2022/08/final-nysp-dcjs-minimum-standards-for-firearm-safety-training-8-23-22.pdf
[49] *C.f., Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 669 (1966) overruling *Breedlove v. Suttles*, 302 U.S. 277 (1937) to the extent that *Breedlove* made paying a fee a "prerequisite" of exercising the right to vote.
[50] See, 18-Hour Training Minimum Standards at n. 48.

made or implied – just that the criteria was 'objective' unlike New York's regime.

The reference to other states with training requirements omits the fact that **none of the training statutes** have been scrutinized under the *Bruen* test. An intellectually honest text, history, and tradition analysis will bring about their abrogation.

## CONCLUSION

The lower court decision should be reversed in its entirety.


Dated: June 8, 2023

*Amy L. Bellantoni*
_____
Amy L. Bellantoni

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). It contains 6,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated:  June 8, 2023