

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

January 9, 2024

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for
 the Second Circuit
40 Foley Square
New York, NY 10007

Re: *Giambalvo v. Suffolk County*, No. 23-208

Dear Ms. Wolfe:

I represent intervenor-appellee the New York State Attorney General in the above-captioned appeal. I write in response to the Court's October 2, 2023, order, directing the parties to submit supplemental letter briefs addressing the effect of *Antonyuk v. Chiumento*, No. 22-2908, 2023 WL 8518003 (2d Cir. Dec. 8, 2023), on this appeal.

As explained below, the Court's decision in *Antonyuk* makes plain the constitutionality of the Concealed Carry Improvement Act's (CCIA) "good moral character" requirement for obtaining a firearm license and

nearly all of the related application requirements. Accordingly, this Court should affirm the district court's decision denying plaintiffs' motion for a preliminary injunction as to those provisions for the reasons set forth in *Antonyuk*. Alternatively, this Court should remand to the district court to address plaintiffs' motion on the merits in light of *Antonyuk*.

### A. Prior Proceedings

Plaintiffs are individuals and a firearms training business challenging the constitutionality of Suffolk County's firearm-licensing policies and several provisions of the CCIA, including the "good moral character" licensing requirement, the in-person interview, the requirement that an applicant submit statutorily required information, and the training requirement. *See* Penal Law § 400.00(1)(b), (1)(o), (19).[1] On December 11, 2022, plaintiffs moved for a preliminary injunction against the County enjoining enforcement of the challenged CCIA provisions and certain county policies. The district court denied the motion, holding, as relevant here, that plaintiffs lacked standing to challenge the CCIA's

---

[1] On appeal, plaintiffs' facial challenges are limited to these provisions. See Br. for Intervenor-Appellee (AG Br.) at 15 n.4.

2

licensing requirements. (A. 218-219.) Plaintiffs subsequently filed this appeal. (A. 225.)

On April 11, 2023, plaintiffs voluntarily dismissed their claims with prejudice against Acting Superintendent of State Police Steven Nigrelli, the sole state defendant. *See* Notice of Voluntary Dismissal (Apr. 11, 2023), EDNY ECF No. 45. However, plaintiffs represented that they still intended to challenge the facial constitutionality of the CCIA's licensing requirements. Accordingly, the Attorney General intervened in the district court for the limited purpose of defending the constitutionality of New York's firearm licensing laws (*see* A. 10) and was granted leave to do the same in this appeal, *see* Order (July 28, 2023), CA2 ECF No. 100.[2]

On September 27, 2023, this Court heard oral argument. Following argument, consideration of this appeal was held in abeyance pending the Court's decision in *Antonyuk*. *See* Order (Oct. 2, 2023), CA2 ECF No. 113. The parties were ordered to submit supplemental letter briefs addressing the effect of *Antonyuk* on this appeal. *Id.*

---

[2] The Attorney General takes no position on plaintiffs' challenges to the County's firearm-licensing policies to the extent those challenges do not involve the constitutionality of the underlying state statutes.

## B. The *Antonyuk* Decision

On December 8, 2023, this Court issued a decision in four challenges to the CCIA, heard and decided in tandem, including *Antonyuk*.[3] *See Antonyuk*, 2023 WL 8518003. As relevant here, the Court (Jacobs, Lynch, and Lee, JJ.) upheld the constitutionality of all but one of the CCIA's licensing provisions challenged in *Antonyuk*.

In its opinion, the Court explained the legal standards governing the Second Amendment right following the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). The Court "read *Bruen* as setting out a two-step framework, with the first step based on text and the second step based on history." *Antonyuk*, 2023 WL 8518003, at *10. Courts begin by "interpreting the plain text of the Amendment as historically understood" to determine whether it protects conduct prohibited by the challenged law. *Id.* at *11. If so, courts must determine whether the challenged law is "consistent with this Nation's historical tradition of firearms regulation." *Id.*

---

[3] This letter brief discusses only those portions of the 261-page opinion that are relevant to this appeal.

4

In applying the second step, "the absence of a distinctly similar historical regulation in the presented record" is not evidence of unconstitutionality because legislatures "have not generally legislated to their constitutional limits." *Id.* at *13. "Stated differently, novelty does not mean unconstitutionality." *Id.* (internal quotation marks omitted). Likewise, a "significant" number of regulations is not necessary to establish a historical tradition where there is no evidence that a law was historically considered unconstitutional. *Id.* at *14. As to the relevant historical time period, when considering state laws like the CCIA, "the understanding that prevailed when the States adopted the Fourteenth Amendment" in 1868 "is, along with the understanding of that right held by the founders in 1791, a relevant consideration." *Id.* at *16 (quotation marks omitted). Likewise, "sources from the time periods close around these dates" are worthy of consideration. *Id.* at *15. Finally, as relevant here, the Court affirmed the relevance of militia regulations in analyzing the historical tradition of firearms regulation. *Id.* at *44-45.

Turning to the *Antonyuk* plaintiffs' claims, the Court held that at least one plaintiff had standing to challenge the CCIA's licensing requirements because a plaintiff "who challenges a component of the application

process itself is *not* required to subject himself to that process in order to present a justiciable constitutional claim." *Id.* at *17.

On the merits, the Second Circuit concluded that nearly all of the challenged licensing requirements were constitutional on their face. First, the Court vacated the district court's preliminary injunction as to the good moral character requirement, Penal Law § 400.00(1)(b), concluding that the *Antonyuk* plaintiffs' facial challenge was not likely to succeed. The Court declined to address the State's argument that the good moral character requirement does not implicate the plain text of the Second Amendment. *Antonyuk*, 2023 WL 8518003, at *22. Instead, the Court reasoned that even if the requirement burdened Second Amendment rights, it served as "a proxy for dangerousness," *id.* at *21, relying on the statute's definition of "good moral character" as "having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others," § 400.00(1)(b), and noting the "widespread agreement among both courts of appeals and scholars that restrictions forbidding dangerous individuals from carrying guns" are consistent with historical tradition, *id.* at *23. The Court rejected the argument that the

"bounded discretion" given to licensing officials applying the good moral character requirement violated the Second Amendment, noting the extensive historical precedents for some exercise of discretion by licensing officials, *id.* at *25-28, and *Bruen*'s approval of shall-issue regimes with features comparable to New York's law, *id.* at *31-34.

Second, the Court vacated the district court's injunction as to two of the information disclosure requirements challenged in this appeal, requiring applicants to disclose the identity of their spouse and cohabitants, § 400.00(1)(o)(i), and any other information "reasonably necessary" to the licensing officer in reviewing the application, § 400.00(1)(o)(v). The Court concluded that historical evidence supported the government's authority to investigate an applicant's reputation and character by inquiring about the applicant's cohabitants. *Antonyuk*, 2023 WL 8518003, at *36. Upholding the requirement, the Court analogized to the character reference requirement, upheld by the district court in *Antonyuk* in a portion of the decision that was not appealed, reasoning that "disclosure of one's cohabitants (in part for the purpose of identifying references regarding the applicant's trustworthiness) is tantamount to the character-reference provision." *Id.* at *35. The Court likewise concluded that the

requirements that applicants disclose any other information deemed necessary had constitutional applications. *Id.* at *34.

The sole exception to the Court's conclusion that the challenged licensing provisions were constitutional was the requirement that applicants disclose their social media accounts, § 400.00(1)(o)(iv). The Court held that although licensing officials may review an applicant's social media accounts, they may not require applicants to affirmatively identify their accounts. *Antonyuk*, 2023 WL 8518003, at *37-38.

### C. The Court Should Affirm the Denial of Plaintiffs' Motion for a Preliminary Injunction as to the Licensing Restrictions for the Reasons Set Forth in *Antonyuk*.

The district court's denial of plaintiffs' motion below was based largely on its finding that plaintiffs lacked standing to challenge the licensing restrictions because they had not yet applied for and been denied a license. (A. 218-219.) Although the district court's standing analysis may no longer be viable in light of *Antonyuk, see* 2023 WL 8518003, at *18-21, this Court may "affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied." *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 n.2 (2d Cir. 2018) (quotation marks omitted). *See NXIVM Corp. v. Ross*

*Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (affirming denial of preliminary injunction despite error in district court's analysis). Here, the merits of the constitutional questions were fully briefed in the district court and in this Court, and the appellate record contains a comprehensive historical record presented in support of the CCIA's licensing provisions. Accordingly, the district court's order as to the CCIA's licensing provisions may be affirmed nearly in its entirety because plaintiffs' facial challenges to those provisions fail as a matter of law for the reasons set forth in *Antonyuk*.[4] In the alternative, this Court may remand to the district court to evaluate plaintiffs' motion based on the standards set forth in *Antonyuk* in the first instance.[5]

---

[4] The Attorney General acknowledges that it may be appropriate to reverse the denial of the preliminary injunction against the County as to the requirement that applicants disclose their social media accounts, § 400.00(1)(o)(iv). The New York State Police are enjoined from enforcing the social media requirement and have removed the question from the State's licensing form. *See* State of New York Pistol/Revolver License Application, *available at* https://troopers.ny.gov/system/files/documents/2023/12/ppb-3-12-23.pdf (revised December 2023).

[5] If the Court remands, this panel may retain jurisdiction over any subsequent appeal of the district court's preliminary injunction order, in the interests of judicial efficiency. *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994); Order, *Corbett v. Hochul*, No. 22-3210 (2d Cir. Nov. 14, 2023).

*Good moral character*. *Antonyuk* mandates affirmance of the district court's decision denying a preliminary injunction as to the good moral character requirement, § 400.00(1)(b). The *Antonyuk* Court held that the good moral character requirement is constitutional on its face because it serves as "a proxy for dangerousness," based on a "widespread consensus" that "restrictions which prevent dangerous individuals from wielding lethal weapons are part of the nation's tradition of firearm regulation." *Antonyuk*, 2023 WL 8518003 at *21. Plaintiffs here brought the same facial challenge adjudicated in *Antonyuk* (*see* A. 57-58), and the historical record assembled at the preliminary injunction stage was largely the same as that evaluated in *Antonyuk*. Accordingly, this panel is bound by the *Antonyuk* panel's rejection of a facial challenge to the validity of the good moral character requirement. *See, e.g.*, *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995).

*Information disclosure requirements*. *Antonyuk* similarly requires affirmance of the district court's denial of a preliminary injunction as to nearly all of the information disclosure requirements. The Court's decision in *Antonyuk* upheld the constitutionality of requiring disclosure of an applicant's domestic partner and cohabitants, § 400.00(1)(o)(i), and

any other information "reasonably necessary" to the licensing officer in reviewing the application, § 400.00(1)(o)(v). *See Antonyuk*, 2023 WL 8518003 at *34-36. As with the good moral character provision, this Court is bound by those conclusions as the historical record evaluated in both cases is substantially similar. *See Jones*, 45 F.3d at 679.

While *Antonyuk* did not present a challenge on appeal to the character reference provision (because the district court had already denied an injunction as to that provision, *see Antonyuk*, 2023 WL 8518003 at *5), the Court's decision nonetheless provides clear guidance on its constitutionality. In denying an injunction of the provision requiring applicants to disclose their cohabitants, the Court emphasized that the district court in *Antonyuk* upheld the constitutionality of the character reference provision pursuant to a historical tradition of firearm regulation "based on reputation," *Antonyuk*, 2023 WL 8518003 at *35 (quotation marks omitted), relying on the same historical evidence the Attorney General has presented here, see Br. for Intervenor-Appellee (AG Br.) at 31-34. The Court explained that the disclosure of cohabitants and character references were "tantamount" to one another, *Antonyuk*, 2023 WL 8518003, at *35, and because the district court correctly concluded

that it is constitutional to make licensing decisions by reference to an applicant's character and reputation, "[i]t follows that the State can also require modest disclosures of information that are relevant to that investigation," *id.* at *36. *Antonyuk* accordingly requires affirmance as to the character reference provision as well.

*In-person interview requirement.* Although the in-person interview requirement, § 400.00(1)(o), was not at issue in *Antonyuk* on appeal (because the district court had already denied an injunction as to that provision, *see Antonyuk*, 2023 WL 8518003, at *5), the Court's decision also supports its constitutionality. The *Antonyuk* Court relied on the same historical licensing regulations cited by the Attorney General here in support of the in-person interview requirement (AG Br. at 28-30) in upholding other licensing requirements, explaining that the historical regulations demonstrated a tradition of determining dangerousness for licensing purposes based on "individualized assessments by local officials," *see Antonyuk*, 2023 WL 8518003, at *25-27. Those historical regulations, which often required an in-person appearance, support the constitutionality of the interview requirement as well. AG Br. at 28-30.

Moreover, the *Antonyuk* Court squarely rejected plaintiffs' arguments that the Court should not rely on the historical licensing regulations presented by the Attorney General in this appeal because they are too few or because they were enacted after the Second Amendment was ratified in 1791. *See* Reply Br. for Plaintiffs-Appellants (Reply) at 21-27. The Court concluded that the same historical evidence the Attorney General relies on here established a historical tradition. *Antonyuk*, 2023 WL 8518003, at *28. Moreover, the Court explained that a "significant" number of regulations is not necessary to establish a historical tradition where there is no evidence of a contrary tradition. *Id.* at *14. And when considering state laws like the CCIA, the Court made clear that laws and regulations from around the time of the adoption of the Fourteenth Amendment in 1868, like the historical regulations relied on here, are relevant evidence of a historical tradition. *Id.* at *16.

*Training requirement.* While the requirement that applicants undergo firearms training, § 400.00(1)(o)(iii), was not at issue on appeal in *Antonyuk* (because the district court had already denied an injunction as to that provision, *see Antonyuk*, 2023 WL 8518003, at *5), the Court's decision supports the constitutionality of the training requirement. As

the Attorney General explained (AG Br. at 20), the Supreme Court in *Bruen* indicated that shall-issue licensing laws requiring applicants "to undergo a background check or pass a firearms safety course" are consistent with the Second Amendment. *See Bruen*, 597 U.S. at 38 n.9; *see also id.* at 79-80 (Kavanaugh, J., concurring). The *Antonyuk* Court acknowledged as much, explaining that the Supreme Court "has approved" such laws. *See Antonyuk*, 2023 WL 8518003, at *23 & n.22.

Moreover, as the Attorney General has explained, the training requirement is consistent with a long tradition of requiring able-bodied men to serve in state militias and participate in frequent, mandatory firearm training. See AG Br. at 37-40. Plaintiffs' only response—that historical militia laws cannot establish a historical tradition supporting modern firearms regulations because these laws did not regulate the possession of firearms and applied to only a subset of the population (Reply at 27-29)—was rejected by the *Antonyuk* Court, which affirmed the relevance of militia regulations. As the *Antonyuk* Court explained in upholding a prohibition on possession of a gun in places providing behavioral-health or chemical-dependence care or services, historical provisions prohibiting those with mental illness, intellectual disabilities,

14

and alcohol addiction from serving in militias were relevant because they established a historical tradition of treating those populations as vulnerable. *See Antonyuk*, 2023 WL 8518003, at *44-45. That historical tradition, along with a tradition of prohibiting the carrying of firearms to protect vulnerable populations, was sufficient to support the constitutionality of the CCIA's modern regulation. *Id.*

Similarly, the militia provisions cited by the State establish a historical tradition of requiring those using firearms to be trained to use them safely. The militia regulations served the same purpose as the CCIA's training requirement—namely, ensuring, through mandated training, that those using firearms would use them safely and effectively. The historical tradition of mandated training for militia members, along with the tradition of denying a license to carry a firearm to those likely to pose a danger to public safety, about which there is "widespread agreement among both courts of appeals and scholars," *id.* at *23, establish the constitutionality of the CCIA's training requirement.

Respectfully,

*/s/ Sarah Coco*

Sarah Coco
Assistant Solicitor General
(212) 416-6312

cc: Counsel of record (by ECF)

15